ROYI MOAS (State Bar No. 10686)
rmoas@wrslawyers.com
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
3773 Howard Hughes Parkway, Suite 590
South Las Vegas, Nevada 89169
Telephone: (702) 341-5200
Facsimile: (702) 341-5300

SIMON ARON (CA State Bar No. 108183) (admitted pro hac vice)
saron@wrslawyers.com
ELSA M. HOROWITZ (CA State Bar No. 195689) (admitted pro hac vice)
ehorowitz@wrslawyers.com
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Boulevard, 9th Floor
Los Angeles, California 90064-1582
Telephone: (310) 478-4100
Facsimile: (310) 479-1422

Attorneys for Secured Creditor
LONE OAK FUND, LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>2700 SLOAT HOLDINGS, LLC,<br><br>Debtor. | Case No. 25-50584-hlb<br><br>Chapter 11<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SECURED CREDITOR LOAN OAK FUND, LLC'S MOTION TO EXCUSE COMPLIANCE WITH TURNOVER OF CERTAIN REAL PROPERTY SUBJECT TO STATE COURT RECEIVERSHIP PURSUANT TO BANKRUPTCY CODE § 543(d)**<br><br>*[Notice of Hearing; Motion to Excuse Compliance; Compendium of Exhibits Filed Concurrently Herewith]*<br><br>Judge: Hon. Hilary L. Barnes<br><br><u>Hearing Information:</u><br>Date: September 9, 2025<br>Time: 2:30 p.m.<br>Place: Courtroom 2<br>C. Clifton Young Federal Building<br>300 Booth Street<br>Reno, NV 89509 |

Pursuant to Federal Rules of Evidence, Rule 201, secured creditor Loan Oak Fund, LLC ("Creditor") hereby respectfully requests that this Court take judicial notice of the following documents, attached hereto in support of Creditor's *Motion to Excuse Compliance with Turnover of Certain Real Property Subject to State Court Receivership Pursuant to Bankruptcy Code § 543(d)*:

| **Exhibit** | **Description** |
|---|---|
| Exhibit "A" | Summary of Assets and Liabilities for Non-Individuals and related Schedules, Declaration and Statements filed on July 10, 2025 in the case entitled *In re 2700 Sloat Holdings, LLC*, United States Bankruptcy Court for the District of Nevada, Case No. 25-505584-hlb, Docket #26. |
| Exhibit "B" | Schedule D filed on July 11, 2025 in the case entitled *In re 2700 Sloat Holdings, LLC*, United States Bankruptcy Court for the District of Nevada, Case No. 25-505584-hlb, Docket #30. |
| Exhibit "C" | *Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing* as instrument no. 2022075367 in the Office of the County Recorder of San Francisco County, State of California. |
| Exhibit "D" | *Deed of Trust, Assignment of Rents, Security Agreement and Fixturing Filing* as instrument no. 2022075368 in the Office of the County Recorder of San Francisco County, State of California. |
| Exhibit "E" | *Notice of Default and Election to Sell Under Deed of Trust* as instrument no. 2025011566 in the Office of the County Recorder of San Francisco County, State of California. |
| Exhibit "F" | *Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order—Rents, Issues, and Profits* filed on February 26, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Franciso County Superior Court Case No. CGC-25-622590. |
| Exhibit "G" | *Receiver Kevin Singer's Ex Parte Application for an Order to Show Cause Re Turnover of Receivership Estate Property or, in the Alternative, Setting the Application for Hearing as a Motion on Shortened Time; Memorandum of Points and Authorities* filed on April 29, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Francisco County Superior Court Case No. CGC-25-622590. |

Exhibit "H" *Order Granting Receiver Kevin Singer's Motion for an Order to Show Cause Re Turnover of Receivership Estate Property* filed on May 29, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Francisco County Superior Court Case No. CGC-25-622590.

Exhibit "I" *Receiver Kevin Singer's Report Regarding Defendant's Accounting and June 12, 2025 OSC Hearing* filed on June 5, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Francisco County Superior Court Case No. CGC-25-622590.

Exhibit "J" *Defendant 2700 Sloat Holding LLC, a Nevada Limited Liability Company's Declaration in Compliance with Court Order of May 22, 2025* filed on May 29, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Francisco County Superior Court Case No. CGC-25-622590.

Exhibit "K" *Stipulation and Order Continuing Hearing on OSC Re Turnover of Receivership Estate Property* filed on June 10, 2025 in the case entitled *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC, et al.*, San Francisco County Superior Court Case No. CGC-25-622590.

## AUTHORITY

### A. APPLICABLE STANDARD

Judicial notice of a fact is proper where the fact is not subject to reasonable dispute because it is: (1) generally known within the territorial jurisdiction of the trial court or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Federal Rule of Evidence ("Rule") 201(b)(2). Courts are required to take judicial notice of facts if requested by a part and supplied with the necessary information. Rule 201(c)(2).

### B. COURT FILINGS AND ORDERS, AND PUBLIC RECORDS

Court documents already in the public record and documents filed in other courts are proper subjects of judicial notice. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006). Indeed, courts regularly take judicial notice of proceedings, court orders, and judgments in other cases. *Id.*; *see also In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016, 1025 (N.D. Cal. 2014) (taking judicial notice of decisions

of other courts and documents that were part of the court's own records); *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n. 2 (9th Cir. 2002) (explaining that the court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992)). *See Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1157–58 (C.D. Cal. 2011); *see also Red v. General Mills, Inc.*, 2015 WL 9484398, *3 (C.D. Cal. 2015) (taking judicial notice of three lawsuits where plaintiff was the named plaintiff in three putative class action complaints filed between October 2009 and February 2011, and also took judicial notice of the allegations made by plaintiff in each of those complaints); *Residence Mut. Ins. Co. v. Travelers Indem. Co. of Conn.*, 26 F. Supp. 3d 965, 970 (C.D. Cal. 2014) (taking judicial notice of court order in unrelated case from out-of-state district court because facts contained in the public record are appropriate subjects of judicial notice).

The above referenced documents are properly the subject of judicial notice pursuant to Federal Rule of Evidence 201(b)(2), which provides that a court may take judicial notice of facts "not subject to reasonable dispute in that it is… capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Pursuant thereto, it is well-established that "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (*citing United States ex rel. Geisler v. Walters*, 510 F.2d 887, 890 n. 4 (3d Cir. 1975).

Furthermore, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of adjudicative facts, which are "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Notably, the Court may "take judicial notice of facts that are a matter of public record." *Hefner v.*

*Chao*, 2009 WL 2485754, *1 (S.D. Cal. 2009); *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001); *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (overruled in part on other grounds by *Astoria Federal Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)).

The Court may take judicial notice of the documents referenced herein because they are matters of public record. Moreover, the documents are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to a resource of reasonably indisputable accuracy, namely via the Superior Court of California, County of San Francisco's online Civil Case Information Search portal, which provides for public access to San Francisco Superior Court records online, via the Public Access to Court Electronic Records (PACER), which provides for online access to bankruptcy filings, and via the online service NetrOnline website for the City and County of San Francisco County Assessor-Recorder.

**WHEREFORE,** Creditor respectfully requests that this Court take judicial notice of the documents attached hereto as Exhibits "A" through "K".

DATED: August 11, 2025

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: */s/ Simon Aron*
SIMON ARON
Attorneys for Secured Creditor, Lone Oak Fund, LLC, a California limited liability company

# EXHIBIT "A"

**Fill in this information to identify the case:**

Debtor name 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada (State)

Case number (If known): 25-50584

☐ Check if this is an amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

12/15

**Part 1:** Summary of Assets

1. ***Schedule A/B: Assets–Real and Personal Property*** (Official Form 206A/B)

| | |
|---|---|
| 1a. **Real property:** Copy line 88 from *Schedule A/B* | $ 44,000,000.00 |
| 1b. **Total personal property:** Copy line 91A from *Schedule A/B* | $ 24.39 |
| 1c. **Total of all property:** Copy line 92 from *Schedule A/B* | $ 44,000,024.39 |

**Part 2:** Summary of Liabilities

| | |
|---|---|
| 2. ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D) Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* | $ 11,707,000.00 |
| 3. ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F) | |
| 3a. **Total claim amounts of priority unsecured claims:** Copy the total claims from Part 1 from line 6a of *Schedule E/F* | $ 0.00 |
| 3b. **Total amount of claims of nonpriority amount of unsecured claims:** Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* | +$ 300,715.90 |
| 4. **Total liabilities** Lines 2 + 3a + 3b | $ 12,007,715.90 |

Fill in this information to identify the case:

Debtor name 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada

Case number (If known): 25-50584

☐ Check if this is an amended filing

# Official Form 206A/B

## Schedule A/B: Assets — Real and Personal Property

12/15

**Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.**

**For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.**

## Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.

☑ Yes. Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor** — **Current value of debtor's interest**

2. **Cash on hand** $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | Current value |
|---|---|---|---|---|
| 3.1. | Wells Fargo checking | Checking | 4 9 5 9 | $ 24.39 |
| 3.2. | | | | $ |

4. **Other cash equivalents** *(Identify all)*

4.1. ______ $______

4.2. ______ $______

5. **Total of Part 1**

Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. **$ 24.39**

## Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☑ No. Go to Part 3.

☐ Yes. Fill in the information below.

**Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

7.1. ______ $______

7.2. ______ $______

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1. ______ $______

8.2. ______ $______

9. **Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81. $______

## Part 3: Accounts receivable

10. **Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.

☐ Yes. Fill in the information below.

**Current value of debtor's interest**

11. **Accounts receivable**

11a. 90 days old or less: ______ face amount – ______ doubtful or uncollectible accounts = ........➔ $______

11b. Over 90 days old: ______ face amount – ______ doubtful or uncollectible accounts = ........➔ $______

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82. $______

## Part 4: Investments

13. **Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

**Valuation method used for current value** | **Current value of debtor's interest**

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. ______ ______ $______

14.2. ______ ______ $______

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity: % of ownership:

15.1.______ ______% ______ $______

15.2.______ ______% ______ $______

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1.______ ______ $______

16.2.______ ______ $______

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83. $______

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**
- ☑ No. Go to Part 6.
- ☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | | | | |
| ______ | MM / DD / YYYY | $______ | ______ | $______ |
| 20. **Work in progress** | | | | |
| ______ | MM / DD / YYYY | $______ | ______ | $______ |
| 21. **Finished goods, including goods held for resale** | | | | |
| ______ | MM / DD / YYYY | $______ | ______ | $______ |
| 22. **Other inventory or supplies** | | | | |
| ______ | MM / DD / YYYY | $______ | ______ | $______ |

23. **Total of Part 5**
Add lines 19 through 22. Copy the total to line 84. $______

24. **Is any of the property listed in Part 5 perishable?**
- ☐ No
- ☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
- ☐ No
- ☐ Yes. Book value ______ Valuation method______ Current value______

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
- ☐ No
- ☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**
- ☑ No. Go to Part 7.
- ☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | | | |
| ______ | $______ | ______ | $______ |
| 29. **Farm animals** *Examples*: Livestock, poultry, farm-raised fish | | | |
| ______ | $______ | ______ | $______ |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| ______ | $______ | ______ | $______ |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| ______ | $______ | ______ | $______ |
| 32. **Other farming and fishing-related property not already listed in Part 6** | | | |
| ______ | $______ | ______ | $______ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

33. **Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85. $______

34. **Is the debtor a member of an agricultural cooperative?**
☐ No
☐ Yes. Is any of the debtor's property stored at the cooperative?
☐ No
☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value $______ Valuation method ______ Current value $______

36. **Is a depreciation schedule available for any of the property listed in Part 6?**
☐ No
☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 7: Office furniture, fixtures, and equipment; and collectibles

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**
☑ No. Go to Part 8.
☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | $______ | ______ | $______ |
| 40. **Office fixtures** | $______ | ______ | $______ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | $______ | ______ | $______ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1______ | $______ | ______ | $______ |
| 42.2______ | $______ | ______ | $______ |
| 42.3______ | $______ | ______ | $______ |

43. **Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86. $______

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
☐ No
☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
☐ No
☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 8: Machinery, equipment, and vehicles

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| **General description**<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | **Net book value of debtor's interest**<br>(Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1 | $ | | $ |
| 47.2 | $ | | $ |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |
| 48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |
| 49. **Aircraft and accessories** | | | |
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |
| 50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | $ | | $ |

51. **Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87. $

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No
☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No
☐ Yes

Debtor 2700 SLOAT HOLDING, LLC Case number (if known) 25-50584

## Part 9: Real property

54. **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| | Description and location of property (Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available.) | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|---|
| 55.1 | 2700-2750 SLOAT BLVD SAN FRANCISCO, CA 94116 | | $ | | $44,000,000.00 |
| 55.2 | | | $ | | $ |
| 55.3 | | | $ | | $ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88. $44,000,000.00

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☑ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☑ Yes

## Part 10: Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| 61. **Internet domain names and websites** | $ | | $ |
| 62. **Licenses, franchises, and royalties** | $ | | $ |
| 63. **Customer lists, mailing lists, or other compilations** | $ | | $ |
| 64. **Other intangibles, or intellectual property** | $ | | $ |
| 65. **Goodwill** | $ | | $ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89. $

Case 25-50584-hlb Doc 4 Entered 07/11/25 11:10:19 Page 8 of 31

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?

- ☐ No
- ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

- ☐ No
- ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

- ☐ No
- ☐ Yes

## Part 11: All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

- ☐ No. Go to Part 12.
- ☑ Yes. Fill in the information below.

**Current value of debtor's interest**

71. **Notes receivable**
Description (include name of obligor)

0.00 Total face amount — 0.00 doubtful or uncollectible amount = → $0.00

72. **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

Tax year ________ $________
Tax year ________ $________
Tax year ________ $________

73. **Interests in insurance policies or annuities**

$________

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

potential claim against City of San Francisco for actual financial dan $Unknown

**Nature of claim** damage claim

**Amount requested** $10,000,000.00

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

$________

**Nature of claim** ________

**Amount requested** $________

76. **Trusts, equitable or future interests in property**

$________

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

$________
$________

78. **Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90. $0.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

- ☑ No
- ☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 12: Summary

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 24.39 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* → | | $ 44,000,000.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. 91a. | $ 24.39 | + 91b. $ 44,000,000.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. 44,000,024.39 ..... $ 44,000,024.39

Fill in this information to identify the case:

Debtor 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada

Case number (If known) 25-50584

☐ Check if this is an amended filing

# Official Form 206E/F

## Schedule E/F: Creditors Who Have Unsecured Claims

12/15

**Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.**

### Part 1: List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☑ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $________ | $________ |
| **Date or dates debt was incurred** ________ | **Basis for the claim:** | | |
| **Last 4 digits of account number** ________ | **Is the claim subject to offset?** ☐ No ☐ Yes | | |
| **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (____) | | | |
| **2.2** Priority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $________ | $________ |
| **Date or dates debt was incurred** ________ | **Basis for the claim:** | | |
| **Last 4 digits of account number** ________ | **Is the claim subject to offset?** ☐ No ☐ Yes | | |
| **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (____) | | | |
| **2.3** Priority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $________ | $________ |
| **Date or dates debt was incurred** ________ | **Basis for the claim:** | | |
| **Last 4 digits of account number** ________ | **Is the claim subject to offset?** ☐ No ☐ Yes | | |
| **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (____) | | | |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

**3.1 Nonpriority creditor's name and mailing address**
EMPLOYMENT DEVELOPMENT
BANKRUPTCY GROUP MIC 92E
P. O. BOX 826880
SACRAMENTO, CA 94280-0001

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 0.00

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ____

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.2 Nonpriority creditor's name and mailing address**
FRANCHISE TAX BOARD BANKRUPTCY SECTION
MS: A-340
P. O. BOX 2952
SACRAMENTO, CA 95812-2952

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 0.00

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ____

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.3 Nonpriority creditor's name and mailing address**
INTERNAL REVENUE SERVICE
BANKRUPTCY DEPARTMENT
P. O. BOX 7346
Philadelphia, PA 19101

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 0.00

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ____

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.4 Nonpriority creditor's name and mailing address**
JEFFER MANGELS BUTLER MITCHELL LLP
TWO EMBARCARDERO
5TH FLOOR
San Francisco, CA 94111

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 122,811.41

**Basis for the claim:** Services

**Date or dates debt was incurred** 2023-2024

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.5 Nonpriority creditor's name and mailing address**
NEVADA DEPARTMENT OF TAXATION
BANKRUPTCY DEPARTMENT
4600 KIETZKE LANE, STE L-235
Reno, NV 89502

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 0.00

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ____

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

**3.6 Nonpriority creditor's name and mailing address**
NEVADA DEPARTMENT OF TAXATION
BANKRUPTCY DEPARTMENT
700 WARM SPRINGS RD,., 2ND FLOOR
Las Vegas, NV 89119

**As of the petition filing date, the claim is:** *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 0.00

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ____

**Last 4 digits of account number** ____

**Is the claim subject to offset?**
☑ No
☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**Part 2: Additional Page**

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

**Amount of claim**

**3.7 Nonpriority creditor's name and mailing address**

NEVADA DEPARTMENT OF TAXATION
BANKRUPTCY DEPARTMENT
1550 COLLECGE PKWY, STE 115
Carson City, NV 89706

**As of the petition filing date, the claim is:** *Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

$ 0.00

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ☒ No
- ☐ Yes

**3.8 Nonpriority creditor's name and mailing address**

NEVADA LABOR COMMISSION
BANKRUPTCY DEPARTMENT
1818 COLLEGE PKWY, STE 102
Carson City, NV 89701

**As of the petition filing date, the claim is:** *Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

$ 0.00

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ✓ No
- ☐ Yes

**3.9 Nonpriority creditor's name and mailing address**

REUBIN JUNIUS ROSE
ONE BUSH STREET
SUITE 600
San Francisco, CA 94104

**As of the petition filing date, the claim is:** *Check all that apply.*
- ☐ Contingent
- ☒ Unliquidated
- ☐ Disputed

**Basis for the claim:** Services

$ 48,529.49

**Date or dates debt was incurred** 2024

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ✓ No
- ☐ Yes

**3.10 Nonpriority creditor's name and mailing address**

SOCIAL SECURITY ADMINISTRATION
160 SPEAR STREET
SUITE 800
San Francisco, CA 94105

**As of the petition filing date, the claim is:** *Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

$ 0.00

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ☒ No
- ☐ Yes

**3.11 Nonpriority creditor's name and mailing address**

SOLOMON CORDWELL BUENZ
255 CALIFORNIA STREET
THIRD FLOOR
San Francisco, CA 94111

**As of the petition filing date, the claim is:** *Check all that apply.*
- ☐ Contingent
- ☒ Unliquidated
- ☐ Disputed

**Basis for the claim:** Services

$ 129,375.00

**Date or dates debt was incurred** 2024-2025

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ✓ No
- ☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 2: Additional Page

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

Amount of claim

**3.12 Nonpriority creditor's name and mailing address**

STATE BOARD OF EQUALIZATION
ACCOUNT INFORMATION GROUP, MIC: 29
P. O. BOX 942879
SACRAMENTO, CA 94279-0029

**As of the petition filing date, the claim is:** $ 0.00
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ☑ No
- ☐ Yes

**3.13 Nonpriority creditor's name and mailing address**

STATE OF NEVADA EMPLOYMENT SECURITY DIVISION
500 E. THIRD STREET
Carson City, NV 89713

**As of the petition filing date, the claim is:** $ 0.00
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ✓ No
- ☐ Yes

**3.14 Nonpriority creditor's name and mailing address**

UNITED STATES TRUSTEE
300 BOOTH STREET
SUITE 3009
Reno, NV 89509

**As of the petition filing date, the claim is:** $ 0.00
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** NOTICE

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ✓ No
- ☐ Yes

**3.__ Nonpriority creditor's name and mailing address**

**As of the petition filing date, the claim is:** $______
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:**

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

**3.__ Nonpriority creditor's name and mailing address**

**As of the petition filing date, the claim is:** $______
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:**

**Date or dates debt was incurred** ______

**Last 4 digits of account number** ______

**Is the claim subject to offset?**
- _ No
- ☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims

**5. Add the amounts of priority and nonpriority unsecured claims.**

| | | | Total of claim amounts |
|---|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. | + | $ 300,715.90 |
| 5c. **Total of Parts 1 and 2** Lines 5a + 5b = 5c. | 5c. | | $ 300,715.90 |

| Fill in this information to identify the case: |
| --- |
| Debtor name 2700 SLOAT HOLDING, LLC |
| United States Bankruptcy Court for the: District of Nevada |
| Case number (If known): 25-50584 |

☐ Check if this is an amended filing

# Official Form 206H

## Schedule H: Codebtors

12/15

**Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.**

1. **Does the debtor have any codebtors?**

   ☒ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☐ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.*** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| | *Column 1:* **Codebtor** | | *Column 2:* **Creditor** | |
| --- | --- | --- | --- | --- |
| | **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |
| 2.1 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.2 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.3 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.4 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.5 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.6 | | | | ☐ D<br>☐ E/F<br>☐ G |

**United States Bankruptcy Court**
Nevada

In re: 2700 SLOAT HOLDING, LLC

Debtor(s)

Case No. 25-50584
Chapter 11

# BUSINESS INCOME AND EXPENSES

| | |
|---|---|
| **Gross Monthly Income** | $ 0.00 |
| **Business Expenses** | |
| Cost of goods sold | |
| Advertising | |
| Car and truck expenses | |
| Fees | |
| Depreciation | |
| Employee benefits | |
| Insurance | 382.41 |
| Interest | |
| Legal and professional | |
| Office expense | |
| Pension and profit sharing | |
| Rent | 236.08 |
| Other leases | |
| Repairs | |
| Maintenance | |
| Supplies | |
| Taxes and licenses | 9,166.66 |
| Travel, meals, etc | |
| Utilities | |
| Other LONE OAK MORTGAGE | 74,166.67 |
| AMINAM | 0.00 |
| **Total Expenses** | $ 83,951.82 |
| **Net Monthly Income** | $ -83,951.82 |

Fill in this information to identify the case and this filing:

Debtor Name 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada

Case number (*If known*): 25-50584

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☑ *Schedule H: Codebtors* (Official Form 206H)
- ☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* ____
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration ____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/09/2025
MM / DD / YYYY

✘ Raelynn Hickey, CEO
Digitally signed by Raelynn Hickey, CEO
Date: 2025.07.09 16:21:04 -07'00'

Signature of individual signing on behalf of debtor

Raelynn Hickey
Printed name

CEO
Position or relationship to debtor

Fill in this information to identify the case:

Debtor name 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada

Case number (If known): 25-50584

☐ Check if this is an amended filing

Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy 04/25

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).**

## Part 1: Income

1. **Gross revenue from business**

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | | Sources of revenue (Check all that apply) | Gross revenue (before deductions and exclusions) |
|---|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From ____ (MM / DD / YYYY) | to | Filing date | ☑ Operating a business ☐ Other | $ 0.00 |
| For prior year: | From 01/01/2024 | to | 12/31/2024 | ☑ Operating a business ☐ Other | $ 960,271.00 |
| For the year before that: | From 01/01/2023 | to | 12/31/2023 | ☐ Operating a business ☐ Other | $ 390,300.00 |

2. **Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | | Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
|---|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From ____ (MM / DD / YYYY) | to | Filing date | | $ |
| For prior year: | From ____ (MM / DD / YYYY) | to | ____ (MM / DD / YYYY) | | $ |
| For the year before that: | From ____ (MM / DD / YYYY) | to | ____ (MM / DD / YYYY) | | $ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**Part 2: List Certain Transfers Made Before Filing for Bankruptcy**

**3. Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☑ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|---|
| 3.1. | Creditor's name | | $ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other |
| 3.2. | Creditor's name | | $ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other |

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Insider's name<br><br>**Relationship to debtor** | | $ | |
| 4.2. | Insider's name<br><br>**Relationship to debtor** | | $ | |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | Creditor's name | | ______ | $______ |
| 5.2. | Creditor's name | | ______ | $______ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|
| Creditor's name | | ______ | $______ |

Last 4 digits of account number: XXXX– ________

## Part 3: Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title / Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Case title: Lone Oak Fund, LLC vs. 2700 sloat Holding LLC<br>Case number: cgc-25-622590 | | Superior Court of the State of California County of San Francisco, Civic Center Courthouse | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. | Case title: JEFFER MANGELS BUTLER & MITCHELL, LLP vs 2700 SLOAT HOLDING. LLC<br>Case number: ADRS NO. 25-1591-KJM | attorney fees | ADR SERVICES, INC.<br>100 FIRST ST., 27TH FLOOR<br>San Francisco, CA 94105 | ☐ Pending<br>☐ On appeal<br>☑ Concluded |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☐ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| KEVIN SINGER<br>Custodian's name | 2700-2750 SLOAT BLVD | $ 0.00 |
| | **Case title**<br>LONE OAK vs. 2700 SLOAT HOLDING, I | **Court name and address**<br>SUPERIOR COURT OF CALIFORNIA, SAN F<br>Name |
| | **Case number**<br>CGC-25-622590 | |
| | **Date of order or assignment**<br>02/2025 | |

## Part 4: Certain Gifts and Charitable Contributions

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| | Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|---|
| 9.1. | Recipient's name | | | $ |
| | | | | $ |
| | **Recipient's relationship to debtor** | | | |
| 9.2. | Recipient's name | | | $ |
| | | | | $ |
| | **Recipient's relationship to debtor** | | | |

## Part 5: Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br>List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | Date of loss | Value of property lost |
|---|---|---|---|
| | | | $ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | DEMETRAS LAW<br>**Address**<br>230 E. LIBERTY STREET<br>Reno, NV 89501<br>**Email or website address**<br><br>**Who made the payment, if not debtor?**<br>JOHN HICKEY | | 06/252025 | $ 10,000.00 |
| 11.2. | <br>**Address**<br><br>**Email or website address**<br><br>**Who made the payment, if not debtor?** | | | $ |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

☑ None

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|
| <br>**Trustee** | | | $ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | ______ | | ______ | $______ |
| | Address | | | |
| | Relationship to debtor ______ | | | |
| 13.2. | Who received transfer? ______ | | ______ | $______ |
| | Address | | | |
| | Relationship to debtor ______ | | | |

## Part 7: Previous Locations

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| | Address | Dates of occupancy | |
|---|---|---|---|
| 14.1. | | From ______ | To ______ |
| 14.2. | | From ______ | To ______ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**Part 8: Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☒ No. Go to Part 9.

☐ Yes. Fill in the information below.

| | Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|---|
| 15.1. | Facility name | | |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br>*Check all that apply:*<br>☐ Electronically<br>☐ Paper |
| 15.2. | Facility name | | |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br>*Check all that apply:*<br>☐ Electronically<br>☐ Paper |

**Part 9: Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☒ No.

☐ Yes. State the nature of the information collected and retained. ____________

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☒ No. Go to Part 10.

Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

**Name of plan** ____________

**Employer identification number of the plan**

EIN: ____________

Has the plan been terminated?

☐ No

☐ Yes

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 10: Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| | Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | ______ Name | XXXX–______ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other______ | ______ | $______ |
| 18.2. | ______ Name | XXXX–______ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other______ | ______ | $______ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| ______ Name | Address | | ☐ No ☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| ______ Name | Address | | ☐ No ☐ Yes |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 11: Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| Name | | | $ |

## Part 12: Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| Case number | Name | | ☐ Pending<br>☐ On appeal<br>☐ Concluded |

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

☒ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
| --- | --- | --- | --- |
| Name | Name | | |

**Part 13: Details About the Debtor's Business or Connections to Any Business**

25. **Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☒ None

| | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
| --- | --- | --- | --- |
| 25.1. | Name | | EIN: ______<br>Dates business existed<br>From ______ To ______ |
| 25.2. | Name | | EIN: ______<br>Dates business existed<br>From ______ To ______ |
| 25.3. | Name | | EIN: ______<br>Dates business existed<br>From ______ To ______ |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

26. **Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

**Name and address**

**Dates of service**

26a.1. RAELYNN HICKEY
Name

From _______

To _______

**Name and address**

**Dates of service**

26a.2. _______
Name

From _______

To _______

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

**Name and address**

**Dates of service**

26b.1. _______
Name

From _______

To _______

**Name and address**

**Dates of service**

26b.2. _______
Name

From _______

To _______

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

**Name and address**

**If any books of account and records are unavailable, explain why**

26c.1. RAELYNN HICKEY
Name

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**Name and address** | **If any books of account and records are unavailable, explain why**

26c.2. Name

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

**Name and address**

26d.1. Name

**Name and address**

26d.2. Name

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
| --- | --- | --- |
| | | $ |

**Name and address of the person who has possession of inventory records**

27.1. Name

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| | | $ |

Name and address of the person who has possession of inventory records

27.2. Name

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| CH PLANNING LLC | 1 EAST LIBERTY STREET SUITE 650, Reno, NV 89501 | | 100 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No

☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | To |
| | | | To |
| | | | To |
| | | | To |

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No

☐ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1. | Name | | | |
| | Relationship to debtor | | | |

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

**Name and address of recipient**

30.2
Name

**Relationship to debtor**

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

**Name of the parent corporation**

**Employer Identification number of the parent corporation**

EIN:

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

**Name of the pension fund**

**Employer Identification number of the pension fund**

EIN:

## Part 14: Signature and Declaration

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/09/2025
MM / DD / YYYY

✘ Raelynn Hickey, CEO Digitally signed by Raelynn Hickey, CEO Date: 2025.07.09 15:51:14 -07'00'

Signature of individual signing on behalf of the debtor

Printed name RAELYNN HICKEY

Position or relationship to debtor CEO

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☑ No
☐ Yes

# EXHIBIT “B”

DEMETRAS LAW
J. Craig Demetras
Nevada Bar. No. 4246
230 E. Liberty Street
Reno, NV 89501
(Telephone): 775-348-4600
jcd@demetraslaw.com
mail@demetraslaw.com

[Proposed] Attorney for
Debtor In Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| IN RE<br><br>2700 SLOAT HOLDING, LLC<br><br>Debtor ,<br><br>______________________________/ | BK-N-25-50584-hlb<br><br>Chapter 11<br><br>**SCHEDULE D OF 2700 SLOAT HOLDING, LLC** |

**Fill in this information to identify the case:**

Debtor name 2700 SLOAT HOLDING, LLC

United States Bankruptcy Court for the: District of Nevada

Case number (If known): 25-50584

☐ Check if this is an amended filing

# Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property

12/15

**Be as complete and accurate as possible.**

1. **Do any creditors have claims secured by debtor's property?**
   - ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   - ■ Yes. Fill in all of the information below.

**Part 1:** List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

*Column A* **Amount of claim** Do not deduct the value of collateral.

*Column B* **Value of collateral that supports this claim**

**2.1 Creditor's name**
AMINAM, LLC

**Creditor's mailing address**
12121 WILSHIRE BLVD
SUITE 555, Los Angeles, CA 90025

**Creditor's email address, if known**

**Date debt was incurred** 07/29/2022

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
- ☐ No
- ☑ Yes. Specify each creditor, including this creditor,

SAN FRANCISCO TAX COLLECTOR, 1st; LONE OAK

**Describe debtor's property that is subject to a lien**
2700-2750 SLOAT BLVD
SAN FRANCISCO, CA 94116

**Describe the lien**
Agreement you made

**Is the creditor an insider or related party?**
- ☑ No
- ☐ Yes

**Is anyone else liable on this claim?**
- ☑ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
- ☐ Contingent
- ☑ Unliquidated
- ☐ Disputed

Column A: $ 600,000.00 — Column B: $ 44,000,000.00

**2.2 Creditor's name**
LONE OAK FUND LLC

**Creditor's mailing address**
11611 SAN VICENTE BLVD
# 640, Los Angeles, CA 90049

**Creditor's email address, if known**

**Date debt was incurred** 07/29/2022

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
- ☐ No
- ☑ Yes. Have you already specified the relative priority?
  - ☐ No. Specify each creditor, including this creditor, and its relative priority.
  - ■ Yes. The relative priority of creditors is specified on lines 2.1

**Describe debtor's property that is subject to a lien**
2700-2750 SLOAT BLVD
SAN FRANCISCO, CA 94116

**Describe the lien**
Agreement you made

**Is the creditor an insider or related party?**
- ☑ No
- ☐ Yes

**Is anyone else liable on this claim?**
- ☑ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
- ☐ Contingent
- ☑ Unliquidated
- ☐ Disputed

Column A: $11,000,000.00 — Column B: $44,000,000.00

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** $ 11,707,000.00

Debtor 2700 SLOAT HOLDING, LLC Case number (if known) 25-50584

## Part 1: Additional Page

Column A — Amount of claim: Do not deduct the value of collateral.
Column B — Value of collateral that supports this claim

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.**

**2.3 Creditor's name**
SAN FRANCISCO TAX COLLECTOR

**Creditor's mailing address**
SECURED PROPERTY TAX
P. O. BOX 7426, SAN FRANCISCO, CA 94

**Creditor's email address, if known**

**Date debt was incurred**

**Last 4 digits of account number** 4199

**Do multiple creditors have an interest in the same property?**
- ☐ No
- ☑ Yes. Have you already specified the relative priority?
  - ☐ No. Specify each creditor, including this creditor, and its relative priority.
  - ☑ Yes. The relative priority of creditors is specified on lines 2.1

**Describe debtor's property that is subject to a lien**
2700-2750 SLOAT BLVD
SAN FRANCISCO, CA 94116

Column A: $107,000.00 | Column B: $44,000,000.00

**Describe the lien**

**Is the creditor an insider or related party?**
- ☑ No
- ☐ Yes

**Is anyone else liable on this claim?**
- ☑ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**2.__ Creditor's name**

**Creditor's mailing address**

**Creditor's email address, if known**

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
- ☐ No
- ☐ Yes. Have you already specified the relative priority?
  - ☐ No. Specify each creditor, including this creditor, and its relative priority.
  - ☐ Yes. The relative priority of creditors is specified on lines _____

**Describe debtor's property that is subject to a lien**

Column A: $__________ | Column B: $__________

**Describe the lien**

**Is the creditor an insider or related party?**
- ☐ No
- ☐ Yes

**Is anyone else liable on this claim?**
- ☐ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Debtor 2700 SLOAT HOLDING, LLC
Name

Case number (if known) 25-50584

## Part 2: List Others to Be Notified for a Debt Already Listed in Part 1

**List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.**

**If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.**

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| PEAK FORECLOSURE SERVICES, INC.<br>5900 CANOGA AVENUE<br>SUITE 420<br>Woodland Hills, CA, 91367 | Line 2. 2 | |
| PEAK FORECLOSURE SERVICES, INC.<br>P. O. BOX 23159<br>SAN DIEGO, CA, 92193-3159 | Line 2. 2 | |
| WOLF, RIFKIN, SHAPIRO, SCHULMAN AND RABKIN, LLP<br>c/o SIMON ARON<br>11400 West Olympic Blvd, 9th Floor<br>Los Angeles, CA, 90064-1582 | Line 2. 2 | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |

# EXHIBIT "C"

Stewart Title of California, Inc.
Recording Requested By EPN
STEWART TITLE GUARANTY COMPANY
Order No. 1613991
APN: 2514-008; 2514-007

City and County of San Francisco
Joaquín Torres, Assessor-Recorder

| | | | |
|---|---|---|---|
| Doc # 2022075367 | | Fees | $101.00 |
| 8/3/2022 | 3:46:11 PM | Taxes | $0.00 |
| NH | Electronic | Other | $0.00 |
| Pages 15 | Title 002 | SB2 Fees | $225.00 |
| Customer | 9034 | Paid | $326.00 |

When Recorded Mail To:

LONE OAK FUND, LLC
11611 San Vicente Boulevard, Suite 640
Los Angeles, CA 90049
1613991

---

**DEED OF TRUST WITH ABSOLUTE ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**
**(First Priority)**

THIS DEED OF TRUST WITH ABSOLUTE ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Deed of Trust**"), made as of July 29, 2022, is entered into by and among:

2700 SLOAT HOLDING LLC, a Nevada limited liability company ("**Trustor**"), whose address is 201 Spear Street, Suite 1100, San Francisco, California 94105, and

LONE OAK INDUSTRIES INC., a California corporation ("**Trustee**"), whose address is 11611 San Vicente Boulevard, Suite 640, Los Angeles, California 90049, and

LONE OAK FUND, LLC, a California limited liability company ("**Beneficiary**"), whose address is 11611 San Vicente Boulevard, Suite 640, Los Angeles, California 90049.

Trustor irrevocably grants, conveys and assigns to Trustee, IN TRUST FOR THE BENEFIT OF BENEFICIARY, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Trustor's right, title and interest, whether now owned or hereafter acquired, in and to that certain real property hereinafter described (the "**Land**"), together with, all buildings and other improvements and fixtures now or hereafter located thereon (the "**Improvements**"), all development rights, mineral and oil rights, appurtenances, easements and rights relating thereto, and all additions and accretions to, and the proceeds of, any of the foregoing (all of the foregoing being collectively referred to as the "**Property**"): 2700 SLOAT BLVD. SAN FRANCISCO, CA. 94116

LOTS 7 AND 8, AS SHOWN ON THE CERTAIN MAP ENTITLED, "PARCEL MAP, BEING A MERGER AND RESUBDIVISION OF THE LANDS DESCRIBED IN GRANT DEEDS, F919 OFFICIAL RECORDS, PAGE 614 AND F669, OFFICIAL RECORDS, PAGE 475, ALSO BEING A MERGER AND RESUBDIVISION OF ASSESSOR'S LOTS 2-A, 4, 5 AND 6, ALSO BEING ALL OF ASSESSOR'S BLOCK NO. 2514, ALSO BEING ALL OF SUNSET BLOCK NO. 1285, SAN FRANCISCO, CALIFORNIA", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, ON MARCH 12TH, 1999, IN BOOK 44 AT PAGE 10, OF PARCEL MAPS.

For the purpose of securing the payment of the indebtedness under a loan (the "**Loan**") from Beneficiary to Trustor evidenced by a Promissory Note (the "**Note**") in the principal amount of TEN MILLION and No/100 Dollars ($10,000,000.00), including future advances thereunder, if any, together with the payment of all other

sums becoming due and payable to Beneficiary under the documents and instruments evidencing or securing the Loan (together with this Deed of Trust, the "**Loan Documents**"), and the performance of all covenants and obligations of Trustor under the Loan Documents, payment of all other obligations owed by Trustor to Beneficiary that by their terms recite that they are secured by this Deed of Trust, and all modifications, extensions and renewals of any of the obligations secured hereby, however evidenced (collectively the "**Secured Obligations**"). The term "obligations" is used herein in its broadest and most comprehensive sense and shall be deemed to include, without limitation, all principal, interest, prepayment charges (if any), late charges, other charges, payments, and loan fees at any time accruing or assessed on any of the Secured Obligations.

All terms of the Secured Obligations and the documents evidencing such obligations are incorporated herein by this reference. Any and all persons or entities who may have or acquire an interest in all or any part of the Property shall be deemed to have notice of the terms of the Secured Obligations.

## ARTICLE 1. ASSIGNMENT OF LEASES AND RENTS

1.1 **Assignment**. Trustor hereby irrevocably assigns to Beneficiary all of Trustor's right, title and interest in, to and under: (a) all leases of the Property or any portion thereof, and all other agreements of any kind relating to the use or occupancy of the Property or any portion thereof, whether now existing or entered into after the date hereof ("**Leases**"); and (b) the rents, revenue, income, issues, deposits security deposits, letters of credit, lease bonds and other deposit substitutes or credit enhancements and profits of the Property, including, without limitation, all amounts payable and all rights and benefits accruing to Trustor under the Leases ("**Payments**"). The term "Leases" shall also include all guarantees of and security for the lessees' performance thereunder, and all amendments, extensions, renewals or modifications thereto which are permitted hereunder. This is a present and absolute assignment, not an assignment for security purposes only, and Beneficiary's right to the Leases and Payments is not contingent upon, and may be exercised without possession of, the Property.

1.2 **Grant of License**. Beneficiary confers upon Trustor a license ("**License**") to collect and retain the Payments as they become due and payable, until the occurrence of a Default (as hereinafter defined). Upon a Default, the License shall be automatically revoked and Beneficiary may collect and apply the Payments pursuant to Section 4.4 without notice and without taking possession of the Property. Trustor hereby irrevocably authorizes and directs the lessees under the Leases to rely upon and comply with any notice or demand by Beneficiary for the payment to Beneficiary of any rental or other sums which may at any time become due under the Leases, or for the performance of any of the lessees' undertakings under the Leases, and the lessees shall have no right or duty to inquire as to whether any Default has actually occurred or is then existing hereunder. Trustor hereby relieves the lessees from any liability to Trustor by reason of relying upon and complying with any such notice or demand by Beneficiary.

1.3 **Effect of Assignment**. The foregoing irrevocable assignment shall not cause Beneficiary to be: (a) a mortgagee in possession; (b) responsible or liable for performing any of the terms, agreements, undertakings, obligations, representations, warranties, covenants and conditions of the Leases; or (c) responsible or liable for any waste committed on the Property by the lessees under any of the Leases or any other parties; for any dangerous or defective condition of the Property; or for any negligence in the management, upkeep, repair or control of the Property. Beneficiary shall not be liable to Trustor or any other person as a consequence of: (i) the exercise or failure to exercise by Beneficiary any of the rights, remedies or powers granted to Beneficiary hereunder; or (ii) the failure of Beneficiary to perform or discharge any obligation, duty or liability of Trustor arising under the Leases.

1.4 **Representations and Warranties**. Trustor represents and warrants that: (a) there are no Leases at the Property other than those set forth in writing and delivered to Beneficiary; (b) all existing Leases are in full force and effect and are enforceable in accordance with their respective terms, and no breach or default, or event which would constitute a breach or default after notice or the passage of time, or both, exists under any existing

Leases on the part of any party; (c) no rent or other payment under any existing Lease has been paid by any lessee for more than one (1) month in advance; and (d) none of the lessor's interests under any of the Leases has been transferred or assigned.

1.5 **Leasing Covenants**. Trustor covenants and agrees at Trustor's sole cost and expense to: (a) perform the obligations of lessor contained in the Leases and enforce by all available remedies performance by the lessees of the obligations of the lessees contained in the Leases; (b) give Beneficiary prompt written notice of any default which occurs with respect to any of the Leases, whether the default be that of the lessee or of the lessor; (c) exercise Trustor's best efforts to keep all portions of the Property that are capable of being leased at all times at rentals not less than the fair market rental value; (d) deliver to Beneficiary fully executed, counterpart original(s) of each and every Lease if requested to do so; and (e) execute and record such additional assignments of any Lease or specific subordinations (or subordination, attornment and non-disturbance agreements executed by the lessor and lessee) of any Lease to the Deed of Trust, in form and substance acceptable to Beneficiary, as Beneficiary may request. Trustor shall not, without Beneficiary's prior written consent: (i) enter into any Leases after the date hereof with a term in excess of three years (including extensions); (ii) execute any other assignment relating to any of the Leases; (iii) discount any rent or other sums due under the Leases or collect the same in advance, other than to collect rentals one (1) month in advance of the time when it becomes due; (iv) terminate, modify or amend any of the terms of the Leases or in any manner release or discharge the lessees from any obligations thereunder; (v) consent to any assignment or subletting by any lessee. Any such attempted action in violation of the provisions of this Section 1.5 shall be null and void. Without in any way limiting the requirement of Beneficiary's consent hereunder, any sums received by Trustor in consideration of any termination (or the release or discharge of any lessee) modification or amendment of any Lease shall be applied to reduce the outstanding Secured Obligations and any such sums received by Trustor shall be held in trust by Trustor for such purpose.

1.6 **Estoppel Certificates**. Within thirty (30) days after written request by Beneficiary, Trustor shall deliver to Beneficiary, and to any party designated by Beneficiary, estoppel certificates executed by Trustor and by each of the lessees, in recordable form, certifying (if such be the case): (a) that the foregoing assignment and the Leases are in full force and effect; (b) the date of each lessee's most recent payment of rent; (c) that there are no defenses or offsets outstanding, or stating those claimed by Trustor or lessees under the foregoing assignment or the Leases, as the case may be; and (d) any other information reasonably requested by Beneficiary.

## ARTICLE 2. SECURITY AGREEMENT AND FIXTURE FILING

2.1 **Security Interest**. Trustor hereby grants and assigns to Beneficiary a security interest, to secure payment and performance of all of the Secured Obligations, in all of the following described personal property, in which Trustor now or at any time hereafter has any interest (collectively, the "Collateral"):

> All goods, building and other materials, supplies, inventory, work in process, equipment, machinery, fixtures, furniture, furnishings, signs and other personal property and embedded software included therein and supporting information, wherever situated, which are or are to be incorporated into, used in connection with, or appropriated for use on the Land and the Improvements; together with all rents and security deposits derived from Land and Improvements; all accounts, cash receipts, deposit accounts, accounts receivable, contract rights, licenses, agreements, general intangibles, payment intangibles, software, chattel paper (whether electronic or tangible), instruments, documents, promissory notes, drafts, letters of credit, letter of credit rights, supporting obligations, insurance policies, insurance and condemnation awards and proceeds, proceeds of the sale of promissory notes, any other rights to the payment of money arising from or related to the ownership, management, leasing, operation, sale or disposition of the Land and the Improvements; all development rights and credits, and any and all permits, consents, approvals, licenses, authorizations and other rights granted by, given by or obtained from, any governmental

entity with respect to the Land and the Improvements, or any of their affiliates; all water and water rights, wells and well rights, canals and canal rights, ditches and ditch rights, springs and spring rights, and reservoirs and reservoir rights appurtenant to or associated with the Land and the Improvements, whether decreed or undecreed, tributary, non-tributary or not non-tributary, surface or underground or appropriated or unappropriated, and all shares of stock in water, ditch, lateral and canal companies, well permits and all other evidences of any of such rights; all deposits or other security now or hereafter made with or given to utility companies by Trustor with respect to the Land and the Improvements; all advance payments of insurance premiums made by Trustor with respect to the Land and the Improvements; all plans, drawings and specifications relating to the Land and the Improvements; all loan funds held by Beneficiary, whether or not disbursed; all funds deposited with Beneficiary pursuant to any loan agreement; all reserves, deferred payments, deposits, security deposits, letters of credit, lease bonds and other deposit substitutes, credit enhancements, other like items, accounts, refunds, cost savings and payments of any kind related to the Land and the Improvements or any portion thereof; together with all replacements and proceeds of, and additions and accessions to, any of the foregoing; together with all books, records and files relating to any of the foregoing.

As to all of the above described personal property, which is or which hereafter becomes a "fixture" under applicable law, this Deed of Trust constitutes a fixture filing under the California Uniform Commercial Code, as amended or recodified from time to time ("**UCC**").

2.2 **Representations and Warranties**. Trustor represents and warrants that: (a) Trustor has, or will have, good title to the Collateral; (b) Trustor has not previously assigned or encumbered the Collateral, and no financing statement covering any of the Collateral has been delivered to any other person or entity; (c) Trustor's principal place of business is located at the address shown in the heading of this Deed of Trust; and (d) Trustor's legal name is exactly as set forth on the first page of this Deed of Trust and all of Trustor's organizational documents or agreements delivered to Beneficiary are complete and accurate in every respect.

2.3 **Covenants**. Trustor agrees: (a) to execute and deliver such documents as Beneficiary deems necessary to create, perfect and continue the security interests contemplated hereby; (b) not to change its name, and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered without giving Beneficiary prior written notice thereof; (c) to cooperate with Beneficiary in perfecting all security interests granted herein and in obtaining such agreements from third parties as Beneficiary deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder; and (d) that Beneficiary is authorized to file financing statements in the name of Trustor to perfect Beneficiary's security interest in Collateral.

2.4 **Remedies**. This Deed of Trust constitutes a security agreement with respect to the Collateral in which Beneficiary is granted a security interest. Beneficiary has all of the rights and remedies of a secured party under the California Uniform Commercial Code as well as all other rights and remedies available at law or in equity. Trustor agrees to execute and deliver on demand, and irrevocably constitutes and appoints Beneficiary the attorney-in-fact of Trustor to execute, deliver, and file, any security agreements, financing statements, continuation statements, or other instruments that Beneficiary may request to impose, perfect or continue the perfection of the lien or security interest created by this Deed of Trust. Upon the occurrence of a Default (as hereinafter defined), Beneficiary will have the right to sell at any public or private sales as permitted by applicable law any of the Collateral that is personal property. Beneficiary will also have any other rights and remedies, whether at law, in equity, or by statute that are available to secured creditors. Any disposition may be conducted by an employee or agent of Beneficiary or Trustee. Any person or entity, including both Trustor and Beneficiary, will be eligible to purchase any part or all of the Collateral at any disposition.

2.5 **Expenses**. Expenses of retaking, holding and preparing for sale, selling, or the like will be borne by Trustor and will include Beneficiary's and Trustee's attorneys' fees and legal expenses. Trustor, on demand, will assemble the Collateral and make it available to Beneficiary at the Property, a place deemed to be reasonably convenient to Beneficiary and Trustor. Beneficiary will give Trustor at least ten (10) days' prior written notice of the time and place of any public sale or other disposition of the Collateral or of the time of or after which any private sale or any other intended disposition is to be made. If the notice is sent to Trustor in the manner provided for the mailing of notices in this Deed of Trust, it is deemed reasonable notice to Trustor.

## ARTICLE 3. RIGHTS AND DUTIES OF THE PARTIES

3.1 **Title**. Trustor represents and warrants that, except as disclosed to Beneficiary in a writing which refers to this warranty, Trustor lawfully holds and possesses fee simple title to the Property without limitation on the right to encumber, and that this Deed of Trust is a first and prior lien on the Property.

3.2 **Taxes and Assessments**. Trustor shall pay prior to delinquency all taxes, assessments, levies and charges imposed by any public or quasi-public authority or utility company which are or which may become a lien upon or cause a loss in value of the Property or any interest therein (the "**Impositions**"). Trustor shall also pay prior to delinquency all Impositions imposed by reason of its interest in any Secured Obligation or in the Property, or by reason of any payment made to Beneficiary pursuant to any Secured Obligation; provided, however, Trustor shall have no obligation to pay taxes which may be imposed from time to time upon Beneficiary and which are measured by and imposed upon Beneficiary's net income.

3.3 **Performance of Secured Obligations**. Trustor shall promptly pay and perform each Secured Obligation when due.

3.4 **Liens, Encumbrances and Charges**. Trustor shall immediately discharge any lien not approved by Beneficiary in writing that has or may attain priority over this Deed of Trust. Trustor shall pay when due all obligations secured by or which may become liens and encumbrances which shall now or hereafter encumber or appear to encumber all or any part of the Property or Collateral, or any interest therein, whether senior or subordinate hereto.

3.5 **Damages, Insurance and Condemnation Proceeds**. The following (whether now existing or hereafter arising) are all absolutely and irrevocably assigned by Trustor to Beneficiary and, at the request of Beneficiary, shall be paid directly to Beneficiary: (i) all awards of damages and all other compensation payable directly or indirectly by reason of a condemnation or proposed condemnation for public or private use affecting all or any part of, or any interest in, the Property or Collateral; (ii) all other claims and awards for damages to, or decrease in value of, all or any part of, or any interest in, the Property or Collateral; (iii) all proceeds of any insurance policies (whether or not expressly required by Beneficiary to be maintained by Trustor, including, but not limited to, earthquake insurance and terrorism insurance, if any) payable by reason of loss sustained to all or any part of the Property or Collateral; and (iv) all interest which may accrue on any of the foregoing. Subject to applicable law, and without regard to any requirement contained in Section 3.6(d), Beneficiary may at its discretion apply all or any of the proceeds it receives to its expenses in settling, prosecuting or defending any claim and may apply the balance to the Secured Obligations in such order and amounts as Beneficiary in its sole discretion may choose, and/or Beneficiary may release all or any part of the proceeds to Trustor upon any conditions Beneficiary may impose. Beneficiary may commence, appear in, defend or prosecute any assigned claim or action and may adjust, compromise, settle and collect all claims and awards assigned to Beneficiary. At its sole option, Beneficiary may permit insurance or condemnation proceeds held by Beneficiary to be used for repair or restoration but may condition such application upon reasonable conditions.

//

3.6 **Maintenance and Preservation of the Property**. Trustor covenants: (a) to insure the Property and Collateral against such risks as Beneficiary may require and, at Beneficiary's request, to provide evidence of such insurance to Beneficiary, and to comply with the requirements of any insurance companies providing such insurance; (b) to keep the Property and Collateral in good condition and repair; (c) not to remove or demolish the Property or Collateral or any part thereof, not to alter, restore or add to the Property or Collateral without Beneficiary's prior written consent; (d) not to initiate or acquiesce in any change in any zoning or other land classification which affects the Property without Beneficiary's prior written consent; (e) to complete or restore promptly and in good and workmanlike manner the Property and Collateral, or any part thereof which may be damaged or destroyed, without regard to whether Beneficiary elects to require that insurance proceeds be used to reduce the Secured Obligations as provided in Section 5.6; (f) to comply with all laws, ordinances, regulations and standards, and all covenants, conditions, restrictions and equitable servitudes of every kind and character which affect the Property or Collateral and pertain to acts committed or conditions existing thereon; (g) not to commit or permit waste of the Property or Collateral; and (h) to do all other acts which from the character or use of the Property or Collateral may be reasonably necessary to maintain and preserve its value.

3.7 **Defense and Notice of Losses, Claims and Actions**. At Trustor's sole expense, Trustor shall protect, preserve and defend the Property and Collateral and title to and right of possession of the Property and Collateral, the security hereof and the rights and powers of Beneficiary and Trustee hereunder against all adverse claims. Trustor shall give Beneficiary and Trustee prompt notice in writing of the assertion of any claim, of the filing of any action or proceeding, of the occurrence of any damage to the Property or Collateral and of any condemnation offer or action.

3.8 **Acceptance of Trust; Powers and Duties of Trustee**.

(a) Trustee accepts this trust when this Deed of Trust is recorded. From time to time on written request of Beneficiary and presentation of this Deed of Trust for endorsement, and without affecting the personal liability of any person for payment of any indebtedness or the performance of any obligations, Trustee may, without liability and without notice: (i) reconvey all or any part of the Property, (ii) consent to the making of any map or plat; and (iii) join in any grant of easement, any declaration of covenants, conditions, and restrictions, any extension agreement, or any agreement subordinating the lien or charge of this Deed of Trust.

(b) With the approval of Beneficiary, Trustee shall have the right to take any and all lawful action as Beneficiary may instruct Trustee to take to protect or enforce Beneficiary's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property.

(c) All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

(d) Should any deed, conveyance, or instrument of any nature be required from Trustor by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to the Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by the Trustee or substitute Trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Trustor.

3.9 **<u>Compensation; Exculpation; Indemnification.</u>**

(a) Trustor shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this trust, including attorneys' fees. Trustor shall pay to Beneficiary reasonable compensation for services rendered concerning this Deed of Trust, including without limit any statement of amounts owing under any Secured Obligation. Beneficiary shall not directly or indirectly be liable to Trustor or any other person as a consequence of (i) the exercise of the rights, remedies or powers granted to Beneficiary in this Deed of Trust; (ii) the failure or refusal of Beneficiary to perform or discharge any obligation or liability of Trustor under any agreement related to the Property or Collateral or under this Deed of Trust; or (iii) any loss sustained by Trustor or any third party resulting from Beneficiary's failure (whether by malfeasance, nonfeasance or refusal to act) to lease the Property after a Default (hereinafter defined) or from any other act or omission (regardless of whether same constitutes negligence) of Beneficiary in managing the Property after a Default unless the loss is caused by the gross negligence or willful misconduct of Beneficiary and no such liability shall be asserted against or imposed upon Beneficiary, and all such liability is hereby expressly waived and released by Trustor.

(b) Trustor indemnifies and holds harmless Trustee and Beneficiary from and against all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title and value, and other expenses which either may suffer or incur: (i) by reason of this Deed of Trust, (ii) by reason of the execution of this Deed of Trust or in performance of any act required or permitted hereunder or by law, (iii) as a result of any failure of Trustor to perform Trustor's obligations, or (iv) by reason of any alleged obligation or undertaking on Beneficiary's part to perform or discharge any of the representations, warranties, conditions, covenants or other obligations contained in any other document related to the Property. The above obligations of Trustor to indemnify and hold harmless Beneficiary and Trustee shall survive the release and cancellation of the Secured Obligations and the release and reconveyance or partial release and reconveyance of this Deed of Trust.

(c) Trustor shall pay all amounts and indebtedness arising under this Section 3.9 immediately upon demand by Trustee or Beneficiary together with interest thereon from the date the indebtedness arises at the rate of interest then applicable to the principal balance of the Note as specified therein.

3.10 **<u>Substitution of Trustee</u>**. From time to time, by a writing, signed and acknowledged by Beneficiary and recorded in the Office of the Recorder of the County in which the Property is situated, Beneficiary may appoint another trustee to act in the place and stead of Trustee or any successor. Such writing shall set forth any information required by law. The recordation of such instrument of substitution shall discharge Trustee herein named and shall appoint the new trustee as the trustee hereunder with the same effect as if originally named Trustee herein. A writing recorded pursuant to the provisions of this Section 3.10 shall be conclusive proof of the proper substitution of such new Trustee.

3.11 **<u>Due on Sale or Encumbrance</u>**. If the Property or any interest therein shall be sold, transferred (including, without limitation, through sale or transfer of a majority or controlling interest of the corporate stock or general partnership interests or limited liability company interests of Trustor, except as otherwise expressly permitted in the Loan Agreement), mortgaged, assigned, further encumbered or leased, whether directly or indirectly, whether voluntarily, involuntarily or by operation of law, without the prior written consent of Beneficiary, <u>THEN</u> Beneficiary, in its sole discretion, may declare all Secured Obligations immediately due and payable.

3.12 **<u>Releases, Extensions, Modifications and Additional Security</u>**. Without notice to or the consent, approval or agreement of any persons or entities having any interest at any time in the Property and Collateral or in any manner obligated under the Secured Obligations ("**Interested Parties**"), Beneficiary may, from time to time, release any person or entity from liability for the payment or performance of any Secured Obligation, take any action or make any agreement extending the maturity or otherwise altering the terms or increasing the amount

of any Secured Obligation, or accept additional security or release all or a portion of the Property and Collateral and other security for the Secured Obligations. None of the foregoing actions shall release or reduce the personal liability of any of said Interested Parties, or release or impair the priority of the lien of and security interests created by this Deed of Trust upon the Property and Collateral.

3.13 **Reconveyance**. Upon Beneficiary's written request, and upon surrender to Trustee for cancellation of this Deed of Trust or a certified copy thereof and any note, instrument, or instruments setting forth all obligations secured hereby, Trustee shall reconvey, without warranty, the Property or that portion thereof then held hereunder. To the extent permitted by law, the reconveyance may describe the grantee as "the person or persons legally entitled thereto" and the recitals of any matters or facts in any reconveyance executed hereunder shall be conclusive proof of the truthfulness thereof. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance. When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all future rents, issues and profits of the Property to the person or persons legally entitled thereto.

3.14 **Subrogation**. Beneficiary shall be subrogated to the lien of all encumbrances, whether released of record or not, paid in whole or in part by Beneficiary pursuant to the Loan Documents or by the proceeds of any loan secured by this Deed of Trust.

3.15 **Hazardous Materials**.

(a) **Representations and Warranties**. Trustor hereby specially represents and warrants to the best of Trustor's knowledge as of the date of this Agreement as follows:

(i) Except as previously disclosed to Beneficiary in the written environmental reports and documents delivered by Trustor to Beneficiary, the Property is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," “wastes,” “regulated substances,” “industrial solid wastes,” or “pollutants” under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances and regulations (collectively, the "**Hazardous Materials**"). "Hazardous Materials" shall not include commercially reasonable amounts of such materials used in the ordinary course of operation of the Property which are used and stored in accordance with all applicable environmental laws, ordinances and regulations.

(ii) The Property is in compliance with all laws, ordinances and regulations relating to Hazardous Materials ("**Hazardous Materials Laws**"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other jurisdictions or orders and regulations.

(iii) There are no claims or actions ("**Hazardous Materials Claims**") pending or threatened against Trustor or the Property by any governmental entity or agency or by any other person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

(iv) The Property has not been designated as Border Zone Property under the provisions of California Health and Safety Code, Sections 25220 et seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

(b) **Hazardous Materials Covenants**. Trustor agrees as follows:

(i) **No Hazardous Activities**. Trustor shall not cause or permit the Property to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials.

(ii) **Compliance**. Trustor shall comply and cause the Property to comply with all Hazardous Materials Laws.

(iii) **Notices**. Trustor shall immediately notify Beneficiary in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property; (ii) any knowledge by Trustor that the Property does not comply with any Hazardous Materials Laws; (iii) any Hazardous Materials Claims; and (iv) the discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

(iv) **Remedial Action**. In response to the presence of any Hazardous Materials on, under or about the Property, Trustor shall immediately take, at Trustor's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

(c) **Hazardous Materials Indemnity.** Trustor hereby agrees to defend, indemnify and hold harmless Beneficiary, its directors, officers, employees, agents, successors and assigns from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including without limitation, attorneys' fees and expenses) which Beneficiary may incur as a direct or indirect consequence of the use, generation, manufacture, storage, disposal, threatened disposal, transportation or presence of Hazardous Materials in, on, under or about the Property. Trustor shall immediately pay to Beneficiary upon demand any amounts owing under this Indemnity, together with interest thereon at the rate provided in the Loan Documents. Trustor's duty and obligation to defend, indemnify and hold harmless Beneficiary shall survive the release, reconveyance or partial reconveyance of the Deed of Trust.

(d) **Legal Effect of Section**. Trustor and Beneficiary agree that: (a) this Article 3 is intended as Beneficiary's written request for information (and Trustor's response) concerning the environmental condition of the real property security as required by California Code of Civil Procedure §726.5; and (b) each provision in this Article (together with any indemnity applicable to a breach of any such provision) with respect to the environmental condition of the real property security is intended by Beneficiary and Trustor to be an "environmental provision" for purposes of California Code of Civil Procedure §736, and as such it is expressly understood that Trustor's duty to indemnify Beneficiary hereunder shall survive: (a) any judicial or non-judicial foreclosure under the Deed of Trust, or transfer of the Property in lieu thereof, (b) the release and reconveyance or cancellation of the Deed of Trust; and (c) the satisfaction of all of Trustor's obligation under the Loan Documents.

3.16 **Right of Inspection**. Beneficiary, its agents and employees, may enter the Property at any reasonable time for the purpose of inspecting the Property and Collateral and ascertaining Trustor's compliance with the terms hereof, including the presence of Hazardous Materials.

## ARTICLE 4. DEFAULT PROVISIONS

4.1 **Default**. The term "Default" shall mean the occurrence of an Event of Default as defined herein. The existence of a Default shall be deemed to be on the first date of the occurrence of an Event of Default (the "Date of Default"), and all rights and remedies of Beneficiary and Trustee under the Loan Documents with respect thereto, with or without notice, shall be retroactive to the Date of Default. Events of Default are:

(a) The failure of Trustor to make any payment of principal or interest on the Note when the same is due and payable, whether at maturity, by acceleration or otherwise;

(b) The failure of Trustor to pay any other amount due hereunder or under the Note when the same is due and payable;

(c) The sale or transfer of the Property, including, without limitation, through sale or transfer of a majority or controlling interest of the corporate stock, general partnership interests or limited liability company interests of Trustor, without the prior written consent of Beneficiary;

(d) The mortgage, assignment or further encumbrance of the Property, whether directly or indirectly, whether voluntarily, involuntarily or by operation of law, without the prior written consent of Beneficiary;

(e) The failure of Trustor to perform any non-monetary obligation hereunder, and the continuance of such failure for ten (10) days after notice, or within any longer grace period, if any, allowed in the Loan Documents for such failure;

(f) The failure to be true of any representation or warranty of Trustor contained in the Loan Documents;

(g) The existence of any Default as defined in the Loan Documents.

(h) The conduct at or on the Property of any illegal activity under California or Federal law, including but not limited to Cannabis Activities, as defined in the Loan Documents.

4.2 **Rights and Remedies**. At any time after Default, Beneficiary and Trustee shall each have all the following rights and remedies:

(a) With or without notice, to declare all Secured Obligations immediately due and payable;

(b) With or without notice, and without releasing Trustor from any Secured Obligation, and without becoming a mortgagee in possession, to cure any breach or Default of Trustor and, in connection therewith, to enter upon the Property and do such acts and things as Beneficiary or Trustee deem necessary or desirable to protect the security hereof, including, without limitation: (i) to appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or the rights or powers of Beneficiary or Trustee under this Deed of Trust; (ii) to pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien which, in the sole judgment of either Beneficiary or Trustee, is or may be senior in priority to this Deed of Trust, the judgment of Beneficiary or Trustee being conclusive as between the parties hereto; (iii) to obtain insurance; (iv) to pay any premiums or charges with respect to insurance required to be carried under this Deed of Trust; or (v) to employ counsel, accountants, contractors and other appropriate persons.

//

(c) To commence and maintain an action or actions in any court of competent jurisdiction to foreclose this instrument as a mortgage or to obtain specific enforcement of the covenants of Trustor hereunder, and Trustor agrees that such covenants shall be specifically enforceable by injunction or any other appropriate equitable remedy and that for the purposes of any suit brought under this subparagraph, Trustor waives the defense of laches and any applicable statute of limitations;

(d) To apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Property as a matter of strict right and without regard to the adequacy of the security for the repayment of the Secured Obligations, the existence of a declaration that the Secured Obligations are immediately due and payable, or the filing of a notice of default, and Trustor hereby consents to such appointment;

(e) To enter upon, possess, manage and operate the Property or any part thereof, to take and possess all documents, books, records, papers and accounts of Trustor or the then owner of the Property, to make, terminate, enforce or modify Leases of the Property upon such terms and conditions as Beneficiary deems proper, to make repairs, alterations and improvements to the Property as necessary, in Trustee's or Beneficiary's sole judgment, to protect or enhance the security hereof;

(f) To execute a written notice of such Default and of its election to cause the Property to be sold to satisfy the Secured Obligations. As a condition precedent to any such sale, Trustee shall give and record such notice as the law then requires. When the minimum period of time required by law after such notice has elapsed, Trustee, without notice to or demand upon Trustor except as required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, at one or several sales, either as a whole or in separate parcels and in such manner and order, all as Beneficiary in its sole discretion may determine, at public auction to the highest bidder for cash, in lawful money of the United States, payable at time of sale. Neither Trustor nor any other person or entity other than Beneficiary shall have the right to direct the order in which the Property is sold. Subject to requirements and limits imposed by law, Trustee may from time to time postpone sale of all or any portion of the Property by public announcement at such time and place of sale. Trustee shall deliver to the purchaser at such sale a deed conveying the Property or portion thereof so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustee, Trustor or Beneficiary may purchase at the sale;

(g) To resort to and realize upon the security hereunder and any other security now or later held by Beneficiary concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken non-judicial proceedings, or both, and to apply the proceeds received upon the Secured Obligations all in such order and manner as Trustee and Beneficiary, or either of them, determine in their sole discretion.

(h) Upon sale of the Property at any judicial or non-judicial foreclosure, Beneficiary may credit bid (as determined by Beneficiary in its sole and absolute discretion) all or any portion of the Secured Obligations. In determining such credit bid, Beneficiary may, but is not obligated to, take into account all or any of the following: (i) appraisals of the Property as such appraisals may be discounted or adjusted by Beneficiary in its sole and absolute underwriting discretion; (ii) expenses and costs incurred by Beneficiary with respect to the Property prior to foreclosure; (iii) expenses and costs which Beneficiary anticipates will be incurred with respect to the Property after foreclosure, but prior to resale, including, without limitation, costs of structural reports and other due diligence, costs to carry the Property prior to resale, costs of resale (e.g. commissions, attorneys' fees, and taxes), costs of any hazardous materials clean-up and monitoring, costs of deferred maintenance, repair, refurbishment and retrofit, costs of defending or settling litigation affecting the Property, and lost opportunity costs (if any), including the time value of money during any anticipated holding period by Beneficiary; (iv) declining trends in real property values generally and with respect to properties similar to the Property; (v) anticipated discounts upon resale of the Property as a distressed or foreclosed property; (vi) the fact of additional collateral (if any), for the Secured Obligations; and (vii) such other factors or matters that Beneficiary

(in its sole and absolute discretion) deems appropriate. In regard to the above, Trustor acknowledges and agrees that: (w) Beneficiary is not required to use any or all of the foregoing factors to determine the amount of its credit bid; (x) this Section does not impose upon Beneficiary any additional obligations that are not imposed by law at the time the credit bid is made; (y) the amount of Beneficiary's credit bid need not have any relation to any loan-to-value ratios specified in the Loan Documents or previously discussed between Trustor and Beneficiary; and (z) Beneficiary's credit bid may be (at Beneficiary's sole and absolute discretion) higher or lower than any appraised value of the Property.

4.3 **Application of Foreclosure Sale Proceeds**. After deducting all costs, fees and expenses of Trustee, and of this trust, including, without limitation, cost of evidence of title and attorneys' fees in connection with sale and costs and expenses of sale and of any judicial proceeding wherein such sale may be made, Trustee shall apply all proceeds of any foreclosure sale: (a) to payment of all sums expended by Beneficiary under the terms hereof and not then repaid, with accrued interest at the rate of interest specified in the Note to be applicable on or after maturity or acceleration of the Note; (b) to payment of all other Secured Obligations; and (c) the remainder, if any, to the person or persons legally entitled thereto.

4.4 **Application of Other Sums**. All sums received by Beneficiary under Section 4.2 or Section 1.2, less all costs and expenses incurred by Beneficiary or any receiver under Section 4.2 or Section 1.2, including, without limitation, attorneys' fees, shall be applied in payment of the Secured Obligations in such order as Beneficiary shall determine in its sole discretion; provided, however, Beneficiary shall have no liability for funds not actually received by Beneficiary.

4.5 **No Cure or Waiver**. Neither Beneficiary's nor Trustee's nor any receiver's entry upon and taking possession of all or any part of the Property and Collateral, nor any collection of rents, issues, profits, insurance proceeds, condemnation proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Secured Obligation, nor the exercise or failure to exercise of any other right or remedy by Beneficiary or Trustee or any receiver shall cure or waive any breach, Default or notice of default under this Deed of Trust, or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and Trustor has cured all other defaults), or impair the status of the security, or prejudice Beneficiary or Trustee in the exercise of any right or remedy, or be construed as an affirmation by Beneficiary of any tenancy, lease or option or a subordination of the lien of or security interests created by this Deed of Trust.

4.6 **Payment of Costs, Expenses and Attorneys' Fees**. Trustor agrees to pay to Beneficiary immediately and without demand all costs and expenses incurred by Trustee and Beneficiary (including, without limitation, court costs and attorneys' fees, whether incurred in litigation or not) with interest from the date of expenditure until said sums have been paid at the rate of interest then applicable to the principal balance of the Note as specified therein. In addition, Trustor shall pay to Trustee all Trustee's fees hereunder and shall reimburse Trustee for all expenses incurred in the administration of this trust, including, without limitation, any attorneys' fees.

4.7 **Power to File Notices and Cure Defaults**. Trustor hereby irrevocably appoints Beneficiary and its successors and assigns, as its attorney-in-fact, which agency is coupled with an interest, (a) to execute and/or record any notices of completion, cessation of labor, or any other notices that Beneficiary deems appropriate to protect Beneficiary's interest, (b) upon the issuance of a deed pursuant to the foreclosure of the lien of this Deed of Trust or the delivery of a deed in lieu of foreclosure, to execute all instruments of assignment or further assurance with respect to the Property and Collateral, Leases and Payments in favor of the grantee of any such deed, as may be necessary or desirable for such purpose, (c) to prepare, execute and file or record financing statements, continuation statements, applications for registration and like papers necessary to create, perfect or preserve Beneficiary's security interests and rights in or to any of the Property and Collateral, and (d) upon the occurrence of an event, act or omission which, with notice or passage of time or both, would constitute a Default,

Beneficiary may perform any obligation of Trustor hereunder; provided, however, that: (i) Beneficiary as such attorney-in-fact shall only be accountable for such funds as are actually received by Beneficiary; and (ii) Beneficiary shall not be liable to Trustor or any other person or entity for any failure to act (whether such failure constitutes negligence) by Beneficiary under this Section.

## ARTICLE 5. MISCELLANEOUS PROVISIONS

5.1 **Merger**. No merger shall occur as a result of Beneficiary's acquiring any other estate in, or any other lien on, the Property unless Beneficiary consents to a merger in writing.

5.2 **Obligations of Trustor, Joint and Several**. If more than one person has executed this Deed of Trust as "Trustor", the obligations of all such persons hereunder shall be joint and several.

5.3 **Waiver of Marshalling Rights**. Trustor, for itself and for all parties claiming through or under Trustor, and for all parties who may acquire a lien on or interest in the Property and Collateral, hereby waives all rights to have the Property and Collateral and/or any other property, which is now or later may be security for any Secured Obligation ("Other Property") marshalled upon any foreclosure of the lien of this Deed of Trust or on a foreclosure of any other lien or security interest against any security for any of the Secured Obligations. Beneficiary shall have the right to sell, and any court in which foreclosure proceedings may be brought shall have the right to order a sale of, the Property and any or all of the Collateral or Other Property as a whole or in separate parcels, in any order that Beneficiary may designate.

5.4 **Rules of Construction**. When the identity of the parties or other circumstances make it appropriate, the singular number includes the plural.

5.5 **Successors in Interest**. The terms, covenants, and conditions herein contained shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties hereto; provided, however, that this Section 5.5 does not waive or modify the provisions of Section 3.11.

5.6 **Execution in Counterparts**. This Deed of Trust may be executed in any number of counterparts. All counterparts shall be construed together and shall constitute but one Deed of Trust.

5.7 **Governing Law**. This Deed of Trust shall be construed in accordance with the laws of the State of California, except to the extent that federal laws preempt the laws of the State of California.

//

//

//

//

5.8 **Notices**. All notices, demands or other communications required or permitted to be given pursuant to the provisions of this Deed of Trust shall be in writing and shall be considered as properly given if delivered personally or sent by first class United States Postal Service mail, postage prepaid, except that Notice of Default may be sent by certified mail, return receipt requested, or by Overnight Express Mail or by overnight commercial courier service, charges prepaid. Notices so sent shall be effective three (3) days after mailing, if mailed by first class mail, and otherwise upon receipt at the address set forth above; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication. For purposes of notice, the address of the parties are set forth in the heading of this Deed of Trust. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days notice to the other party in the manner set forth hereinabove.

IN WITNESS WHEREOF, Trustor has executed this Deed of Trust as of the date set forth above.

2700 SLOAT HOLDING LLC, a
Nevada limited liability company

By: CH PLANNING LLC, a
Nevada limited liability company,
Sole Member

By ______________________
Raelynn Hickey, Manager

Raelynn Hickey, Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO

On 08/01/2022 before me, RAYMOND TRINH/NOTARY PUBLIC,
(insert name and title of the officer)

personally appeared RAELYNN HICKEY, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

RAYMOND TRINH
Notary Public - California
San Francisco County
Commission # 2332095
My Comm. Expires Aug 21, 2024

Signature______________________ **(Seal)**

# EXHIBIT "D"

Stewart Title of California, Inc.
RECORDING REQUESTED BY EPN
AND WHEN RECORDED, MAIL TO:

Aminam, LLC
12121 Wilshire Blvd, Suite 555
Los Angeles, CA 90025

1613991

City and County of San Francisco
Joaquín Torres, Assessor-Recorder

| | | | |
|---|---|---|---|
| Doc # 2022075368 | | Fees | $116.00 |
| 8/3/2022 | 3:46:12 PM | Taxes | $0.00 |
| NH | Electronic | Other | $0.00 |
| Pages 20 | Title 002 | SB2 Fees | $0.00 |
| Customer | 9034 | Paid | $116.00 |

APN: -2514-008
-2514-007

Exempt from fee per GC27388.1; fee cap of $225 reached

**DEED OF TRUST, ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

This Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing ("Deed of Trust") is made to be effective as of July 29, 2022, by 2700 Sloat Holding, LLC, a Nevada limited liability company (the "Trustor"), whose address is 201 Spear Street, Suite 1100, San Francisco, California 94105 to Stewart Title Company, as Trustee ("Trustee"), for the benefit of AMINAM, LLC, a California limited liability company, as Beneficiary (including its assignees, "Lender").

**THIS DEED OF TRUST IS JUNIOR AND SUBORDINATE TO THE FIRST DEED OF TRUST IN FAVOR OF LONE OAK FUND, LLC, RECORDING CONCURRENTLY HEREWITH.**

THIS DEED OF TRUST ALSO CONSTITUTES A FIXTURE FILING UNDER DIVISION 9 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE AND COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF. TRUSTOR IS A RECORD OWNER OF AN INTEREST IN SAID REAL PROPERTY.

**GRANT IN TRUST:**

Trustor irrevocably grants, transfers and assigns to Trustee, in trust, for the benefit of Lender, with power of sale, all of Trustor's interest in that certain real property located in the County of San Francisco, California, described as: 2700 SLOAT BLVD. SAN FRANCISCO, CA. 94116

[SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE]

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in such real property and all appurtenances, easements, covenants, rights of way, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining thereto now or hereafter, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Trustor therein or thereto, at law or in equity, now or hereafter in possession or expectancy, including, without limitation, all mineral, oil, and gas rights and royalties and profits therefrom, all water and water rights and shares of stock pertaining to water and water rights, and all sewers, pipes, conduits, wires and other facilities furnishing utility or services to the real property (collectively, the "Land");

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to all buildings, structures and improvements now or hereafter erected on the Land, including, without

limitation, all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever now or hereafter located on and affixed to said buildings, structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter sometimes collectively referred to as the "Premises");

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in and to the land lying in the bed of any street, road, highway or avenue now or hereafter in front of or adjoining the Premises;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all awards heretofore or hereafter made by any governmental authorities (federal, state, local or otherwise) to Trustor and all subsequent owners of the Property (as defined below) which may be made with respect to the Property as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Property, which said award or awards are hereby assigned to Lender;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all unearned premiums accrued, accruing or to accrue, and the proceeds of insurance now or hereafter in effect with respect to all or any portion of the Property;

TOGETHER WITH: Any and all claims or demands which Trustor now has or may hereafter acquire against anyone with respect to any damage to all or any portion of the Property;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all claims under and proceeds of any insurance policies by reason of or related to a loss of any kind sustained to the Property, now or hereafter, whether or not such policies name Lender as an insured and whether or not such policies are required by Lender, and whether or not such claims thereunder are characterized as personal claims;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all instruments, investment property, deposit accounts, accounts, contract rights, general intangibles, and other intangible property and rights now or hereafter relating to the foregoing property, or the operation thereof or used in connection therewith, including, without limitation, all options, letters of intent, and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any modifications thereof, and deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights, density bonus rights, and transferable development rights; all of Trustor's right, title, and interest in and to any awards, remunerations, settlements, or compensation heretofore made or hereafter made by any and all courts, boards, agencies, commissions, offices, or authorities, of any nature whatsoever for any governmental unit (federal, state, local or otherwise) to the present or any subsequent owner of the foregoing property, including those for any vacation of, or change of grade in, any streets affecting the foregoing property and all licenses and privileges obtained by Trustor from non-governmental sources;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all leases of the Premises, Fixtures (as defined below), or any part thereof, now or hereafter entered into and all right, title and interest of Trustor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms); all other rights and easements of Trustor now or hereafter existing pertaining to the use and enjoyment of the Premises; and all right, title and interest of Trustor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Property;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all permits, plans, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges, or other rights as may affect or otherwise relate to the Property;

TOGETHER WITH: All right, title and interest which Trustor now has or may later acquire in any and all rents, income, issues and profits (subject, however, to the rights given in this Deed of Trust to Lender to collect and apply same), including, without limitation, prepaid municipal and utility fees, bonds, revenues, income, and other benefits to which Trustor may now or hereafter be entitled to, or which are derived from, the Premises or any portion thereof or interest therein.

The foregoing listing is intended only to be descriptive of the property encumbered hereby, and not exclusive or all inclusive. It is the intent of Trustor to encumber hereby all real property located or to be located upon the above-described real property in which Trustor now has or may later acquire an interest. Said real property (or the leasehold estate if this Deed of Trust encumbers a leasehold estate), Premises, buildings, Improvements, appurtenances, Fixtures, additions, accretions, and other property are hereinafter referred to as the "Property." As used herein, the term "Fixtures" shall include all articles of personal property hereinabove described (in which Trustor now has or may later acquire an interest), now or hereafter affixed to the Property, but shall not include trade fixtures. As used herein, the term "Property" shall include all affixed furniture, furnishings, equipment, machinery, goods, contract rights, general intangibles, revenues, equipment leases, vehicles, money, deposit accounts, instruments, accounts, chattel paper and other personal property (in which Trustor now has or may later acquire an interest) of any kind or character now existing or hereafter arising or acquired in connection with Trustor's business operations at the Property, and all products and proceeds thereof.

Trustor makes the foregoing grant to Trustee, and to Lender, as applicable, to hold the Property in trust for the benefit of Lender and for the purposes and upon the terms and conditions hereinafter set forth.

Upon recordation of this Deed of Trust, this Deed of Trust will create a valid first priority lien, in, on and to the Property, which shall be free and clear of all liens and encumbrances, except for any matters or exceptions expressly approved in writing by Lender; and all action required to perfect fully the lien created by this Deed of Trust will have been taken and completed.

**FOR THE PURPOSE OF SECURING:**

(1) Payment of the sum of **$3,000,000.00** together with interest thereon and certain additional costs and expenses related to or incurred in connection with or as provided in that certain Promissory Note of even date herewith, executed by Trustor, payable to Lender, or order, and all extensions, modifications or renewals thereof (including, without limitation, any extension, modification, or renewal of the Note at a different rate of interest or on different terms) (collectively, the "Note");

(2) Payment of all other sums, with interest, advanced, paid, or incurred by Lender or Trustee under the terms of this Deed of Trust to protect the Property or Lender's security interest therein;

(3) Payment of such additional sums, with interest, as the then record owner of the Property may later borrow from Lender, in those instances in which the later obligations are evidenced by a promissory note or notes reciting that it or they are so secured (which additional obligations shall be referred to as "future advances" in this Deed of Trust); and

(4) Trustor's performance of each agreement in this Deed of Trust, and in all other agreements and instruments made by Trustor in favor of Lender in connection with the Note.

**TRUSTOR AND LENDER AGREE AS FOLLOWS:**

**RIGHTS AND DUTIES OF THE PARTIES:**

(1) PAYMENT AND PERFORMANCE BY TRUSTOR; TITLE: Trustor represents and warrants to and for the benefit of Lender and Trustee that Trustor holds good and marketable title of record to the Land and Improvements in fee simple. Trustor shall promptly: (a) pay when due all sums payable under the Note and all future advances; and (b) perform each and every term, covenant and condition of this Deed of Trust and any other obligation secured by this Deed of Trust.

(2) PAYMENT BY TRUSTOR OF TAXES AND OTHER IMPOSITIONS: The term "Taxes" shall mean all taxes, bonds and assessments, both general and special, affecting or levied upon the Property or any part thereof, assessments on water company stock, if any, all taxes or excises levied or assessed against Trustor, the Property, or any part thereof, in addition to or as a substitution in whole or in part for any real estate taxes or assessments, all taxes or excises measured by or based in whole or in part upon the rents, operating income, or any other factor relating to the Property, or any part thereof, and all license fees, taxes and excises imposed upon Lender (but not any federal or state income taxes imposed upon Lender) and measured by or based in whole or in part upon the obligations secured hereby. The term "Other Impositions" shall mean any fine, fee, charge, or other imposition in connection with the Property or Trustor, payment of which Lender shall deem to be necessary to protect, preserve, and defend Lender's interests hereunder. Trustor shall pay all Taxes, insurance premiums, and Other Impositions attributable to the Property, at least five (5) days before delinquency directly to the payee thereof, or in such other manner as Lender may designate in writing. Trustor shall promptly furnish to Lender all notices of amounts due under this paragraph, and if Trustor shall make payment directly, Trustor shall furnish to Lender receipts evidencing payments of Taxes before delinquency and shall promptly deliver to Lender receipts evidencing all other payments above required.

Subsequent to a default hereunder, at the request of Lender, made at any time, or as provided by applicable law, Trustor shall pay to Lender, on each day on which monthly installments of principal and/or interest are payable under the Note, until the Note is paid in full, an amount equal to one-twelfth (1/12) of the sum of the estimated annual Taxes and Other Impositions, together with annual insurance premiums on all policies of insurance required by this Deed of Trust, plus additional amounts reasonably estimated by Lender for the purpose of paying future installments of Taxes, Other Impositions, and insurance premiums. In such event, Trustor further agrees to cause all bills, statements, or other documents relating to Taxes, Other Impositions, and insurance premiums to be sent or mailed directly to Lender. Upon receipt of such bills, statements, or other documents, and provided Trustor has deposited sufficient funds with Lender pursuant to this paragraph (2), Lender shall pay such amounts as may be due thereunder out of the funds so deposited with Lender for that purpose, subject to Lender's rights to seize and apply said funds to satisfy, in whole or in part, any default by Trustor. If at any time and for any reason the funds deposited with Lender are or will be insufficient to pay such amounts as may then or subsequently be due, Lender shall notify Trustor and Trustor shall immediately deposit an amount equal to such deficiency with Lender. Notwithstanding the foregoing, nothing contained herein shall cause Lender to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds deposited with Lender pursuant to this paragraph (2). Lender shall not be obligated to pay or allow any interest on any sums held by Lender pending disbursement or application hereunder, and Lender may impound or reserve for future payment of Taxes, Other Impositions, and insurance such portion of such payments as Lender may in his absolute discretion deem proper, applying the balance on the principal of or interest on the obligations secured hereby. Should Trustor fail to deposit with Lender (exclusive of that portion of said payments which has been applied by Lender on principal of or interest

on the indebtedness secured hereby) sums sufficient to fully pay such Taxes, Other Impositions, or insurance premiums, at least fifteen (15) days before delinquency thereof, Lender may, at Lender's election, but without any obligation so to do, advance any amounts required to make up the deficiency, which advances, if any, shall be secured hereby and shall be repayable to Lender as herein elsewhere provided, or at the option of Lender the latter may, without making any advance whatever, apply any sums held by it upon any obligation of Trustor secured hereby. Shall any default occur or exist on the part of Trustor in the payment or performance of any of Trustor's and/or any guarantor's obligation in connection with the above Note, Lender may, at Lender's option, apply any sums or amounts in his possession or under his control, received pursuant hereto or as rents or income of the Property or otherwise, upon any indebtedness or obligation of Trustor secured hereby in such manner and order as Lender may elect. The receipt, use or application of any such sums paid by Trustor to Lender hereunder shall not be construed to affect the maturity of any indebtedness secured by this Deed of Trust or any of the rights or powers of Lender or said Trustee under this Deed of Trust or any other obligation secured hereby.

In the event of the passage, after the date of this Deed of Trust, of any law or judicial decision deducting from the value of the Property for the purposes of taxation any lien thereon, or changing in any way the laws now in force for the taxation of deeds of trust or obligations secured by deeds of trust, or the manner of operation of any such Taxes so as to adversely affect the interest of Lender, or imposing payment of the whole or any portion of any Taxes upon Lender, then and in such event, Trustor shall bear and pay the full amount of such Taxes; provided that if for any reason payment by Trustor of any such new or additional Taxes would be unlawful or if the payment thereof would constitute usury or render the Note, or other indebtedness secured hereby, wholly or partially usurious under any of the terms or provisions of the Note, or this Deed of Trust, or otherwise, Lender may, at his option, upon thirty (30) days' written notice to Trustor, or (i) pay that amount or portion of such Taxes as render the Note, or other indebtedness secured hereby, unlawful or usurious, in which event Trustor shall concurrently therewith pay the remaining lawful nonusurious portion or balance of such Taxes, or (ii) in the event that Lender is prohibited from collecting such payment as provided in (i) declare the whole indebtedness secured by this Deed of Trust, together with accrued interest thereon, to be immediately due and payable.

(3) TRUSTOR TO PAY GROUND RENTS AND OBLIGATIONS THAT COULD RESULT IN LIENS ON THE PROPERTY: Trustor shall fully and faithfully pay and perform each and every obligation, and otherwise satisfy all conditions and covenants, which are or may be secured by any deed of trust upon the Property, or any portion thereof, existing of record as of the date this Deed of Trust is recorded. Trustor shall pay at or prior to the due date, or, if applicable, at maturity, any and all ground rents and any liens, charges and encumbrances that are, later become, claim to be or appear to Lender to be prior or superior to the lien of this Deed of Trust, including, without limiting the generality of the foregoing, any and all claims for (a) work or labor performed, (b) materials and services supplied in connection with any work of demolition, alteration, improvement of or construction upon the Property, and (c) fees, charges and liens for utilities provided to the Property.

(4) TRUSTOR TO MAINTAIN INSURANCE: (a) Trustor shall maintain insurance covering the Property against loss or damage by fire, and other risks as shall from time to time be reasonably required by Lender as necessary to protect the security interest of Lender in the Property. The insurance shall be maintained with such companies, in such amounts, for such terms, and in form and content satisfactory to Lender, in Lender's reasonable opinion and judgment. Lender shall be named as loss payee and Mortgagee/additional insured, if possible, under all of the insurance policies, and Trustor shall assure that Lender receive a certificate from each insurance company that acknowledges Lender's position as loss payee and that states that the insurance policy cannot be terminated as to Lender except upon thirty (30) days' prior written notice to Lender. Such policies of insurance shall include, without limitation, the following: (i) insurance against loss or damage to the Property (including contents) by fire or other risk embraced by coverage of the type known as the broad form or extended coverage (or special

extended coverage) in the amount required by Lender, but in no event less than one hundred percent (100%) of the full replacement cost of the Improvements and Fixtures included within the Property without deduction for depreciation of any kind or the unpaid balance of the Note, whichever is greater, (ii) insurance against the loss of rental value of the Property on a "rented or vacant basis," including business interruption insurance, arising out of the perils insured against pursuant to clause (i) above in the amount not less than one (1) year's gross rental income and other revenues from the Property, and (iii) commercial general liability insurance against claims for personal injury, death, or property damage occurring on, in, or about the Property, or arising from or connected with the use, conduct, or operation of Trustor's business in the amount from time to time reasonably required by Lender, (b) If such insurance, together with written evidence of the premium having been paid, are not delivered to Lender at least five (5) days prior to the expiration of such insurance, Lender shall have the right, but without obligation to do so, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, to obtain such insurance or like insurance through or from any insurance agency or company acceptable to it, pay the premium for such insurance, and add the amount of the premium to the loan secured by this Deed of Trust, and this amount shall bear interest at the applicable rate of interest set forth in the Note. Neither the Trustee nor Lender shall be responsible for such insurance or for the collection of any insurance monies, or for any insolvency of any insurer or insurance underwriter. (c) In the event that the Property is sold to Lender at any trustee's sale under this Deed of Trust (see paragraph (17), below), Trustor hereby assigns to Lender all unearned premiums on all policies of insurance covering the Property and agrees that any and all unexpired insurance covering the Property shall inure to the benefit of and pass to Lender at the time of such Trustee's sale.

(5) INSURANCE PROCEEDS, CONDEMNATION PROCEEDS AND OTHER RECOVERIES: (a) All settlements, awards, damages and proceeds received by Trustor or any other person under any fire, earthquake or other hazard insurance policy, for losses existing as of or occurring after the effective date of this Deed of Trust, or in connection with any condemnation for public use of or injury to the Property (or any part of or interest in the Property) are assigned to Lender and may, at the option of Lender, be applied by Lender as provided in section (c) of this paragraph (5). (b) All right, title and interest which Trustor now has or may later acquire in and to all causes of action, whether accrued before or after the date of this Deed of Trust, of any type for any damage or injury to the Property (or any portion of or interest in the Property), or adversely affecting the value of the Property (or any portion of or interest in the Property), including causes of action arising in tort or contract and causes of action in fraud or concealment of a material fact, are assigned to Lender, and the proceeds of any such causes of action may, at the option of Lender, be applied by Lender as provided in section (c) of this paragraph (5). Subsequent to a default hereunder, which is not remedied during any applicable cure period, Lender may, at his option, appear in and prosecute in his own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement of any such action or proceeding. Trustor agrees to execute such further assignments of any settlements, awards, damages and causes of action as Lender from time to time may reasonably request. (c) Subject to the further provisions of this paragraph (5), settlements, awards, proceeds and damages (collectively, "Awards") received by Lender under the provisions of section (a) and section (b) of this paragraph (5), at the option of Lender, may (i) be applied by Lender to the outstanding balance due on the Note, or any other obligation secured by this Deed of Trust, in such order as Lender may determine; (ii) be used by Lender, without reducing the principal balance of the Note or any other obligation secured by this Deed of Trust, to replace, restore or reconstruct the Property to its condition just prior to the loss, as determined by Lender; or (iii) any such amount may be divided in any manner among any such application, use or release. No such application, use or release of the Award shall cure or waive any default or invalidate any act done pursuant to any notice of such default, except to the extent such default is actually cured.

Trustor agrees to endorse in favor of Lender any Award which is made payable to Trustor or to Lender and Trustor and deliver same to Lender immediately upon receipt. Notwithstanding anything herein to the contrary, the amount collected under any fire or other insurance policy may be applied by

Lender, first, to reimbursement of all costs of collection of the proceeds. Thereafter, the proceeds shall be applied to repair, replace, restore or construct the Property (hereafter collectively referred to as "Repair") to its physical condition immediately prior to the act or occurrence that caused the loss, damage or destruction, as the case may be, but only if (a) no default has occurred hereunder and is continuing and (b) the insurance proceeds (together with such additional funds as are required to be paid by Trustor pursuant to this paragraph), are sufficient for the Repair. Otherwise, at the election of Lender, in Lender's reasonable opinion and judgment, the proceeds may be applied to reduce the principal balance of the Note or any obligation secured hereby in such order as Lender may determine, whether or not then due, unless such application is prohibited by applicable law, or be released to Trustor. Such application or release shall not cure or waive any default, except to the extent such default is actually cured, invalidate any act done pursuant to any notice of such default or extend due dates of payments or modify any obligations of Trustor.

Should insurance proceeds be used for Repair, Lender may condition such application upon (a) evidence satisfactory to Lender, in Lender's discretion, that Trustor has sufficient additional funds on hand from their own financial resources as Lender reasonably determines are necessary to pay all costs of Repair; (b) delivery of plans and specifications, executed construction contracts, and cost breakdowns satisfactory to Lender, in his reasonable opinion and judgment; (c) establishment of a procedure satisfactory to Lender for lien waivers and disbursement of funds, disbursement being conditioned upon Lender having sufficient proceeds to pay the cost of Repair free of liens; and (d) evidence acceptable to Lender that the Property after completion will be in at least the same condition as existed prior to the damage, destruction or loss, as the case may be, and that there has been no material adverse change in the financial condition of Trustor since the date of this Deed of Trust. In the event Trustor does not comply with the foregoing conditions within sixty (60) days of the casualty, Lender may, at his option, use the proceeds to reduce the principal balance of the Note or pay any other obligation secured by this Deed of Trust.

(6) MAINTENANCE AND PRESERVATION OF THE PROPERTY:

(a) Trustor shall: (i) keep the Property, and every portion thereof, in good condition and repair and replace from time to time, or at any time, any Fixtures, or other items comprising the Property which may become obsolete or worn out, with Fixtures, or other items of at least the same utility, quality and value, each such replacement to be free of any liens or security interests of any kind or character other than the lien of this Deed of Trust, or any other document or instrument securing the indebtedness hereunder; (ii) not remove or demolish the Property, or any part thereof, except as part of alterations to the Property permitted hereunder; (iii) complete or restore promptly and in good and workmanlike manner the Property, or any part thereof, which may be damaged or destroyed; (iv) comply with and not suffer violations of (A) any and all laws, ordinances, rules, regulations, standards and orders, including, without limitation, making any alterations or additions required to be made to, or safety appliances and devices required to be installed or maintained in or about, the Property, or any portion thereof, under any such laws, ordinances, rules, regulations, standards or orders now or hereafter adopted, enacted or made applicable to the Property, or any portion thereof, and payment of any fees, charges or assessments arising out of or in any way related to treatment of the Property, or any portion thereof, as a source of air pollution, traffic, storm water runoff, or other adverse environmental impacts or effects, and (B) any and all covenants, conditions, restrictions, equitable servitudes and easements, whether public or private, of every kind and character, and (C) any and all requirements of insurance companies and any bureau or agency which establishes standards of insurability, which laws, covenants or requirements affect the Property and/or pertain to acts committed or conditions existing thereon, or the use, management, operation or occupancy thereof by Trustor and anyone holding under Trustor, including (but without limitation) such work of alteration, improvement or demolition as such laws, covenants or requirements mandate; (v) not commit or permit waste of the Property, or any portion thereof; (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain,

preserve and enhance its value, including, without limitation, keeping all plants, lawns and other landscaping in a good and thriving condition, and otherwise performing such appropriate upkeep and maintenance to the Property to insure that the Property, and each part thereof, is maintained in the manner and retains at all times the same appearance and condition, as exists as of the date of this Deed of Trust, reasonable wear and tear excepted, such upkeep to include, without limitation, appropriate measures to protect wood, stucco and concrete surfaces from weathering, deterioration and aging, and to protect from and immediately remove graffiti or other defacement from such surfaces; (vii) perform all obligations required to be performed in leases or conditional sales or like agreements affecting the Property or the operation, occupation or use thereof (and, if not previously assigned, in the event of default, all right, title and interest of Trustor under any such leases, conditional sales or like agreements shall be automatically assigned to Lender hereunder, together with any deposits made in connection therewith); (viii) make payment of any and all charges, assessments or fees imposed in connection with the delivery, installation or maintenance of any utility services or installations on, to or for the Property, or any portion thereof; (ix) not create any deed of trust, liens or encumbrances upon the Property subsequent hereto, the parties hereby having specifically bargained in contemplation of the fact that any subsequent encumbrance upon the Property would adversely affect Lender's reasonable security interests hereunder; (x) make no further assignment of rents of the Property; and (xi) execute and, where appropriate, acknowledge and deliver such further documents or instruments as Lender or Trustee deem necessary or appropriate to preserve, continue, perfect and enjoy the security provided for herein, including (but without limitation) assignments of Trustor's interest in leases of the Property.

(b) Trustor shall not undertake or suffer to be made pursuant to section (a) of this paragraph (6), any material alterations, additions, repairs, expansions, relocations, remodeling or demolition of, or structural or other material changes in, any Improvements or Fixtures comprising the Property that would materially diminish the value of the Property except as permitted pursuant to the written consent of Lender, which consent shall not be unreasonably withheld. All such work shall be performed promptly and in good and workmanlike manner, using first quality materials in conformity with plans and specifications approved in advance by Lender, and shall be diligently prosecuted to completion free of liens and encumbrances, other than this Deed of Trust and any other document or instrument evidencing or securing the indebtedness secured hereby.

(c) Without limiting the generality of this paragraph (6), Trustor hereby warrants, represents and covenants to Lender that Trustor, and to the best of Seller's knowledge, the Property, presently comply with, and will in the future comply fully with, all applicable federal, state and local laws, ordinances, rules and regulations, and all permits and approvals issued thereunder, affecting Trustor's qualification to do business, the construction of any improvements to be located upon the Property, the sale, operation, leasing or financing of the Property and the intended occupancy, use and enjoyment thereof, including, but not limited to, all applicable subdivision laws, licenses and permits, building codes, zoning ordinances, environmental protection laws, flood disaster laws, and all laws pertaining to industrial hygiene and the environmental conditions on, under or about the Property, including, but not limited to, soil and groundwater condition. Trustor further warrants, represents and covenants that Trustor does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with the Property or the business of Trustor on the Property; except as are expressly described in Exhibit "B" attached hereto and incorporated herein, and which are used, stored or maintained in full and complete compliance with all such laws ("Permitted Toxic Materials"). Trustor further warrants, represents and covenants to Lender that Trustor does not presently, and will not, permit any lessee or other user of the Property to use, store, manufacture, generate, transport to or from, release or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related materials on or in connection with the Property or the business of said lessee or other user of the Property, except as are permitted pursuant to Exhibit "B." Trustor further warrants, represents and covenants to Lender that as to the Permitted Toxic

Materials, Trustor or their lessee shall obtain and continue to maintain all necessary permits and approvals for the Permitted Toxic Materials, and comply with all laws, ordinances, rules and regulations, and all permits and approvals issued thereunder, pertaining thereto. ("Toxic substances," "hazardous materials" and "hazardous wastes" shall include, but not be limited to, such substances, materials and wastes which are or become regulated under applicable federal, state or local laws, ordinances, rules or regulations.) Without the prior written consent of Lender, Trustor shall not seek, make or consent to any change in the zoning, conditions of use, or any other applicable land use permits, approvals or regulations pertaining to the Property, or any portion thereof, which would constitute a violation of the warranties, representations and covenants herein contained, or would otherwise impair the ability of Trustor to complete construction of any improvements now underway or to be constructed, constituting the Property, or would change the nature of the use or occupancy of the Property. Within five (5) days of (i) any contact from any federal, state, or local governmental agency concerning any environmental protection laws, including, but not limited to, any notice of any proceeding or inquiry with respect to the presence of any hazardous wastes, toxic substances or hazardous materials on the Property or the migration thereof from or to other property, (ii) any and all claims made or threatened by any third party against or relating to the Property concerning any loss or injury resulting from toxic substances, hazardous wastes, or hazardous materials, or (iii) Trustor's discovery of any occurrence or condition on any property adjoining or in the vicinity of the Property that could cause the Property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the Property under any federal, state, or local laws, ordinances, rules, or regulations, Trustor shall deliver to Lender a report regarding such contact and setting forth in detail and describing any action which Trustor proposes to take with respect thereto, signed by Trustor.

(d) If Trustor has executed any unsecured agreement regarding hazardous materials containing any warranties and/or indemnities by Trustor in favor of Lender pertaining to the presence or release of hazardous and/or toxic materials or other similar substances upon, within or from the Property (hereinafter "Hazardous Substances Indemnity"), then the covenants, duties, and liabilities of Trustor, and the rights and remedies of Lender with respect to the subject of hazardous and/or toxic materials, shall be governed by the provisions of the Hazardous Substances Indemnity in addition to the provisions of this Deed of Trust; provided, however, that the provisions of the Hazardous Substances Indemnity shall prevail and exclusively govern the subject matter to the extent of any duplication, conflict or inconsistency between such provisions and the provisions of this Deed of Trust, and payment or performance of Trustor's obligations under said Hazardous Substances Indemnity shall not be secured by this Deed of Trust but shall be and remain unsecured obligations of Trustor, unless expressly otherwise therein provided.

(e) Trustor shall deliver to Lender such affidavits, reports, certificates or other written instruments as may be requested by Lender, in Lender's sole and absolute opinion and judgment, pertaining to Trustor's compliance with this paragraph (6). Lender may conclusively assume that the statements, facts, information and representations contained herein and/or in any affidavits, orders, receipts or other written instruments that are filed with Lender or exhibited to it, are true and correct. Lender may rely thereon without any investigation or inquiry. By accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this paragraph (6), Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, or of Trustor's compliance with the terms of this Deed of Trust, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

(7) LEGAL ACTIONS AND PAYMENT OF RELATED COSTS: Trustor shall appear in and defend any action or proceeding that may, in Lender's judgment, affect Lender's security interest

under this Deed of Trust or any of the rights or powers of Lender or Trustee under this Deed of Trust. Whether or not Trustor so appears or defends, Trustor shall pay all costs and expenses, including, without limitation, cost of evidence of title and reasonable attorneys' fees, that are incurred by Trustor, Lender or Trustee in any such action or proceeding in which Lender or Trustee may appear, by virtue of being made a party defendant or otherwise, and irrespective of whether the interest of Lender or Trustee in the Property is directly questioned by such action or proceeding or whether Lender's rights or interests are otherwise adversely affected thereby, or whether Lender is or shall become a party, including by way of intervention. Trustor promises and agrees to give Lender notice in writing of the pendency of any such action or proceeding promptly, but in any event no later than five (5) days, after Trustor first obtains knowledge of the pendency of such action or proceeding. Trustor shall cooperate with Lender in any action that is brought by Lender to protect his security interest under this Deed of Trust. Trustor will, upon demand by Lender, commence any action or proceeding reasonably required to protect or facilitate Lender's recovery of Awards under paragraph (5) of this Deed of Trust. If Trustor fails to bring any such action or proceeding, then Lender may, but need not, do so, and Trustor shall pay to Lender all costs, expenses and reasonable attorneys' fees that are incurred by Lender in doing so. Whenever, under this Deed of Trust, or any other document or instrument evidencing or securing the indebtedness secured hereby, Trustor is obligated to appear in and defend Lender or defend or prosecute any action or proceeding, Lender shall have the right of full participation in any such action or proceeding, with counsel of Lender's choice, and all costs and expenses incurred by Lender in connection with such participation (including, without limitation, reasonable attorneys' fees) shall be reimbursed by Trustor to Lender immediately upon demand. In addition, Lender shall have the right to approve any counsel retained by Trustor in connection with the prosecution or defense of any such action or proceeding by Trustor, which approval shall not be unreasonably withheld. All costs or expenses required to be reimbursed by Trustor to Lender hereunder shall, if not paid upon demand by Lender, thereafter bear interest at the applicable rate of interest set forth in the Note. As used herein, "proceeding" shall include litigation (whether by way of complaint, answer, cross-complaint, counter claim or third party claim), arbitration and administrative hearings or proceedings, and shall include commencement of any case or the filing of any petition for relief or other action under any Chapter of the U.S. Bankruptcy Code.

(8) LENDER'S RIGHTS TO INSPECT THE PROPERTY: Subject to the rights of tenants occupying all or any portion of the Property, Lender and his agents, employees and contractors, may enter upon the Property at any reasonable time to inspect the Property for any purpose relating to Lender's rights and interests under the terms of this Deed of Trust, including, but not limited to, Trustor's compliance with the terms of paragraph (6).

(9) SUBSTITUTION OF TRUSTEE: From time to time, by an instrument signed and acknowledged by Lender, and recorded in the Office of the Recorder of the County in which the Property is located, Lender may appoint a substitute trustee or trustees in place of the Trustee. Such instrument shall refer to this Deed of Trust and shall set forth the date and instrument number or book and page of its recordation. Upon recordation of such instrument, the Trustee shall be discharged and the new trustee so appointed shall be substituted as Trustee under this Deed of Trust with the same effect as if originally named Trustee in this Deed of Trust. An instrument recorded pursuant to the provisions of this paragraph (9) shall be conclusive proof of the proper substitution of such new Trustee.

(10) MISCELLANEOUS POWERS OF LENDER AND TRUSTEE: In addition to any other powers granted in this Deed of Trust to the Trustee, from time to time, upon the written request of Lender and upon the presentation of this Deed of Trust and any obligation secured by this Deed of Trust for endorsement, and without affecting any obligation secured by this Deed of Trust or the performance of the obligations set forth in this Deed of Trust, the Trustee may, without liability and without notice to any person: reconvey all or any part of the Property to Trustor, consent to the making of any map or plat of the Property, join in granting any easement on the Property, join in any agreement subordinating the lien of this Deed of Trust, release any obligation secured by this Deed of Trust, in whole or in part, with

regard to any Trustor, extend or renew the Note or any other obligation secured by this Deed of Trust, accept or release any additional security under this Deed of Trust, or accept and release the guaranty of any additional person or any obligation secured by this Deed of Trust.

(11) ASSIGNMENT AND COLLECTION OF RENTS: (a) Trustor hereby assigns absolutely to Lender the rents of the Property, with a revocable license to collect such rents as they become due and payable, prior to any default by Trustor under paragraph (14) of this Deed of Trust, being retained by Trustor. (b) Upon any default by Trustor under paragraph (14) of this Deed of Trust which default is not remedied during any applicable cure period, such license will, automatically, be deemed revoked without the necessity for any act or notice by Lender, and Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and may collect the rents of the Property, and, after so taking possession, shall be entitled to collect any rents that are past due. Lender has, however, no duty to produce rents from the Property nor any responsibility for pursuing or collecting claims or rights of Trustor. If Trustor, at or immediately prior to such taking of possession by or on behalf of Lender, has operated a business upon the Property other than the rental thereof, the authority granted herein to so take possession of the Property shall also include the authority and power to take possession of the receipts of such business and, if appropriate, to operate such business, and the receipts thereof shall be deemed herein to be a form of rents. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and of collection of rents, including, but not limited to, costs and expenses of any receivership and reasonable attorneys' fees incurred by Lender in connection with the receivership, and then to the Note and any other obligations secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received. (c) At any time, subsequent to a default hereunder, which default is not remedied during any applicable cure period, Trustor shall, on demand, deliver to Lender from time to time all security deposits made by lessees to Trustor under the terms of any lease of all or part of the Property. These funds shall be held by Lender without interest payable to Trustor and as a part of and commingled with Lender's general funds. These funds, however, will be repayable to lessees pursuant to the provisions of the leases under which security deposits are made. In the event of any conflict between the provisions of this paragraph (11) and the provisions of a specific separate assignment of rents and/or assignment of lease(s), the provisions of the specific assignment(s) shall be deemed to govern over the provisions of this paragraph.

(12) RECONVEYANCE OF THE PROPERTY: Upon the written request of Lender stating that the Note and all other obligations secured by this Deed of Trust have been discharged, and upon surrender of this Deed of Trust, the Note or any other notes or instruments evidencing such other obligations to the Trustee, and upon payment of the Trustee's fees, the Trustee shall reconvey, without warranty, the Property or that portion of the Property then held by the Trustee under this Deed of Trust. The recitals in any such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such matters or facts. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." When the Property has been fully reconveyed, the last such reconveyance shall operate as a reassignment of all of the rents of the Property to the person or persons legally entitled to such rents. Five (5) years after issuance of such full reconveyance, the Trustee may destroy this Deed of Trust and any such notes, unless directed in such request to retain them.

(13) CHANGE OF LENDER'S RECORDS: In the event Trustor requests Lender to change any of his records relating to the Property, the Note or this Deed of Trust (including, but not limited to, changes in mailing address or ownership of the Property), Trustor shall pay a reasonable fee prescribed by Lender to so change his records.

**ACCELERATION AND DEFAULT:**

(14) CONDITIONS UNDER WHICH LENDER MAY DECLARE A DEFAULT BY TRUSTOR: A default under this Deed of Trust shall occur in the event that: (a) Trustor fails to pay when due: (i) any sum payable under the Note (subject to any express grace period under the Note); or (ii) any sum the payment of which is required or secured by this Deed of Trust; (b) Trustor fails to perform any other obligation required to be performed by Trustor under this Deed of Trust or secured by this Deed of Trust; (c) the Property is or becomes subject to any proceedings for abatement of a public nuisance, and such proceedings are not dismissed within thirty (30) days of the date of commencement thereof; (d) any material information given to Lender by Trustor, intended to or which does, in fact, induce the granting of any loan secured by this Deed of Trust, was not true in any respect when given, or any material information requested or required by Lender is withheld or concealed by Trustor; (e) there is an event of default under any other agreement, document or instrument which further evidences or secures the loan evidenced by the Note, or which encumbers the Property; and/or (f) there is an event of default under any other agreement, document or instrument which further evidences or secures the loan secured by this Deed of Trust.

(15) LENDER'S RIGHT TO REQUIRE IMMEDIATE PAYMENT IN FULL: In the event: (a) of a default under this Deed of Trust, or (b) Trustor sells, transfers, grants, hypothecates, conveys, encumbers, alienates, or assigns (voluntarily, involuntarily, or by operation of law), enters into a contract of sale of, or leases (other than in the ordinary course of business on commercially reasonable terms and conditions), the Property, or any portion of the Property or any interest therein, or any interest in Trustor (each or all of the foregoing, a "Transfer"), Lender may, at his option and without further notice to any person, declare the entire principal balance and any other obligations under the Note and/or any other obligations secured by this Deed of Trust, together with accrued interest thereon, immediately due and payable. Trustor shall provide to Lender a complete and exact duplicate copy of any contract providing for the transfer of any interest in the Property, or any deed of trust or similar instrument creating a lien or encumbrance on the Property, immediately upon the execution of any such contract, deed of trust, or other instrument. No waiver of Lender's right to accelerate shall be effective unless it is in writing.

(16) LENDER'S RIGHT TO PERFORM ACTS TRUSTOR FAILS TO PERFORM AND INDEMNIFICATION:

(a) If Trustor fails to make any payment when due or to do any act required to be made or performed under this Deed of Trust, which failure is not remedied during any applicable express cure period, then Lender or Trustee, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, may, but are not required to, make or do the same in such manner and to such extent as either may deem necessary or desirable to protect the security of this Deed of Trust. Lender and Trustee are authorized to (i) enter upon the Property for such purposes; (ii) appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or the rights or powers of Lender or Trustee; and (iii) pay, purchase, contest or compromise any encumbrance, charge, lien or claim of lien, in whole, in part and/or in installments, which in the judgment of either Lender or Trustee appears to be prior or superior to the lien of this Deed of Trust, and/or is of such nature that a default thereunder could adversely impact Lender or this Deed of Trust, the judgment of Lender or Trustee being conclusive of the matter as among the parties to this Deed of Trust. In exercising the above powers, Lender or Trustee may pay necessary costs and expenses, employ counsel, consultants, any other agents or independent contractors, and pay reasonable fees, compensation, and costs thereof. Trustor promises and agrees to pay immediately upon demand all amounts so expended by Lender or Trustee (including all such costs, expenses and attorneys' fees) under this paragraph (16), together with any fees charged by Lender in regard to such activity by Lender and interest from the date of expenditure at the applicable rate of interest set forth in the Note, with payment of such amounts being secured by this Deed of Trust.

(b) Trustor hereby indemnifies and agrees to hold harmless Lender and Trustee and their directors, officers, shareholders, agents and employees (individually and collectively the "Indemnitees") from and against: (i) any and all claims, demands, actions, liabilities, or causes of action that are asserted against any Indemnitee by any person or entity if the claim, demand, action, liability, or cause of action, directly or indirectly, relates to a claim, demand, action, liability, or cause of action that the person or entity has or asserts based upon, arising out of, or in connection with, the Property, the conduct of Trustor, or any action or non-action by Trustor in connection with the Property or this Deed of Trust; and (ii) any and all claims, liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any such claim, demand, action, liability or cause of action. The foregoing indemnity shall survive the release of this Deed of Trust, whether such release is as a result of payment of the indebtedness secured hereby, foreclosure, acceptance of a deed in lieu of foreclosure, other action, or otherwise.

(17) TRUSTEE'S RIGHTS AND DUTIES TO SELL THE PROPERTY: (a) In the event of a default under this Deed of Trust by Trustor, which default is not remedied during any applicable cure period, Lender may then or thereafter execute or cause the Trustee to execute a written notice of such default and of their election to have the Property sold to satisfy the obligations secured by this Deed of Trust. Such notice shall be recorded in the office of the Recorder of the County where the Property is located. (b) When the minimum period of time required by law following recordation of such notice of default has elapsed, and notice of sale having been given as then required by law, the Trustee, without demand upon Trustor, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as Lender may determine, at public auction to the highest bidder for cash or a cash equivalent acceptable to Trustee, in lawful money of the United States, payable at time of sale. Lender shall have the right, at his option, to offset Lender's bid(s) to the extent of the total amount due Lender, including but not limited to all Trustee's fees, costs, expenses (including, without limitation, premiums for guarantees or other evidence of title), and other amounts secured by this Deed of Trust. The Trustee may postpone the sale of all or any portion of the Property by public notice at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Additionally, Lender, from time to time before any Trustee's sale, may rescind or cause to be rescinded any notice of default and election to sell or notice of sale by executing and delivering to Trustee a written notice of such rescission, which notice, when recorded, shall also constitute a cancellation of any prior declaration of default and demand for sale. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default and demand for sale of the Property to satisfy the obligations hereof, nor otherwise affect any provision, covenant or condition of the Note or any of the rights, obligations or remedies of Trustee to Lender. (c) The Trustee shall deliver to the purchaser at such sale its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. (d) Any person, including Trustor, Lender or Trustee may purchase at such sale. After deducting all costs, fees and expenses of the Trustee and of this Trust, including, without limitation, cost of evidence of title and attorneys' fees in connection with the sale, the Trustee shall apply the proceeds of the sale to the payment of: first, all sums expended under the terms of this Deed of Trust not then repaid, with interest at the applicable rate of interest set forth in the Note; second, the payment of all other sums then secured by this Deed of Trust; and third, the remainder, if any, to the person or persons legally entitled to such proceeds.

(18) OTHER REMEDIES IF TRUSTOR DEFAULTS: (a) All of the remedies of Lender and Trustee set forth in this Deed of Trust are intended to be in addition to and not in substitution for any other remedies available to Lender or Trustee at law or in equity. It is expressly understood and agreed that Lender or Trustee, or both, may bring suit in any court of competent jurisdiction to foreclose this Deed of Trust by judicial action or to obtain specific performance of the assignment of rents contained in

this Deed of Trust. In connection with any such action, Lender or Trustee may apply to the court for the appointment of a receiver to take possession of the Property, operate the business of Trustor being conducted on the Property, utilize and enforce all agreements of Trustor in respect of the operation of such business, the utilization of any such agreement being at the election of Lender or the receiver, to be exercised at any time after declaration of a default hereunder, receive the rents of the Property and apply the same to the obligations of Trustor under this Deed of Trust and under the Note and any other obligations secured by this Deed of Trust. (b) Neither the acceptance of this Deed of Trust nor its enforcement in any manner shall prejudice the right of Lender or Trustee to realize upon or enforce any other security now or later held by Lender or Trustee. Trustor promises and agrees that the rights of Lender and Trustee under this Deed of Trust, and with respect to any other security now or later held by Lender, may be enforced in such order and manner as Lender and Trustee, or either of them, may determine in their sole and absolute discretion.

(19) TRUSTOR'S OBLIGATIONS AND LENDER'S RIGHTS NOT WAIVED: By accepting payment of any sum secured by this Deed of Trust after its due date, or by accepting late performance of any obligation secured by this Deed of Trust, or by making any payment or performing any act on behalf of Trustor that Trustor was obligated to make or perform under this Deed of Trust but failed to make or perform, or by adding any payment so made by Lender to the Note secured by this Deed of Trust, Lender does not waive his right either to require prompt payment when due of all other sums so secured or to declare a default for failure to make any such prompt payment or to perform any such act. No failure or delay on the part of Lender, Trustee, or any holder of the Note or this Deed of Trust in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any such power, right or privilege shall preclude any other or further exercise thereof or of any other right, power or privilege. No exercise of any right or remedy of Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law. All rights and remedies existing under this Deed of Trust are cumulative to, and not exclusive of, any rights or remedies otherwise available.

(20) SUCCESSORS IN INTEREST: The terms, agreements, and conditions contained in this Deed of Trust shall apply to, be binding upon and inure to the benefit of, all of the parties to this Deed of Trust, their heirs, personal representatives, successors and assigns.

(21) STATEMENTS CONCERNING THE STATUS OF THE LOAN: From time to time as required by law, Lender shall furnish to Trustor such statements as may be required concerning the status of the obligations secured by this Deed of Trust. Trustor promises and agrees to pay upon demand for such statements the maximum amount permitted by law.

(22) TRUSTEE'S OBLIGATIONS: The Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. The Trustee is not obligated to notify any party to this Deed of Trust of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Lender or Trustee is a party unless such action is brought by the Trustee. The Trustee shall not be obligated to perform any act required of it under this Deed of Trust unless the performance of such act is requested in writing and the Trustee is reasonably indemnified against loss, costs, liability and expense.

(23) OBLIGATIONS OF TRUSTOR ARE JOINT AND SEVERAL; GENDER AND NUMBER: If more than one person has executed this Deed of Trust as "Trustor," the obligations of all such persons under this Deed of Trust shall be joint and several. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(24) NO OFFSETS: No offset or claims which Trustor now or in the future may have against Lender shall relieve Trustor from making payments or performing any other obligations contained in or secured by this Deed of Trust. Despite any right or option that may be granted to Lender or Trustee by this Deed of Trust or in the evidence of any obligations secured by this Deed of Trust or document ancillary to this Deed of Trust to receive, collect, accept deposit of, use, apply or in any other manner obtain or dispose of any funds or property, the same shall not be deemed to constitute any credit against or to satisfy any obligation secured by this Deed of Trust, in whole or in part, unless and until such funds or property shall be both so obtained and expressly so applied by Lender or Trustee to such satisfaction of such obligation and then only in the manner and to the extent of such application.

(25) GOVERNING LAW: The loan secured by this Deed of Trust is made pursuant to the laws of the State of California, and the rules and regulations promulgated thereunder. The loan contracts between the parties, including this Deed of Trust, shall be construed and governed by such laws, rules, and regulations.

(26) AGREEMENT CHANGED ONLY BY WRITING: This Deed of Trust cannot be changed except by agreement in writing signed by Trustor and Lender.

(27) TIME: Time is of the essence in connection with all of Trustor's obligations under this Deed of Trust.

(28) NOTICE: Except for any notice required under applicable law to be given in another manner: (a) any notice to Trustor provided for in this Deed of Trust shall be addressed to Trustor at the address of Trustor set forth above, or to such other address as Trustor may designate by notice to Lender pursuant to the terms of paragraph (28)(c), and (b) any notice to Lender provided for in this Deed of Trust shall be addressed to Lender at his address shown on the top of the first page of this Deed of Trust, and/or to such other address as Lender may designate by notice to Trustor, pursuant to the terms of paragraph (28)(c).

(c) Except as otherwise provided by law, all notices, requests, demands, directions, and other communications provided for in this Deed of Trust must be in writing mailed, telegraphed, delivered, or sent by telex, facsimile, cable or other form of electronic written communication to the appropriate party at its respective address. Any notice given by telegram, telex, facsimile, cable or other form of electronic written communication must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any notice is given by mail it will be effective when deposited in the mails with first-class or airmail postage prepaid; if given by telegraph or cable, when delivered to the telegraph company with charges prepaid; if given by telex, facsimile or other form of electronic written communication, when sent; or if given by personal delivery, when delivered.

(29) TITLES, CAPTIONS, AND HEADINGS: The titles, captions, and headings to paragraphs contained in this Deed of Trust are for assistance in identification only and are not to be considered part of the substance of the provisions of this Deed of Trust.

(30) SEVERABILITY OF PROVISIONS: If any paragraph, clause or provision of this Deed of Trust is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those paragraphs, clauses or provisions so construed or interpreted and shall not affect the remaining paragraphs, clauses and provisions of this Deed of Trust.

(31) ACKNOWLEDGMENT OF TRUSTOR'S UNDERSTANDING OF DEED OF TRUST: The foregoing terms, provisions and conditions of this Deed of Trust have been read and are understood by Trustor. Trustor hereby acknowledges receipt of a copy of this Deed of Trust.

(32) LENDER'S RELIANCE: The financial accommodations made or to be made by Lender to Trustor are being made, renewed or extended, as applicable, by Lender to Trustor at the request and urging of Trustor and this Deed of Trust is being given in consideration of such financial accommodations, and Lender may rely upon the validity and enforceability of this Deed of Trust in making such financial accommodations.

(33) SECURITY AGREEMENT:

(a) Security Interest and Fixture Filing. This Deed of Trust shall also constitute and serve as a security agreement and financing statement for Fixtures, and any of the Property in which a security interest can be perfected under and within the meaning of Division 9 of the California Uniform Commercial Code, and shall grant to Lender, until the obligations secured hereby shall be satisfied, a second priority security interest, including but not limited to a fixture filing, pursuant to Division 9 of the California Uniform Commercial Code with respect to the Fixtures. To this end, Trustor shall and hereby does grant to Lender, a second priority security interest in, under and to the Fixtures, and any of the Property in which a security interest can be perfected under Division 9 of the California Uniform Commercial Code.

(b) Financing Statements. Trustor shall deliver to Lender, in form and substance satisfactory to Lender, such financing statements and further assurances as Lender may, from time to time, require to create, perfect, and preserve Lender's security interest herein granted, and Lender may cause such financing statements and assurances to be recorded and filed at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.

(c) Remedies on Default. Upon default, Lender may, at his option: (i) exercise any remedy permitted by law or in equity, including without limitation, all the rights and remedies of a secured party under the California Uniform Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; (ii) notify any parties obligated on any of the Fixtures to make payment to Lender and enforce collection thereof; (iii) apply any sums received or collected from or on account of any Fixtures, including the proceeds of any sales thereof, to the payment of any indebtedness of Trustor to Lender in any order, including the costs and expenses incurred in preserving and enforcing the rights of Lender and attorneys' fees, in such order and manner as Lender in Lender's sole discretion determines. All of Lender's rights and remedies shall be cumulative and not exclusive.

(d) This Deed of Trust shall constitute a fixture filing under the California Uniform Commercial Code. Lender's address from which information concerning Lender's security interest can be obtained is set forth in paragraph (28) above, subject to change as therein provided.

(34) SALE OF INTEREST: Trustor acknowledges and accepts that Lender may, at any time, in Lender's sole discretion sell all or any portion of Lender's interest in the Note and this Deed of Trust to one or more third parties. The sale of all or any part of Lender's interest in the Note or Deed of Trust shall not relieve Trustor of any of Trustor's obligations hereunder.

(35) SEPARATE PROPERTY: Any married person executing this Deed of Trust in an individual capacity agrees that recourse may be had to his or her separate property for satisfaction of all sums secured under this Deed of Trust.

(36) BOOKS AND RECORDS: Trustor shall keep and maintain at all times at Trustor's address stated above, or at such other place as Lender may approve in writing from time to time, complete and accurate books or accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, leases, rental agreements, concessions, licenses, and other

documents and instruments which affect the Property, or any portion thereof or interest therein. Such books, records, contracts, leases, documents, and other instruments shall be subject to examination and inspection by Lender, or Lender's agents or designated auditors, at any reasonable time and from time to time. Promptly upon request, Trustor shall furnish a rent schedule for the Property, certified by Trustor, showing the name of each tenant and, for each tenant, the space occupied, the expiration date of the lease or rental agreement, the rent payable and the rent paid, the security deposit held, and such other information regarding the leasing of the Property as Lender shall require.

(37) INSPECTION, APPRAISAL, AND ASSESSMENTS: Lender may, at any time and from time to time and as and when Lender deems it to be appropriate, whether or not Trustor is then in default, (a) enter upon the Premises, directly or through one or more agents or independent contractors, to inspect any and all Property which is security for the obligations herein described, subject to the rights of tenants occupying all or any portion of the Property, and (b) cause to be performed and prepared one or more appraisals and/or preliminary or other environmental assessments of the Property, or any portion thereof, in form and content satisfactory to Lender and meeting all requirements or standards of applicable laws, regulations, ordinances, orders, and generally recognized industry standards relating thereto; provided, however, environmental assessments shall only be performed subject to the Environmental Indemnity. All costs and expenses incurred by Lender or Trustee in connection with any such inspection, appraisal, or assessment, shall be payable by Trustor upon demand and shall be secured by this Deed of Trust. All reports and other evidence and work papers relating to such inspections, appraisals, and assessments, shall be and remain the sole property of Lender, and Trustor hereby waives any right which Trustor may have by agreement or by operation of law to receive an original or duplicate thereof. Any appraisal or assessment may, at Lender's sole election, be relied upon by Lender in taking any action Lender deems to be necessary or appropriate in connection with the enforcement of his rights and exercise of remedies under or by virtue of this Deed of Trust, or under any obligation secured hereby, or under any separate obligation pertaining to the Property, or in connection with the protection, maintenance, preservation, remediation, restoration, or repair of the Property. Unless Lender otherwise expressly declares in writing, neither said appraisal nor assessment shall constitute conclusive evidence of the value or condition of the Property or as a representation or warranty by Lender as to the value or condition of the Property, and may not be used or relied upon by Trustor for any purpose.

THE UNDERSIGNED TRUSTOR REQUESTS THAT A COPY OF ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE HEREUNDER BE MAILED TO TRUSTOR AT TRUSTOR'S ADDRESS SET FORTH ABOVE.

**"TRUSTOR"**

2700 Sloat Holding, LLC,
a Nevada limited liability company

By: CH Planning LLC,
a Nevada limited liability company
Its: Manager

By: ______________________
Raelynn Hickey
Its: Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of SAN FRANCISCO )

On 08/01/2022, before me, RAYMOND TRINH, a Notary Public, personally appeared **Raelynn Hickey**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

RAYMOND TRINH
Notary Public - California
San Francisco County
Commission # 2332095
My Comm. Expires Aug 21, 2024

Signature ______________________

**EXHIBIT A**
**Legal Description**

The land hereinafter referred to is situated in the City of San Francisco, County of San Francisco, State of California, and is described as follows:

Lots 7 and 8, as shown on the certain Map entitled, "Parcel Map, being a Merger and Resubdivision of the Lands described in Grant Deeds, F919 Official Records, Page 614 and F669, Official Records, Page 475, also being a Merger and Resubdivision of Assessor's Lots 2-A, 4, 5 and 6, also being all of Assessor's Block No. 2514, also being all of Sunset Block No. 1285, San Francisco, California", which Map was filed for Record in the Office of the Recorder of the City and County of San Francisco, State of California, on March 12th, 1999, in Book 44 of Parcel Maps, at Pages 10.

APN: -2514-008-

APN: -2514-007-

PROPERTY ADDRESS: 2700–2750 Sloat Blvd., San Francisco, CA 94116

**EXHIBIT "B"**
**(Permitted Toxic Materials)**

Trustor shall not permit there to be any hazardous and/or toxic materials at, on, in, around and/or under the Property and improvements, other than those as used in the regular course of business and for which Trustor (or the user) has licenses from the proper authority (if required by applicable law), such as a government agency or regulatory body, and further, notwithstanding the foregoing, Trustor hereby expressly covenants, represents and warrants to Lender that all such materials shall be used or stored in strict compliance with the provisions as set forth in paragraph (6)(c) of the Deed of Trust for compliance with all state and federal laws, rules, regulations, relating to or governing the use, storage and/or presence of toxic and/or Hazardous Substances Indemnity (as defined below).

Notwithstanding any provisions to the contrary contained in this Exhibit "B" and paragraph (6)(c) of the Deed of Trust, in the event Trustor has executed any unsecured Hazardous Substances Indemnity Agreement ("Hazardous Substances Indemnity") in favor of Lender pertaining to the presence or release of hazardous and/or toxic materials or other similar substances upon, within or from the Property, then the covenants, duties and liabilities of Trustor, and the rights and remedies of Lender with respect to the subject of hazardous and/or toxic materials, shall be governed by the provisions of the Hazardous Substances Indemnity in addition to the provisions of the Deed of Trust; provided, however, that the provisions of said Hazardous Substances Indemnity shall prevail and exclusively govern the subject matter to the extent of any duplication, conflict or inconsistency between such provisions and the provisions of this Deed of Trust, and payment or performance of Trustor's obligations under said Hazardous Substances Indemnity shall not be secured by this Deed of Trust, but shall be and remain unsecured obligations of Trustor.

# EXHIBIT "E"

RECORDING REQUESTED BY
WFG National-Default Services

WHEN RECORDED MAIL TO

PEAK FORECLOSURE SERVICES, INC.
5900 Canoga Avenue, Suite 420
Woodland Hills, CA 91367

City and County of San Francisco
Joaquín Torres, Assessor-Recorder

| | | | |
|---|---|---|---|
| Doc # 2025011566 | | Fees | $26.00 |
| 2/12/2025 | 11:04:17 AM | Taxes | $0.00 |
| ES | Electronic | Other | $0.00 |
| Pages 4 | Title 007 | SB2 Fees | $75.00 |
| Customer | 2392 | Paid | $101.00 |

Trustee's Sale No: CA-LOF-25020855
2593099CAD
2700-2750 Sloat Blvd, San Francisco, CA 94116

APN:18-2514-008-01 **NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST**

NOTE: PURSUANT TO 2923.3(C)THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

[PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice). This amount is $10,250,601.34 as of 2/11/2025, and will increase until your account becomes current.**

**While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.**

**Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the Notice of Sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).**

Trustee's Sale No: CA-LOF-25020855

---

**Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.**

**To find out the amount you must pay, or to arrange for payment to stop the foreclosure or if your property is in foreclosure for any other reason, contact:**

LONE OAK FUND, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY C/O
**PEAK FORECLOSURE SERVICES, INC.**
**5900 Canoga Avenue, Suite 420**
**Woodland Hills, CA 91367**
**(818) 591-9237**

**If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.**

**Remember,**

**YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

**NOTICE IS HEREBY GIVEN** that PEAK FORECLOSURE SERVICES, INC., IS EITHER THE ORIGINAL TRUSTEE, THE DULY APPOINTED TRUSTEE OR ACTING AS AGENT FOR THE TRUSTEE OR BENEFICIARY under a Deed of Trust dated 7/29/2022, executed by 2700 SLOAT HOLDING LLC, A NEVADA LIMITED LIABILITY COMPANY, as Trustor, to secure obligations in favor of LONE OAK FUND, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, as Beneficiary, recorded 8/3/2022, as Instrument No. 2022075367, of Official Records in the office of the Recorder of SAN FRANCISCO County, CALIFORNIA, as more fully described on said deed of trust including one note(s) for the sum of $10,000,000.00. That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred as follows:

FAILURE TO PAY THE PRINCIPAL BALANCE WHICH BECAME DUE ON 01/31/2025 TOGETHER WITH ACCRUED AND ACCRUING INTEREST, LATE CHARGES, FORECLOSURE FEES AND EXPENSES. ALL OBLIGATIONS AND INDEBTEDNESSES AS THEY BECOME DUE AND CHARGES PURSUANT TO SAID NOTE AND DEED OF TRUST. THE BENEFICIARY MAY ELECT, IN ITS DISCRETION, TO EXERCISE ITS RIGHTS AND REMEDIES IN ANY MANNER PERMITTED UNDER SECTION 9501 (4)(A)II OF THE CALIFORNIA COMMERCIAL CODE, OR ANY OTHER APPLICABLE SECTION, AS TO ALL OR SOME OF THE PERSONAL PROPERTY, FIXTURES AND OTHER GENERAL TANGIBLES AND INTANGIBLES MORE PARTICULARLY DESCRIBED IN THE DEED OF TRUST.

THIS LOAN IS SECURED BY COMMERCIAL PROPERTY - COMPLIANCE OF CIVIL CODE SECTION 2923.5 IS NOT REQUIRED.

That by reason thereof, the present beneficiary under such Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all the documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Trustee's Sale No: CA-LOF-25020855

---

Dated: 2/11/2025

PEAK FORECLOSURE SERVICES, INC., AS TRUSTEE

By ______________________________
Lilian Solano, Trustee Sale Officer

# Declaration of Mortgage Servicer Pursuant to Civil Code §2923.5(b)

Borrower(s): 2700 Sloat Holding LLC
Mortgage Servicer: Lone Oak Fund, LLC
Property Address: 2700-2750 Sloat Blvd, San Francisco, CA 94116
T.S. No.: 25020855

The undersigned, as an authorized agent or employee of the mortgage servicer named below, declares that:

1. [√] The mortgage servicer has contacted the borrower pursuant to California Civil Code § 2923.5(a)(2) to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since the initial contact was made.

2. [ ] Despite the exercise of due diligence pursuant to California Civil Code § 2923.5(e), the mortgage servicer has been unable to contact the borrower to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Thirty (30) days, or more, have passed since these due diligence efforts were satisfied.

3. [ ] No contact was required by the mortgage servicer because the individual(s)did not meet the definition of "borrower" pursuant to subdivision (c) of Section 2920.5.

4. [ ] The requirements of Cal. Civil Code § 2923.5 do not apply because the loan is not secured by a first lien mortgage or first deed of trust that secures a loan, or that encumbers real property, described in Civil Code § 2924.15(a).

5. [ ] The requirements of Cal. Civil Code § 2923.5 do not apply because:

   a.______The secured property is non-owner occupied.

   b.______The secured property is commercial or vacant land.

I certify that this declaration is accurate, complete and supported by competent and reliable evidence which the mortgage servicer has reviewed to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

Lone Oak Fund, LLC

Dated: 2/11/2025 By: [signature]
Claire Trinh, Loan Servicing

# EXHIBIT "F"

RC-200

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
SIMON ARON (SBN 108183); ELSA HOROWITZ (SBN 195689)
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Boulevard, 9th Floor
Los Angeles, CA 90064-1582
TELEPHONE NO.: (310) 478-4100 FAX NO. (Optional): (310) 479-1422
E-MAIL ADDRESS (Optional): saron@wrslawyers.com; ehorowitzwrslawyers.com
ATTORNEY FOR (Name): Plaintiff Lone Oak Fund, LLC

FOR COURT USE ONLY

FILED
San Francisco County Superior Court
FEB 26 2025
CLERK OF THE COURT
By: [signature] Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, 94102-4515
BRANCH NAME: Civic Center Courthouse

PLAINTIFF: Lone Oak Fund, LLC

DEFENDANT: 2700 Sloat Holding LLC, et al.

**EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE [X] AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS**

CASE NUMBER: CGC-25-622590

## NOTICE OF HEARING

| Date: 3/25/2025 | Time: 9:30 a.m. | Dept.: 501 | Room: |
|---|---|---|---|

The address of the court [X] is shown above [ ] is (specify):

## ORDER TO SHOW CAUSE

1. **To defendant** *(name each)*: 2700 SLOAT HOLDING LLC, a Nevada limited liability company; and AMINAM, LLC, a California limited liability company

2. **THE COURT ORDERS** the defendants named in item 1 to appear in this court at the date, time, and place shown in the box above to give any legal reason
   a. Why a receiver should not be confirmed to
      (1) take possession and continue in possession of the property described in Attachment 2a *(attach a description of the real and personal property subject to the receivership) (the "property")*, and
      (2) manage the property in accordance with this order until further order of this court.
   b. Why you should not be prohibited from controlling or receiving any income from the property described in Attachment 2a.

## ORDER APPOINTING RECEIVER

**THE COURT ORDERS, pending the hearing on the Ex Parte Order to Show Cause, the following:**

3. **Receiver.** *(Name):* Kevin Singer
   is appointed as receiver to take possession of the property described in Attachment 2a.

4. **Receiver's oath and bond.** The receiver shall immediately, and before performing any duties:
   a. execute and file a receiver's oath, and
   b. file the bond required by Code of Civil Procedure section 567(b) in the amount of: $ 10,000.00

5. **Receiver's fees.** The receiver may charge for the receiver's services no more than *(check all that apply)*:
   a. [X] $350.00 [ ] per month [X] per hour [ ] other *(specify)*:
   b. [ ] percent of gross monthly rents
   c. [ ] the greater of a or b
   d. [ ] $ as a one-time start-up fee

| PLAINTIFF *(Name)*: Lone Oak Fund, LLC<br>DEFENDANT *(Name)*: 2700 Sloat Holding LLC, et al. | CASE NUMBER:<br>CGC-25-622590 |
|---|---|

6. [X] **Management company.** The receiver may employ the management company of *(name):*

a. [X] The receiver may pay the company not more than
(1) [ ] $ [ ] per month [ ] per hour [ ] other *(specify):*
(2) [X] 5% percent of gross monthly rents
(3) [ ] the greater of (1) or (2)
(4) [ ] $ as a one-time start-up fee

b. [ ] Management company fees are included in receiver's fees in item 5.

7. **Disclosure.** The receiver shall immediately disclose to all parties any financial relationship between the receiver and any company hired to assist in the management of the receivership property.

8. **Plaintiff's ex parte bond.** Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of: $10,000.00

9. **General duties.** After qualifying, the receiver
   a. shall take possession of and manage the property,
   b. shall collect the income from the property,
   c. shall care for the property and may incur the expenses necessary for that care, and
   d. may change the locks on the property.

10. **Prohibited agreements.** The receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any postreceivership matter.

11. **Inventory.** Within 30 days after qualifying, the receiver shall file an inventory of all property possessed under this order.

12. **Expenditures.** The receiver shall expend money coming into his or her possession to operate and preserve the property and only for the purposes authorized in this order. Unless the court orders otherwise, the receiver shall to the extent practical hold the balance in interest-bearing accounts in accordance with Code of Civil Procedure section 569.

13. **Leases and rentals.** The receiver may without court approval enter into leases for a term not exceeding one year, obtain and evict tenants, and set and modify the amounts and terms of leases.

14. **Security deposits.** Unless the security deposit has been turned over or paid to the receiver, the receiver shall not refund a deposit to a tenant.

15. **Monthly accounting of receiver's income, expenses, and fees.**
   a. The receiver shall each month prepare and serve on the parties, but not file, an accounting of the income and expenses incurred in the administration of the receivership property, including the receiver's fees and expenses.
   b. The receiver may pay the receiver's own fees and expenses only by the following procedures:
      (1) By serving on all parties a notice of intent to pay to which no objection is served on the receiver within 20 days of the date the notice is served.
      (2) By serving and filing a request for interim payment, which the court then approves.
      (3) By obtaining and filing an agreement among all the parties approving the payment, which the court then approves.
      (4) By filing the receiver's final accounting and report, which the court then approves.
   c. The receiver shall not reimburse the receiver for the receiver's general office administration expenses or overhead without court approval. These expenses include, for example, office supplies and employee payroll, benefits, and taxes.

16. **Management.**
   a. The receiver shall operate the property and take possession of all accounts relating to the property.
   b. The receiver may
      (1) employ agents, employees, clerks, accountants, and property managers to administer the receivership property, and
      (2) purchase materials, supplies, and services reasonably necessary to administer the receivership property.
   c. The receiver may do all the things, and incur the risks and obligations, ordinarily done or incurred by owners, managers, and operators of businesses and property similar to that possessed by the receiver; *except* the receiver shall not make any capital improvements to the property without prior court approval.

| PLAINTIFF (Name): Lone Oak Fund, LLC<br>DEFENDANT (Name): 2700 Sloat Holding LLC, et al. | CASE NUMBER:<br>CGC-25-622590 |
|---|---|

17. **Bank accounts.** The receiver
    a. may establish accounts at any financial institutions insured by an agency of the United States government that are not parties to this proceeding,
    b. shall deposit in those accounts funds received in connection with the receivership property, and
    c. shall deposit in interest-bearing accounts money not expended for receivership purposes.

18. **Court instructions.** The receiver and the parties may at any time apply to this court for further instructions and orders and for additional powers necessary to enable the receiver to perform the receiver's duties properly.

19. **Insurance.**
    a. The receiver shall determine upon taking possession of the property whether there is sufficient insurance coverage.
    b. The receiver shall notify the insurer that the receiver is to be named as an additional insured on each insurance policy on the property.
    c. If the receiver determines that the property does not have sufficient insurance coverage, the receiver shall immediately notify the parties and shall procure sufficient all-risk and liability insurance on the property (excluding earthquake and flood insurance).
    d. If the receiver does not have sufficient funds to obtain insurance, the receiver shall seek instructions from the court on whether to obtain insurance and how it is to be paid for.

20. **Employment of attorneys.**
    a. The receiver may employ unlawful detainer attorneys and eviction services without a court order.
    b. ☐ The receiver may employ counsel *(name)*:
       at the hourly rate of: $
    c. ☐ Except as provided in items 20a and 27d, before employing counsel the receiver shall apply to the court for an order authorizing the receiver to employ counsel.

21. **Taxpayer ID numbers.** The receiver may use any federal taxpayer identification numbers relating to the property for any lawful purpose.

22. **Duty to turn over possession.** Upon receipt of a copy of a recorded trustee's deed upon foreclosure or written notice from plaintiff that defendant has cured the defaults existing under plaintiff's loan documents or that plaintiff has accepted a deed in lieu of foreclosure, the receiver shall, without further order of the court, turn over possession of the property to the successful purchaser or defendant or plaintiff respectively.

23. **Plaintiff's notification of termination.** Plaintiff shall notify the receiver in writing within 48 hours of any event within plaintiff's knowledge that terminates the receivership.

24. **Receiver's final report and account and discharge.**
    a. *Motion required.* Discharge of the receiver shall require a court order upon noticed motion for approval of the receiver's final report and account and exoneration of the receiver's bond.
    b. *Time.* Not later than 60 days after the receivership terminates, the receiver shall file, serve, and obtain a hearing date on a motion for discharge and approval of the final report and account.
    c. *Notice.* The receiver shall give notice to all persons of whom the receiver is aware who have potential claims against the receivership property.
    d. *Contents of motion.* The motion to approve the final report and account and for discharge of the receiver shall contain the following:
       (1) *Declaration or declarations.* A declaration or declarations: (i) stating what was done during the receivership, (ii) certifying the accuracy of the final accounting, (iii) stating the basis for the termination of the receivership (such as foreclosure or reinstatement), and (iv) stating the basis for an order for the distribution of any surplus or payment of any deficit.
       (2) *Accounting summary.* A summary of the receivership accounting, which shall include (i) the total revenues received, (ii) the total expenditures identified and enumerated by major categories, (iii) the net amount of any surplus or deficit, and (iv) evidence of necessary supporting facts.

| PLAINTIFF *(Name)*: Lone Oak Fund, LLC<br>DEFENDANT *(Name)*: 2700 Sloat Holding LLC, et al. | CASE NUMBER:<br>CGC-25-622590 |
|---|---|

25. **Plaintiff's notice to receiver.** Plaintiff shall promptly notify the receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties shall give notice to the receiver of all events that affect the receivership.

26. **Bankruptcy Plaintiff's duty to give notice.** If a defendant files a bankruptcy case during the receivership, plaintiff shall give notice of the bankruptcy case to the court, to all parties, and to the receiver by the close of the next business day after the day on which plaintiff receives notice of the bankruptcy filing.

27. **Bankruptcy Receiver's duties.** If the receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the receiver shall have the following duties:
   a. *Turn over property if no relief from stay will besought.* The receiver shall immediately contact the party who obtained the appointment of the receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the receiver's obligation to turn over the property (11 U.S.C. § 543). If the party has no intention to make such a motion, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession - and otherwise comply with 11 United States Code section 543.
   b. *Remain in possession pending resolution.* If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the receiver's obligation to turn over the property, the receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)). The receiver's authority to preserve the property shall be limited as follows:
      (1) The receiver may continue to collect rents and other income;
      (2) The receiver may make only those disbursements necessary to preserve and protect the property;
      (3) The receiver shall not execute any new leases or other long-term contracts; and
      (4) The receiver shall do nothing that would effect a material change in the circumstances of the property.
   c. *Turn over property if no motion for relief is filed within 10 days after notice of the bankruptcy.* If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543.
   d. *Retain bankruptcy counsel.* The receiver may petition the court to retain legal counsel to assist the receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

28. **Failure to turn over property.** A receiver who fails to turn over the property in accordance with this order shall not be paid for time and expenses after the date on which the receiver should have turned the property over.

29. [X] **Other orders.** *(Additional orders may include authority of the receiver to do any other acts arising from special circumstances.)* Other orders [ ] are specified in Attachment 29 [X] are as follows *(specify):*

Defendant and Nominal Defendant and their agents are not to be on the Subject Property or communicate with the staff, vendors, employees, etc. of the Subject Property without the Court Receiver's written consent.

| PLAINTIFF (Name): Lone Oak Fund, LLC<br>DEFENDANT (Name): 2700 Sloat Holding LLC, et al. | CASE NUMBER:<br>CGC-25-622590 |
|---|---|

## [X] TEMPORARY RESTRAINING ORDER

30. **THIS ORDER EXPIRES AT THE DATE AND TIME OF THE HEARING SHOWN IN THE BOX ON PAGE ONE (UNDER "NOTICE OF HEARING") UNLESS EXTENDED BY THE COURT.**

31. **THE COURT ORDERS DEFENDANT** to do the following:
   a. **Turn over property.** Immediately turn over possession of the property described in Attachment 2a to the receiver when the appointment becomes effective, including any security deposits, prepaid rent, other rental or lease payments, and funds in property management bank accounts for the property.
   b. **Turn over related items.** Immediately turn over to the receiver all keys, books, documents, and records relating to the property and advise the receiver of federal taxpayer identification numbers relating to the property.
   c. **Insurance.**
      (1) Immediately advise the receiver about the nature and extent of insurance coverage on the property;
      (2) Immediately name the receiver as an additional insured on each insurance policy on the property; and
      (3) DO NOT cancel, reduce, or modify the insurance coverage.
   d. **Restraints.** Refrain from
      (1) committing or permitting any waste on the property or any act on the property in violation of law or removing, encumbering, or otherwise disposing of any of the fixtures on the property;
      (2) demanding, collecting, or in any other way diverting or using any of the rents from the property;
      (3) interfering in any manner with the discharge of the receiver's duties under this order;
      (4) selling, transferring, disposing, encumbering, or concealing the property without a prior court order; and
      (5) doing any act that will impair the preservation of the property or plaintiff's interest in the property.
   e. [X] **Other** *(specify):* Defendant and Nominal Defendant and their agents are not to be on the Subject Property or communicate with the staff, vendors, employees, etc. of the Subject Property without the Court Receiver's written consent.

32. **THE COURT ORDERS PLAINTIFF** to immediately file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of: $

33. [X] **OTHER ORDERS** [ ] are specified in Attachment 33 [X] are as follows *(specify):*
   (1) Directing Defendant, Nominal Defendant, and anyone holding under them, to deliver possession of the Subject Property and rents therefrom to the receiver;
   (2) For a temporary restraining order enjoining the tenants of the Subject Property from paying any rents due from the Subject Property to Defendant, Nominal Defendant, or to any other party except the receiver;
   (3) For funds received by the receiver to be distributed as follows:
      a. Costs to operate the Subject Property;
      b. Receivership fees and expenses to administer the receivership estate;
      c. Past due and current property taxes as needed; and
      d. Payment of Plaintiff's past-due mortgage payments and amounts due under the Plaintiff's deed of trust.

## SERVICE AND BRIEFING SCHEDULE

34. By *(date):* 3/3/2025 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel and any other appearing parties, and to file proof of service of, the summons and complaint, the memorandum of points and authorities, these orders, and all declarations and supporting papers.

35. By *(date):* 3/11/2025 **DEFENDANT IS ORDERED** to personally serve on each plaintiff or counsel and any other appearing parties, and to file proof of service of, any opposition to these orders.

36. By *(date):* 3/18/2025 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel, and to file proof of service of, any reply to defendant's opposition to these orders.

37. Number of pages attached: 1

Date: 2/26/2025

Charles F. Haines [signature]
CHARLES F. HAINES
JUDGE OF THE SUPERIOR COURT

MC-025

| SHORT TITLE: Lone Oak Fund, LLC v. 2700 Sloat Holding LLC, et al. | CASE NUMBER: CGC-25-622590 |
|---|---|

**ATTACHMENT** *(Number)*: 2a

*(This Attachment may be used with any Judicial Council form.)*

The real property situated in the County of San Francisco, State of California, commonly known as 2700 - 2750 Sloat Boulevard, San Francisco, California 94116 (the "Subject Property"), legally described as follows:

LOTS 7 AND 8, AS SHOWN ON THE CERTAIN MAP ENTITLED, "PARCEL MAP, BEING A MERGER AND RESUBDIVISION OF THE LANDS DESCRIBED IN GRANT DEEDS, F919 OFFICIAL RECORDS, PAGE 614 AND F669, OFFICIAL RECORDS, PAGE 475, ALSO BEING A MERGER AND RESUBDIVISION OF ASSESSOR'S LOTS 2-A, 4, 5 AND 6, ALSO BEING ALL OF ASSESSOR'S BLOCK NO. 2514, ALSO BEING ALL OF SUNSET BLOCK NO. 1285, SAN FRANCISCO, CALIFORNIA", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, ON MARCH 12TH, 1999, IN BOOK 44 AT PAGE 10, OF PARCEL MAPS.

ASSESSOR'S PARCEL NUMBER: Block 2514 Lot 007 and Block 2514 Lot 008.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

# EXHIBIT “G”

Kevin Singer
Superior Court Receiver
Receivership Specialists
One Sansome Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 590-4823
Facsimile: (415) 946-8837
Kevin@ReceivershipSpecialists.com
efilings@receivershipspecialists.com

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**04/29/2025**
**Clerk of the Court**
BY: BOWMAN LIU
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

LONE OAK FUND, LLC, a California limited liability company,

Plaintiff,

v.

2700 SLOAT HOLDINGS LLC, a Nevada limited liability company; and DOES 1 through 50, inclusive,

Defendants.

AMINAM, LLC, a California limited liability company,

Nominal Defendants.

CASE NO. CGC-25-622590

**RECEIVER KEVIN SINGER'S *EX PARTE* APPLICATION FOR AN ORDER TO SHOW CAUSE RE TURNOVER OF RECEIVERSHIP ESTATE PROPERTY OR, IN THE ALTERNATIVE, SETTING THE APPLICATION FOR HEARING AS A MOTION ON SHORTENED TIME; MEMORANDUM OF POINTS AND AUTHORITIES**

[*Concurrently Filed with Declarations of Kevin Singer and Jackson Wyche, [Proposed] Order, and Proof of Service*]

**<u>HEARING INFORMATION</u>**
Date: May 1, 2025
Time: 9:00 a.m.
Dept.: 501

Court: Civic Center Courthouse
400 McAllister Street
San Francisco, CA, 94102

Case filed: February 20, 2025
Trial Date: None set

**TO ALL PARTIES, INTERESTED THIRD PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 1, 2025, at 9:00 a.m. in Department 501 of the above-referenced Court, located at 400 McAllister Street, San Francisco, CA 94102, Kevin Singer,

the duly-appointed Receiver in the above referenced action (the "**Receiver**") will and hereby does apply ex parte (the "**Application**") for an Order to Show Cause why Defendant 2700 Sloat Holdings LLC, a Nevada limited liability company ("**Defendant**"), and its principal, Raelynn Hickey ("**Hickey**") should not immediately turn over $415,584.59 in prepaid rents (the "**Prepaid Rents**") collected from the Receivership Estate real property commonly known as 2700-2750 Sloat Boulevard, San Francisco, California 94116 (the "**Property**") shortly before the Receiver was appointed and/or provide a comprehensive accounting for the disposition of the Prepaid Rents. Should the Court decline to grant the Application on an ex parte basis, the Receiver respectfully requests that it be set for hearing as a noticed motion on shortened time.

**<u>THE NEED FOR *EX PARTE* RELIEF</u>**

The Application is sought on an ex parte basis because the Receiver was appointed to manage the Property, but the Property's sole tenant, Sloat Garden Center ("**Tenant**"), has demonstrated that it prepaid its rents for November 2024 through August 2025 to Defendant shortly before the Receiver was appointed, so there are no rents for the Receiver to collect, and no funds with which to operate or maintain the Property. The Receiver has directed Defendant to turn over the Prepaid Rents, but Defendant has failed to do so, claiming that the Prepaid Rents were already spent, but has refused to provide a full accounting for the Prepaid Rents or adequate evidence demonstrating that they were actually consumed. The Receiver has spent nearly two months attempting to obtain either turnover of the Prepaid Rents or a satisfactory accounting demonstrating that no funds remain to turn over, but Defendant has failed to comply, thereby necessitating the Application. The Receiver has an affirmative duty to marshal the assets of the Receivership Estate and cannot properly operate the Property without funding, which underscores the Application's exigency. (Declaration of Kevin Singer ("**Singer Dec.**"), filed separately herewith, ¶ 2.)

The Court's February 26, 2025 *Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order—Rents, Issues, and Profits* (the "**Appointing Order**," which was confirmed at the Court's March 25, 2025 confirmation hearing) authorizes the Receiver to "at any time apply to this court for further instructions and orders," ergo submitting this request on an ex parte basis is appropriate. If the Court is disinclined to grant the Application on an ex parte

basis, the Receiver respectfully requests that the Court treat the Application as a motion and schedule it for hearing on shortened time, with the Application serving as the Receiver's moving papers. (*Id*., **Exh. 1**.)

This Application is based on this Application, the accompanying Memorandum of Points and Authorities, the concurrently-filed Singer Dec. and Declaration of Jackson Wyche ("**Wyche Dec.**"), the pleadings, documents, records, and files herein, and upon such further oral evidence as may be presented at the hearing on this Application.

**_*EX PARTE*_ _NOTICE PURSUANT TO CALIFORNIA RULES OF COURT 3.1203_**

As provided in the concurrently-filed Declaration of Jackson Wyche, Ex Parte Notice was properly given to the Parties' and Hickey's counsel, as well as various interested parties, as required under California Rules of Court, rule 3.1203 *et seq.* by email and FedEx overnight delivery on April 29, 2025. (See Wyche Dec., ¶¶ 2 – 6, **Exh. A**.)

DATED: April 29, 2025

Respectfully submitted,

By: ______________________
Kevin A. Singer
Superior Court Receiver

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. STATEMENT OF RELEVANT FACTS

The Receiver was appointed on February 26, 2025, and promptly filed his Oath, posted his bond, took possession of the Property, and met with Tenant. On February 28, 2025, Tenant informed the Receiver's office that it had prepaid its rents through August 2025 and provided a copy of a Third Amendment to Commercial Lease (Sloat Garden Center) dated December 31, 2024 (the "**Third Amendment**"), which provides, in pertinent part, that Tenant is to prepay $140,969.22 to Defendant for May 2025 through August 2025 rents. The Receiver subsequently obtained and reviewed a copy of a Second Amendment to Commercial Lease (Sloat Garden Center) dated October 31, 2024 (the "**Second Amendment**"), which provides, in pertinent part, that Tenant is to prepay $274,615.37 to Defendant for November 2024 through April 2025 rents. (Singer Dec., ¶ 3, **Exh. 2 – 4**.)

On March 4, 2025, Tenant provided copies of bank transaction reports showing that it paid the Prepaid Rents to Defendant via two wire transfers: $274,615.37 on November 1, 2024, and $140,969.22 on December 30, 2024. (*Id*., ¶ 4, **Exh. 5 – 6**.)

On March 5, 2025, the Receiver sent a letter to Defendant and Hickey which directed turnover of various documents and records, as well as the Prepaid Rents and an accounting. (*Id*., ¶ 5, **Exh. 7**.)

On March 10, 2025, Hickey sent a responsive letter along with copies of various loan statements relating to Plaintiff's loan to Defendant, a receipt for a purported April 10, 2024 property tax payment, a pair of property tax bills, copies of the Property's lease agreement and amendments, and an insurance certificate. Hickey's letter claimed, *inter alia*, that Defendant "has no financial statements relating to the operation of the property," "does not operate the property or pay any bills related to its operation except for Property Taxes," has no invoices relating to the Property, and holds less than $100 relating to the Property. It further stated that Defendant has not received any lease revenue since December 2024 (e.g., when the Prepaid Rents were paid), and that all lease revenue "was used to continue to pay for the development expenses of the [Property] … in addition to paying April 2024 Property Taxes, the 2024 Lone Oak interest and extension fee payments and

other administrative expense (*sic*).” (*Id*., ¶ 6, **Exh. 8 – 9**.)

On March 12, 2025, the Receiver’s Senior Project Manager, Jackson Wyche (‘**Wyche**”) responded and asked Hickey to provide “any additional records reflecting the expenditures from the [P]repaid [R]ents”. On March 18, 2025, Hickey responded, reiterated that she and Defendant held less than $100, and claimed that “All funds received from [Tenant] in 2024, regardless of when received, were used to offset payments paid by [Defendant] to [Plaintiff] in 2024, and then applied as offsets to appropriate related other costs.” Hickey attached copies of an April 26, 2023 insurance declarations page, an April 17, 2024 insurance declarations page, what appears to be an office lease agreement dated September 1, 2022, an invoice for $17,600 dated February 15, 2024 (which Hickey stated was for utility consulting work), and an email from Wells Fargo reflecting a $10,000 wire transfer on January 18, 2024. Confusingly, Hickey’s email concluded, “I do not know, but I assume, that the Receiver has received the lease payment from the [Tenant] for March 2025? Please let me know.” (Wyche Dec., ¶ 7, **Exh. B**.)

Later that day, Wyche responded, noting that the Prepaid Rents had been paid after the expenditures Hickey had identified, and that all rents for the post-appointment period would need to be turned over, as well as “comprehensive records detailing the expenditures—bank statements, general ledgers, etc.”. Wyche followed up on March 25th and March 27th, but Hickey failed to respond. (*Id*., ¶ 8, **Exh. C**.)

On March 28th, attorney Mark S. Hall, Esq. (“**Hall**”) contacted Wyche and advised that he had been engaged by Defendant and Hickey. Between this date and April 17th, Hall and Wyche exchanged a total of seven emails regarding the financial records Wyche had requested. Finally, on April 22nd, Hall sent Wyche a letter which stated, “Hickey has nothing to add to her prior response,” that she and Defendant had not maintained any general ledgers, that the rents had been “used to pay the property taxes and the loan from Plaintiff,” and that “it is Ms. Hickey’s position that the receiver has all the information to verify that the prepaid rents received through August 2025 have been applied to property taxes and the … loan. There are no additional documents to produce.” (*Id*., ¶ 9, **Exh. D – E**.)

/ / /

## II. AUTHORITY AND REQUEST FOR ORDER

A receiver's powers in any particular action are established by statute, the appointment order, and the court's subsequent orders. (*Cal-American Income Property Fund VII v. Brown Development Corp.* (1982) 138 Cal.App.3d 268, 273.) With respect to statutory authority, the California Code of Civil Procedure section 568 plainly grants receivers the authority to "generally to do such acts respecting the property as the Court may authorize." The court has "full power" to order the receiver to manage receivership property in the manner the court deems to be for "the best interest of the parties concerned." (*People v. Riverside University* (1973) 35 Cal.App.3d 572, 583.) The receiver's advice and opinions as to the disposition of property are "entitled to great respect and weight." (*Id.* (internal citations omitted).)

The Receiver is bringing this Application under paragraph 18 of the Appointing Order, which authorizes him to "at any time apply to this court for further instructions and orders and for additional powers necessary to enable [him] to perform [his] duties properly."

A) The Court has jurisdiction over the Property and its rents and records

Property in the possession of a receiver is held in *custodia legis*, or in the custody of the Court. (*See Pac. Ry. Co. v. Wade*, 91 Cal. 449, 455 [1891].) "Because the receiver is appointed by the court, he becomes an officer of the court; thus his custody is actually the custody of the court." (*Robbins v. Bueno*, 262 Cal. App. 2d 79, 84–85 [1968].) In general, a receivership court has broad authority to determine the assets that belong to the receivership estate, which is a vital function that enables a receiver to effectively fulfill his duties:

> The extent of the property embraced by a receivership is a question the court appointing the receiver has the power and jurisdiction to determine, and it may therefore determine whether any particular property is or is not involved in the action and in the receivership proceeding.

(*Steinberg v. Goldstein,* 129 Cal. App. 2d 682, 686 (1954) [*citing Irer v. Gawn,* 99 Cal. App. 17, 31 (Cal. Ct. App. 1929].).

/ / /

/ / /

B) <u>The Receiver is obligated to marshal the assets, and the Court can issue orders even against non-parties who hold Receivership Estate assets</u>

However, once the Court has defined the parameters of the property to be included in the Receivership Estate, the Receiver does not merely have a right, but an affirmative legal duty to marshal those assets: "[w]here property is under the control of a person who is not a party to the litigation and that person denies the receiver's right to take possession and control of the property, the receiver must take whatever steps are necessary to obtain possession." (MILLER & STARR, California Real Estate (4th ed. 2020) § 41:11 [citing *Crouse v. Superior Court of Los Angeles County*, 28 Cal. App. 625, 625-26 (1915).] Indeed, **any interference with the Receiver's control of Receivership Estate property – whether by a party or nonparty – may be punished as contempt of court**. (*Id.*) Alternatively, the Court may simply require that such a party turn over Receivership Estate property to the Receiver. (*See id.*)

A receivership court may employ summary proceedings to allow its receiver to gain possession of and protect receivership assets, thereby allowing for a later determination upon a full briefing from individuals concerning the proper title thereto. (*See United States v. Arizona Fuels* Corp., 739 F.2d 455, 458 (9th Cir. 1984); *see also* 2 Clark on Receivers (3d Ed. 1959) § 333 ["One having property belonging to a receiver must deliver it up"]; *see also Crouse, supra*, 28 Cal. App. at 625-26.) The appropriate form of a "summary proceeding" in this Receivership, under present circumstances, is an Order to Show Cause ("**OSC**"), which provides notice and an opportunity to be heard why Defendant and Hickey have failed to comply with the Appointing Order.

C) <u>The Appointing Order requires Defendant to turn over the Prepaid Rents and records</u>

Finally, paragraph 31 of the Appointing Order orders Defendant to turn over the Property, "including any security deposits, prepaid rent, other rental or lease payments, and funds in property management bank accounts," as well as all "records relating to the [P]roperty," and to refrain from "demanding, collecting, or in any other way diverting or using any of the rents from the [Properties] and "interfering in any manner with the discharge of the [R]eceiver's duties".

D) The Court should schedule an OSC against Defendant and Hickey

By collecting, and then refusing to turn over, the Prepaid Rents, Defendant and Hickey have deprived the Receivership Estate of its sole source of revenue through August 2025. Defendant and Hickey contend that the Prepaid Rents were fully exhausted to fund the Property's operations, but they have failed to provide satisfactory evidence to support their claim. Notably, they have refused to provide any bank statements, general ledgers, or other documents from which their claims can be verified. It appears from Hickey's correspondence that, to the extent the Prepaid Rents were actually consumed, they were applied to ***reimburse*** Defendant for expenditures allegedly made before the Prepaid Rents were collected at the end of 2024—meaning that, by Hickey's admission, Defendant pocketed the Prepaid Rents.

Whether retroactive reimbursement is an appropriate use of the Prepaid Rents is for the Court to determine, but it is beyond dispute that Defendant and Hickey have failed to comply with the Appointing Order by refusing to turn over, at minimum, records relating to the Property. Hickey's claim that she has "no additional documents to produce" defies credulity, as she (as Defendant's principal) undoubtedly holds at least one bank statement reflecting expenditures from the Prepaid Rents, which leads the Receiver to conclude that the bank statements may reflect improper transfers or expenditures. Accordingly, the Court should order Defendant and Hickey to appear and show cause why they should not immediately turn over the Prepaid Rents. If Defendant and Hickey still contend that the Prepaid Rents were fully consumed, they should be ordered to produce satisfactory records supporting all such expenditures, including, at minimum, bank statements and general ledgers, so that the Receiver (and the Court) can verify the authenticity and appropriateness of the purported expenditures.

Finally, should the Court decline to grant this Application on an ex parte basis, the Receiver respectfully requests that the Court convert it to a noticed motion and set it for hearing at the earliest possible hearing date, as the Receiver has no funding and must promptly resolve this issue in order to properly carry out the Court's orders.

/ / /

**III. CONCLUSION**

For the foregoing reasons, the Receiver respectfully requests this Court issue the [Proposed] Order filed herewith which schedules an Order to Show Cause hearing, or alternatively set this matter for hearing as a motion on shortened time.

DATED: April 29, 2025

Respectfully submitted,

By: ______________________
Kevin A. Singer
Superior Court Receiver

# EXHIBIT "H"

Kevin Singer
Superior Court Receiver
Receivership Specialists
One Sansome Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 590-4823
Facsimile: (415) 946-8837
Kevin@ReceivershipSpecialists.com
efilings@receivershipspecialists.com

FILED
Superior Court of California
County of San Francisco
MAY 29 2025
CLERK OF THE SUPERIOR COURT
By [signature] Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| LONE OAK FUND, LLC, a California limited liability company,<br><br>Plaintiff,<br>v.<br><br>2700 SLOAT HOLDINGS LLC, a Nevada limited liability company; and DOES 1 through 50, inclusive,<br><br>Defendants.<br><br>AMINAM, LLC, a California limited liability company,<br><br>Nominal Defendants. | CASE NO. CGC-25-622590<br><br>~~[PROPOS~~ED] **ORDER GRANTING RECEIVER KEVIN SINGER'S MOTION FOR AN ORDER TO SHOW CAUSE RE TURNOVER OF RECEIVERSHIP ESTATE PROPERTY**<br><br>[*Concurrently Filed with Proof of Service*]<br><br>**HEARING INFORMATION**<br>Date: May 22, 2025<br>Time: 9:30 a.m.<br>Dept.: 501<br><br>Court: Civic Center Courthouse<br>400 McAllister Street<br>San Francisco, CA, 94102<br><br>Case filed: February 20, 2025<br>Trial Date: None set |

[PROPOSED] **ORDER**

Receiver Kevin Singer's (the "**Receiver**") motion (the "**Motion**") for an Order to Show Cause why Defendant 2700 Sloat Holdings LLC, a Nevada limited liability company ("**Defendant**"), and its principal, Raelynn Hickey ("**Hickey**") should not immediately turn over $415,584.59 in prepaid rents (the "**Prepaid Rents**") collected from the Receivership Estate real property commonly known as 2700-2750 Sloat Boulevard, San Francisco, California 94116 (the

"**Property**") shortly before the Receiver was appointed and/or provide a comprehensive accounting for the disposition of the Prepaid Rents came on for a hearing on May 22, 2025, at 9:30 a.m., in Department 501 of the above-entitled Court. Appearances were as noted at the time of the hearing. The Receiver, counsel for Plaintiff Lone Oak Fund, and counsel for Defendant all advised the Court that they would submit on the Court's tentative ruling. The Court directed the Receiver to convert the tentative ruling into a [Proposed] Order and file it with the Court.

Accordingly, the Court adopted its tentative ruling as follows:

**IT IS HEREBY ORDERED**:

1. A further hearing on this matter is set for June 12, 2025.

2. Defendant (through Hickey) is ordered to provide an explanation and accounting, supported by up-to-date financial statements, ledgers, invoices, or other supporting documentation, as to how the money from the November 1, 2024 and December 30, 2024 wire transfers (e.g., the Prepaid Rents) was spent.

3. Defendant (through Hickey) is further ordered to provide a declaration, supported by up-to-date documentation, accounting the expenditures made to Hartford Insurance, Pacific Workplaces, Jeffer Mangels, and Veriliant. Defendant's explanation and accounting must be provided to the Receiver by May 29, 2025.

4. By June 5, 2025, the Receiver shall submit a report to the Court regarding whether Defendant's accounting is satisfactory and whether the June 12, 2025 hearing is necessary.

5. ~~Such other relief as the Court may deem just and appropriate.~~

DATED: 5/29/2025     per MN By: ______________________

Hon. Victor M. Hwang
Judge of the Superior Court

# EXHIBIT "I"

Kevin Singer
Superior Court Receiver
Receivership Specialists
One Sansome Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 590-4823
Facsimile: (415) 946-8837
Kevin@ReceivershipSpecialists.com
efilings@receivershipspecialists.com

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
06/05/2025
Clerk of the Court
BY: ERNALYN BURA
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

LONE OAK FUND, LLC, a California limited liability company,

Plaintiff,

v.

2700 SLOAT HOLDINGS LLC, a Nevada limited liability company; and DOES 1 through 50, inclusive,

Defendants.

AMINAM, LLC, a California limited liability company,

Nominal Defendants.

CASE NO. CGC-25-622590

**RECEIVER KEVIN SINGER'S REPORT REGARDING DEFENDANT'S ACCOUNTING AND JUNE 12, 2025 OSC HEARING**

**HEARING INFORMATION**
Date: June 12, 2025
Time: 9:30 a.m.
Dept.: 501

Court: Civic Center Courthouse
400 McAllister Street
San Francisco, CA, 94102

Case filed: February 20, 2025
Trial Date: None set

**TO ALL PARTIES, INTERESTED THIRD PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

Superior Court Receiver Kevin Singer (the "**Receiver**") hereby submits this report (the "**Report**") pursuant to the Court's May 29, 2025 *Order Granting Receiver Kevin Singer's Motion for an Order to Show Cause re Turnover of Receivership Estate Property* (the "**OSC Order**"), which granted the Receiver's motion[1] for an Order to Show Cause why Defendant 2700 Sloat

[1] The Motion was originally presented as an ex parte application, which the Court converted to a noticed motion via its May 1, 2025 "Order Granting Receiver Kevin Singer's Ex Parte Application for an Order to Show Cause re Turnover of Receivership Estate Property or, in the alternative, Setting the Application for Hearing as a Motion on Shortened Time".

Holdings LLC ("**Defendant**") and its principal, Raelynn Hickey ("**Hickey**") should not immediately turn over $415,584.59 in prepaid rents (the "**Prepaid Rents**") collected from the Receivership Estate real property commonly known as 2700-2750 Sloat Boulevard, San Francisco, California 94116 (the "**Property**") shortly before the Receiver was appointed and/or provide a comprehensive accounting for the disposition of the Prepaid Rents (the "**Motion**").

**I. The Court's OSC Order and Defendant's subsequent filing**

The OSC Order scheduled a further hearing for June 12, 2025 and directed Defendant (through Hickey) to "provide an explanation and accounting, supported by up-to-date financial statements, ledgers, invoices, or other supporting documentation, as to how [the Prepaid Rents] was spent" and to "provide a declaration, supported by up-to-date documentation, accounting the expenditures made to Hartford Insurance, Pacific Workplaces, Jeffer Mangels, and Veriliant". The explanation and accounting were to be provided to the Receiver by May 29, 2025. Finally, the OSC order directed the Receiver to "submit a report to the Court regarding whether Defendant's accounting is satisfactory and whether the June 12, 2025 hearing is necessary".

On May 29, 2025, Defendant served *Defendant 2700 Sloat Holding LLC, a Nevada Limited Liability Company's Declaration in Compliance with Court Order of May 22, 2025* ("**Defendant's Declaration**").

Upon review of Defendant's Declaration, the Receiver must unfortunately report that **Defendant's purported "accounting" is entirely unsatisfactory and the June 12, 2025 hearing remains necessary because Defendant has continued to defy the Court's orders**. No actual accounting was presented, and Defendant's Declaration largely reiterates prior arguments and attaches previously-provided exhibits, none of which directly address the disposition of the Prepaid Rents. The only novel evidence presented appears to confirm that at least $79,000 of the Prepaid Rents was directly transferred to Defendant's manager.[2]

/ / /

[2] Additionally, Defendant's Declaration fails to present any actual accounting for the expenditures allegedly made to Hartford Insurance, Pacific Workplaces, and Jeffer Mangels, which the OSC Order required.

### II. Defendant's Declaration fails to provide a proper accounting

Defendant's Declaration is primarily devoted to arguing that Defendant was allowed to reimburse itself for the Property's operating expenses and was not obligated to turn over the Property's rents to Plaintiff Lone Oak Fund, LLC ("**Plaintiff**"). Whether or not Defendant is correct, this argument is irrelevant to the issue at hand: Defendant's failure to comply with a lawful court order which required it to turn over all prepaid rents and accounting records to the Receiver. Critically, nowhere in Defendant's Declaration does Defendant explain how the Prepaid Rents were spent, nor does Defendant provide any accounting records or bank statements regarding the disposition of the Prepaid Rents. At the absolute minimum, Defendant was obligated to provide copies of bank statements for the account into which the Prepaid Rents were paid for November 2024 through March 2025, which statements are undoubtedly in Defendant's possession. Accordingly, Defendant and Hickey have failed to comply with the OSC Order, and the Court should order the immediate turnover of the Prepaid Rents and authorize the Receiver to, *inter alia*, levy upon Defendant and Hickey's bank accounts to collect said funds.

The exhibits provided with Defendant's Declaration are largely items which were previously provided to the Receiver and the Court—the same items which were so unsatisfactory that the Court issued the OSC Order. To wit:

- Exhibits A through L and O are Plaintiff's interest invoices for February 2023 through February 2024.
- Exhibit M is the Property's lease.
- Exhibit N is a 2023-24 insurance policy.
- Exhibit P is the closing statement for Plaintiff's loan to Defendant dated August 4, 2022.
- Exhibit Q is Defendant's March 10, 2025 letter to the Receiver (which refused to provide the accounting records the Receiver requested).
- Exhibits R and S are 2024 secured property tax bills for the Property.
- Exhibit T—the relevant and novel information contained in Defendant's Declaration—is a list of transactions, clearly copied/pasted from a bank statement, seemingly showing payments made between "9/3" and "12/31"—presumably of 2024—including several large

payments to Plaintiff. Despite clearly possessing the underlying bank statement, Defendant failed to provide it, despite repeated instructions from the Receiver and orders from this Court.

- Exhibit U is a property tax payment receipt from April 10, 2024.
- Exhibit V is the tenant's insurance certificate.
- Exhibits W, X, and Y are a consulting agreement and two wire transfer records from 2022, all relating to vendor Verliant.

Critically, **none of these exhibits directly address the disposition of the Prepaid Rents**, and only Exhibit T provides any insight whatsoever (and only in the sense that it appears to reflect payments made by Defendant from some unspecified bank account after the November 1, 2024 wire was received). But Exhibit T raises more questions than it answers, as it shows unexplained transfers of $89,046.29 on October 30, 2024 and $79,000 on November 25, 2024 to "CH Planning LLC"—which is Defendant's manager—thereby evidencing that Defendant pocketed at least some of the Prepaid Rents. No accounting records whatsoever were provided, not even a simple list of specific expenditures made on behalf of the Property and corresponding reimbursements from the prepaid rents. Defendant has merely tripled down on its untenable position and refusal to provide an accounting or bank statements, wasting the Court's and the Receiver's time in the process.

Most remarkable is paragraph 6 of Defendant's Declaration, quoted verbatim as follows:

> Defendant 2700 SLOAT contends that this Courts earlier comments in the Tentative Ruling related to its conclusion that defendant 2700 SLOAT was treating the November and December 2024 prepaid rents as "offsets" payments for expenses incurred by defendant prior to the creation of the Receivership ***is very possibly correct***, in the sense that such offsets have always been allowed under the terms of the Lone Oak Fund loan to defendant as demonstrated by Declarations #s 4 & 5 above of defendant 2700 SLOAT. (*See* Defendant's Declaration at p. 3:11 – 16.) (emph. added.)

Defendant ***has actual knowledge*** of what became of the Prepaid Rents, including whether they were applied as reimbursements to Defendant for prior expenditures. By characterizing the Court's description of how the Prepaid Rents were applied as "very possibly correct" instead of simply explaining how the Prepaid Rents were applied, Defendant has willfully refused to comply with the OSC Order.

## III. Conclusion

Perhaps Defendant properly applied the Prepaid Rents to reimburse itself for legitimate expenditures made on behalf of the Property. But Defendant has failed to provide any evidence demonstrating that this occurred, despite undoubtedly possessing, at minimum, bank statements reflecting the disposition of the Prepaid Rents. Defendant's continued refusal to do so despite repeated opportunities and multiple Court orders constitutes contempt of Court and leads to the unavoidable conclusion that Defendant did not properly apply the Prepaid Rents to the Property's expenses. Accordingly, the Prepaid Rents (and Defendant's bank statements and actual accounting records) must immediately be turned over to the Receiver, and the Court should authorize the Receiver to levy on any bank accounts associated with Defendant, Hickey, and CH Planning LLC to obtain turnover.

DATED: June 5, 2025

Respectfully submitted,

By: ______________________________
Kevin A. Singer
Superior Court Receiver

# PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen and not a party to the within action; my business address is 11500 W Olympic Boulevard, Suite 530, Los Angeles, California 90064.

On June 5, 2025, I served the foregoing documents described herein as:

**RECEIVER KEVIN SINGER'S REPORT REGARDING DEFENDANT'S ACCOUNTING AND JUNE 12, 2025 OSC HEARING**

[ X ] BY EMAIL: I emailed said document to the email address(es) included in the attached Service List.

[ X ] BY FEDEX OVERNIGHT (NEXT DAY DELIVERY): I enclosed the documents in an envelope or package provided by FedEx and addressed to the offices of the listed address on the attached Service List. I placed the envelope or packaged for collection and overnight delivery at an office or a regularly utilized drop box of FedEx.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 5, 2025, at Los Angeles, California.

Jackson Wyche

**Service List**

| | |
|---|---|
| ***Via email only:*** | |
| Simon Aron, Esq.<br>Elsa Horowitz, Esq.<br>WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP<br>11400 West Olympic Blvd, 9th Floor<br>Los Angeles, CA 90064<br>saron@wrslawyers.com<br>ehorowitz@wrslawyers.com | *Counsel for Plaintiff Lone Oak Fund, LLC* |
| ***Via email and U.S. Mail:*** | |
| 2700 Sloat Holding LLC<br>c/o CH Planning LLC, Manager<br>Attn: Raelynn Hickey<br>201 Spear Street, Suite 1100<br>San Francisco, CA 94105<br>rh@ch-planning.com | *Defendant in pro per* |
| Aminam, LLC<br>Attn.: Ezri Namvar<br>1212 Wilshire Boulevard, Suite 555<br>Los Angeles, CA 90025<br>ezrinamvar@gmail.com | *Nominal Defendant* |
| Raelynn Hickey<br>1663 35th Avenue<br>San Francisco, CA 94122<br>rh@ch-planning.com | *Interested Party/Third Party* |
| ***Via U.S. Mail only:*** | |
| Aminam, LLC<br>Attn: Shira M. Namvar<br>12173 Leven Lane<br>Los Angeles, CA 90049 | *Nominal Defendant* |
| 2700 Sloat Holding LLC<br>c/o Registered Agents Inc.<br>401 Ryland Street, Suite 200a<br>Reno, NV 89502 | *Defendant in pro per* |
| ***Courtesy service via email:*** | |
| John Hickey<br>jh@lifetimeaffordablehousing.org | *Interested Party/Third Party* |
| Daniel Namvar<br>daniel@shatar.com | *Interested Party/Third Party* |
| Mark S. Hall, Esq.<br>ESTAVILLO LAW GROUP<br>mark@estavillolaw.com<br><br>Copy to Nicole Gibson, paralegal<br>nicole@estavillolaw.com | *Counsel for Defendant 7200 Sloat Holding LLC and Raelynn Hickey (no substitution of counsel on file yet)* |

# EXHIBIT "J"

Mark S. Hall (Bar No. 150681)
Jason W. Estavillo (Bar No. 188093)
ESTAVILLO LAW GROUP
555 12th Street, Suite 1280
Oakland, CA 94607
Telephone: (510) 982-3001
Facsimile: (510) 982-3002
Email: mark@estavillolaw.com

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**05/29/2025**
**Clerk of the Court**
**BY: MARK UDAN**
**Deputy Clerk**

Attorneys for Defendant 2700 SLOAT HOLDING LLC, a Nevada limited liability company

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, CIVIC CENTER COURTHOUSE

LOAN OAK FUND, LLC, a California limited liability company,

Plaintiff,

vs.

2700 SLOAT HOLDING LLC, a Nevada limited liability company; DOES 1 through 50, inclusive,

Defendants.

AMINAM, LLC, a California limited liability company,

Nominal Defendant.

Case No.: CGC-25-622590

**DEFENDANT 2700 SLOAT HOLDING LLC, A NEVADA LIMITED LIABILITY COMPANY'S DECLARATION IN COMPLIANCE WITH COURT ORDER OF MAY 22, 2025**

**HEARING INFORMATION**
Date:
Time:
Dept:
Hon.:

Court: Civic Center Courthouse
400 McAllister Street
San Francisco, CA, 94102
Complaint filed: February 20, 2025

Case filed: February 20, 2025
Trial Date:

**DECLARATION OF RAELYNN HICKEY CEO OF 2700 SLOAT HOLDING LLC**

I, RAELYNN HICKEY declare as follows:

1. I am the Chief Executive Officer of 2700 SLOAT HOLDINGS LLC ("2700 SLOAT"), a Nevada limited liability company qualified to do business in California. I have provided the following documents attached as exhibits to the Receiver and provide them to the Court in compliance with the Order of May 22, 2025. I have personal knowledge of the facts set forth in this declaration, and if called to testify, I could and would competently testify thereto.

2. 2700 SLOAT is the borrower under a loan agreement dated August 3, 2022, with Lone Oak Fund, LLC, in the original principal amount of $10,000,000, secured by real property located at 2700 and 2750 Sloat Blvd., San Francisco, CA 94116.

3. On May 22, 2025, the Court ordered the defendant, 2700 SLOAT, to provide this declaration and supporting documentation so as how the money from November 1, 2024, and December 30, 2024 "was spent". Defendant was further ordered to provide this Declaration "… Accounting. The expenditures made to Hartford Insurance, Pacific Workplaces, Jeffer Mangels, and Veriliant. Explanation and accounting must be provided to the receiver by May 29, 2025."

4. Defendant 2700 SLOAT, contends that it was allowed to spend the rents received from the Garden Center tenant lease on expenses related to holding and developing the property. The loan from Lone Oak Fund included a $3,000,000 amount that was held by Lone Oak and released to defendant as "reimbursements of expenses paid" upon submission to Lone Oak of paid expense receipts for development and property expenses (architects, engineers, landscape and utility consultants, affordable housing consultants, insurance, taxes, etc., anything related to the on-going development efforts of the defendant for the 2700 Sloat development site) incurred and paid by defendant. The total $3,000,000 expense reimbursements funds had been submitted to Lone Oak, reviewed and approved by Lone Oak, and paid as reimbursements to defendant 2700 SLOAT, by Lone Oak prior to the start of the 2024 year.

5. Defendant 2700 SLOAT further contends that the use of the rents received (including prepaid rents) from the Garden Center tenant lease was and remains approved for use by



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

defendant (subject to the current receivership restrictions) to pay project and property expenses under the Lone Oak loan documents. Defendant believes this position is substantiated by the existence of an approximate initial $1,000,000 Interest Reserve included in the loan to Defendant from Lone Oak. Lone Oak Fund would send a monthly invoice for the currently monthly interest expense amount due and automatically deduct such amount from the $1,000,000 Interest Reserve funds that were in Lone Oak's possession. There was no requirement in the Lone Oak Loan documents that required defendant 2700 SLOAT to pay the monthly lease revenue to Lone Oak and Lone Oak Fund never requested that any of the lease revenues be paid to them to offset or supplement the $1,000,000 Interest Reserve funds they were applying to the payment of the invoiced monthly interest payment due on the Lone Oak Fund loan to defendant 2700 SLOAT.

6. Defendant 2700 SLOAT contends that this Courts earlier comments in the Tentative Ruling related to its conclusion that defendant 2700 SLOAT was treating the November and December 2024 prepaid rents as "offsets" payments for expenses incurred by defendant prior to the creation of the Receivership is very possibly correct, in the sense that such offsets have always been allowed under the terms of the Lone Oak Fund loan to defendant as demonstrated by Declarations #s 4 & 5 above of defendant 2700 SLOAT.

7. Defendant 2700 SLOAT has previously, on multiple occasions, informed the Receiver that defendant did not create or keep ledgers or other books related to the Garden Center lease activity. Defendant 2700 SLOAT was solely pursuing development of the 2700 SLOAT property. The Garden Center tenant previously sold the 2700 Sloat property to defendant 2700 SLOAT in 2020 and was remaining on site as a holdover of possession from the sale until construction was planned to commence. The property was not purchased or held for retail commercial investment purposes.

8. I have attached all supporting documents that substantiate this declaration as Exhibits A through Y.


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 29th day of May, 2025, at San Francisco, California.

Raelynn Hickey

RAELYNN HICKEY, CEO of 2700 SLOAT HOLDINGS LLC

## EXHIBIT INDEX

| EXHIBT | DESCRIPTION |
|---|---|
| A | January 2024 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| B | February 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| C | March 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| D | April 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| E | May 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| F | June 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| G | July 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| H | August 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

| | |
|---|---|
| I | September 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| J | October 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| K | November 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| L | December 2023 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan |
| M | Fully Executed Lease Agreement for 2700 Sloat Property Renovation (Dated September 8, 2022) |
| N | Hartford Business Owner's Insurance Policy for 2700 Sloat Holding LLC (Policy Year 2023–2024) |
| O | February 2025 Interest Invoice from Lone Oak Fund for 2700 and 2750 Sloat Blvd Loan (Invoice No. 85679) |
| P | Final Loan Closing Statement Between Lone Oak Fund and 2700 Sloat Holding LLC (Dated August 4, 2022) |
| Q | March 10, 2025 Response to Receiver's Letter Regarding Lone Oak Foreclosure |
| R | 2024 Secured Property Tax Bill for 2750 Sloat Blvd (Parcel 2514-007), San Francisco |
| S | 2024 Secured Property Tax Bill for 2700 Sloat Blvd (Parcel 2514-008), San Francisco |
| T | Sep - Dec 2024 payments to Lone Oak - and Recurring vendor payments to Hartford Pacific Work Places Verliant |

| | |
|---|---|
| U | April 10, 2024 San Francisco Tax Collector Payment Portal Receipt for Property Taxes |
| V | Sloat Garden Center – Certificate Insurance for Lease |
| W | Proof of $10,000 Wire Transfer from 2700 Sloat Holding LLC to Verliant Energy – Retainer Payment (Dated August 18, 2022) |
| X | Proof of $11,000 Wire Transfer from 2700 Sloat Holding LLC to Verliant Energy – Retainer Payment (Dated July 29, 2022) |
| Y | Verliant Energy Consulting Agreement for Utility and Energy Feasibility Study at 2700 Sloat Blvd (Signed July 1, 2022) |


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

EXHIBIT A

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 1/1/2024 | 80964 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 1/1/2024 | 08/03/2022 | $10,000,000 | 6.90% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $10,000,000 | 30 | 1,916.66667 | 57,500.00 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $57,500.00 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $57,500.00 |

**LOAN IS ALL DUE JANUARY 31, 2024**
**MATURITY INTEREST BEGINNING FEBRUARY 1, 2024 IS 24.00%.**

**NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.**

EXHIBIT B


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 2/1/2023 | 77521 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 2/1/2023 | 08/03/2022 | $8,588,000 | 6.40% | 01/31/2024 |

| Principal Balance | From | To | No. of Days | Daily Rate | Amount |
|---|---|---|---|---|---|
| $8,343,000 | 01/01/23 | 01/12/23 | 12 | 1,483.20 | 17,798.40 |
| $8,588,000 | 01/13/23 | 01/31/23 | 18 | 1,526.75556 | 27,481.60 |

Payments are due on the 1st and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $45,280.00 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $45,280.00 |

**NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.**

EXHIBIT C



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

# Invoice

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

| Date | Invoice # |
|---|---|
| 3/1/2023 | 77726 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 3/1/2023 | 08/03/2022 | $8,588,000 | 6.40% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $8,588,000 | 30 | 1,526.75556 | 45,802.67 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $45,802.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $45,802.67 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT D

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 4/1/2023 | 78039 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 4/1/2023 | 08/03/2022 | $8,588,000 | 6.40% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $8,588,000 | 30 | 1,526.75556 | 45,802.67 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $45,802.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $45,802.67 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT E

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

# Invoice

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

| Date | Invoice # |
|---|---|
| 5/1/2023 | 78371 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 5/1/2023 | 08/03/2022 | $8,960,000 | 6.40% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $8,960,000 | 30 | 1,592.88889 | 47,786.67 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $47,786.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $47,786.67 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT F



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

# Invoice

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

| Date | Invoice # |
|---|---|
| 6/1/2023 | 78696 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 6/1/2023 | 08/03/2022 | $8,960,000 | 6.40% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $8,960,000 | 30 | 1,592.88889 | 47,786.67 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $47,786.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $47,786.67 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT G

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 7/1/2023 | 79022 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 7/1/2023 | 08/03/2022 | $9,713,000 | 6.40% | 01/31/2024 |

| Principal Balance | From | To | No. of Days | Daily Rate | Amount |
|---|---|---|---|---|---|
| $8,960,000 | 06/01/23 | 06/07/23 | 7 | 1,592.88889 | 11,150.22 |
| $9,713,000 | 06/08/23 | 06/30/23 | 23 | 1,726.75556 | 39,715.38 |

Payments are due on the 1st and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $50,865.60 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $50,865.60 |

**NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.**

EXHIBIT H

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 8/1/2023 | 79333 |

| Bill To |
|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 |

| Property Located At |
|---|
| 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 8/1/2023 | 08/03/2022 | $9,713,000 | 6.40% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $9,713,000 | 30 | 1,726.75556 | 51,802.67 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $51,802.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $51,802.67 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT I

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 9/1/2023 | 79651 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 9/1/2023 | 08/03/2022 | $9,713,000 | 6.90% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $9,713,000 | 30 | 1,861.65833 | 55,849.75 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $55,849.75 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $55,849.75 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT J

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 10/1/2023 | 79963 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 10/1/2023 | 08/03/2022 | $10,000,000 | 6.90% | 01/31/2024 |

| Principal Balance | From | To | No. of Days | Daily Rate | Amount |
|---|---|---|---|---|---|
| $9,713,000 | 09/01/23 | 09/07/23 | 7 | 1,861.65833 | 13,031.61 |
| $10,000,000 | 09/08/23 | 09/30/23 | 23 | 1,916.66667 | 44,083.33 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $57,114.94 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $57,114.94 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT K

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

# Invoice

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

| Date | Invoice # |
|---|---|
| 11/1/2023 | 80295 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 11/1/2023 | 08/03/2022 | $10,000,000 | 6.90% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $10,000,000 | 30 | 1,916.66667 | 57,500.00 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $57,500.00 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $57,500.00 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT L


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 12/1/2023 | 80616 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 12/1/2023 | 08/03/2022 | $10,000,000 | 6.90% | 01/31/2024 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $10,000,000 | 30 | 1,916.66667 | 57,500.00 |

Payments are due on the 1st
and late after the 10th of each month.

Amount due will be deducted from your reserve account with Lone Oak Fund.

| | |
|---|---|
| **Total** | $57,500.00 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $57,500.00 |

NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

EXHIBIT M

PACIFIC WORKPLACES

# Client Summary

## CLIENT INFORMATION

Company Name: 2700 Sloat Holding LLC

User Name(s): Raelynn Hickey

Address: 1 East Liberty Street Suite 600 (Street address) | Reno (City) | NV (State) | 89501 (Zip)

Phone: 415-601-2326 Email: rh@2700sloat.com

## OPERATOR INFORMATION

Location: Reno Community Manager: Travis Leffew

Address: 1 E Liberty Street Suite 600 (Street address) | Reno (City) | NV (State) | 89501 (Zip)

Phone: 775-360-2000 Contact Email: travis@pacificworkplaces.com

## TERM

Commencement: 09 (Month) / 01 (Day) / 2022 (Year)

- [ ] Month to Month
- [ ] 6 months
- [ ] 12 Months
- [x] 3 Months
- [ ] Weekly

## DEDICATED USE

Office#(s): 5A Max Office Occupancy: 1 Monthly Office Fee: $ 585.00

Building-Suite: Dedicated Desk Occupancy: Monthly Dedicated Desk Fees:

- [x] Kick Starter
- [ ] Standard
- [ ] Full
- [ ] 20 Credit Add On
- [ ] Other:

**Monthly Dedicated Use Total:** $ 585.00

## VIRTUAL OFFICE SUBSCRIPTION *(if applicable)*

- [ ] Mail Plan
- [ ] On-The-Go Office
- [ ] V-Office
- [ ] V-Office Plus
- [ ] Mail Plan – Add. Users
- [ ] On-The-Go Office - Add. Users
- [ ] V-Office - Add. Users
- [ ] V-Office Plus - Add. Users
- [ ] 20 Credit Bundle - Stand Alone
- [ ] 20 Credit Bundle - Add On
- [ ] 2 mo. free when pre-paying for first 10 mo. upfront. First 12 mo.-New Member subscription Only
- [ ]

**Monthly Subscription Use Total:**

PACIFIC WORKPLACES

# Client Summary (continued)

## MAIL FOWARWARDING ADDRESS *(if applicable)*

Friday Mail Forward (Name):

Address:

(Street address) (City) (State) (Zip)

## ADDITIONAL MONTHLY SERVICES

☐ VO 24/7 Access ☐ Directory Listing ☐ Extended Live Answering ☐ Call Patching

☐ Call Screening ☐ Portable Phone Number ☐ Digital Mail ☐ Additional DBA - dba paperwork required

**Additional Monthly Services Total:** $

## DEPOSITS, SET UP AND INSTALLATION

Refundable Svc./Sec. Deposit: $ 549.00 Keys (Access card, Suite, Office, Mailbox:

Office/Dedicated Set Up: $ 99.00 Virtual Office Set Up:

Lobby Listing Installation

**Deposits, Set up and Installation Total:** 648.00

**By signing below, Client agrees to the Terms of Use established in the attached and agree that the details included in the Client Summary are inclusive to the Agreement with operator.**

## SIGNATURE *(please print and sign below)*

Client Name: Raelynn Hickey Signature: DocuSigned by: Raelynn Hickey D857D1F6154747A...

Date 9/01/2022

Manager Name: Travis Leffew Signature: DocuSigned by: Travis Leffew 501DB4F557E4422...

Date 9/01/2022

**Due Now:** $ 684.00 **Recurring Monthly Total Summary:** $ 585.00

Dedicated Use: (Includes 1st month service, deposits, setups/installations)

Virtual Office Subscription:

Month-to-Month & 6 Month: (Includes 1st month service, deposits, setups/installations) 12 Month (Includes 10 Months Service, deposits, setups/installations)

Client License Agreement and Terms of Use

*We know that Agreements are never fun to read, but we have taken the time to draft this so that our Client relationship goes as smoothly as possible with no surprises. Please take the time to read this and reach out to our staff right away if you have questions or concerns. Thank you.*

1. Definitions:

Operator: Refers to one or more entities operating serviced office or coworking facilities, known collectively as Pacific Workplaces.

Client: Refers to a company or an individual who has subscribed to use services and/or access space from Operator. Clients include full time licensees, virtual licensees, coworking licensees, and monthly, multi-day pass licensees.

Client Summary: Refers to the attached document which details the specific and variable elements that make this Agreement unique to Client. If purchased online, the Client Summary includes the information contained in the Package Order Receipt and corresponding Invoice.

Users: Refers to the individuals identified to use services and access space under the Client's Agreement. Under the terms of this Agreement, Client can purchase plans for additional Users at any of Operator's locations at their then current location rates.

Premises: Refers to the entire suite of offices and related support facilities managed by Operator.

Dedicated Space Subscription: Refers to Client's plan that includes the licensed use of a dedicated office or desk space.

Virtual Office and Open Coworking Subscription: Refers to Client's plan that includes a monthly service package made up of some component of temporary desk or meeting space, telephone answering services and business address use, typically referred to as '*Virtual Office*", "*Open Coworking*", or "*All Access Pass*" plans.

Service Plans: Refers to optional services available for purchase on a per user basis. The Service Plans may include some or all of the following (non-exhaustive list): Internet, Phone Equipment, Call Answering Services, Furniture, Beverage Services, Meeting Room Credits, Copy and Scanning, Administrative and Mail Management Services. Service plans are purchased and run concurrent with the Term of this Agreement.

Pass-Through Fee: Refers to credit card processing fees incurred by Operator and charged back to Client regardless of client type or subscription type, including one-time credit card transactions for hourly Meeting Room, Day Office, and Day Pass purchases. There will be a pass-through fee charged for all credit and debit card transactions. This pass-through fee will not be returned if transaction is refunded for any reason. ACH transactions will be processed free of charge.

Common Areas: All public space in the building which Operator resides, plus open space in Premises, including but not limited exclusively to: Business Lounge, Reception Area, Bathrooms, Hallways, and Copier space.

Client License Agreement and Terms of Use: Refers to the terms of business to which Operator and Client agree. Referred to hereinafter as simply "Agreement."

Notice: Refers to the email address or premises address to which Client notification must be given. For Operator, Notice may be given in writing to either address of the location where Client's services are primarily provided, or emailed to the same location at (example email address) location@PacificWorkplaces.com or, if unknown, to info@PacificWorkplaces.com.

DS RH

DocuSign Envelope ID: 8795892E-E5FE-4BC8-AAFA-629948E5E5F5

2. License:

License: Subject to the terms and conditions of this Agreement, Operator grants Client a non-transferable license to occupy and use the Premises ("License") during the term of this Agreement, and Client accepts such License. This Agreement is the commercial equivalent of an agreement for accommodations in a hotel. The whole of the Premises remains in Operator's possession and control. CLIENT ACCEPTS THAT THIS AGREEMENT CREATES NO TENANCY INTEREST, LEASEHOLD ESTATE, OR OTHER REAL PROPERTY INTEREST IN CLIENT'S FAVOR WITH RESPECT TO THE ACCOMMODATIONS. Operator is providing Client the right to share with Operator the use of the Premises on these terms and conditions, as supplemented by the House Rules (described in Section 4), so that Operator can provide the services to Client. This Agreement is personal to Client and cannot be transferred to anyone else without the prior written consent of Operator. Operator will not unreasonably withhold consent to assignment to a parent, subsidiary, or affiliate of Client provided that Client and assignee execute Operator's form of agreement of Client License Agreement and Terms of Use which will require assignee to assume all Client's obligations under the Agreement. Such assignment will not release Client from its obligations under this Agreement.

3. Term of Agreement:

Initial Term: This Agreement shall commence on date specified on Client Summary, so shall the number of months agreed to for the initial term. This Agreement does NOT terminate automatically. Unless notice, under the timelines detailed in Section 8 below: Termination of Agreement, is received by Operator, this Agreement will be automatically extended under the terms and conditions set forth below, for successive periods equal to the initial term. Regardless of commencement or notice date, this Agreement can only be terminated by Client at the end of a calendar month.

4. House Rules:

House Rules: During the term of this Agreement, Client agrees to adhere to all terms, conditions, and policies provided by Operator relating to the use of the Common Areas, Premises, including building security procedures, IT access and use procedures, maximum occupancy limitations, specific state law requirements, and other terms or procedures provided by Operator ("House Rules"). The House Rules, the most recent version which is attached, may be revised and amended by Operator without the prior consent of Client, provided that Operator will provide Client notice of such revisions and/or amendments. In the event of a conflict between the terms of this Agreement and the House Rules, the House Rules shall govern and control.

5. Office Use, Office Services, & Monthly Fees:

Office Use:

Dedicated Space Subscription: The monthly fee for Clients who have contracted for the specific use of a uniquely identified office or a dedicated desk space includes: a) dedicated use of a desk or office space, b) access to shared center amenities, c) light janitorial maintenance, building operating expenses, and taxes, d) utilities and heating and air conditioning (where available) during "normal" business hours, and e) after-hours access to the Premises.

Virtual Office and Open Coworking Subscription: The monthly fee for Clients who have contracted for a Virtual Office and Open Coworking Subscription includes: a) access to shared center amenities, b) light janitorial maintenance, building operating expenses, and taxes, c) utilities and heating and air conditioning (where available) during "normal" business hours, and e) if plan permits, after-hours access to the Premises.

DS RH

Office Services and Administrative Set Up Fees:

Dedicated Space Subscription: Clients may choose a Service Plan or avail themselves of services on an a la carte basis. The Client's Service Plan commitment, which is included on the Client Summary, is part of the fixed monthly package and runs concurrent with the term of this Agreement. Terminations or downgrading of Service Plans may only occur with notice at term.

Client will be charged an up front, per User, non-refundable Administrative/Set Up fee dependent upon the Service plan chosen.

Virtual Office and Coworking Subscription: Client may take advantage of additional service offerings on a per User, per month basis. These services can only be terminated or downgraded with notice.

Clients agree to a one-time, per User, non-refundable administrative fee paid upon signing this Agreement.

Where available and where applicable, and at a Client's request, a one-time directory signage set up fee may be charged. The amount charged varies depending on location.

Telephone Service:

When applicable, Operator will provide personalized phone services dependent on the Client's Service Plan from 8:30 a.m. to 5:00 p.m., Pacific Standard Time, Monday – Friday, holidays excluded (a list of holidays will be published by Operator each year). Client may purchase additional hours via Operator's 'Coast to Coast' add on service. Voicemail is accessible 24-hours per day to Client. Call answering services will only be provided to individual, named Users.

Unless pre-agreed, in writing, all components of the telephone service, including phone numbers and phone equipment issued by Operator but used by Client will remain at all times property of Operator. Client may request, upon commencement of this Agreement, a portable telephone number at an additional monthly fee. Client is not permitted to install any communication equipment, including telephone or network lines for internal or external use without prior written approval of Operator. Local and long-distance phone usage will be charged to Client at Operator's then marketed rates *plus applicable taxes*.

Business Address/Mail Service:

When applicable, Operator will act as an agent for Client in receiving mail and reasonably sized packages when such are delivered to Client in conjunction with services to Client. Depending upon plan, Client may be required to complete and submit to Operator a USPS Form 1583 which will become part of this Agreement and service will NOT commence prior to the completed forms being notarized, returned, and reviewed by Operator's staff. Any violation of USPS laws, rules, and/or regulations by Client may result in immediate termination of services by Operator. Operator will accept mail in Client's name, as detailed in this Agreement, and any additional, pre-agreed upon User names only. Operator is not responsible for mail returned to sender for improper address. Client authorizes Operator to sign for mail and packages deliverable only upon signature and agrees to pick up mail and packages in a timely manner or storage fees may apply. Note: DBA's or additional company names require separate CMRA forms and will incur additional charges for Address/Mail services.

Mail Management Services:

Mail Forwarding: Where forwarding is available and upon written instruction, Operator will forward mail and deliveries to another address by repackaging and posting the contents of Client's mail and deliveries. Mail and packages will not be forwarded to other 3rd party agents for delivery addresses. Client agrees to pay for

DS RH

administrative costs, supplies, and postage to accommodate forwarding. Operator is not responsible for any delay or loss of mail during the forwarding process. International forwarding of packages is not available in all cases. Overnight and express forwarding of packages may require Client's account number, at the discretion of Operator. Operator is not responsible for mail returned to sender for non-payment of service fees.

Client agrees that administrative charges will apply if Client requests, Operator's staff to retrieve, read, or review the contents of Client's mail.

Scanning Services: If Client choses to have Operator open and scan the contents of its mail, Client agrees that, unless specifically requested in writing to discard mail, Operator will forward the accumulated mail, one time per month, at the then published service rates.

Hourly Meeting Room and Day Office Use:

Client will be required to use Operator's online booking system or submit a request via email to reserve space. Space is available on a first-come, first-served basis. Cancellation of any booking must be made 24 hours prior to commencement or Client will be charged the full amount of the booking or have its credit value deducted. All bookings will be invoiced a minimum of one full hour and then in subsequent full hour increments. An allotment of credits (to be use against hourly use of meeting rooms and open desk coworking) are available for purchase or included in some service plans. Credits are NOT transferable; Client or pre-identified Users must be present at all meetings. Overage may be charged at a discounted rate depending on Client's service plan.

Network and Internet Connectivity:

Operator will provide Client with access to the internet in the form of a shared fiber gateway. The standard shared fiber connection is available for individual internet access for all Operator's clients using secured VLANS for wired connectivity and standard WPA1/2 encrypted security for wireless. The service does NOT have a firewall, proxy server or other preventative measures against outside intrusions. Client acknowledges that the standard internet access service is provided 'as is'. Operator cannot be held responsible for any security intrusions, damages or faults that occur as a result of this service. The Operator recommends that Client place the following protections on all computers connected to the service: automatic virus scanning software, installation of personal computer firewalls, shutting down computers when not in use for long periods of time, unique ID and password for each computer.

Client may not use this service to publish, post, upload, distribute, or disseminate any inappropriate, profane, defamatory, obscene, indecent or unlawful topic, name, material, or information on or through Operator's servers or bandwidth. Client may not upload any information, including images or photographs, or video/film, software, content or other material protected by intellectual property laws, including, by way of example, but not as limitation, copyright or trademark laws (or by rights of privacy or publicity) unless Client owns or controls the rights thereto or has received all necessary consent to do so. Client may not download any files that Client knows or reasonably should know cannot be legally reproduced, displayed, performed, and/or distributed in such a manner. Client may not use the services in any way to restrict or inhibit other Clients from using and enjoying the Services. Operator is not responsible for any data, business, or other losses that result from interruption to the internet service provided by Operator. Client is responsible for protecting its own computers and data from electrical surges, theft, viruses, other malicious attacks, or network interruptions.

DS
RH

6. Monthly Fees

Monthly Fees: As a matter of convenience Operator will produce a monthly invoice, which will include all Client charges as of the first day of each month. Client may also access their payment portal throughout the month to review itemized charges. Payments are due on the 1st calendar day of the month. Clients may pay by credit card, debit card, ACH or by check. Operator will process credit and debit cards and ACH transactions on the 1st calendar day of the month. There will be a pass-through fee charged for all credit and debit card transactions. ACH transactions will be processed free of charge. Client agrees that any errors or delays in billing for additional charges may be corrected by Operator at any time. Client will have 30 days to dispute any charge from the date of the first invoice with disputed item. All disputed charges must be submitted to Operator in writing. Client agrees to pay any amount not in dispute by the due date.

Late Payment of Fees: Payment not made by close of business on 5th calendar day of each month will result in a late fee of $25.00 or 10% of the monthly fee, whichever is greater.

Dedicated Space Subscription: If Client is more than ten (10) calendar days past due, Operator shall have the right to declare Client in default. If after three (3) working days from notification of default, full payment for fixed charges has not been received by Operator, Operator may without further notice terminate all services provided under this Agreement, including, for avoidance of doubt, denying Client access to the Premises and/or Dedicated Space. If any part of the invoice is disputed, Client must pay the amount not in dispute by the due date, or be subject to late fees. Any dispute must be in writing and submitted to Operator within 30-days of the due date indicated on the invoice.

Virtual Office and Open Coworking Subscription: If Client has not paid by the 10th calendar day of the month, with or without notice, all services will be terminated: mail will be returned to sender, and phone services and access to meeting room space will be discontinued. Once in default, the total balance due must be paid in full and a re-activation fee of $99.00 will be assessed in order to resume services.

Declined payments: Any check, credit card transaction, wire-transfer, or other payment method that is declined for insufficient funds or other reasons shall result in a $25.00 fee per occurrence. Client remains subject to the timing and late fee provisions established above. In the event that Client's credit card is declined due to expiration, Client consents that Operator attempt, per credit card company rules, to add a date extension to the existing credit card data on file and re-run the card.

Taxes: Client agrees to pay for all sales, use, and consumption taxes which Operator is required to pay for via local tax regulations.

Renewal Escalations:

Dedicated Office Subscription: In the event of any automatic renewal, Operator reserves the right to raise the rent, up to 10% of the current rate, without notice, to adjust for changes in the market value of Client's office(s).

Virtual Office, Open Coworking and Dedicated Desk Subscriptions: Client agrees that an automatic 4% increase will be assessed annually to the monthly plan rate regardless of term or then published, new client pricing and/or discounts.

7. Manner of Use:

Manner of Use: Client may use the facilities and services for legitimate business purposes only. Client shall not conduct any activity on the Premises which is forbidden by law, hazardous, or may invalidate or increase the

DS
RH

premium of any insurance policy carried by the Operator or its partners. Client shall not conduct any activity which impairs the character, quiet enjoyment, reputation, appearance or operation of the business. Client agrees to strictly adhere to the reasonable rules and regulations mandated by Operator's landlord and staff. Client is responsible to ensure that its personnel and guests conduct themselves in a business-like and professional manner at all times. Operator may immediately terminate a Client's Agreement in Operator's sole discretion if Client, Client's employees, agents or guests use vulgar, abusive, violent or insulting language or demonstrates aggressive behavior directed toward or observed by any of the Operator's staff or takes action to disrupt the business environment of the Premises or if Client's business lawfulness is questioned by local, state or federal policing or regulatory authorities.

Damages to Premises: Client agrees to not damage, deface or alter the offices, meeting rooms, common areas, furniture, furnishings, walls, ceilings, floors or equipment or otherwise improperly use the space. If Operator is forced to make repairs due to Client's use of the space either by its employees or guests, Client will reimburse Operator for all costs associated with repair over and above normal wear and tear.

Sexual Harassment and Discrimination: Client and its employees, agents, and guests will not engage in legally prohibited acts of sexual harassment to any of Operator's employees. Client and Operator agree to comply with all laws prohibiting discrimination based on a person's sex, age, race, color, national origin, disability and/or religion and similar statues.

Confidentiality: Client acknowledges that during its participation in the use of the Premises, Client may be exposed to Confidential Information of Operator and/or other Clients. "Confidential Information" shall mean all information, in whole or in part, that is nonpublic, confidential, or proprietary in nature. Confidential Information includes, without limitation, information about business, sales, operations, know how, trade secrets, technology, products, employees, customers, marketing plans, financial information, services, business affairs, any knowledge gained through examination or observation of or access to the Premises, computer systems, and/or books and records of Operator or any Client, any analyses, compilations studies or other documents prepared by Operator or any Client or otherwise derived in any manner from the Confidential Information and any information that you are obligated to keep confidential or know or have reason to believe should be treated as confidential. Client's license obligates Client to: a) maintain all Confidential Information of Operator or any other Client in strict confidence, b) not disclose Confidential Information to any third parties, including any other Client, and c) not to use Confidential Information in any way directly or indirectly detrimental to Operator or any other Client. Operator shall have no liability arising from Client's disclosure, whether intentional or not, of any Confidential Information shared to third parties in or about the Premises.

8. Termination of Agreement:

Termination of Agreement: Any notice required or permitted under this Agreement must be in writing addressed to Operator via email (with confirmation from Operator) or delivered to Operator at the Premises. Client agrees Operator's written notice may be delivered via email or delivered to Client's designated mailbox.

Dedicated Space Subscription: Either party can terminate or downgrade space and services this Agreement at the end of the initial or subsequent terms within the time specified in the following schedule:

| # of offices | Required Written Notice |
|---|---|
| 1/Dedicated Desk(s) | No later than 30-days prior to termination date |
| 2-3 | No later than 60-days prior to termination date |
| 4 + | No later than 90-days prior to termination date |

DS RH

In any event, the termination of this Agreement shall be effective on the last calendar day of the month in which the last of required period falls. Failure to notify Operator of Client's intent to terminate shall result in an automatic renewal of this Agreement for subsequent periods equal in length to this Agreement.

Virtual Office and Open Coworking Subscription: Unless specified otherwise, Client must give at least 30 days' written notice to discontinue or downgrade service prior to the end of the initial term. Regardless of commencement or notice date, this Agreement can only be terminated on the last day of the calendar month.

Holding Over: If Client does not surrender possession of the Dedicated Space(s) promptly upon termination of this Agreement and does not have written permission of Operator, Client shall pay Operator for each day of such possession one-fifteenth (1/15th) of the amount of the monthly office fee plus all costs, expenses and damages sustained by Operator as a result of such possession and Client will continue to be bound be all the other terms and conditions of this Agreement.

Telephone Number and Mail Forward: Client acknowledges that the U.S. Postal Service will NOT accept a "Change of Address" request for any of Operator's Clients. Therefore, for ninety (90) days after termination of this Agreement, Operator will automatically invoice Client a fee of $99.00 for transitional services. During this period, Operator will hold or forward mail once per week, supplies and postage included and will re-direct callers to Client's new telephone number and address via voicemail instruction. One additional 90 day forwarding period may be purchased for $99.00, if the Client chooses. In the event that Client does not pay the invoice and adequate deposits are not available, the length of this transitional service will be pro-rated based upon available funds. Client further understands that at the expiration of the transition term, irrespective of length, all mail will be marked "Return to Sender" and the phone number, which is the property of Operator, will be assigned to another user.

Client's Personal Property: Upon vacating the Premises, client is expected to remove all personal property. Any personal property remaining on the Premises will be disposed of and costs of dispossession will be charged to Client. If dispossession includes the sale of said property, Operator has no obligation to the Client for any of the proceeds of the sale.

Closing Fees:

Dedicated Office Subscription: (Note, this applies to Dedicated Office Subscriptions only.) Upon termination of this Agreement, Client will return the Dedicated Space(s) and furniture in as good a condition as when client commenced use, normal wear and tear excepted. Client agrees to vacate the premises promptly and to leave the Dedicated Space in at least "broom clean" condition. Client will be invoiced for painting at a cost of $295.00 per Dedicated Space, plus repairs. Client will be invoiced for cleaning at a cost $99.00 per User. In addition, a charge of $89.00 will be assessed to disconnect each User with either/or telephone/network connections.

9. Service Deposits:

Service Deposits - Dedicated Office Subscriptions: Client agrees to deposit with Operator funds equivalent to the first full month's Monthly Fee, to Operator for advances made on Client's behalf for: a) all of its obligations, including: services and rents, b) as security for full performance by Client of the terms set forth in this Agreement, c) for the repair or correction of damage to client's office, furnishings, and/or equipment beyond normal wear and tear. Under no circumstances may Client use the Service Deposit in lieu of the last monthly payment of fixed or variable charges.

DS
RH

Service Deposits - Virtual Office and Open Coworking Subscription and Dedicated Desk Subscribers: Operator may waive Service Deposit fees so long as payment is made via Credit Card. If Client's credit card is declined for any reason and Client does not make alternative payment arrangements in order to insure timely payment, in accordance with 'Payment of Fees' provision above, Client will be in default. If such default occurs, Operator may request a refundable deposit to hold on account, interest-free, until such time as this Agreement is terminated and Client has paid Operator in full.

Keys: Where applicable, Clients will be given the number of keys (including, if required, fobs, mail keys, and access keys) according to the number of prescribed Users. Any key which is lost or stolen must be reported to Operator immediately and Client must pay the cost of replacement and re-keying, if necessary. Client shall not copy any key or allow anyone, through digital access or otherwise, to access the space under Client's access privileges without Operator's written consent. Client agrees to deposit with Operator $50.00 for each set of keys/ access cards assigned to Users.

Return of Deposit: Subject to Operator's rights under the preceding paragraph, the entire deposit, or any balance thereof after final Closing Fees and outstanding balances are assessed, shall be returned to Client within sixty (60) days after Client has terminated this Agreement, and, if applicable, completely vacated the premises and/or surrendered all keys.

Remedies Upon Client's Default: On default, Operator may choose any or all of the following remedies: a) terminate this Agreement, b) accelerate all rent payments payable under this Agreement, c) demand security deposit or additional deposits, d) take any action authorized by law to recover office space and Operator's property from Client, e) Operator may immediately cease providing Client with any or all services, including telecommunications and network/IT services. Client agrees that the withholding of services without the compliance with the provisions of any applicable unlawful detainer or eviction statute which only governs the physical occupancy of the office(s) and is inapplicable to other services such as telecommunications, reception services, network access, conference rooms, parking, etc. Client agrees that Operator is incapable of mitigating damages for breach of this Service Agreement.

10. Miscellaneous Provisions

Occupancy: If occupancy cannot be provided by Operator for any reason by the commencement date stated above, Operator shall not be liable for any damages, but rent shall not accrue until occupancy can be provided.

Relocation: Dedicated Space Clients agree that upon 30 days' written notice Operator may require that you relocate to another office/desk space within the premises. Operator will make space available of approximate equal size (or larger) and similar configuration for the remainder of the term at a rate no greater than Client's current Monthly Fees for the same number of users.

Insurance: Client understands that Operator does not provide any insurance for Client's benefit. Client agrees to insure, at its own expense, its personal property from all perils and assumes all risk of loss with respect to its property and that of its employees, agents and guests. Client agrees to endorse Operator as additional named insured on its policy.

Media Consent: From time to time Operator takes videos and photos of the space, particularly during community events. These videos and photos may be posted to Operator's website and social media accounts. Users of the space expressly consent to the use of any photos or video which include their likeness on Operator's website or social media postings.

DS
RH

Waiver: Client acknowledges that due to the imperfect nature of verbal, written, and electronic communications and equipment, Operator shall not be responsible for damages, direct or consequential, which may result from the failure of Operator to furnish any service, including but not limited to the service of conveying messages, communications, and other utility or services described under this Agreement or agreed by Operator. This indemnification of liability includes any perceived loss of business, profits, or anticipated earnings that rises out of or in connection with the Client's use of Operator's services including telephone, voicemail, phone answering, mail delivery or mail forwarding, internet and computer services. Client's sole remedy and Operator's sole obligation for any failure to render any service, any error or omission or any delay or interruption with respect thereto, is limited to an adjustment to Client's billing in an amount equal to the charge for such service for the period during which the failure, delay, interruption occurs or continues. Nonetheless, Client may terminate this Agreement by providing Operator with five (5) days advance written notice if Operator's services substantially cease to function for five (5) consecutive business days during the term of this Agreement unless Client is in default of this Agreement. Further, except for loss or damage to Client's property intentionally caused by Operator's agents or employees, Client, as a material consideration of this Agreement waives all claims against Operator for loss or damage to the Client's property caused by fire, water, theft or otherwise.

Indemnify and Hold Harmless: Due to the imperfect nature of technology and verbal, written, mailed, or electronic communication, as well as mistakes by employees or associates, or due to strike, Force Majeure, or other unforeseen occurrence, Client agrees that Operator is free from all liability for claims for damages by any reason barring willful misconduct on behalf of Operator. This indemnification of liability includes any perceived loss of business, profits, or anticipated earnings that arises out of or is in connection with Client's use of Operators' services, including: telephone, voicemail, phone answering, mail delivery or mail forwarding, internet and computer services, or center specific services. Client agrees that Operator is to be free from all liability for claims for damages by reason of injury to any person or loss or damage to any property from any cause while in, upon, or in any way connected with the facilities of Operator. Client agrees to hold Operator harmless from all liability, loss, cost, or obligations arising out of any such injuries or losses, however occurring.

Limitation of Liability: Operator shall not be liable for any direct, indirect, incidental, punitive, special, multiple, or consequential damages resulting from Client's use or inability to use the Services or for cost of procurement or substitute goods and services or resulting from any products or services purchased or obtained through the site including loss of profits, use, data or intangible property, even if Operator has been advised of the possibility of such damages. The entire liability of Operator, and Client's exclusive remedy with respect to the use of the site and Services, are limited to the lesser of: 1) the amount actually paid by Client for the Services during the three (3) months preceding the date of any claim made by Client; or 2) $500.00 (US), whichever is less. By acceptance of this Agreement, Client hereby releases Operator from any obligations, liabilities and/or claims in excess of this limitation.

Force Majeure: Performance of any obligation or service of Operator, hereunder will be excused so long as prevented by pandemic, government shutdown, act of God, weather, act of a public enemy, fire, or other casualty, electrical shortage, failure of communications or common carrier or other circumstances reasonably beyond Operator's control and that it cannot circumvent using its best efforts.

Attorney's Fees: If either party breaches any term, covenant or condition of this Agreement, the breaching party shall pay the other party's reasonable expenses, including attorney's fees, incurred in enforcing its rights under this Agreement.

DS
RH

Operator's Employees:

Client agrees that during the term of this Agreement and for Six (6) months after termination, neither Client nor any affiliate of Client shall solicit for hire anyone who is or has been an employee of Operator during the term of term of Client's Agreement or accept compensation in connection with the employment of Operator's employees. Client may recruit generally in the media and may hire an Employee who answers an advertisement without having been personally solicited or recruited by the Client. Upon breach of this provision, Client agrees to pay the Operator ten thousand dollars ($10,000) as compensation and agrees that this provision for liquidated damages is reasonable and that the actual damage which would be sustained by the Operator as a result would be difficult to fix.

Right of Entry: Operator shall have the right to enter Client's Dedicated Space(s) in the following circumstances: a) in the case of emergency, b) upon reasonable advanced notice to Client for cleaning, to make repairs or to exhibit the office(s) to potential Clients, and c) to supply services requested by Client.

Rules and Regulations: Client agrees to comply with the normal rules and regulations imposed upon Operator by the Master Lease or by norms dictated by the use of the space, for which amendments may be required from time to time, for which Client will be notified in writing. Documented Rules and Regulations are available on Premises. If applicable and required by Master Lease, Client agrees to accept and sign acknowledgement of specific Premises-based Rules and Regulations.

Master Lease: This Agreement shall be subject and subordinate to the Lease under which the Operator holds possession of the Premises. Upon termination of such Lease, for any reason, this Agreement shall terminate and Client shall promptly surrender Client's office. If applicable, Client may be asked to accept location specific provisions mandated. Any required Addendum will be submitted to Client, for review and signature, as an attachment to this Agreement prior to Commencement.

Partnership Agreement: This Agreement might be subject and subordinate to a Partnership Agreement under which, if applicable, 3rd party dedicated office, subscription or day use services are provided to Client on behalf of Operator.

Management Contract: This Agreement might be subject to and subordinate to a Management Contract under which, if applicable, dedicated office, subscription or day use services are provided.

Assignment and Subletting: Client's interest under this Agreement many not be encumbered or assigned, in whole or part, either by act of Client or by operation of law without the express written consent of Operator.
In the absence of written consent, any purported encumbrance, assignment or sublease by Client shall not be binding on Operator.

Time is of the Essence: The timing provisions contained in this Agreement constitute a material part of the Agreement.

Applicable Law: The Agreement shall be governed and construed in accordance with the laws of the State of California. This instrument and all documents incorporated by reference contains the entire Agreement of the parties. No representation or promise relating to and no amendment of this Agreement shall be binding unless it is in writing and signed by both parties. If any provision of this Agreement is held to be unenforceable, this Agreement shall be construed without such provision. The captions are not part of the Agreement.

DS
RH

House Rules

Conference Room Usage: (If applicable) Client will receive account information to access the Operator's meeting room booking portal for the purposes of scheduling, on a first-come, first-served basis day office or meeting room space. Contracted credits are to be used by the last billing day of the month and will not be carried over. Credit use over the contracted amounts will be billed at then Operator's hourly rates. Client agrees to adhere to Operator's cancellation and other pertinent policies regarding use as posted on the Client Services Portal. Pre-purchased Credit plans will be tracked and overage fees, when applicable, will be applied on a calendar month schedule and usage will be tracked on a calendar month. Fees will appear on the invoice due on the 1st day of the following month.

Alterations: Client may not make any physical alterations to Client's office(s) or dedicated space without the prior written consent of Operator. Exceptions are: a) hanging light-weight pictures, b) adding furniture that doesn't interfere with the space (moving regulations must be adhered to), and c) installing business equipment that does not interfere with the interior surfaces or existing electrical, cabling or telephonic systems.

Corridor and Exit Doors: Client will not prop open any corridor doors, exit doors or doors connected to corridors during or after business hours.

Service Animals: No animals, except those assisting the disabled, may be brought in or kept in or about the Premises or Building.

Smoking: Smoking, including vape and e-cigarettes, is prohibited in the Premises at all times. Individual building rules regarding smoking restrictions must be followed by Client and its employees and guests.

Signage: No sign, placard, picture, advertisement, name, or notice shall be inscribed, displayed, or printed, or affixed on or to any part of the outside or inside of the Building without the written consent of Operator. Operator shall have the right to remove same without notice to and at the expense of Client.

Common Areas: The sidewalks, halls, passages, exits, entrances, elevators, and stairways shall not be obstructed by any use of the Client or used for any purpose other than for ingress and egress from their respective office(s) or Premise.

Quiet Enjoyment: Client will not interfere with the quiet enjoyment of any of Operator's other clients.

Door Locks: Client shall not alter any lock or install any new or additional locks or any bolts on any doors or windows of the Premises.

Restrooms: The building restrooms, urinals, wash bowls, and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind shall be thrown therein and the expense of any breakage, stoppage, or damage resulting from the violation of this rule shall be borne by the Client who, or whose agents, officers, employees, invitees or guests, shall have caused it.

Office Safe/Heavy Equipment: Client must inform Operator of safes or other heavy equipment intended for placement in the office(s). Operator shall have the right to prescribe the weight, size, and position of all safes and other heavy equipment and also the time and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Operator, stand on supports of such thickness as necessary to properly distribute the weight. Operator will not be responsible for loss of or damage to said property from any cause. The repair of damage done to the Premises or building by moving or maintaining any such equipment shall be at the expense of Client.

DS RH

Moving: Any moving company or contractor retained by Client to undertake moving activities, including but not limited to furniture, freight and other large equipment, to or from the Premises must first be pre-approved by Operator, in Operator's sole but reasonable discretion; and obtain Operator's approval of the timing and manner of the moving activities and schedule.

Use: Other than use of the microwave and coffee machine, no other cooking shall be done or permitted by any Client on the Premises, nor shall the Premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable, or immoral purpose.

No Flammable or Toxic Materials: Client shall not use or keep in the Premises any flammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Operator (small office fans excluded). Client shall not use, keep, or permit to be used or kept, any foul or noxious gas or substance in the Premises.

Telephone/Cabling Installation: Operator will direct electricians as to where and how telephone and data cabling of any kind are to be installed. No boring or cutting for the wires and cable will be allowed without the consent of the Operator. The location of telephones, call boxes, and other office equipment affixed to the Premises shall be subject to the approval of Operator. Operator may, at its sole discretion, reallocate phone lines available on the floor in which the Premises are located at any time during the term of this Agreement.

Access to Building and Premises: On Weekends and legal holidays, and on other days between the hours of 5:00 p.m. and 8:30 a.m. the following day, access to the Premises, building, elevators and stairways may be refused unless the person seeking access is known to the person or employee of the Building and has access "keys." The Operator shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Premises or building of any person. In case of invasion, mob, riot, public excitement, or other commotion, access to the Building and/or Premises may be denied by closing of the doors or otherwise, for the safety and protection of the suite and building's Clients and property. Operator reserves the right to exclude or expel from the Premises and building any person who, in the judgment of the Operator, is intoxicated or under the influence of liquor or drugs, or who shall in any manner appear likely to act in violation of any of the rules of the Premises or Building.

Common Area Operations: Operator shall have the right to control and operate the public portions of the Building, and the public facilities, and heating and air conditioning, as well as facilities furnished for the common use of the Clients, in such manner as it deems best for the benefit of the Clients generally.

Enforcement: Client agrees that compliance with these House Rules is a material component of the Client License Agreement and Terms of Use between Client and Operator. Client agrees to abide by all such rules and regulations and any written amendments or modifications to same. Operator shall have no responsibility to Client for any violation or non-performance of these House Rules by any of Operator's other Clients or Clients of the building.

DS
RH

EXHIBIT N

# THANK YOU FOR RENEWING YOUR POLICY WITH US

If you're receiving this renewal through the mail directly from The Hartford, please note that we've only attached new, changed or updated documents. These include your new declarations page, which outlines your coverage, as well as any notices and brochures with updated information. We leave out unchanged documents to help cut down on paperwork and mailing costs. You can keep the attached documents filed alongside those from your previous policy if you wish.

If you're receiving this renewal electronically, or it's been mailed by your agent, it may include all of your documents - even ones that haven't changed.

In either case, keep in mind that you can view, download or print any of these documents online. Just register or log into your account https://business.thehartford.com and click on "Documents". For added convenience, you can also pay your bill, request a Certificate of Insurance, check claims status, update preferences and more.


© 2019, The Hartford


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

# FRAUD NOTICE

The following statement is added to the policy:

**CALIFORNIA NOTICE:** For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**COLORADO NOTICE:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

**NEW YORK NOTICE:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, and any person who, in connection with such application or claim, knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or the stated value of the claim for each such violation.

**PENNSYLVANIA NOTICE:** Any person who knowingly and with intent to injure or defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, including imprisonment for up to seven years and payment of a fine of up to $15,000.


© 2022, The Hartford

# Insurance Policy Billing Information

**Thank you for selecting The Hartford for your business insurance needs.**

**Shortly, you will receive your first bill from us. You are receiving this Notice so you know what to expect as a valued customer of The Hartford. Should you have any questions after reviewing this information, please contact us at 866-467-8730, and we will be happy to assist you.**

- Your total policy premium will appear on your policy's Declarations Page. You will be billed based on the payment plan you selected.
- You may pay the "minimum due" as it appears on your insurance bill or pay the policy balance in full.
- An installment service fee is added to each installment. A late fee will also be applied if the "minimum due" is not **received** by the due date shown on your bill. Service and late payment fees do not apply in all states.
- If you selected installment billing, any credit or additional premium due as the result of a change made to your policy, will be spread over the remaining billing installments. Additional premium due as a result of an **audit** will be billed in full on your next bill date following the completion of the audit.
- If you elected Electronic Funds Transfer (EFT), policy changes may result in changes to the amount automatically withdrawn from your bank account. The invoice you receive following a policy change will include future withdrawal amounts. If you need to adjust or stop your next scheduled EFT withdrawal, please contact us **at least 3 days prior** to the scheduled withdrawal date at the telephone number shown below.
- If you selected installment billing and pay the premiums for your first policy term on time, at renewal, your account may qualify for our "Equal Installment" feature. This means that the percentage due for each installment, including the initial renewal installment, will be the same throughout the policy term – helping you better manage cash flow. Equal installments will continue as long as you pay your premiums on time and no cancellation notices are issued for any policy on your account. If you no longer qualify for Equal Installments, future renewals will be billed based on the payment plan you selected, which includes a higher initial installment amount.
- If your policy is eligible for renewal, your bill for the upcoming policy term will be sent to you approximately 30 days prior to your policy's renewal date. If your insurance needs change, please contact us at least 60 days prior to your renewal date so we can properly address any adjustments needed.
- **One bill convenience** -- you have the option of combining all eligible Hartford policies on one single bill allowing you to make one payment for all policies on your account as payments are due.

## You're In Control

In addition to selecting a bill plan option that best meets your budget, you have the flexibility to decide ***how*** your payments are made …

- **Repetitive EFT:** Sign up for Repetitive EFT payments and have payments automatically withdrawn from your bank account. This option saves you money by reducing the amount of the installment service fee.
- **Pay Online:** Register at **www.thehartford.com/servicecenter.** Online Bill Pay is Quick, Easy and Secure!
- **Pay by Check:** Send a check with your remittance stub in the envelope provided with your bill.
- **Pay by Phone:** Call toll-free **1-866-467-8730.**

**Should you have any questions about your bill, please call Customer Service toll-free number: 1-866-467-8730 - 7AM – 7PM CST. We look forward to being of service to you.**

# IMPORTANT NOTICE TO POLICYHOLDERS
# THE HARTFORD CYBER CENTER WEBSITE ACCESS

Thank you for choosing The Hartford for your business insurance needs.

You are receiving this Notice because you purchased a business owner's policy from The Hartford, (your Policy was issued by The Hartford writing company identified on your policy Declarations page) which includes access to The Hartford Cyber Center. This portal was created because we recognize that businesses face a variety of cyber-related exposures and need help managing the related risks. These exposures include data breaches, computer virus attacks and cyber extortion threats.

Through The Hartford Cyber Center, you have access to:

- A panel of third party incident response service providers
- Third party cybersecurity pre-incident service providers and a list of approved services to help protect your business before a cyber-threat occurs
- Risk management tools, including self-assessments, best practice guides, templates, sample incident response plans, and data breach cost calculators
- White papers, blogs and webinars from leading privacy and security practitioners
- Up-to-date cyber-related news and events, including examples of privacy and security related events

Accessing The Hartford Cyber Center is easy

1. Visit www.thehartford.com/cybercenter
2. Enter policyholder information
3. Access code: 952689
4. Login to The Hartford Cyber Center

This Notice does not amend or otherwise affect the provisions of your business owner's policy.

**Coverage Options:**

The Hartford offers a variety of endorsements to your business owner's policy that can help protect your business from a broad range of cyber-related threats. Please review your coverage with your insurance agent or broker to determine the most appropriate cyber coverages and limits for your business.

**Claims Reporting:**

If you have a claim, you can report it by calling The Hartford's toll-free claims line at **1-800-327-3636.**

Should you have any questions, please contact your insurance agent, broker or you may contact us directly.

We appreciate your business and look forward to being of continued service to you.

Please be aware that:

- The Hartford Cyber Center is a proprietary web portal exclusively provided to customers of The Hartford. Please do not share the access code with anyone outside your organization.
- Registration is required to access the Cyber Center. You may register as many users as necessary.
- Contacting a service provider about any issue does not constitute providing The Hartford notice of a claim as required under your insurance policy. Read your insurance policy and discuss any questions with your agent or broker.

The Hartford Cyber Center provides third party service provider references and materials for educational purposes only. The Hartford does not specifically endorse any such service provider within The Hartford Cyber Center and hereby disclaims all liability with respect to use of or reliance on such service providers. All service providers are independent contractors and not agents of The Hartford. The Hartford does not warrant the performance of the service providers, even if such services are covered under your Business Owners Policy. We strongly encourage you to conduct your own assessments of the service providers' services and the fitness or adequacy of such services for your particular needs.



© 2016, The Hartford

# Spectrum®

# Business Owner's Policy

THE HARTFORD



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

THE HARTFORD

## PRODUCER COMPENSATION NOTICE

You can review and obtain information on The Hartford's producer compensation practices at www.TheHartford.com or at 1-800-592-5717.

**POLICY NUMBER:** 57 SBA BN7134

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

| SCHEDULE |
|---|
| **Terrorism Premium:** |
| **$** $124.00 |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for "certified acts of terrorism" under TRIA. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement.

**B.** The following definition is added with respect to the provisions of this endorsement:

**1.** A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of TRIA, to be an act of terrorism under TRIA. The criteria contained in TRIA for a "certified act of terrorism" include the following:

**a.** The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

**b.** The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion

**C. Disclosure Of Federal Share Of Terrorism Losses**

The United States Department of the Treasury will reimburse insurers for a portion of insured losses, as indicated in the table below, attributable to "certified acts of terrorism" under TRIA that exceeds the applicable insurer deductible:

| Calendar Year | Federal Share of Terrorism Losses |
|---|---|
| **2015** | **85%** |
| **2016** | **84%** |
| **2017** | **83%** |
| **2018** | **82%** |
| **2019** | **81%** |
| **2020 or later** | **80%** |

However, if aggregate industry insured losses under TRIA exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.



© 2015 , The Hartford
(Includes copyrighted material of the Insurance Services Office, Inc., with its permission.)

**D. Cap On Insurer Liability for Terrorism Losses**

If aggregate industry insured losses attributable to "certified acts of terrorism" under TRIA exceed $100 billion in a calendar year and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceed $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro-rata basis in accordance with procedures established by the Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

**E. Application of Other Exclusions**

The terms and limitations of any terrorism exclusion, the inapplicability or omission of a terrorism exclusion, or the inclusion of terrorism coverage, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Form, Coverage Part or Policy.

**F. All other terms and conditions remain the same.**

# IMPORTANT NOTICE TO POLICYHOLDERS

To help your insurance keep pace with increasing costs, we have increased your amount of insurance . . . giving you better protection in case of either a partial, or total loss to your property.

If you feel the new amount is not the proper one, please contact your agent or broker.

34 This **Spectrum Policy** consists of the Declarations, Coverage Forms, Common Policy Conditions and any
71 other Forms and Endorsements issued to be a part of the Policy. This insurance is provided by the stock
BN insurance company of The Hartford Insurance Group shown below.
SBA

**INSURER:** SENTINEL INSURANCE COMPANY, LIMITED
ONE HARTFORD PLAZA, HARTFORD, CT 06155
COMPANY CODE: A

THE HARTFORD

**Policy Number:** 57 SBA BN7134 SC

## SPECTRUM POLICY DECLARATIONS

**Named Insured and Mailing Address:** 2700 SLOAT HOLDING, LLC
(No., Street, Town, State, Zip Code) SEE FORM SS 12 35
201 SPEAR ST STE 1100
SAN FRANCISCO CA 94105

**Policy Period:** **From** 07/16/23 **To** 07/16/24 1 YEAR
12:01 a.m., Standard time at your mailing address shown above. **Exception:** 12 noon in New Hampshire.

**Name of Agent/Broker:** BROAD SPECTRUM INS SERVICES INC
**Code:** 556930

**Previous Policy Number:** 57 SBA BN7134

**Named Insured is:** LIMITED LIAB CORP

**Audit Period:** NON-AUDITABLE

**Type of Property Coverage:** SPECIAL

**Insurance Provided:** In return for the payment of the premium and subject to all of the terms of this policy, we agree with you to provide insurance as stated in this policy.

---

**TOTAL ANNUAL PREMIUM IS:** $6,310

---

Countersigned by Susan L. Castaneda — Authorized Representative — 04/26/23 Date



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

## SPECTRUM POLICY DECLARATIONS (Continued)

**POLICY NUMBER:** 57 SBA BN7134

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

**Location:** 001 **Building:** 001

2700-2710 SLOAT BLVD
SAN FRANCISCO CA 94116

**Description of Business:**
Building Owner - Lessors Risk Only - Retail Occupancy

**Deductible:** $ 5,000 PER OCCURRENCE

| BUILDING AND BUSINESS PERSONAL PROPERTY | LIMITS OF INSURANCE |
|---|---|
| **BUILDING** | |
| REPLACEMENT COST | $ 3,290,000 |
| **BUSINESS PERSONAL PROPERTY** | |
| **REPLACEMENT COST** | $ 5,700 |
| **PERSONAL PROPERTY OF OTHERS** | |
| **REPLACEMENT COST** | NO COVERAGE |
| MONEY AND SECURITIES | |
| INSIDE THE PREMISES | $ 10,000 |
| OUTSIDE THE PREMISES | $ 5,000 |

## SPECTRUM POLICY DECLARATIONS (Continued)

**POLICY NUMBER:** 57 SBA BN7134

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

**Location:** 001 **Building:** 001

| PROPERTY OPTIONAL COVERAGES APPLICABLE TO THIS LOCATION | LIMITS OF INSURANCE |
|---|---|
| BACK-UP OF SEWERS AND DRAINS COVERAGE FORM SS 04 53 | $ 100,000 |
| BUILDING STRETCH - INCREASED POR FORM: SS 41 79 THIS FORM INCLUDES MANY ADDITIONAL COVERAGES AND EXTENSIONS OF COVERAGES. A SUMMARY OF THE COVERAGE LIMITS IS ATTACHED. | |
| ORDINANCE OR LAW COVERAGE: FORM SS 04 15 | |
| UNDAMAGED PART COVERAGE | |
| DEMOLITION COST COVERAGE | $ 200,000 |
| INCREASED COST COVERAGE | $ 200,000 |
| LIMITED FUNGI, BACTERIA OR VIRUS COVERAGE: FORM SS 40 93 THIS IS THE MAXIMUM AMOUNT OF INSURANCE FOR THIS COVERAGE, SUBJECT TO ALL PROPERTY LIMITS FOUND ELSEWHERE ON THIS DECLARATION. | $ 50,000 |
| INCLUDING BUSINESS INCOME AND EXTRA EXPENSE COVERAGE FOR: | 30 DAYS |

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 57 SBA BN7134

| PROPERTY OPTIONAL COVERAGES APPLICABLE TO ALL LOCATIONS | LIMITS OF INSURANCE |
|---|---|
| BUSINESS INCOME AND EXTRA EXPENSE COVERAGE | 12 MONTHS ACTUAL LOSS SUSTAINED |
| COVERAGE INCLUDES THE FOLLOWING COVERAGE EXTENSIONS: | |
| ACTION OF CIVIL AUTHORITY: | 30 DAYS |
| EXTENDED BUSINESS INCOME: | 12 CONSECUTIVE MONTHS |
| FORM SS 40 91 | |
| EQUIPMENT BREAKDOWN COVERAGE COVERAGE FOR DIRECT PHYSICAL LOSS DUE TO: MECHANICAL BREAKDOWN, ARTIFICIALLY GENERATED CURRENT AND STEAM EXPLOSION | |
| THIS ADDITIONAL COVERAGE INCLUDES THE FOLLOWING EXTENSIONS | |
| HAZARDOUS SUBSTANCES | $ 50,000 |
| EXPEDITING EXPENSES | $ 50,000 |
| MECHANICAL BREAKDOWN COVERAGE ONLY APPLIES WHEN BUILDING OR BUSINESS PERSONAL PROPERTY IS SELECTED ON THE POLICY | |
| IDENTITY RECOVERY COVERAGE | $ 15,000 |
| FORM SS 41 12 | |

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 57 SBA BN7134

| BUSINESS LIABILITY | LIMITS OF INSURANCE |
|---|---|
| LIABILITY AND MEDICAL EXPENSES | $1,000,000 |
| MEDICAL EXPENSES - ANY ONE PERSON | $ 10,000 |
| PERSONAL AND ADVERTISING INJURY | $1,000,000 |
| DAMAGES TO PREMISES RENTED TO YOU ANY ONE PREMISES | $1,000,000 |
| AGGREGATE LIMITS | |
| PRODUCTS-COMPLETED OPERATIONS | $2,000,000 |
| GENERAL AGGREGATE | $2,000,000 |

**LIMITATION OF COVERAGE TO THE DESIGNATED PREMISES OR PROJECT FORM SS 05 62 LIMITATION APPLIES TO THE FOLLOWING LOCATION: 001 BUILDING: 001**

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 57 SBA BN7134

**MORTGAGE HOLDER**
**SEE FORM IH 12 00**

**Form Numbers of Forms and Endorsements that apply:**

| | | | |
|---|---|---|---|
| SS 00 01 03 14 | SS 00 05 10 08 | SS 00 07 07 05 | SS 00 08 04 05 |
| SS 00 45 12 06 | SS 00 60 09 15 | SS 00 61 07 19 | SS 00 64 09 16 |
| SS 12 35 03 12 | SS 85 01 03 15 | SS 01 21 02 20 | SS 42 06 03 17 |
| SS 04 15 07 05 | SS 04 19 04 09 | SS 04 44 07 05 | SS 04 53 02 11 |
| SS 40 18 07 05 | SS 40 91 11 08 | SS 40 93 07 05 | SS 41 12 06 22 |
| SS 41 51 10 09 | SS 41 63 06 11 | SS 41 79 12 14 | IH 10 01 09 86 |
| SS 05 47 09 15 | SS 05 62 04 17 | SS 50 57 04 05 | SS 51 11 03 17 |
| G-4190-0 | IH 12 05 02 21 | SS 12 12 03 92 | SS 50 19 01 15 |
| IH 99 40 04 09 | IH 99 41 04 09 | SS 83 76 01 15 | SS 89 93 07 16 |

IH 12 00 11 85 LOSS PAYEE
IH 12 00 11 85 MORTGAGEE

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 57 SBA BN7134

**SUPPLEMENTAL DECLARATIONS:**

**A service fee of $** 7.00 **is charged for each installment when your premium is paid in installments. The service fee is $** 5.00 **per withdrawal when you select an electronic fund transfer payment plan. The service fee will be added to the premium amount shown on your premium billing statement.**

**POLICY NUMBER:** 57 SBA BN7134

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF THE DECLARATIONS - ADDITIONAL PERSONS OR ORGANIZATIONS DESIGNATED AS NAMED INSUREDS

The following person(s) or organization(s) are added to the Declarations as Named Insureds:

2700 SLOAT HOLDING, LLC A NEVADA LIMITED LIABILITY COMPANY.


© 2012, The Hartford

# BUILDING STRETCH - INCREASED PERIOD OF RESTORATION SUMMARY

## SUMMARY OF COVERAGE LIMITS

This is a summary of the Coverages and the Limits of Insurance provided by the building Building Stretch Coverage form SS 41 79 which is included in this policy. No coverage is provided by this summary. Refer to coverage form SS 41 79 to determine the scope of your insurance protection.

The Limit of Insurance for the following Additional Coverages are in addition to any other limit of insurance provided under this policy:

| Coverage | Limit |
|---|---|
| Claim Expenses | $ 10,000 |
| Debris Removal | $ 25,000 |
| Lessor's – Tenant Move Back Expenses | $ 10,000 |
| Lessor's – Lease Cancellation | $ 10,000 |
| Off Premises Utility Services – Direct Damage | $ 10,000 |
| Ordinance or Law | |
| Undamaged Part | Included in Building Limit |
| Demolition Cost | $ 50,000 |
| Increased Cost of Construction | $ 50,000 |
| Outdoor Signs | Full Value |
| Sewer and Drain Back Up | Included up to Covered Property Limits |
| Sump Overflow or Sump Pump Failure | $ 50,000 |

The Limits of Insurance for the following Additional Coverages or Coverage Extensions are a replacement of the Limit of Insurance provided under the Standard Property Coverage Form or the Special Property Coverage Form, whichever applies to the policy:

| Coverage | Limit |
|---|---|
| Business Income | 24 Months |
| Extra Expense | 24 Months |
| Newly Acquired or Constructed Property – 180 Days | |
| Building | $1,000,000 |
| Business Personal Property | $ 500,000 |
| Business Income | $ 500,000 |
| Outdoor Property | $ 25,000 aggregate/ $1,000 per item |

The following changes apply only if Business Income and Extra Expense are covered under this policy. The Limits of Insurance for the following Business Income and Extra Expense Coverages are in addition to any other Limit of Insurance provided under this policy:

| Coverage | Limit |
|---|---|
| Business Income Extension for Off-Premises Utility Services | $ 25,000 |



© 2015, The Hartford

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

# COMMON POLICY CONDITIONS



© 2008, The Hartford

# QUICK REFERENCE - SPECTRUM POLICY

## DECLARATIONS
## and
## COMMON POLICY CONDITIONS

## I. DECLARATIONS

Named Insured and Mailing Address
Policy Period
Description and Business Location
Coverages and Limits of Insurance

## II. COMMON POLICY CONDITIONS

**Beginning on Page**


| | | |
|---|---|---|
| **A.** | Cancellation | **1** |
| **B.** | Changes | **1** |
| **C.** | Concealment, Misrepresentation Or Fraud | **2** |
| **D.** | Examination Of Your Books And Records | **2** |
| **E.** | Inspections And Surveys | **2** |
| **F.** | Insurance Under Two Or More Coverages | **2** |
| **G.** | Liberalization | **2** |
| **H.** | Other Insurance - Property Coverage | **2** |
| **I.** | Premiums | **2** |
| **J.** | Transfer Of Rights Of Recovery Against Others To Us | **2** |
| **K.** | Transfer Of Your Rights And Duties Under This Policy | **3** |
| **L.** | Premium Audit | **3** |

# COMMON POLICY CONDITIONS

All coverages of this policy are subject to the following conditions.

**A. Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 5 days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

**(1)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

**(a)** Seasonal unoccupancy; or

**(b)** Buildings in the course of construction, renovation or addition.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**(2)** After damage by a Covered Cause of Loss, permanent repairs to the building:

**(a)** Have not started; and

**(b)** Have not been contracted for,

within 30 days of initial payment of loss.

**(3)** The building has:

**(a)** An outstanding order to vacate;

**(b)** An outstanding demolition order; or

**(c)** Been declared unsafe by governmental authority.

**(4)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

**(5)** Failure to:

**(a)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

**(b)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**c.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is canceled, we will send the first Named Insured any premium refund due. Such refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.



© 2008, The Hartford

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to the policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

1. We have the right but are not obligated to:
   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. Any inspections, surveys, reports or recommendations will relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of any person. We do not represent or warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.
3. This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations on our behalf.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to, or at any time during, the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance - Property Coverage**

If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**I. Premiums**

1. The first Named Insured shown in the Declarations:
   a. Is responsible for the payment of all premiums; and
   b. Will be the payee for any return premiums we pay.
2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. If applicable, on each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.
3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:
   a. Paid to us prior to the anniversary date; and
   b. Determined in accordance with Paragraph **2.** above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.
4. Changes in exposures or changes in your business operation, acquisition or use of locations that are not shown in the Declarations may occur during the policy period. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

**J. Transfer Of Rights Of Recovery Against Others To Us**

Applicable to Property Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property; or
2. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

**a.** Someone insured by this insurance;

**b.** A business firm:

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you; or

**c.** Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

**K. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**L. Premium Audit**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** The premium amount shown in the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Any additional premium found to be due as a result of the audit are due and payable on notice to the first Named Insured. If the deposit premium paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must maintain all records related to the coverage provided by this policy and necessary to finalize the premium audit, and send us copies of the same upon our request.

Our President and Secretary have signed this policy. Where required by law, the Declarations page has also been countersigned by our duly authorized representative.



Kevin Barnett, Secretary



M. Ross Fisher, President

# SPECIAL PROPERTY COVERAGE FORM



© 2005, The Hartford

# QUICK REFERENCE

## SPECIAL PROPERTY COVERAGE FORM
## READ YOUR POLICY CAREFULLY

**SPECIAL PROPERTY COVERAGE FORM** **Beginning on Page**


| | | |
|---|---|---|
| **A.** | **COVERAGES** | **1** |
| | Covered Property | **1** |
| | Property Not Covered | **1** |
| | Covered Causes of Loss | **2** |
| | Limitations | **2** |
| | Additional Coverages | **3** |
| | Coverage Extensions | **13** |
| **B.** | **EXCLUSIONS** | **16** |
| **C.** | **LIMITS OF INSURANCE** | **18** |
| **D.** | **DEDUCTIBLES** | **19** |
| **E.** | **PROPERTY LOSS CONDITIONS** | **19** |
| | Abandonment | **20** |
| | Appraisal | **20** |
| | Duties in the Event of Loss or Damage | **20** |
| | Legal Action Against Us | **20** |
| | Loss Payment | **20** |
| | Recovered Property | **22** |
| | Resumption of Operations | **22** |
| | Vacancy | **22** |
| **F.** | **PROPERTY GENERAL CONDITIONS** | **23** |
| | Control of Property | **23** |
| | Mortgage Holders | **23** |
| | No Benefit to Bailee | **24** |
| | Policy Period, Coverage Territory | **24** |
| **G.** | **PROPERTY DEFINITIONS** | **24** |

# SPECIAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to the SECTION **G** - PROPERTY DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

1. **Covered Property**

   Covered Property as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:

   **a.** **Buildings,** meaning only building(s) and structure(s) described in the Declarations, including:

   **(1)** Completed additions;

   **(2)** Permanently installed:

   **(a)** Fixtures;

   **(b)** Machinery; and

   **(c)** Equipment;

   **(3)** Outdoor fixtures;

   **(4)** Your personal property in apartments, rooms or common areas furnished by you as landlord;

   **(5)** Building Glass, meaning glass that is part of a building or structure;

   **(6)** Personal property owned by you that is used to maintain or service the buildings or structures on the premises, including:

   **(a)** Fire extinguishing equipment;

   **(b)** Outdoor furniture;

   **(c)** Floor coverings; and

   **(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering; and

   **(7)** If not covered by other insurance:

   **(a)** Additions under construction, alterations and repairs to the buildings or structures;

   **(b)** Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the "scheduled premises", used for making additions, alterations or repairs to the buildings or structures.

   **b.** **Business Personal Property** located in or on the building(s) described in the Declarations at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", including:

   **(1)** Property you own that is used in your business;

   **(2)** Tools and equipment owned by your employees, which are used in your business operations;

   **(3)** Property of others that is in your care, custody or control;

   **(4)** “Tenant Improvements and Betterments”; and

   **(5)** Leased personal property for which you have contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

2. **Property Not Covered**

   Covered Property does not include:

   **a.** Aircraft, automobiles, motor trucks and other vehicles subject to motor vehicle registration;

   **b.** Automobiles held for sale;

   **c.** "Money”, bullion, numismatic and philatelic property and bank notes or "securities" except as provided in any Additional Coverages or Optional Coverages. Lottery tickets held for sale and postage stamps in current use and having face value are not "securities".

   **d.** Contraband, or property in the course of illegal transportation or trade;

e. Land (including land on which the property is located), water, growing crops or lawns;

f. Outdoor fences, radio or television antennas (including satellite dishes), including their lead in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other then those held for sale or sold but not delivered), except as any of these may be provided in the:

(1) Outdoor Property Coverage Extension; or

(2) Outdoor Signs Optional Coverage;

g. Watercraft (including motors, equipment and accessories) while afloat;

h. The cost to research, replace or restore the information on "valuable papers and records", except as may be provided in any Coverage Extensions or Optional Coverages.

i. "Data" and "software" which exists on electronic "media" including the cost to research, replace or restore them, except as may be provided for in any Additional Coverages or Optional Coverages.

j. Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided for in this policy.

**3. Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section **B., EXCLUSIONS;** or

b. Limited in Paragraph **A.4.** Limitations; that follow.

**4. Limitations**

a. We will not pay for direct loss of or damage to:

(1) Property that is missing, where the only evidence of the direct physical loss or physical damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Additional Coverage for "Money" and "Securities".

(2) Property that has been transferred to a person or to a place outside the "scheduled premises" on the basis of unauthorized instructions.

(3) The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(a) The building or structure first sustains physical damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(b) The direct physical loss or physical damage is caused by or results from thawing of snow, sleet, or ice on the building or structure.

b. Pets and animals are covered only if:

(1) They are inside the building; and

(2) They are owned by others and boarded by you, or owned by you and held for sale or sold but not delivered.

And then we will pay only if they are killed, stolen, or their destruction is made necessary by a "specified cause of loss".

c. For direct physical loss or physical damage by “theft”, the following types of property are covered only up to the limits shown:

(1) $2,500 for furs, fur garments and garments trimmed with fur;

(2) $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item;

(3) $2,500 for patterns, dies, molds and forms; and

(4) $500 for stamps, lottery tickets held for sale and letters of credit.

d. Unless specifically provided under a separate endorsement and with a specific Limit of Insurance indicated in the Declarations, we will not pay for direct physical loss of or physical damage to "perishable stock" caused by or resulting from:

(1) A change in temperature or humidity resulting from:

(a) Mechanical breakdown or failure of:

(i) Stationary heating plants; or

(ii) Refrigerating, cooling, or humidity control apparatus or equipment;

(b) Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires; or

(c) Complete or partial failure of electric power on your "scheduled premises".

(2) Contamination by refrigerant.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**5. Additional Coverages**

**a. Collapse**

**(1)** With respect to Buildings:

**(a)** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building cannot be occupied for its intended purpose;

**(b)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

**(c)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

**(d)** A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

**(2)** We will pay for direct physical loss or physical damage caused by or resulting from risks of collapse of a building or any part of a building that is insured by this policy caused only by one or more of the following:

**(a)** "Specified cause of loss" or breakage of building glass, if such loss or breakage was covered by this policy;

**(b)** Decay that is hidden from view, unless the presence of such decay was known to an insured prior to collapse;

**(c)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(d)** Weight of people or personal property;

**(e)** Weight of rain that collects on a roof; and

**(f)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

The criteria set forth in Paragraphs **(1)(a)** through **(1)(d)** do not limit the coverage otherwise provided under this Additional Coverage for the Causes of Loss listed in Paragraph **(2)(a)**, **(2)(d)**, and **(2)(e).**

**(3)** If the collapse is caused by a Covered Cause of Loss listed in Paragraphs **(2)(b)** through **(2)(f)**, we will pay for direct physical loss of or physical damage to the property listed below, but only if such physical loss or physical damage is a direct result of the collapse of a building insured under this policy, and the property is property covered under this policy:

**(a)** Awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks, roadways and other paved surfaces.

**(4)** If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if

**(a)** The collapse was caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(f)** of this Additional Coverage;

**(b)** The personal property which collapses is inside a building; and

**(c)** The property which collapses is not of a kind listed in Paragraph **(3)** above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **(4)** does not apply to personal property if marring or scratching is the only damage to that personal property caused by the collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(5)** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this policy.

**b. Debris Removal**

**(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

**(a)** The date of direct physical loss or physical damage; or

**(b)** The end of the policy period.

**(2)** The most we will pay under this additional Coverage is 25% of the amount we pay for the direct loss of or physical damage to Covered Property plus the deductible in this policy applicable to that physical loss or physical damage.

But this limitation does not apply to any additional Debris Removal limit provided in the Limits of Insurance section.

**(3)** This Additional Coverage does not apply to costs to:

**(a)** Extract "pollutants and contaminants" from land; or

**(b)** Remove, restore or replace polluted or contaminated land or water.

**c. Equipment Breakdown**

**(1)** We will pay for direct physical loss or physical damage caused by or resulting from an Equipment Breakdown Accident to Equipment Breakdown Property.

Equipment Breakdown Accident means:

**(a)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

**(b)** Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires.

**(c)** Explosion of steam boilers, steam piping, steam engines or steam turbines owned or leased by you, or operated under your control.

**(d)** Physical loss or physical damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such boilers or equipment.

**(e)** Physical loss or physical damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

Equipment Breakdown Property means Covered Property built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilization of energy.

The following is not Equipment Breakdown Property:

**(a)** Any structure, foundation, cabinet, compartment or air supported structure building;

**(b)** Any insulating or refractory material;

**(c)** Any sewer piping, any underground vessels or piping, any piping forming a part of a sprinkler system, water piping other than boiler feed water piping, boiler condensate return piping, or water piping forming a part of a refrigerating or air conditioning system;

**(d)** Any vehicle or any equipment mounted on a vehicle. As used here, vehicle means any machine or apparatus that is used for transportation or moves under its own power. Vehicle includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester. However, any property that is stationary, permanently installed at a “scheduled premises” and that receives electrical power from an external power source will not be considered a vehicle.

**(e)** Any equipment manufactured by you for sale.

**(2) Coverage Extensions**

The following coverage extensions apply only to direct physical loss or physical damage caused by or resulting from an Equipment Breakdown Accident:



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(a) Hazardous Substances**

We will pay in any one occurrence for the additional cost, not to exceed $50,000, to repair or replace Covered Property because of contamination by a hazardous substance. This includes the expenses to clean up or dispose of such property. Hazardous substance means any substance that is hazardous to human health or that has been declared by a government agency to be hazardous to human health.

Additional cost in this extension means those beyond what would have been required had no hazardous substance been involved.

This limit is part of and not in addition to the Limits of Insurance for Covered Property.

**(b) Expediting Expenses**

With respect to your damaged Covered Property, we will pay in any one occurrence, up to $50,000, for the reasonable and necessary additional expenses you incur to:

**(i)** Make temporary repairs; or

**(ii)** Expedite permanent repairs or permanent replacement.

**(c) Defense**

If a claim or "suit" is brought against you alleging that you are liable for damage to property of another in your care, custody or control directly caused by Equipment Breakdown we will either:

**(i)** Settle the claim or "suit"; or

**(ii)** Defend you against the claim or "suit," but keep for ourselves the right to settle it at any point.

**(d) Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

**(i)** All expenses we incur;

**(ii)** The cost of bonds to release attachments, but only for bond amounts within the Limit of Insurance. We do not have to furnish these bonds;

**(iii)** All reasonable expenses incurred by you at our request to assist us in the investigation or defense of the claim or "suit" including actual loss of earnings up to $100 a day because of time off from work;

**(iv)** All costs taxed against you in any "suit" we defend;

**(v)** Prejudgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer; and

**(vi)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the Limit of Insurance shown in the Declarations.

These payments will not reduce the Limit of Insurance shown in the Declarations.

**(e) Business Income and Extra Expense Extension**

The Business Income and Extra Expense Additional Coverages are extended to provide coverage for a tenant who has a loss of income from the lack of heating, cooling or power as a result of equipment breakdown to mechanical, electrical or pressure equipment of the building owner.

**(f)** If Equipment Breakdown Property requires replacement due to an Equipment Breakdown Accident, we will pay your additional cost to replace it with equipment that is better for the environment, safer or more efficient than the equipment being replaced. However, we will not pay more than 125% of what the cost would have been to repair or replace with property of



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

comparable material and quality. This coverage does not increase any of the applicable limits. This coverage does not apply to any property indicated as being valued on an Actual Cash Value basis.

If you wish to retrofit air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances to accept a non-CFC refrigerant or replace the system with a system using a non-CFC refrigerant, we will consider this better for the environment. Any associated Business Income or Extra Expense will be included in determining the additional cost, if Business Income and Extra Expense apply to this policy.

**(3) Additional Condition - Bankruptcy**

The bankruptcy or insolvency of you or your estate will not relieve us of any obligation under this Additional Coverage.

**(4) Jurisdictional Inspections:**

If any boiler or pressure vessel requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf.

**d. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 in any one occurrence for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**e. Fire Extinguisher Recharge**

We will pay to cover your expenses for recharge of your hand fire extinguishers when they are emptied while fighting fire.

**f. Forgery**

**(1)** We will pay for loss resulting directly from forgery or alteration of any check, draft, promissory note, or similar written promises, orders or directions to pay a sum certain in "money" that you or your agent has issued, or that was issued by someone who impersonates you or your agent. This includes written instruments required in conjunction with any credit, debit, or charge card issued to you or any "employee" for business purposes.

**(2)** If you are sued for refusing to pay any Covered Instrument on the basis that it has been forged or altered, and you have our written consent to defend against the "suit", we will pay for any reasonable expenses that you incur and pay in that defense.

**(3)** We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(a)** Money orders, including counterfeit money orders, of any United States or Canadian post office, express company or national or state (or Canadian) chartered bank that are not paid upon presentation; and

**(b)** Counterfeit United States or Canadian paper currency.

**(4)** The most we will pay in any one occurrence, including legal expenses, under this Additional Coverage is $5,000, unless a higher Limit of Insurance is shown in the Declarations.

**g. Glass Expense**

We will pay for necessary expenses incurred to:

**(1)** Put up temporary plates or board up openings if repair or replacement of damaged glass is delayed;

**(2)** Repair or replace encasing frames; and

**(3)** Remove or replace obstructions when repairing or replacing glass that is part of a building.

This does not include removing or replacing window displays.

**h. Lock and Key Replacement**

We will pay up to $1,000 in any one occurrence for the re-keying of locks or the repair or replacement of locks at "scheduled premises" following the theft or the attempted theft of keys by burglars.

**i. Money and Securities**

**(1)** We will pay for loss of "money" and "securities" used in your business while



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the "scheduled premises", or in transit between any of these places, resulting directly from:

**(a)** "Theft";

**(b)** Disappearance; or

**(c)** Destruction.

**(2)** In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

**(a)** Resulting from accounting or arithmetical errors or omissions;

**(b)** Due to the giving or surrendering of property in any exchange or purchase; or

**(c)** Of property contained in any "money"-operated device unless a continuous recording instrument in the device records the amount of "money" deposited in the "money"-operated device.

**(3)** The most we will pay for loss in any one occurrence is:

**(a)** The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

**(i)** In or on the "scheduled premises"; or

**(ii)** Within a bank or savings institution; and

**(b)** The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

**(4)** All loss:

**(a)** Caused by one or more persons; or

**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(5)** You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**j. Ordinance or Law**

**(1)** If a Covered Cause of Loss occurs to covered Building property, we will pay on a "scheduled premises" any of the following costs that are caused by enforcement of an ordinance or law:

**Undamaged Part**

**(a)** For loss to the undamaged portion of the Building that requires the demolition of parts of the same property not damaged by a Covered Cause of Loss provided that any such ordinance or law resulting in this type of loss:

**(i)** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the "scheduled premises"; and

**(ii)** Is in force at the time of the loss.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**Demolition Cost**

**(b)** The cost to demolish and clear the site of undamaged parts of the property caused by enforcement of a building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**Increased Cost of Construction**

**(c)** The increased cost to repair, rebuild or reconstruct the covered property, caused by enforcement of a building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**"Tenants Improvements and Betterment"**

**(d)** The increased cost to repair, rebuild or reconstruct "tenant's improvements and betterments" caused by enforcement of building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**(2) Additional Exclusions**

We will not pay under this Additional Coverage for:

**(a)** The enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or

remediation of property due to contamination by "pollutants and contaminants" or due to the presence, growth, proliferation, spread of any activity of "fungi", wet or dry rot, bacteria or virus; or

**(b)** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants or contaminants", "fungi", wet or dry rot, bacteria or virus.

**(c)** Loss caused by, resulting from, contributed to or aggravated by earthquake or volcanic eruption.

**(d)** Loss due to an ordinance or law that:

**(i)** You were required to comply with before the loss even if the building was undamaged; and

**(ii)** You failed to comply with.

**(3) Additional Limitations – Loss to Undamaged Portion of Building**

Subject to the limit stated in Paragraph **A.5.j.(1)(a)**, the insurance provided under this Additional Coverage for loss in value to the undamaged portion of the building is limited as follows:

**(a)** If Replacement Cost applies and the property is repaired or replaced on the same or another premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than:

**(i)** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for more than the amount it would cost to restore the Building on the same premises; and

**(ii)** The amount it would cost to restore the undamaged portion to the same height, floor area, style and comparable quality of the original property insured.

**(b)** If the Building(s) Full Value Endorsement applies and the property is repaired or replaced on the same or another premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than:

**(i)** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for more than the amount it would cost to restore the Building on the same premises; and

**(ii)** The amount it would cost to restore the undamaged portion to the same height, floor area, style and comparable quality of the original property insured.

**(c)** If Replacement Cost or the Building(s) Full Value Endorsement applies and the property is not repaired or replaced, or if Actual Cash Value applies, then we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than the lesser of:

**(i)** The Actual Cash Value of the Building at the time of loss; or

**(ii)** The Limit of Insurance applicable to the covered Building property stated in Paragraph **A.5.j.(1)(a)**.

**(4) Additional Limitation – Demolition Cost**

We will not pay more than the lesser of:

**(a)** The amount actually spent to demolish and clear the site of the "scheduled premises"; or

**(b)** The applicable Demolition Cost Limit of Insurance as stated in Paragraph **A.5.j.(1)(b)**.

**(5) Additional Limitation – Increased Cost of Construction**

The insurance provided under this Additional Coverage for increased cost of construction is limited as follows:

**(a)** We will not pay:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repairs or replacements are made as soon as reasonably possible after the physical loss or physical damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the Building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay is the lesser of:

**(i)** The increased cost of construction at the same premises; or

**(ii)** The applicable Increased Cost of Construction Limit of Insurance stated in Paragraph **A.5.j.(1)(c)**.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay is the lesser of:

**(i)** The Increased Cost of Construction at the new premises; or

**(ii)** The applicable Increased Cost of Construction Limit of Insurance stated in Paragraph **A.5.j.(1)(c)**.

**k. "Pollutants and Contaminants" Clean Up and Removal**

We will pay your expense to extract "pollutants and contaminants" from land or water at the "scheduled premises" if the discharge, dispersal, seepage, migration, release or escape of the "pollutants and contaminants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

**(1)** The date of direct physical loss or physical damage; or

**(2)** The end of the policy period.

The most we will pay in any one occurrence for each location under this Additional Coverage is $15,000 for the sum of all such expenses arising out of Covered Causes of Loss.

**l. Preservation of Property**

If it is necessary to move Covered Property from the "scheduled premises" to preserve it from direct physical loss or physical damage by a Covered Cause of Loss, we will pay for any direct physical loss of or physical damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the direct physical loss or physical damage occurs within 45 days after the property is first moved.

**m. Theft Damage to Building**

This Additional Coverage applies only to premises where you are a tenant and are responsible in the lease for physical loss or physical damage to the building you lease, rent, or occupy that is caused by or results from "theft", burglary or robbery.

We will pay for direct physical loss or physical damage directly resulting from "theft", burglary or robbery (except loss by fire or explosion) to a building:

**(1)** You occupy, including personal property that is used to maintain or service the building; or

**(2)** Containing covered personal property if you are legally liable for such physical loss or physical damage.

But we will not pay for such physical loss of or physical damage to property that is away from the "scheduled premises".

**n. Water Damage, Other Liquid, Powder or Molten Material Damage**

If direct physical loss or physical damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the direct physical loss or physical damage except as provided in paragraph **A.5.c., Equipment Breakdown** of this coverage form. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

**(2)** Is directly caused by freezing.

**o. Business Income**

**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the “scheduled premises”, caused by or resulting from a Covered Cause of Loss.

**(2)** With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the “scheduled premises” are located, your “scheduled premises” also means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the “scheduled premises” are located, but only if that area services, or is used to gain access to, the “scheduled premises”.

**(3)** We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.

This Additional Coverage is not subject to the Limits of Insurance.

**(4)** Business Income means the:

**(a)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and

**(b)** Continuing normal operating expenses incurred, including payroll.

**(5)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That part or all of the “scheduled premises” is rendered untentantable as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

**p. Extra Expense**

**(1)** We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

**(2)** With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the “scheduled premises” are located, your “scheduled premises” also means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the “scheduled premises” are located, but only if that area services, or is used to gain access to, the “scheduled premises”.

**(3)** Extra Expense means expense incurred:

**(a)** To avoid or minimize the suspension of business and to continue "operations":

**(i)** At the "scheduled premises"; or

**(ii)** At replacement premises or at temporary locations, including:

**(aa)** Relocation expenses; and

**(bb)** Cost to equip and operate the replacement or temporary location, other than those costs necessary to repair or to replace damaged stock and equipment.

**(b)** To minimize the suspension of business if you cannot continue "operations".

**(c) (i)** To repair or replace any property; or

**(ii)** To research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **o.,** Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

**(4)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Extra Expense applies to the policy.

**(5) Limitation**

This Extra Expense Coverage does not apply to:

**(a)** Any deficiencies in insuring building or business personal property; or

**(b)** Any expense related to any recall of products you manufacture, handle or distribute.

**q. Civil Authority**

**(1)** This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

**(2)** The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:

**(a)** When access is permitted to your "scheduled premises"; or

**(b)** 30 consecutive days after the order of the civil authority.

**r. Extended Business Income**

**(1)** If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations" with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

**(ii)** 30 consecutive days after the date determined in **(1)(a)** above.

Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

**(2)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; and

**(b)** That a part or all of the "scheduled premises" is rendered untenantable as a result of a Covered Cause of Loss.

**s. Business Income from Dependent Properties**

**(1)** We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss.

The most we will pay under this Additional Coverage is $5,000 in any one occurrence unless a higher Limit of Insurance is indicated in the Declarations.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(2)** We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

**(a)** Source of materials; or

**(b)** Outlet for your products.

**(3)** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**(4)** Dependent Property means property owned, leased or operated by others whom you depend on to:

**(a)** Deliver materials or services to you or to others for your account. But services do not include:

**(i)** Water, communication, power services or any other utility services; or

**(ii)** Any type of web site, or Internet service.

**(b)** Accept your products or services;

**(c)** Manufacture your products for delivery to your customers under contract for sale; or

**(d)** Attract customers to your business premises.

The dependent property must be located in the coverage territory of this policy.

**(5)** The coverage period for Business Income under this Additional Coverage:

**(a)** Begins 72 hours after the time of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the premises of the dependent property; and

**(b)** Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

**(6)** The Business Income coverage period, as stated in Paragraph **(5),** does not include any increased period required due to the enforcement of any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects "pollutants."

**(7)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**t. Tenant Glass**

This Additional Coverage applies only to premises where you are a tenant and are responsible in the lease for such damage.

We will cover loss to glass, which is in your care, custody or control and for which the lease holds you responsible. The glass must be part of a building described in the Declarations or at a location that would be included in Coverage Extension **b.** Newly Acquired or Constructed Property.

The most that we will pay in any one occurrence for each location under this Additional Coverage is $25,000.

**u. Leasehold Improvements**

If your lease is cancelled in accordance with a valid lease provision as the direct result of a Covered Cause of Loss to property at the location in which you are a tenant, and you cannot legally remove “Tenant Improvements and Betterments”, we will extend Business Personal Property coverage to apply to the unamortized value of “Tenants Improvement and Betterment” that remain and that you were forced to abandon.

The most we will pay in any one occurrence for loss under this Additional Coverage is $25,000.

**v. Lease Assessment**

Your Business Personal Property is extended to apply to your share of any assessment charged to all tenants by the building owner as a result of direct physical damage caused by or resulting from a Covered Cause of Loss to building property you occupy as agreed to in your written lease agreement.

We will pay no more than $2,500 in any one occurrence for this Additional Coverage.

**6. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises". All Coverage Extensions are subject to the terms, conditions and exclusions of this policy, except as otherwise provided.

In addition to the Limits of Insurance, you may extend the insurance provided by this policy as follows:

**a. Accounts Receivable**

**(1)** You may extend the insurance that applies to your Business Personal Property, to apply to your accounts receivable.

We will pay for:

**(a)** All amounts due from your customers that you are unable to collect;

**(b)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

**(c)** Collection expenses in excess of your normal collection expenses that are made necessary by the physical loss or physical damage; and

**(d)** Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss of or physical damage to your records of accounts receivable.

**(2)** Paragraph **A.3.,** Covered Causes of Loss, and Section **B.,** Exclusions, do not apply to this Additional Coverage except for:

**(a)** Paragraph **B.1.b.**, Governmental Action;

**(b)** Paragraph **B.1.c.**, Nuclear Hazard; and

**(c)** Paragraph **B.1.e.**, War and Military Action.

**(3)** Additional Exclusions

**(a)** Dishonest acts by you, anyone else with an interest in the records of accounts receivable, or your or their employees or authorized representatives, or anyone entrusted with the records of accounts receivable, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

This exclusion does not apply to a carrier for hire.

**(b)** Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money," "securities," or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**(c)** Bookkeeping, accounting or billing errors or omissions.

**(d)** Electrical or magnetic injury, disturbance or erasure of electronic recordings.

But we will pay for direct physical loss or physical damage caused by Lightning.

**(e)** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**(f)** Unauthorized instructions to transfer property to any person or to any place.

**(4)** We will not pay for direct physical loss or physical damage that requires any audit of records or any inventory computation to prove its factual existence.

**(5)** The most we will pay in any one occurrence for direct physical loss of or physical damage to your accounts receivable at each "scheduled premises" is $25,000.

**(6)** The most we will pay in any one occurrence for direct physical loss of or physical damage to accounts receivables away from the "scheduled premises", including while in transit, is $25,000.

**b. Arson and "Theft" Reward**

**(1)** In the event that a covered fire loss was the result of an act of arson, we will reimburse you for rewards you pay for information leading to convictions for that act of arson.

**(2)** In the event of a covered "theft" loss, we will reimburse you for rewards you pay for information leading to convictions for the "theft" loss.

The most we will pay to reimburse you in any one occurrence for arson or "theft" rewards is $10,000.

This is additional insurance. The deductible does not apply to these reimbursements.

**c. Data and Software**

We will pay up to $10,000 in any one occurrence to cover your costs to research, replace or restore "data" or "software" which exists or existed on electronic or magnetic "media" that is lost or damaged as a result of direct physical loss or physical damage to "computer equipment" at the "scheduled premises".

**d. Garages, Storage Buildings and Other Appurtenant Structures**

**(1)** You may extend the insurance that applies to Building to apply to garages, storage buildings and other appurtenant structures, except outdoor fixtures, at the "scheduled premises".

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $50,000 at each "scheduled premises".

**(2)** You may extend the insurance that applies to Business Personal Property in garages, storage buildings and other appurtenant structures at the "scheduled premises".

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $5,000 at each "scheduled premises".

**e. Newly Acquired or Constructed Property**

**(1)** You may extend the insurance that applies to Building to apply to:

**(a)** Your new buildings while being built on the "scheduled premises"; and

**(b)** Buildings you acquire at locations other than the "scheduled premises", intended for:

**(i)** Similar use as the Building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay in any one occurrence for loss or damage under this Extension is 25% of the Limit of Insurance for Building shown in the Declarations, but not more than $500,000 at each premises.

**(2)** You may extend the insurance that applies to Business Personal Property to apply to:

**(a)** Property at any premises you acquire or construct;

**(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed building, or

**(c)** Business Personal Property that you newly acquire, located at the "scheduled premises".

This extension does not apply to:

**(a)** Personal Property that you temporarily acquire in the course of installing or performing work on such property;

**(b)** Personal property of others that you temporarily acquire in the course of your wholesaling activity.

**(c)** Merchandise held for sale, except as provided under Paragraph **C.6.** Business Personal Property Limit – Seasonal Increase.

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $250,000 at each premises.

**(3)** You may extend the insurance that applies to Business Income and Extra Expense to apply to newly acquired or constructed locations.

The most we will pay in any one occurrence under this Extension is $50,000.

**(4)** If Covered Property is moved to a new premises endorsed onto this policy, from a "scheduled premises" being endorsed off this policy, the Limit of Insurance applicable to that vacated premises will apply proportionately to both premises as the property is moved. This coverage applies to up to 180 days after the move begins or upon completion of the move, whichever is sooner. This coverage does not apply to Business Personal Property while in transit.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(5)** Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 180 days after you acquire or begin to construct the property, or

**(c)** You report values to us.

We will charge you additional premium for values reported from the day construction begins or you acquire the property.

**f. Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor:

**(1)** Fences, signs (other than signs attached to buildings), trees, shrubs and plants caused by or resulting from any of the following causes of loss:

**(a)** Fire;

**(b)** Lightning;

**(c)** Explosion;

**(d)** Riot or Civil Commotion; and

**(e)** Aircraft.

The most we will pay in any one occurrence for direct physical loss or physical damage, including debris removal expense, under this Extension is $10,000 but not more than $1,000 for any one tree, shrub or plant.

**(2)** Radio and television antennas (including satellite dishes) caused by or resulting from any of the following causes of loss:

**(a)** Fire;

**(b)** Lightning;

**(c)** Windstorm;

**(d)** Ice, Snow, Sleet or Hail;

**(e)** Explosion;

**(f)** Riot or Civil Commotion; and

**(g)** Aircraft.

The most we will pay in any one occurrence for direct physical loss or physical damage, including debris removal expense, under this Extension is $2,000.

**g. Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners, "managers", "members", or your employees.

The most we will pay in any one occurrence for physical loss or physical damage under this Extension is $10,000 at each "scheduled premises".

**h. Property Off-Premises**

**(1)** You may extend the insurance that applies to Building to apply to such property that is temporarily at a location you do not own, lease or operate. This Extension applies only if physical loss or physical damage is caused by or resulting from a Covered Cause of Loss. This Extension does not apply to property in course of transit.

The most we will pay in any one occurrence under this coverage extension is $5,000.

**(2)** You may extend the insurance that applies to Business Personal Property to apply to such property, other than Accounts Receivable, "money" and "securities" while:

**(a)** In the course of transit and more than 1,000 feet from the "scheduled premises". Property must be in or on, but not permanently attached to or installed in, a motor vehicle you own, lease or operate while between points in the coverage territory; or

**(b)** Temporarily at a premises you do not own, lease or operate.

**(c)** At a premises owned, leased, operated or used by you and the Business Personal Property is a vending machine.

**(d)** In or on, but not permanently attached to or installed in, motor vehicles operated by your employees in the course of your business operations.

**(e)** On temporary public display, or while being used at fairs, exhibitions, expositions, or trade shows or while in transit to and from these temporary sites.

The most we will pay in any one occurrence under this Extension is $2,500.

**i. Valuable Papers and Records - Cost of Research**

You may extend the insurance that applies to Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged ''valuable papers and records'', for which duplicates do not exist.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

The most we will pay in any one occurrence under this Extension is $25,000 at each "scheduled premises". For "valuable papers and records" not at the "scheduled premises", including while in transit, the most we will pay in any one occurrence is $25,000.

**B. EXCLUSIONS**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Earth Movement**

**(1)** Earthquake, meaning a shaking or trembling of the earth's crust, caused by underground tectonic forces resulting in breaking, shifting, rising, settling, sinking or lateral movement;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil, and the action of water under the ground surface;

But if Earth Movement, as described in Paragraphs **(1)** through **(4)** above, results in fire or explosion, we will pay for the physical loss or physical damage caused by that fire or explosion.

**(5)** Volcanic eruption, meaning the eruption, explosion or effusion of a volcano. But if physical loss or physical damage by fire or volcanic action results, we will pay for that resulting physical damage.

Volcanic action means direct physical loss or physical damage resulting from the eruption of a volcano when the physical loss or physical damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust, or particulate matter; or

**(c)** Lava flow.

**(d)** All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust, or particulate matter. That does not cause direct physical loss or physical damage to Covered Property.

**b. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**c. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination however caused.

But if physical loss or physical damage by fire results, we will pay for that resulting physical loss or physical damage.

**d. Power Failure**

The failure of power or other utility service supplied to the "scheduled premises", however caused, if the failure occurs away from the "scheduled premises". Failure includes lack of sufficient capacity and reduction in supply necessary to maintain normal operations.

But if physical loss or physical damage by a Covered Cause of Loss results, we will pay for that resulting physical loss or physical damage.

**e. War and Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**f. Water**

**(1)** Flood, including the accumulation of surface water, waves, tides, tidal waves, overflow of streams or any other bodies of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mud flow;

**(3)** Water that backs up from a sewer or drain; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting physical loss or physical damage.

**(5)** Water damage caused by or resulting from earthquake or volcanic eruption:

**(a)** Earthquake means a shaking or trembling of the earth's crust, caused by underground tectonic forces resulting in breaking, shifting, rising, settling, sinking or lateral movement or other movement;

**(b)** Volcanic eruption means the eruption, explosion or effusion of a volcano.

**g. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**2.** We will not pay for physical loss or physical damage caused by or resulting from:

**a. Consequential Losses:** Delay, loss of use or loss of market.

**b Smoke, Vapor, Gas:** Smoke, vapor or gas from agricultural smudging or industrial operations.

**c. Miscellaneous Types of Loss:**

**(1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, mold, spore or other animals;

**(6)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if physical loss or physical damage by the "specified causes of loss", building glass breakage or Equipment Breakdown Accident results, we will pay for that resulting physical loss or physical damage.

**d. Frozen Plumbing:** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**e. Dishonesty:** Dishonest or criminal act by you, any of your partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

**f. False Pretense:** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**g. Exposed Property:** Rain, snow, ice or sleet to personal property in the open, except as provided in the Coverage Extension for Outdoor Property.

**h. Collapse:** Collapse, except as provided in the Additional Coverage for Collapse. But if loss or damage by a Covered Cause of Loss results at the "scheduled premises", we will pay for that resulting loss or damage.

**i. Pollution:** We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants and



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

contaminants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if physical loss or physical damage by the "specified causes of loss" results, we will pay for the resulting physical loss or physical damage caused by the "specified cause of loss."

**3.** We will not pay for loss or damage caused by or resulting from any of the following. But if physical loss or physical damage by a Covered Cause of Loss results, we will pay for that resulting physical loss or physical damage.

**a.** **Weather conditions:** Weather conditions. This exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph **1.** above to produce the physical loss or physical damage.

**b.** **Acts or Decisions:** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** **Negligent Work:** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance of part or all of any property on or off the "scheduled premises".

**4.** **Business Income and Extra Expense Exclusions**. We will not pay for:

**a.** Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

**(1)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(2)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations', we will cover such loss that affects your Business Income during the "period of restoration".

**b.** Any other consequential loss.

**5.** **Equipment Breakdown Exclusion**

We will not pay for physical loss or physical damage caused by or resulting from any of the following tests:

**(a)** A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or

**(b)** An insulation breakdown test of any type of electrical equipment.

## C. LIMITS OF INSURANCE

**1.** The most we will pay for physical loss or physical damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

**2.** The most we will pay for physical loss of or physical damage to outdoor signs attached to buildings is $5,000 per sign in any one occurrence.

**3.** The limits applicable to:

**a.** Coverage Extensions; and

**b.** The following Additional Coverages:

**(1)** Accounts Receivable,

**(2)** Fire Department Service Charges,

**(3)** Fire Extinguisher Recharge, and

**(4)** "Pollutants and Contaminants" Clean Up and Removal

are in addition to the Limits of Insurance.

**4.** Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**a.** Preservation of Property; or

**b.** Debris Removal; but if:

**(1)** The sum of direct physical loss or physical damage and Debris Removal expense exceeds the Limit of Insurance; or

**(2)** The Debris Removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage.

We will pay up to an additional $10,000 for each location stated in the Declarations in any one occurrence under the Debris Removal Additional Coverage.

**5.** **Building Limit - Automatic Increase**

**a.** The Limit of Insurance for Buildings will automatically increase annually by 8%.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance for Buildings that applied on the most recent of the policy



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

inception date, policy anniversary date, or the date of any other policy change amending the Buildings limit, times

(2) The percentage of annual increase shown above, expressed as a decimal (.08); times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance for Buildings, divided by 365.

Example: The applicable Limit of Insurance for Buildings is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy period (or last policy change) is 146.

The amount of increase is:

$100,000 X .08 X 146 divided by 365 = $3,200

**6. Business Personal Property Limit - Seasonal Increase**

a. The Limit of Insurance for Business Personal Property will automatically increase by 25% to provide for seasonal variations.

b. This increase will apply only if all Limits of Insurance shown in the Declarations for Business Personal Property at the “scheduled premises” is at least 100% of your average monthly values during the lesser of:

(1) The 12 months immediately preceding the date the physical loss or physical damage occurs; or

(2) The period of time you have been in business as of the date the physical loss or physical damage occurs.

**D. DEDUCTIBLES**

1. We will not pay for physical loss or physical damage in any one occurrence until the amount of physical loss or physical damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

2. Except as otherwise listed, the deductible applicable to Additional Coverages and Coverage Extensions is the Special Property Coverage Form is $250.

3. A $250 deductible applies to the following Glass Coverages, unless Glass Coverage is provided under a separate coverage form:

a. Building Glass

b. Glass Expense

c. Tenant Glass

4. Unless a separate deductible is shown in the Declarations, the deductible applicable to the following Additional Coverages or Coverage Extensions is $250, whether the coverage is provided under this coverage form, provided on a separate coverage form or the coverage is provided in a form that includes a package of coverages, such as a Stretch endorsement:

a. Accounts Receivable;

b. Fine Arts

c. Outdoor Signs; and

d. "Valuable Papers and Records";

5. Unless a separate deductible is shown in the Declarations, the deductible applicable to the following Additional Coverages or Coverage Extensions is $100, whether the coverage is provided under this coverage form, provided on a separate coverage form or the coverage is provided in a form that includes a package of coverages, such as a Stretch endorsement:

a. Employee Dishonesy; and

b. Temperature Change.

6. No deductible applies to the following Coverage Extensions and Additional Coverages:

a. Fire Extinguisher Recharge;

b. Preservation of Property;

c. Fire Department Service Charge;

d. Business Income, Extra Expense, Civil Authority and Extended Business Income;

e. Arson Reward; and

f. Lock and Key Replacement

6. The Deductible applicable to the following Additional Coverages is the policy deductible or the deductible shown in the Declarations for the following coverage:

a. Equipment Breakdown;

b. Ordinance or Law Coverage; and

c. Leasehold Improvements.

7. Each deductible applicable to this policy shall be applied separately but only to the coverage specified, and the total deductible for all losses in any one occurrence shall be the highest deductible amount that applies to the occurrence.

**E. PROPERTY LOSS CONDITIONS**

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In that event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

You must see that the following are done in the event of loss of or damage to Covered Property:

**a.** Notify the police if a law may have been broken.

**b.** Give us prompt notice of the physical loss or physical damage. Include a description of the property involved.

**c.** As soon as possible, give us description of how, when and where the physical loss or physical damage occurred.

**d.** Take all reseasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside in the best possible order for examination. Also, keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim.

This will not increase the Limits of Insurance.

**e.** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**f.** Permit us to inspect the property and records proving the loss or damage. Also permit us to take samples of damaged property for inspection, testing and analysis.

**g.** If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

**h.** Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**i.** Cooperate with us in the investigation or settlement of the claim.

**j.** Resume part or all of your "operations" as quickly as possible.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within 2 years after the date on which the direct physical loss or physical damage occurred.

**5. Loss Payment**

In the event of physical loss or physical damage covered by this policy:

**a.** At our option we will either:

**(1)** Pay the value of physically lost or physically damaged property, as described in paragraph **d.** below;

**(2)** Pay the cost of repairing or replacing the physically lost or physically damaged property, plus any reduction in value of repaired items;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn statement of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** We will determine the value of Covered Property as follows:

**(1)** At replacement cost (without deduction for depreciation), except as provided in **(2)** through **(7)** below.

**(a)** You may make a claim for physical loss or physical damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have physical loss or physical damage settled on an actual cash value basis, you may still make a claim on a



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

replacement cost basis if you notify us of your intent to do so within 180 days after the physical loss or physical damage.

**(b)** We will not pay on a replacement cost basis for any physical loss or physical damage:

**(i)** Until the physically lost or physically damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the physical loss or physical damage.

However, if the cost to repair or replace the damaged property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

**(c)** We will not pay more for physical loss or physical damage on a replacement cost basis than the least of:

**(i)** The cost to replace, on the same premises, the physically lost or physically damaged property with other property of comparable material and quality and which is used for the same purpose; or

**(ii)** The amount you actually spend that is necessary to repair or replace the physically lost or physically damaged property.

**(2)** If the **Actual Cash Value - Buildings** option applies, as shown in the Declarations, paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Manuscripts;

**(b)** Works of art, antiques or rare articles, including etchings, pictures, statuary, objects of marble, bronzes, porcelains and bric-a-brac.

**(c)** Household contents, except personal property in apartments or rooms furnished by you as landlord.

**(4)** Glass at the cost of replacement with safety glazing material if required by law.

**(5)** "Tenants' Improvements and Betterments" at:

**(a)** Replacement cost if you make repairs promptly.

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the physical loss or physical damage to the expiration of the lease; and

**(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing, if others pay for repairs or replacement.

**(6)** "Valuable Papers and Records", at the cost of:

**(a)** Blank materials for reproducing the records; and

**(b)** Labor to transcribe or copy the records.

**(7)** "Money" and "Securities":

**(a)** "Money" at its face value; and

**(b)** "Securities" at their value at the close of business on the day the loss is discovered.

**(8)** The value of United States Government Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully determined on the following property held for sale will not be considered in determining the value of Covered Property:

**(a)** Distilled spirits;

**(b)** Wines;

**(c)** Rectified products; or

**(d)** Beer.

**(9)** Applicable to Accounts Receivable:

**(a)** If you can not accurately establish the amount of the accounts receivable outstanding as of the time of physical loss or physical damage the following method will be used:

**(i)** Determine the total of the average monthly value of accounts receivable for 12 months immediately preceding the month in which the direct physical loss or physical damage occurred; and

**(ii)** Adjust the total determined in paragraph **(i)** above for any normal fluctuations in the value of accounts receivable for the month in which the direct physical loss or physical damage occurred for any demonstrated variance from the average of that month.

**(b)** The following will be deducted from the total value of accounts receivable, however that value is established:

**(i)** The value of the accounts for which there is no physical loss or physical damage;

**(ii)** The value of the accounts that you are able to re-establish or collect;

**(ii)** A value to allow for probable bad debts that you are normally unable to collect; and

**(iv)** All unearned interest and services charged.

**e.** Our payment for physical loss of or physical damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of physically lost or physically damaged property if other than you. If we pay the owners, such payment will satisfy your claims against us for the owners' property.

We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered physical loss or physical damage within 30 days after we receive the sworn statement of loss**,** if:

**(1)** You have complied with all of the terms of this policy; and

**(2)** **(a)** We have reached agreement with you on the amount of loss, or

**(b)** An appraisal award has been made.

**h.** The following condition applies to any loss payment for Extra Expense:

We will deduct from the total Extra Expense to be paid:

**(1)** The salvage value that remains of any property bought for temporary use during the Period of Restoration, once business operations are resumed; and

**(2)** Any Extra Expense that is paid for by other insurance.

**6. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance.

**7. Resumption of Operations**

In the event of physical loss or physical damage at the "scheduled premises" you must resume all or part of your "operations" as quickly as possible.

We will reduce the amount of your:

**a.** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the "scheduled premises" or elsewhere.

**b.** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**8. Vacancy**

**a. Description of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(a)** and **(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where physical loss or physical damage occurs has been vacant for more than 60 consecutive days before that physical loss or physical damage occurs:

**(1)** We will not pay for any physical loss or physical damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you had protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the physical loss or physical damage by 15%.

## F. PROPERTY GENERAL CONDITIONS

### 1. Control of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at one or more locations will not affect coverage at any location where, at the time of physical loss or physical damage, the breach of condition does not exist.

### 2. Mortgage Holders

**a.** The term mortgage holder includes trustee.

**b.** We will pay for covered physical loss of or physical damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

**(1)** Pays any premium due under this policy at our request if you have failed to do so;

**(2)** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this policy will then apply directly to the mortgage holder.

**e.** If we pay the mortgage holder for any physical loss or physical damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

**(1)** The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgage holder's rights to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**f.** If we cancel this policy, we will give written notice to the mortgage holder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your non payment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgage holder at least 10 days before the expiration date of this policy.

**3. No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4. Policy Period, Coverage Territory**

Under this form:

**a.** We cover physical loss or physical damage commencing:

**(1)** During the policy period shown in the Declarations; and

**(2)** Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

But we do not cover physical loss or physical damage that is also covered by a preceding policy.

**b.** The coverage territory is:

**(1)** The United States of America (including its territories and possessions);

**(2)** Puerto Rico; and

**(3)** Canada.

**5.** Additional Conditions

The following conditions apply to paragraph **A.5.u.**, Forgery Additional Coverage:

**a.** We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**b.** You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**c.** The Coverage Territory is revised to cover loss you sustain anywhere in the world.

**G. PROPERTY DEFINITIONS**

**1.** "Computer" means a programmable electronic device that can store, retrieve and process "data".

**2.** "Computer Equipment" means "computers", "peripheral devices", "media", and manuals that are purchased to be used in conjunction with hardware and "software".

**3.** "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

**4.** "Data" means information or facts stored in a "computer's" memory, on "software" or on "media".

**5.** "Finished Stock" means stock you have manufactured.

"Finished Stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this policy.

**6.** "Manager" means a person serving in a directorial capacity for a limited liability company.

**7.** "Media" means the material used solely with the "computer" or "peripheral device" upon which "software" or "data" is stored, such as tapes, CD-ROMs or disks.

**8.** "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

**9.** “Messenger” means you, any any of your partners or any employee while having care and custody of the property outside your premises.

**10.** "Money" means:

**a.** Currency, coins and bank notes whether or not in current use; and

**b.** Travelers checks, registered checks and money orders held for sale to the public.

**11.** "Operations" means your business activities occurring at the "scheduled premises" and tenantability of the "scheduled premises".

**12.** "Period of Restoration" means the period of time that:

**a.** Begins with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the "scheduled premises", and

**b.** Ends on the date when:

**(1)** The property at the "scheduled premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality;

**(2)** The date when your business is resumed at a new, permanent location.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

"Period of Restoration" does not include any increased period required due to enforcement of any law that:

**a.** Regulates the construction, use or repair, or required the tearing down of any property; or

**b.** Regulates the prevention, control, repair, clean up or restoration of environmental damage.

The expiration date of this policy will not cut short the "period of restoration".

**13.** "Peripheral Device" means any physical unit used to operate the "computer' that cannot be used for purposes other than as part of the computer's system, such as tape or disk drives, printers, or modems.

**14.** "Perishable Stock" means personal property:

**a.** Maintained under controlled conditions for its preservation; and

**b.** Susceptible to physical loss or physical damage if the controlled conditions change.

**15.** "Pollutants and Contaminants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste, or any other material which causes or threatens to cause physical loss, physical damage, impurity to property, unwholesomeness, undesirability, loss of marketability, loss of use of property, or which threatens human health or welfare. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Scheduled Premises" means any premises listed by location address in the Scheduled Premises section of the Declarations.

**17.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets except Lottery Tickets, revenue and other non-postage stamps whether or not in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which are not of your own issue;

but does not include "money."

**18.** "Software" means instructions or programs that are stored on "media" and which instruct the hardware as to how to process "data".

**19.** "Specified Cause of Loss" means the following:

Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. It does not include the cost of filling sinkholes.

**b.** Falling objects does not include loss of or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

**20.** "Suit" means a civil proceeding and includes:

**a.** An arbitration proceeding in which damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which damages are claimed and to which you submit with our consent.

**21.** "Tenant Improvements and Betterments" means fixtures, alterations, installations or additions made a part of the Building you occupy but do not own and that you cannot legally remove; and

**a.** Which are made at your expense; or

**b.** That you acquired from the prior tenant at your expense.

**22.** "Theft" means the act of stealing.

**23.** "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" and "securities", "data" and "software" or the materials on which the "data" and "software" is recorded.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

# BUSINESS LIABILITY COVERAGE FORM



© 2005, The Hartford

# QUICK REFERENCE
# BUSINESS LIABILITY COVERAGE FORM
# READ YOUR POLICY CAREFULLY


| BUSINESS LIABILITY COVERAGE FORM | | Beginning on Page |
|---|---|---|
| **A.** | **COVERAGES** | 1 |
| | Business Liability | 1 |
| | Medical Expenses | 2 |
| | Coverage Extension - Supplementary Payments | 2 |
| **B.** | **EXCLUSIONS** | 3 |
| **C.** | **WHO IS AN INSURED** | 10 |
| **D.** | **LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE** | 14 |
| **E.** | **LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS** | 15 |
| | **1.** Bankruptcy | 15 |
| | **2.** Duties In The Event Of Occurrence, Offense, Claim Or Suit | 15 |
| | **3.** Financial Responsibility Laws | 16 |
| | **4.** Legal Action Against Us | 16 |
| | **5.** Separation Of Insureds | 16 |
| | **6.** Representations | 16 |
| | **7.** Other Insurance | 16 |
| | **8.** Transfer Of Rights Of Recovery Against Others To Us | 17 |
| **F.** | **OPTIONAL ADDITIONAL INSURED COVERAGES** | 18 |
| | Additional Insureds | 18 |
| **G.** | **LIABILITY AND MEDICAL EXPENSES DEFINITIONS** | 20 |

# BUSINESS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the stock insurance company member of The Hartford providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **C**. - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **G**. **-** Liability And Medical Expenses Definitions.

## A. COVERAGES

**1. BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**

**Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **D.** - Liability And Medical Expenses Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or medical expenses to which this insurance applies.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage Extension - Supplementary Payments.

**b.** This insurance applies:

**(1)** To "bodily injury" and "property damage" only if:

**(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(b)** The "bodily injury" or "property damage" occurs during the policy period; and

**(c)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **C.** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**(2)** To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**c.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **C.** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;



© 2005, The Hartford

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**e. Incidental Medical Malpractice**

**(1)** "Bodily injury" arising out of the rendering of or failure to render professional health care services as a physician, dentist, nurse, emergency medical technician or paramedic shall be deemed to be caused by an "occurrence", but only if:

**(a)** The physician, dentist, nurse, emergency medical technician or paramedic is employed by you to provide such services; and

**(b)** You are not engaged in the business or occupation of providing such services.

**(2)** For the purpose of determining the limits of insurance for incidental medical malpractice, any act or omission together with all related acts or omissions in the furnishing of these services to any one person will be considered one "occurrence".

**2. MEDICAL EXPENSES**

**Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within three years of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**3. COVERAGE EXTENSION - SUPPLEMENTARY PAYMENTS**

**a.** We will pay, with respect to any claim or "suit" we investigate or settle, or any "suit" against an insured we defend:

**(1)** All expenses we incur.

**(2)** Up to $1,000 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

**(3)** The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**(4)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

**(5)** All costs taxed against the insured in the "suit".

**(6)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**(7)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

Any amounts paid under **(1)** through **(7)** above will not reduce the limits of insurance.

**b.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**(1)** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**(2)** This insurance applies to such liability assumed by the insured;

**(3)** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**(4)** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interest of the indemnitee;

**(5)** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**(6)** The indemnitee:

**(a)** Agrees in writing to:

**(i)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(ii)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(iii)** Notify any other insurer whose coverage is available to the indemnitee; and

**(iv)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(b)** Provides us with written authorization to:

**(i)** Obtain records and other information related to the "suit"; and

**(ii)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments.

Notwithstanding the provisions of Paragraph **1.b.(b)** of Section **B.** – Exclusions, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(1)** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**(2)** The conditions set forth above, or the terms of the agreement described in Paragraph **(6)** above, are no longer met.

## B. EXCLUSIONS

### 1. Applicable To Business Liability Coverage

This insurance does not apply to:

**a. Expected Or Intended Injury**

**(1)** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property; or

**(2)** "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

**b. Contractual Liability**

**(1)** "Bodily injury" or "property damage"; or

**(2)** "Personal and advertising injury"

for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This exclusion does not apply to liability for damages because of:

**(a)** "Bodily injury", "property damage" or "personal and advertising injury" that the insured would have in the absence of the contract or agreement; or

**(b)** "Bodily injury" or "property damage" assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purpose of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage" provided:

**(i)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract", and

**(ii)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business, or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible;

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 51 feet long; and

**(b)** Not being used to carry persons for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment"; or

**(6)** An aircraft that is not owned by any insured and is hired, chartered or loaned with a paid crew. However, this exception does not apply if the insured has any other insurance for such "bodily injury" or "property damage", whether the other insurance is primary, excess, contingent or on any other basis.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications;

**(3)** Supervisory, inspection, architectural or engineering activities;

**(4)** Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(5)** Any health or therapeutic service treatment, advice or instruction;

**(6)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**(7)** Optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(8)** Optometry or optometric services including but not limited to examination of the eyes and the prescribing, preparation, fitting,demonstration or distribution of ophthalmic lenses and similar products;

**(9)** Any:

**(a)** Body piercing (not including ear piercing);

**(b)** Tattooing, including but not limited to the insertion of pigments into or under the skin; and

**(c)** Similar services;

**(10)** Services in the practice of pharmacy; and

**(11)** Computer consulting, design or programming services, including web site design.

Paragraphs **(4)** and **(5)** of this exclusion do not apply to the Incidental Medical Malpractice coverage afforded under Paragraph **1.e.** in Section **A.** - Coverages.

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Section **D.** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to the use of elevators.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to "property damage" to borrowed equipment while not being used to perform operations at a job site.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**l. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(2)** Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

**(3)** Arising out of a criminal act committed by or at the direction of the insured;

**(4)** Arising out of any breach of contract, except an implied contract to use another's "advertising idea" in your "advertisement";

**(5)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(6)** Arising out of the wrong description of the price of goods, products or services;

**(7)** Arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.

However, this exclusion does not apply to infringement, in your "advertisement", of

**(a)** Copyright;

**(b)** Slogan, unless the slogan is also a trademark, trade name, service mark or other designation of origin or authenticity; or

**(c)** Title of any literary or artistic work;

**(8)** Arising out of an offense committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **a.**, **b.** and **c.** under the definition of "personal and advertising injury" in Section **G.** – Liability And Medical Expenses Definitions.

For the purposes of this exclusion, placing an "advertisement" for or linking to others on your web site, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting;

**(9)** Arising out of an electronic chat room or bulletin board the insured hosts, owns, or over which the insured exercises control;

**(10)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers;

**(11)** Arising out of the violation of a person's right of privacy created by any state or federal act.

However, this exclusion does not apply to liability for damages that the insured would have in the absence of such state or federal act;

**(12)** Arising out of:

**(a)** An "advertisement" for others on your web site;

**(b)** Placing a link to a web site of others on your web site;

**(c)** Content from a web site of others displayed within a frame or border on your web site. Content includes information, code, sounds, text, graphics or images; or

**(d)** Computer code, software or programming used to enable:

**(i)** Your web site; or

**(ii)** The presentation or functionality of an "advertisement" or other content on your web site;

**(13)** Arising out of a violation of any anti-trust law;

**(14)** Arising out of the fluctuation in price or value of any stocks, bonds or other securities; or

**(15)** Arising out of discrimination or humiliation committed by or at the direction of any "executive officer", director, stockholder, partner or member of the insured.

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

**r. Employment-Related Practices**

"Bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to the person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**s. Asbestos**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the "asbestos hazard".

**(2)** Any damages, judgments, settlements, loss, costs or expenses that:

**(a)** May be awarded or incurred by reason of any claim or suit alleging actual or threatened injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the "asbestos hazard";

**(b)** Arise out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an "asbestos hazard"; or

**(c)** Arise out of any claim or suit for damages because of testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of an "asbestos hazard".

**t. Violation Of Statutes That Govern E-Mails, Fax, Phone Calls Or Other Methods Of Sending Material Or Information**

"Bodily injury", "property damage", or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**Damage To Premises Rented To You – Exception For Damage By Fire, Lightning or Explosion**

Exclusions **c.** through **h.** and **k.** through **o.** do not apply to damage by fire, lightning or explosion to premises rented to you or temporarily occupied by you with permission of the owner. A separate Limit of Insurance applies to this coverage as described in Section **D.** - Liability And Medical Expenses Limits Of Insurance.

2. **Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

f. **Products-Completed Operations Hazard**

Included with the "products-completed operations hazard".

g. **Business Liability Exclusions**

Excluded under Business Liability Coverage.

## C. WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. **Employees And Volunteer Workers**

Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or that "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

If you are not in the business of providing professional health care services, Paragraph **(d)** does not apply to any nurse, emergency medical technician or paramedic employed by you to provide such services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b. Real Estate Manager**

Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c. Temporary Custodians Of Your Property**

Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d. Legal Representative If You Die**

Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this insurance.

**e. Unnamed Subsidiary**

Any subsidiary and subsidiary thereof, of yours which is a legally incorporated entity of which you own a financial interest of more than 50% of the voting stock on the effective date of this Coverage Part.

The insurance afforded herein for any subsidiary not shown in the Declarations as a named insured does not apply to injury or damage with respect to which an insured under this insurance is also an insured under another policy or would be an insured under such policy but for its termination or upon the exhaustion of its limits of insurance.

**3. Newly Acquired Or Formed Organization**

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain financial interest of more than 50% of the voting stock, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**b.** Coverage under this provision does not apply to:

**(1)** "Bodily injury" or "property damage" that occurred; or

**(2)** "Personal and advertising injury" arising out of an offense committed

before you acquired or formed the organization.

**4. Operator Of Mobile Equipment**

With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**5. Operator of Nonowned Watercraft**

With respect to watercraft you do not own that is less than 51 feet long and is not being used to carry persons for a charge, any person is an insured while operating such watercraft with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the watercraft, and only if no other insurance of any kind is available to that person or organization for this liability.

However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person operating the watercraft; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**6. Additional Insureds When Required By Written Contract, Written Agreement Or Permit**

The person(s) or organization(s) identified in Paragraphs **a.** through **f.** below are additional insureds when you have agreed, in a written

contract, written agreement or because of a permit issued by a state or political subdivision, that such person or organization be added as an additional insured on your policy, provided the injury or damage occurs subsequent to the execution of the contract or agreement, or the issuance of the permit.

A person or organization is an additional insured under this provision only for that period of time required by the contract, agreement or permit.

However, no such person or organization is an additional insured under this provision if such person or organization is included as an additional insured by an endorsement issued by us and made a part of this Coverage Part, including all persons or organizations added as additional insureds under the specific additional insured coverage grants in Section **F.** – Optional Additional Insured Coverages.

**a. Vendors**

Any person(s) or organization(s) (referred to below as vendor), but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

**(1)** The insurance afforded to the vendor is subject to the following additional exclusions:

This insurance does not apply to:

**(a)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**(b)** Any express warranty unauthorized by you;

**(c)** Any physical or chemical change in the product made intentionally by the vendor;

**(d)** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**(e)** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**(f)** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**(g)** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**(h)** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(i)** The exceptions contained in Subparagraphs **(d)** or **(f)**; or

**(ii)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**(2)** This insurance does not apply to any insured person or organization from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**b. Lessors Of Equipment**

**(1)** Any person or organization from whom you lease equipment; but only with respect to their liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after you cease to lease that equipment.

**c. Lessors Of Land Or Premises**

(1) Any person or organization from whom you lease land or premises, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land or premises leased to you.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

(a) Any "occurrence" which takes place after you cease to lease that land or be a tenant in that premises; or

(b) Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

**d. Architects, Engineers Or Surveyors**

(1) Any architect, engineer, or surveyor, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(a) In connection with your premises; or

(b) In the performance of your ongoing operations performed by you or on your behalf.

(2) With respect to the insurance afforded to these additional insureds, the following additional exclusion applies:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or the failure to render any professional services by or for you, including:

(a) The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

(b) Supervisory, inspection, architectural or engineering activities.

**e. Permits Issued By State Or Political Subdivisions**

(1) Any state or political subdivision, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

(a) "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

(b) "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**f. Any Other Party**

(1) Any other person or organization who is not an insured under Paragraphs **a.** through **e**. above, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(a) In the performance of your ongoing operations;

(b) In connection with your premises owned by or rented to you; or

(c) In connection with "your work" and included within the "products-completed operations hazard", but only if

(i) The written contract or written agreement requires you to provide such coverage to such additional insured; and

(ii) This Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**(a)** The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

**(b)** Supervisory, inspection, architectural or engineering activities.

The limits of insurance that apply to additional insureds are described in Section **D.** – Limits Of Insurance.

How this insurance applies when other insurance is available to an additional insured is described in the Other Insurance Condition in Section **E.** – Liability And Medical Expenses General Conditions.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## D. LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE

**1. The Most We Will Pay**

The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2. Aggregate Limits**

The most we will pay for:

**a.** Damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard" is the Products-Completed Operations Aggregate Limit shown in the Declarations.

**b.** Damages because of all other "bodily injury", "property damage" or "personal and advertising injury", including medical expenses, is the General Aggregate Limit shown in the Declarations.

This General Aggregate Limit applies separately to each of your "locations" owned by or rented to you.

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway or right-of-way of a railroad.

This General Aggregate limit does not apply to "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner, arising out of fire, lightning or explosion.

**3. Each Occurrence Limit**

Subject to **2.a.** or **2.b** above, whichever applies, the most we will pay for the sum of all damages because of all "bodily injury", "property damage" and medical expenses arising out of any one "occurrence" is the Liability and Medical Expenses Limit shown in the Declarations.

The most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses Limit shown in the Declarations.

**4. Personal And Advertising Injury Limit**

Subject to **2.b.** above, the most we will pay for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization is the Personal and Advertising Injury Limit shown in the Declarations.

**5. Damage To Premises Rented To You Limit**

The Damage To Premises Rented To You Limit is the most we will pay under Business Liability Coverage for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning or explosion, while rented to you or temporarily occupied by you with permission of the owner.

In the case of damage by fire, lightning or explosion, the Damage to Premises Rented To You Limit applies to all damage proximately caused by the same event, whether such damage results from fire, lightning or explosion or any combination of these.

**6. How Limits Apply To Additional Insureds**

The most we will pay on behalf of a person or organization who is an additional insured under this Coverage Part is the lesser of:

**a.** The limits of insurance specified in a written contract, written agreement or permit issued by a state or political subdivision; or

**b.** The Limits of Insurance shown in the Declarations.

Such amount shall be a part of and not in addition to the Limits of Insurance shown in the Declarations and described in this Section.

If more than one limit of insurance under this policy and any endorsements attached thereto applies to any claim or "suit", the most we will pay under this policy and the endorsements is the single highest limit of liability of all coverages applicable to such claim or "suit". However, this paragraph does not apply to the Medical Expenses limit set forth in Paragraph **3.** above.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## E. LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a. Notice Of Occurrence Or Offense**

You or any additional insured must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b. Notice Of Claim**

If a claim is made or "suit" is brought against any insured, you or any additional insured must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You or any additional insured must see to it that we receive a written notice of the claim or "suit" as soon as practicable.

**c. Assistance And Cooperation Of The Insured**

You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**d. Obligations At The Insured's Own Cost**

No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**e. Additional Insured's Other Insurance**

If we cover a claim or "suit" under this Coverage Part that may also be covered by other insurance available to an additional insured, such additional insured must submit such claim or "suit" to the other insurer for defense and indemnity.

However, this provision does not apply to the extent that you have agreed in a written contract, written agreement or permit that this insurance is primary and non-contributory with the additional insured's own insurance.

**f. Knowledge Of An Occurrence, Offense, Claim Or Suit**

Paragraphs **a.** and **b.** apply to you or to any additional insured only when such "occurrence", offense, claim or "suit" is known to:

**(1)** You or any additional insured that is an individual;

**(2)** Any partner, if you or an additional insured is a partnership;

**(3)** Any manager, if you or an additional insured is a limited liability company;

**(4)** Any "executive officer" or insurance manager, if you or an additional insured is a corporation;

**(5)** Any trustee, if you or an additional insured is a trust; or

**(6)** Any elected or appointed official, if you or an additional insured is a political subdivision or public entity.

This Paragraph **f.** applies separately to you and any additional insured.

**3. Financial Responsibility Laws**

**a.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, the insurance provided by the policy for "bodily injury" liability and "property damage" liability will comply with the provisions of the law to the extent of the coverage and limits of insurance required by that law.

**b.** With respect to "mobile equipment" to which this insurance applies, we will provide any liability, uninsured motorists, underinsured motorists, no-fault or other coverage required by any motor vehicle law. We will provide the required limits for those coverages.

**4. Legal Action Against Us**

No person or organization has a right under this Coverage Form:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**5. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom a claim is made or "suit" is brought.

**6. Representations**

**a. When You Accept This Policy**

By accepting this policy, you agree:

**(1)** The statements in the Declarations are accurate and complete;

**(2)** Those statements are based upon representations you made to us; and

**(3)** We have issued this policy in reliance upon your representations.

**b. Unintentional Failure To Disclose Hazards**

If unintentionally you should fail to disclose all hazards relating to the conduct of your business at the inception date of this Coverage Part, we shall not deny any coverage under this Coverage Part because of such failure.

**7. Other Insurance**

If other valid and collectible insurance is available for a loss we cover under this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1) Your Work**

That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(2) Premises Rented To You**

That is fire, lightning or explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3) Tenant Liability**

That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

**(4) Aircraft, Auto Or Watercraft**

If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **A.** – Coverages.

**(5) Property Damage To Borrowed Equipment Or Use Of Elevators**

If the loss arises out of "property damage" to borrowed equipment or the use of elevators to the extent not subject to Exclusion **k.** of Section **A.** – Coverages.


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(6) When You Are Added As An Additional Insured To Other Insurance**

That is other insurance available to you covering liability for damages arising out of the premises or operations, or products and completed operations, for which you have been added as an additional insured by that insurance; or

**(7) When You Add Others As An Additional Insured To This Insurance**

That is other insurance available to an additional insured.

However, the following provisions apply to other insurance available to any person or organization who is an additional insured under this Coverage Part:

**(a) Primary Insurance When Required By Contract**

This insurance is primary if you have agreed in a written contract, written agreement or permit that this insurance be primary. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

**(b) Primary And Non-Contributory To Other Insurance When Required By Contract**

If you have agreed in a written contract, written agreement or permit that this insurance is primary and non-contributory with the additional insured's own insurance, this insurance is primary and we will not seek contribution from that other insurance.

Paragraphs **(a)** and **(b)** do not apply to other insurance to which the additional insured has been added as an additional insured.

When this insurance is excess, we will have no duty under this Coverage Part to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**8. Transfer Of Rights Of Recovery Against Others To Us**

**a. Transfer Of Rights Of Recovery**

If the insured has rights to recover all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**b. Waiver Of Rights Of Recovery (Waiver Of Subrogation)**

If the insured has waived any rights of recovery against any person or organization for all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, we also waive that right, provided the insured waived their rights of recovery against such person or organization in a contract, agreement or permit that was executed prior to the injury or damage.

## F. OPTIONAL ADDITIONAL INSURED COVERAGES

If listed or shown as applicable in the Declarations, one or more of the following Optional Additional Insured Coverages also apply. When any of these Optional Additional Insured Coverages apply, Paragraph **6.** (Additional Insureds When Required by Written Contract, Written Agreement or Permit) of Section **C.**, Who Is An Insured, does not apply to the person or organization shown in the Declarations. These coverages are subject to the terms and conditions applicable to Business Liability Coverage in this policy, except as provided below:

**1. Additional Insured - Designated Person Or Organization**

WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**a.** In the performance of your ongoing operations; or

**b.** In connection with your premises owned by or rented to you.

**2. Additional Insured - Managers Or Lessors Of Premises**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured - Designated Person Or Organization; but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Declarations.

**b.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**(1)** Any "occurrence" which takes place after you cease to be a tenant in that premises; or

**(2)** Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

**3. Additional Insured - Grantor Of Franchise**

WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured - Grantor Of Franchise, but only with respect to their liability as grantor of franchise to you.

**4. Additional Insured - Lessor Of Leased Equipment**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Lessor of Leased Equipment, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

**b.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after you cease to lease that equipment.

**5. Additional Insured - Owners Or Other Interests From Whom Land Has Been Leased**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Owners Or Other Interests From Whom Land Has Been Leased, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Declarations.

**b.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**(1)** Any "occurrence" that takes place after you cease to lease that land; or

**(2)** Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

**6. Additional Insured - State Or Political Subdivision – Permits**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the state or political subdivision shown in the Declarations as an Additional

Insured – State Or Political Subdivision - Permits, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

**b.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

**(2)** "Bodily injury" or "property damage" included in the "product-completed operations" hazard.

**7. Additional Insured – Vendors**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) (referred to below as vendor) shown in the Declarations as an Additional Insured - Vendor, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

**b.** The insurance afforded to the vendor is subject to the following additional exclusions:

**(1)** This insurance does not apply to:

**(a)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**(b)** Any express warranty unauthorized by you;

**(c)** Any physical or chemical change in the product made intentionally by the vendor;

**(d)** Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**(e)** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**(f)** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**(g)** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**(h)** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(i)** The exceptions contained in Subparagraphs **(d)** or **(f)**; or

**(ii)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**(2)** This insurance does not apply to any insured person or organization from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**8. Additional Insured – Controlling Interest**

WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Controlling Interest, but only with respect to their liability arising out of:

**a.** Their financial control of you; or

**b.** Premises they own, maintain or control while you lease or occupy these premises.

This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

9. **Additional Insured – Owners, Lessees Or Contractors – Scheduled Person Or Organization**

   a. WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Owner, Lessees Or Contractors, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

      (1) In the performance of your ongoing operations for the additional insured(s); or

      (2) In connection with "your work" performed for that additional insured and included within the "products-completed operations hazard", but only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

   b. With respect to the insurance afforded to these additional insureds, this insurance does not apply to "bodily injury", "property damage" or "personal an advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

      (1) The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

      (2) Supervisory, inspection, architectural or engineering activities.

10. **Additional Insured – Co-Owner Of Insured Premises**

    WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or Organization(s) shown in the Declarations as an Additional Insured – Co-Owner Of Insured Premises, but only with respect to their liability as co-owner of the premises shown in the Declarations.

The limits of insurance that apply to additional insureds are described in Section **D.** – Limits Of Insurance.

How this insurance applies when other insurance is available to an additional insured is described in the Other Insurance Condition in Section **E.** – Liability And Medical Expenses General Conditions.

## G. LIABILITY AND MEDICAL EXPENSES DEFINITIONS

1. "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

   a. (1) Radio;

      (2) Television;

      (3) Billboard;

      (4) Magazine;

      (5) Newspaper;

   b. The Internet, but only that part of a web site that is about goods, products or services for the purposes of inducing the sale of goods, products or services; or

   c. Any other publication that is given widespread public distribution.

   However, "advertisement" does not include:

   a. The design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products; or

   b. An interactive conversation between or among persons through a computer network.

2. "Advertising idea" means any idea for an "advertisement".

3. "Asbestos hazard" means an exposure or threat of exposure to the actual or alleged properties of asbestos and includes the mere presence of asbestos in any form.

4. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

5. "Bodily injury" means physical:

   a. Injury;

   b. Sickness; or

   c. Disease

   sustained by a person and, if arising out of the above, mental anguish or death at any time.

6. "Coverage territory" means:


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above;

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in **a.** above;

(2) The activities of a person whose home is in the territory described in **a**. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in the United States of America (including its territories and possessions), Puerto Rico or Canada, in a "suit" on the merits according to the substantive law in such territory, or in a settlement we agree to.

7. "Electronic data" means information, facts or programs:

a. Stored as or on;

b. Created or used on; or

c. Transmitted to or from

computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

10. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is subject to the Damage To Premises Rented To You limit described in Section **D.** – Liability and Medical Expenses Limits of Insurance.

b. A sidetrack agreement;

c. Any easement or license agreement, including an easement or license agreement in connection with construction or demolition operations on or within 50 feet of a railroad;

d. Any obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement; or

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** includes that part of any contract or agreement that indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing.

However, Paragraph **f.** does not include that part of any contract or agreement:


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a.**, **b.**, **c.**, or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a.**, **b.**, **c.**, or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment, of at least 1,000 pounds gross vehicle weight, designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral, written or electronic publication of material that violates a person's right of privacy;

f. Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement";

g. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement"; or

h. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person.

**18.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**19.** "Products-completed operations hazard";

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed to be completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**20.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it.

As used in this definition, "electronic data" is not tangible property.

**21.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Volunteer worker" means a person who:

**a.** Is not your "employee";

**b.** Donates his or her work;

**c.** Acts at the direction of and within the scope of duties determined by you; and

**d.** Is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**24.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**25**. "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS LIABILITY COVERAGE FORM AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**A.** Sub-subparagraphs 1.p. (7), (8), (15) of Paragraph 2., of Section B. **Exclusions** are deleted and replaced with the following:

**p. Personal and Advertising Injury:**

**(7) (a)** Arising out of any actual or alleged infringement or violation of any intellectual property right, such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity; or

**(b)** Any injury or damage alleged in any claim or "suit" that also alleges an infringement or violation of any intellectual property right, whether such allegation of infringement or violation is made by you or by any other party involved in the claim or "suit", regardless of whether this insurance would otherwise apply.

However, this exclusion does not apply if the only allegation in the claim or "suit" involving any intellectual property right is limited to:

**(1)** Infringement, in your "advertisement", of:

**(a)** Copyright;

**(b)** Slogan; or

**(c)** Title of any literary or artistic work; or

**(2)** Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement".

**(8)** Arising out of an offense committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs a., b. and c. of the definition of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(15)** Arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**B.** Subparagraph 1.r. of Section B. **Exclusions** is deleted and replaced with the following:

**r. Employment-Related Practices**

"Personal and advertising injury" to:

**(1)** A person arising out of any "employment–related practices"; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any "employment-related practices" are directed.

This exclusion applies:

**(a)** Whether the injury-causing event described in the definition of "employment-related practices" occurs before employment, during employment or after employment of that person;

**(b)** Whether the insured may be liable as an employer or in any other capacity; and

**(c)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**C.** Subparagraph 1.q. "Electronic Data" of Section B. **Exclusions** is deleted and replaced with the following:

**q. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

**(1)** Damages, other than damages because of "personal and advertising injury", arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

However, unless Paragraph (1) above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**D.** Sub-subparagraph 7.b.(1) Other Insurance of Section E. **Liability and Medical Expenses General Conditions** is deleted and replaced with the following:

**b. Excess Insurance**

**(1) Your Work**

That is Fire, Extended Coverage, Builder's Risk, Installation Risk, Owner Controlled Insurance Program or OCIP, Wrap Up Insurance or similar coverage for "your work".

**E.** Subparagraph 17. c. "Personal and Advertising Injury" of Section G, **Liability and Medical Expenses Definitions** is deleted and replaced with the following:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person or organization occupies, committed by or on behalf of its owner, landlord or lessor;

**F.** Subparagraph 17.h. of Section G, **Liability and Medical Expenses Definitions** deleted.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PROPERTY COVERAGE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

**A.** The following changes are made to Paragraph **A.5.**, **Additional Coverages**:

**1.** Paragraph **f.**, **Forgery** is deleted and replaced with the following:

**f. Forgery**

**(1)** We will pay for loss resulting directly from forgery or alteration of any check, draft, promissory note, or bill of exchange or similar written promise of payment in "money" that you or your agent has issued, or that was issued by someone who impersonates you or your agent. This includes written instruments required in conjunction with any credit, debit, or charge card issued to you or any employee for business purposes.

**(2)** If you are sued for refusing to pay the check, draft, promissory note, or bill of exchange or similar written promise of payment in "money" on the basis that it has been forged or altered, and you have our written consent to defend against the "suit", we will pay for any reasonable expenses that you incur and pay in that defense.

**(3)** We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(a)** Money orders, including counterfeit money orders, issued by any post office, express company or bank that are not paid upon presentation; and

**(b)** Counterfeit United States or Canadian paper currency.

**(4)** For the purpose of this Coverage Extension, check includes a substitute check as defined in the Check Clearing for the 21st Century Act and will be treated the same as the original it replaced.

**(5)** We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

**(6)** The most we will pay in any one occurrence, including legal expenses, under this Additional Coverage is $5,000, unless a higher Limit of Insurance is shown in the Declarations.

**2.** Paragraph **i.(2)(c)** of the **Money and Securities** Additional Coverage is deleted and replaced with the following:

**(c)** Loss or damage to "money" and "securities" following and directly related to the use of any "computer" to fraudulently cause a transfer of that property.

**B.** The following changes are made to Section **B.**, **EXCLUSIONS**

**1.** Paragraph **1.a.**, **Earth Movement** is amended to add the following:

This Exclusion applies regardless of whether any of the following is caused by weather, an act of nature, by an artificial, man-made or other cause.

**2.** The following is exclusion is added to Paragraph **1.**:

**Electronic Vandalism or Corruption of "Electronic Data" or Corruption of "Computer Equipment"**



© 2019, The Hartford

This exclusion does not apply to Electronic Vandalism, form SS 14 29 or Electronic Vandalism, form SS 40 08 if either form has been made part of this policy.

**(1)** Destruction or corruption of "electronic data" caused by a virus, malicious code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

**(2)** Unauthorized viewing, copying or use of electronic data (or any proprietary or confidential information or intellectual property in any form) by any person, even if such activity is characterized as "theft";

**(3)** Errors or omissions in programming or processing "electronic data";

**(4)** Errors or deficiency in design, installation, maintenance, repair or modification of your computer system or any computer system or network to which your system is connected or on which your system depends (including "electronic data");

**(5)** Manipulation of your computer system, including "electronic data", by an employee, volunteer worker or contractor, for the purpose of diverting or destroying "electronic data" or causing fraudulent or illegal transfer of any property;

**(6)** Interruption in normal computer function or network service or function due to insufficient capacity to process transactions or to an overload of activity on the system or network;

**(7)** Unexplained or indeterminable failure, malfunction or slowdown of a computer system, including "electronic data" and the inability to access or properly manipulate the "electronic data";

**(8)** Complete or substantial failure, disablement or shutdown of the Internet, regardless of the cause;

**(9)** The inability of a computer system to correctly recognize, process, distinguish, interpret or accept one or more dates or times.

But if direct physical loss or direct physical damage occurs to Covered Property from a resulting Covered Cause of Loss, we will pay for that resulting direct physical loss or direct physical damage. Mere loss of use or loss of functionality of any property is not considered physical loss or physical damage.

**3.** Paragraph **2.** is deleted and replaced with the following:

We will not pay for loss or damage caused by or resulting from:

**a. Consequential Losses:** Delay, loss of use or loss of market.

**b. Smoke, Vapor, Gas:** Smoke, vapor or gas from agricultural smudging or industrial operations.

**c. Miscellaneous Types of Loss:**

**(1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, mold, spore or other animals;

**(6)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if physical loss or physical damage by the "specified causes of loss", building glass breakage or Equipment Breakdown Accident results, we will pay for that resulting physical loss or physical damage.

**d. Frozen Plumbing:** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**e. Dishonesty:** Dishonest or criminal act by you, any of your partners, "members", officers, "managers", employees,



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

**f.** **False Pretense:** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**g.** **Exposed Property:** Rain, snow, ice or sleet to personal property in the open, except as provided in the Coverage Extension for Outdoor Property.

**h.** **Collapse:** Collapse, except as provided in the Additional Coverage for Collapse. But if loss or damage by a Covered Cause of Loss results at the "scheduled premises", we will pay for that resulting loss or damage.

**i.** **Pollution:** We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants and contaminants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if physical loss or physical damage by the "specified causes of loss" results, we will pay for the resulting physical loss or physical damage caused by the "specified cause of loss."

**C.** Definition **4.**, "Data", of Section **G.**, **PROPERTY DEFINITIONS** is deleted and replaced with the following.

**4.** "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

"Electronic data" it is not considered physical property under this Coverage Part and is covered only as expressly provided for in this Coverage Part. Any such coverage does not indicate that "electronic data" is considered to be tangible property subject to physical loss or physical damage for purposes of any business interruption coverage or other coverage that requires physical loss or physical damage.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS LIABILITY COVERAGE FORM AMENDATORY ENDORSEMENT- SUPPLEMENTARY PAYMENTS

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**A.** Sub-subparagraph 3.a.(5) of Paragraph 3., Section A. **Coverages** is deleted and replaced with the following:

**3. Coverage Extension - Supplementary Payments:**

**a. (5)** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.



© 2016, The Hartford

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

**COMMON POLICY CONDITIONS**
**SPECIAL PROPERTY COVERAGE FORM**
**STANDARD PROPERTY COVERAGE FORM**
**BUSINESS LIABILITY COVERAGE FORM**
**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2.** All Policies in Effect for 60 Days Or Less:

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** All Policies in Effect For More Than 60 Days

**a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following, or as permitted under applicable California law:

**(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**i.** Place us in violation of California law or the laws of the state where we are domiciled; or

**ii.** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.



© 2019, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc., with its permission)
Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud, or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in paragraph **3.a.**

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under this policy:

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in **b.** and **c.** below.

**b.** We may not cancel solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included and earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This restriction **(c.)** applies only if coverage under the **Special Property Coverage Form**, which excludes loss or damage caused by or resulting from corrosive soil conditions.

If a state of emergency under California Law is declared and the residential property is located in any ZIP Code within or adjacent to the fire perimeter, as determined by California Law, we may not cancel this policy for one year, beginning from the date the state of emergency is declared, solely because the dwelling or other structure is located in an area in which a wild fire has occurred.

However, we may cancel:

**a.** When you have not paid the premium, at any time by letting you know at least 10 days before the date cancellation takes effect;

**b.** If willful or grossly negligent acts or omissions by the named insured, or his or her representatives, are discovered that materially increase any of the risks insured against; or

**c.** If there are physical changes in the property insured against, beyond the catastrophe- damaged condition of the structures and surface landscape, which result in the property becoming uninsurable.

**C.** The following is added and supersedes any provisions to the contrary:

**NONRENEWAL**

**1.** Subject to the provisions of paragraphs **C.2**. and **C.3.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2. Residential Property**

This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under this policy.

**a.** We may elect not to renew such coverage for any reason, except as provided in **b., c.** and **d.** below:

**b.** We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

However, the following applies only to insurers who are associated participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

**(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

**(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

**(3)** We have:

**(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

**(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

**c.** We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority that included an earthquake policy premium surcharge.

**d.** We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This restriction (d) applies only if coverage is subject to the Special Property Coverage Form, which excludes loss or damage caused by or resulting from corrosive soil conditions.

If a state of emergency under California Law is declared and the residential property is located in any ZIP Code within or adjacent to the fire perimeter, as determined by California Law, we may not nonrenew this policy for one year, beginning from the date the state of emergency is declared, solely because the dwelling or other structure is located in an area in which a wildfire has occurred.

However, we may nonrenew:

**(1)** If willful or grossly negligent acts or omissions by the named insured, or his or her representatives, are discovered that materially increase any of the risk insured against.

**(2)** If losses unrelated to the post disaster loss condition of the property have occurred that would collectively render the risk ineligible for renewal; or

**(3)** If there are physical changes in the property insured against, beyond the catastrophe-damaged condition of the structures and surface landscape, which result in the property becoming uninsurable.

**3.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with paragraph **C.1**.

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the time frames shown in paragraph **C.1.,** to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

If there is an appraisal, we will still retain our right to deny the claim.

**D.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following with respect to loss of damage caused by fire:

We do not provide coverage to the insured who, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** That insured's interest in the Covered Property; or

**4.** A claim under this Coverage Part or Coverage Form.

**E.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following with respect to loss of damage caused by a Covered Cause of Loss other than fire:

This Coverage Part is void if any insured, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** That insured's interest in the Covered Property; or

**4.** A claim under this Coverage Part or Coverage Form.

**F.** The **Other Insurance - Property Coverage** Condition is replaced by the following:

If there is other insurance covering the same loss or damage, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable limit of insurance bears to the limits of insurance of all insurance covering on same basis.

**G.** Paragraph **E.2., Appraisal** of the **Standard** and **Special Property Form** is deleted and replaced by the following:

**2.** If we and you disagree on the value of the property or the amount of loss, either may make written request for an appraisal of the loss. If the request is accepted, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**H.** With respect to an "Open Policy", the **Loss Payment** Condition of the **Standard** and **Special Property Form** is amended by the following:

**1.** The following changes are made to Section **E. PROPERTY LOSS CONDITIONS:**

**a.** Paragraph **5.d.(1)(b)** of the Loss Payment condition is deleted and replaced by:

**(b)** We will not pay on a replacement cost basis for any loss or damage until the lost or damaged property is actually repaired or replaced, and then only subject to deduction for depreciation. Prior to such repair or replacement, and in accordance with the terms applicable in this Paragraph **5., Loss Payment,** we will pay the actual cash value of the lost or damaged property as described in Paragraph **2.** below. If the actual cash value does not exhaust the applicable Limit of Insurance, we will then pay the difference between the actual cash value and the replacement cost, provided that the repair or replacement is completed:

**(i)** Within 12 months after our payment of the actual cash value; or

**(ii)** Within 36 months after our payment of the actual cash value if the loss or damage relates to a state of emergency under California Law.

The following provision applies to real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit.

If you, acting in good faith and with reasonable diligence, encounter a delay or delays in approval for, or reconstruction of, the residence that are beyond your control, we shall provide one or more additional extensions of six months for good cause. Circumstances beyond your control include, but are not limited to:

**(i)** Unavoidable construction permit delays;

**(ii)** The lack of necessary construction materials; or


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**(iii)** The unavailability of contractors to perform the necessary work.

The foregoing provisions do not constitute a waiver of our right to deny the claim for any valid reason or to restrict payment in cases of suspected fraud.

**2.** The following provision is added:

**Provision Applicable to California**

Actual cash value is determined as follows:

**a.** In the event of a partial or total loss to a building or structure, actual cash value is calculated as shown below, whichever is less:

**(1)** The amount it would cost to repair, rebuild or replace the property less a fair and reasonable deduction for physical depreciation of the components of the building or structure that are normally subject to repair or replacement during its useful life. Physical depreciation is based upon the condition of the property at the time of the loss; or

**(2)** The limit of Insurance applicable to the property.

**b.** In the event of a partial or total loss to Covered Property other than a building or structure, actual cash value is calculated as the lesser of the following:

**(1)** The amount it would cost to repair or replace the property less a fair and reasonable deduction for physical depreciation, based on the condition of the property at the time of loss; or

**(2)** The Limit of Insurance applicable to the property.

**I.** With respect to this endorsement, the following definition is added to Section **G. PROPERTY DEFINITIONS**:

"Open Policy" means a policy under which the value of Covered Property is not fixed at policy inception, but is determined at the time of loss in accordance with policy provisions on valuation. The term "open policy" does not apply to Covered Property that is subject to an Agreed Value clause or similar clause that establishes an agreed value prior to loss, unless such clause has expired.

**POLICY NUMBER:** 57 SBA BN7134

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UNMANNED AIRCRAFT - LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**SCHEDULE**

| | |
|---|---|
| ☐ | **Option 1**: If an "X" is shown in this box, Bodily Injury and Property Damage coverage for Unmanned Aircraft applies and the Unmanned Aircraft Exclusion in Paragraph **A.1.g.(1)** of this endorsement does not apply. |
| ☐ | **Option 2**: If an "X" is shown in this box, Personal And Advertising Injury coverage for Unmanned Aircraft applies and the Unmanned Aircraft - Personal And Advertising Injury Exclusion in Paragraph **A.2.** of this endorsement does not apply. |

Except as otherwise stated in this endorsement or the schedule above, the terms and conditions of the policy apply to the insurance stated below.

**A.** The following changes are made to Section **B.1.**, **EXCLUSIONS**:

**1.** Paragraph **g.**, **Aircraft, Auto or Watercraft**, is deleted and replaced with the following:

**g. Aircraft, Auto or Watercraft**

**(1) Unmanned Aircraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This Paragraph **g.(1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

**(2) Aircraft (Other Than Unmanned Aircraft), Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This Paragraph **g.(2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft), "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

Paragraph **g. (2)** does not apply to:

**(a)** A watercraft while ashore on premises you own or rent;

**(b)** A watercraft you do not own that is:

**(i)** Less than 51 feet long; and

**(ii)** Not being used to carry persons for a charge;

**(c)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(d)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(e)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Section G Liability and Medical Expenses Definitions, Paragraph 15 **f. (2)** or **f. (3)** of the definition of "mobile equipment"; or

**(f)** An aircraft (other than unmanned aircraft) that is not owned by any insured and is hired, chartered or loaned with a paid crew. However, this exception does not apply if the insured has any other insurance for such "bodily injury" or "property damage", whether the other insurance is primary, excess, contingent or on any other basis.

**2.** The following is added to Section **B. EXCLUSIONS** Paragraph **p.**, **Personal and Advertising Injury**:

**Unmanned Aircraft - Personal and Advertising Injury**

Arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

However, this exclusion does not apply if the only allegation in the claim or "suit" involves an intellectual property right which is limited to:

**(a)** Infringement, in your "advertisement", of:

**(i)** Copyright;

**(ii)** Slogan; or

**(iii)** Title of any literary or artistic work; or

**(b)** Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement".

**B.** The following changes apply to Section **G. LIABILITY AND MEDICAL EXPENSES DEFINITIONS:**

**1.** The following definition is added:

"Unmanned aircraft" means an aircraft that is not:

**a.** Designed;

**b.** Manufactured; or

**c.** Modified after manufacture

to be controlled directly by a person from within or on the aircraft.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

This coverage is subject to the provisions applicable to the Standard Property Coverage Form or the Special Property Coverage Form, including the deductible, except as provided below.

**A. Ordinance or Law - Undamaged Part**

If a Covered Cause of Loss occurs to covered Building property shown in the Declarations, we will pay for loss to the undamaged portion of the Building caused by enforcement of any ordinance or law that:

**1.** Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

**2.** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the ”scheduled premises”; and

**3.** Is in force at the time of loss.

This coverage is included within the Limit of Insurance applicable to the covered Building property shown in the Declarations.

**B. Demolition Cost**

If a Covered Cause of Loss occurs to covered Building property shown in the Declarations with a Limit of Insurance for Demolition Cost, we will pay the cost to demolish and clear the site of undamaged parts of the property caused by enforcement of building, zoning or land use ordinance or law.

**C. Increased Cost of Construction**

If a Covered Cause of Loss occurs to covered Building property shown in the Declarations with a Limit of Insurance for Increased Cost of Construction, we will pay for the increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance or law.

However, we will not pay for the Increased Cost of Construction if the Building is not repaired or replaced.

**D. Additional Exclusions:**

The following additional exclusions apply to the coverage afforded by this endorsement. We will not pay for:

**1.** The enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by “pollutants” or due to the presence, growth, proliferation, spread of any activity of “fungi”, wet or dry rot, bacteria or virus; or

**2.** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of “pollutants and contaminants”, “fungi”, wet or dry rot, bacteria or virus.

**3.** Loss caused by, resulting from, contributed to or aggravated by earthquake or volcanic eruption.

**4.** Loss due to an ordinance or law that:

**a.** You were required to comply with before the loss even if the building was undamaged; and

**b.** You failed to comply with.

**E. Applicable to Ordinance or Law - Undamaged Part:**

**1.** If Replacement Cost applies and the property is repaired or replaced on the same or other premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than the lesser of:

**a.** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for



© 2005, The Hartford

more than the amount it would cost to restore the Building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**b.** The Limit of Insurance applicable to the covered Building property.

**2.** If the Building(s) Full Value Endorsement applies and the property is repaired or replaced, on the same or another premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than the lesser of:

**a.** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for more than the amount it would cost to restore the Building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

**b.** The amount payable under the Building(s) Full Value Endorsement.

**3. a.** If Replacement Cost or the Building(s) Full Value Endorsement applies and the property is not repaired or replaced; or

**b.** If actual cash value applies;

We will not pay more for physical loss or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than the lesser of:

**(1)** The actual cash value of the Building at the time of loss; or

**(2)** The Limit of Insurance applicable to the covered Building property.

**F. Applicable to Demolition Cost:**

We will not pay more than the lesser of:

**1.** The amount actually spent to demolish and clear the site of the "scheduled premises"; or

**2.** The applicable Demolition Cost Limit of Insurance shown in the Declarations.

**G. Applicable to Increased Cost of Construction:**

**1.** We will not pay under Increased Cost of Construction:

**a.** Until the property is actually repaired or replaced, at the same or another premises; and

**b.** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**2.** If the Building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay is the lesser of:

**a.** The increased cost of construction at the same premises; or

**b.** The applicable Increased Cost of Construction Limit of Insurance shown in the Declarations.

**3.** If the ordinance or law requires relocation to another premises, the most we will pay is the lesser of:

**a.** The increased cost of construction at the new premises; or

**b.** The applicable Increased Cost of Construction Limit of Insurance shown in the Declarations.

**H.** The following definition is added to Paragraph **G.**, Property Definitions:

**1.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME EXTENSION FOR OFF-PREMISES UTILITY SERVICES

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

This insurance applies only when Business Income and Extra Expense is shown in the Declarations as applicable. Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

**A. BUSINESS INCOME EXTENSION FOR OFF-PREMISES UTILITY SERVICES**

This Coverage Extension applies only when the Business Income Additional Coverage is included in this policy.

We will pay for loss of Business Income or Extra Expense at the "scheduled premises" caused by the interruption of service to the "scheduled premises". The interruption must result from direct physical loss or physical damage by a Covered Cause of Loss to the following property not on "scheduled premises":

**1.** "Water Supply Services";

**2.** "Communication Supply Services"; or

**3.** "Power Supply Services".

**B. WAITING PERIOD**

We will only pay for loss you sustain after the first 12 consecutive hours following the direct physical loss of or physical damage to the off-premises property to which this endorsement applies. We will not pay for any reduction in business income or extra expense after electricity, steam or gas has been restored to the "scheduled premises".

**C. LIMIT OF INSURANCE**

The most we will pay in any one occurrence for loss under this extension is the limit of insurance shown in the Declarations at each "scheduled premises".

**D. ADDITIONAL DEFINITIONS**

**1. "Water Supply Services",** meaning the following types of property supplying water to the "scheduled premises":

**a.** Pumping stations; and

**b.** Water mains.

**2. "Communication Supply Services",** meaning property, including overhead transmission lines supplying communication services, including telephone, radio, microwave or television services, to the "scheduled premises", such as:

**a.** Communication transmission lines, including optic fiber transmission lines;

**b.** Coaxial cables; and

**c.** Microwave radio relays except satellites.

**3. "Power Supply Services",** meaning the following types of property supplying electricity, steam or gas, including overhead transmission lines to the "scheduled premises":

**a.** Utility generating plants;

**b.** Switching stations;

**c.** Substations;

**d.** Transformers; and

**e.** Transmission Lines.



© 2009, The Hartford

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OUTDOOR SIGNS

This endorsement modifies insurance provided under the following:

**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

This coverage applies only when it is indicated in the Declarations. The provisions of this policy apply to the coverage stated in this endorsement, except as indicated below.

**A.** We will pay for direct physical loss of or physical damage to all outdoor signs at the "scheduled premises":

**(1)** Owned by you; or

**(2)** Owned by others but in your care, custody and control.

**B.** Paragraph **A.3.**, Covered Causes of Loss, and Section **B.**, Exclusions, do not apply, to this Optional Coverage, except for:

**(1)** Governmental Action;

**(2)** Nuclear Hazard; and

**(3)** War and Military Action.

**C. Additional Exclusion**

We will not pay for physical loss or physical damage caused by or resulting from:

**(1)** Wear and tear;

**(2)** Hidden or latent defect;

**(3)** Rust;

**(4)** Corrosion; or

**(5)** Mechanical breakdown.

**D. Limit of Insurance**

The most we will pay for physical loss or physical damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

**E.** The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.



© 2005, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BACK-UP OF SEWERS AND DRAINS COVERAGE

This endorsement modifies insurance provided under the following:

**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

This coverage applies only when it is indicated in the Declarations. Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

The following Additional Coverage is added:

**A. Back-Up of Sewer or Drain Water Damage**

**1. Coverage**

We will pay for direct physical loss or physical damage to Covered Property solely caused by or resulting from water that backs up from a sewer or drain.

**THIS IS NOT FLOOD INSURANCE**

**2. Exclusion**

**a.** Except for the coverage provided in the Limited Coverage Extension in paragraph **B.** below, we will not pay for loss or damage caused by or resulting from water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity of the flood to the Covered Property. Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

**b.** Sump overflow that does not occur concurrently with a back-up of a sewer or drain is not covered by this endorsement.

**3. Limit of Insurance**

The most we will pay in any one occurrence for all direct physical loss or physical damage under this Additional Coverage is the Limit of Insurance shown in the Declarations for Back-Up of Sewers and Drains.

**B. Limited Coverage Extension When Back-Up of Sewer or Drain Caused by Flood**

**1. Coverage**

We will pay up to $25,000 in any one "Policy Year" as a Limit of Insurance for direct physical loss or physical damage to Covered Property (including resulting loss of Business Income and Extra Expense) solely caused by or resulting from water or other materials that back up from a sewer or drain at the "scheduled premises" if the back up is caused by flood water that enters the sewer or drain system. Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

**2. Exclusion**

**a.** There is no coverage when the sewer and drain backs up concurrently or in any other sequence to the inundation of the building at the "scheduled premises" by flood.

**b.** The Water Exclusions **B.1.h.** in the Standard Property Form and **B.1.f.** in the Special Property Form remain in full force and effect except to the limited extent of coverage provided in this endorsement.

**3. Definitions**

**a.** "Policy Year" means the period of time that:

**(1)** Begins with the inception or anniversary date of this policy; and

**(2)** Ends at the expiration or at the next anniversary date of this policy.



© 2011, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OFF-PREMISES UTILITY SERVICES – DIRECT DAMAGE

This endorsement modifies insurance provided under the following:

**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

**A. DIRECT DAMAGE EXTENSION FOR OFF-PREMISES UTILITY SERVICES**

This Coverage Extension applies only to the "scheduled premises" shown in the Declarations with a Utility Services Limit of Insurance. The Utility Services Limit of Insurance is part of, not in addition to, the Limit of Insurance stated in the Declarations as applicable to the Covered Property.

We will pay for direct physical loss of or physical damage to Covered Property described in the Declarations caused by the interruption of utility service to the "scheduled premises". The interruption must result from direct physical loss or physical damage by a Covered Cause of Loss to the following property, not on the "scheduled premises":

**1.** "Water Supply Services";

**2.** "Communication Supply Services"; or

**3.** "Power Supply Services".

**B. ADDITIONAL DEFINITIONS**

**1. "Water Supply Services",** meaning the following types of property supplying water to the "scheduled premises":

**a.** Pumping stations; and

**b.** Water mains.

**2. "Communication Supply Services",** meaning property supplying communication services, including telephone, radio, microwave or television services, including overhead transmission lines to the "scheduled premises", such as:

**a.** Communication transmission lines, including optic fiber transmission lines;

**b.** Coaxial cables; and

**c.** Microwave radio relays except satellites.

**3. "Power Supply Services",** meaning the following types of property supplying electricity, steam or gas, including overhead transmission lines to the "scheduled premises":

**a.** Utility generating plants;

**b.** Switching stations;

**c.** Substations;

**d.** Transformers; and

**e.** Transmission Lines.


© 2005, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXTENDED BUSINESS INCOME

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

This coverage applies only when it is indicated in the declarations. The provisions of this policy apply to the coverage stated in this endorsement, except as indicated below:

Additional Coverage of **Extended Business Income**, Paragraph **A.5.r.(1)(b)**, is deleted and replaced by the following:

**(b)** Ends on the date you could restore your "operations" with reasonable speed to the condition that would have existed if no direct physical loss or damage occurred; or, until the number of consecutive days or months indicated in the declarations has elapsed after the date determined in **(1)(a)** above, whichever is earlier.

This replaces and supersedes any other Extended Business Income provision in the policy.



© 2008, The Hartford

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITED FUNGI, BACTERIA OR VIRUS COVERAGE

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**
**STANDARD PROPERTY COVERAGE FORM**
**PERSONAL PROPERTY OF OTHERS**
**COMPUTERS AND MEDIA COVERAGE**

**A. Fungi, Bacteria or Virus Exclusions**

**1.** Paragraph **A.5.i.(5).** of the Increased Cost of Construction Additional Coverage of the Standard Property Coverage Form is replaced by the following:

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling, or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, bacteria or virus; or

**(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants", "fungi", wet or dry rot, bacteria or virus.

**2.** The following exclusion is added to Paragraph **B.1.** Exclusions of the Standard Property Coverage Form and the Special Property Coverage Form; Paragraph **F.**, Additional Exclusions of Computers and Media, form SS 04 41, and to form SS 04 45, Personal Property of Others:

**i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

**(1)** Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.

**(2)** But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet or dry rot, bacteria or virus results from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.

This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

**B.** The following Additional Coverage is added to Paragraph **A.4.** of the Standard Property Coverage Form or Paragraph **A.5.** of the Special Property Coverage Form, and applies to the optional coverage form SS 04 41, Computers and Media and SS 04 45, Personal Property of Others and form:



© 2005, The Hartford

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**1. Limited Coverage For "Fungi", Wet Rot, Dry Rot, Bacteria and Virus**

**a.** The coverage described in **1.b.** below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**(1)** A "specified cause of loss" other than fire or lightning;

**(2)** Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises.

**b.** We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means:

**(1)** Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;

**(2)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot, dry rot, bacteria or virus; and

**(3)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot, dry rot, bacteria or virus are present.

**c.** Unless a higher Limit of Insurance is shown in the Declarations for Limited "Fungi", Bacteria or Virus Coverage, the coverage described under this Limited Coverage is no more than the Limit of Insurance stated in the Declarations for Building and Business Personal Property, but not greater than $50,000.

If form SS 04 41, Computers and Media, and form SS 04 45, Personal Property of Others, are made a part of this policy, then the Limits of Insurance for Computers and Media, and Personal Property of Others is included within this coverage limit. This coverage is made applicable to separate "scheduled premises" as described in the Declarations. Regardless of the number of claims, this limit is the most we will pay per "scheduled premises" for the total of all loss or damage arising out of all

**(1)** occurrences of "specified causes of loss" (other than fire or lightning); and

**(2)** Equipment Breakdown Accident that occurs to Equipment Breakdown Property;

which take place in a 12-month period (starting with the beginning of the present annual policy period).

With respect to a particular occurrence of loss which results in "fungi", wet or dry rot, bacteria or virus, we will not pay more than the total of $50,000 unless a higher Limit of Insurance is shown in the Declarations, even if the "fungi", wet or dry rot, bacteria, or virus continues to be present or active, or recurs, in a later policy period.

**d.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot, dry rot, bacteria or virus, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot, dry rot, bacteria or virus, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet or dry rot, bacteria or virus causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**e.** The terms of this Limited Coverage do not increase or reduce the coverage for Water Damage provided under provision **B.1.h., Exclusion – Water Damage** of the Standard Property Coverage Form or Additional Coverage provision **A.5.n., Water Damage, Other Liquid, Powder or Molten Material Damage** of the Special Property Coverage Form.

**f.** The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.

**(1)** If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to

property caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

**C. Fungi Definition**

1. **"Fungi"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE FOR BUSINESSOWNERS AND EMPLOYEES

## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

**A.** The following is added to paragraph **5.** Additional Coverages (Section **A. -** Coverage):

**IDENTITY RECOVERY COVERAGE**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

**1.** There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

**2.** Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery coverage is applicable; and

**3.** Such "identity theft" is reported to us as soon as practicable but in no event later than 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

**1. Case Management Service**

Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

**2. Expense Reimbursement**

Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

This coverage is additional insurance.

**B.** The following additional exclusions are added to Section **B. -** Exclusions and apply to this coverage:

**EXCLUSIONS**

We do not cover loss or expense arising from any of the following:

**1.** Theft of a professional or business identity.

**2.** Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an "insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

**3.** Loss other than "identity recovery expenses".

**4.** An "identity theft" that is first discovered by the "identity recovery insured" prior to or after the policy period for which this coverage applies. This exclusion applies whether or not such "identity theft" began or continued during the period of coverage.

**5.** An "identity theft" that is not reported to us within 60 days after it is first discovered by the "identity recovery insured."

**6.** An "identity theft" that is not reported in writing to the police.


© 2022, The Hartford

**C. LIMITS OF INSURANCE**

1. Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

2. Expense Reimbursement coverage is subject to a limit of $15,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

   a. Legal costs as provided under paragraph **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.

   b. Lost Wages and Child and Elder Care Expenses as provided under paragraphs **e.** and **f.** of the definition of "identity recovery are jointly subject to a sublimit of $250 per day, not to exceed $5,000 in total. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to lost wages and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

   c. Mental Health Counseling as provided under paragraph **g.** of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

**D. DEDUCTIBLE**

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to a deductible of $250. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

**E.** The following additional conditions are added to Section **F.** - Property General Conditions and apply to this coverage:

**CONDITIONS**

1. Assistance and Claims

   For assistance, the "identity recovery insured" should call the Claims Service Center at 800-327-3638.

   The Claims Service Center can provide the "identity recovery insured" with:

   a. Resources for how to respond to a possible "identity theft"

   In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identify theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identify theft" has not occurred.

   As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

2. Services

   The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

   a. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

   b. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in United States and Puerto Rico in accordance with local conditions.

   c. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

**F.** With respect to the provisions of this endorsement only, the following definitions are added to Section **G.** - Property Definitions:

**DEFINITIONS**

**1.** "Identity Recovery Case Manager" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

**2.** "Identity Theft" means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

**3.** "Identity Recovery Expenses" means the following when they are reasonable and necessary expenses that are incurred in the United States or Canada as a direct result of an "identity theft":

**a.** Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

**b.** Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

**c.** Costs for up to twelve (12) credit reports from established credit bureaus dated within 12 months after your knowledge or discovery of an "identity theft."

**d.** Legal Costs

Fees and expenses for an attorney approved by us for:

**(1)** Defending any civil suit brought against an "identity recovery insured" by a creditor or collection agency or entity acting on behalf of a creditor for non-payment of goods or services or default on a loan as a result of an "identity theft"; and

**(2)** Removing any civil judgment wrongfully entered against an "identity recovery insured" as a result of the "identity theft."

**e.** Lost Wages

Actual lost wages of the "identity recovery insured" for time reasonably and necessarily take away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

**f.** Child and Elder Care Expenses

Actual costs for supervision of children or elderly or infirm relatives or dependents of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

**g.** Mental Health Counseling

Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

**4.** "Identity Recovery Insured" means the following:

**a.** A full time employee of the entity insured under this policy; or

**b.** The owner of the entity insured under this policy who meets any of the following criteria:

**(1)** A sole proprietor of the insured entity;

**(2)** A partner in the insured entity; or

**(3)** An individual having an ownership position of 20% or more of the insured entity.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

All other provisions of this policy apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUILDING LIMIT- AUTOMATIC INCREASE REVISION

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**
**STANDARD PROPERTY COVERAGE FORM**

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

**A.** Paragraph **C.5 Building Limit-Automatic Increase** of the **SPECIAL PROPERTY COVERAGE FORM** or **STANDARD PROPERTY COVERAGE FORM** is deleted.

**B.** The following is added to **Additional Coverages,** paragraph **A.5** of the **SPECIAL PROPERTY COVERAGE FORM** or paragraph **A.4.** of the **STANDARD PROPERTY COVERAGE FORM**:

**Building Limit - Automatic Increase**

**a.** If the covered loss or damage to Building property at a "scheduled premises" exceeds the Limit of Insurance stated in the Declarations, the Limit of Insurance available for the covered loss or damage in that occurrence will automatically increase by up to 8%.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance for Buildings that applied on the most recent of the policy inception date, policy anniversary date, or the date of any other policy change amending the Building limit, multiplied by

**(2)** The 8% annualized percentage of Automatic Increase, expressed as a decimal

(08), multiplied by

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance for Buildings, divided by 365.

Example:

The applicable Limit of Insurance for Buildings is $100,000. The automatic increase percentage is 8%. The number of days since the beginning of the policy period (or last policy change) is 146.

The amount of increase is:

$100,000 X .08 X 146 divided by 365 = $3,200



© 2009, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT - DEFINITION OF INSURED CONTRACT

This endorsement modifies insurance provided under the following:

BUSINESS LIABILITY COVERAGE FORM

Paragraph **f.** of the definition of "insured contract" in the **Liability And Medical Expenses Definitions** Section is replaced by the following:

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** includes that part of any contract or agreement that indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing.

However, Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports surveys, field orders, change orders, designs or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.



© 2011, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc. with its permission.)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# BUILDING STRETCH - INCREASED PERIOD OF RESTORATION

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

**A.** The following changes apply to the Special Property Coverage Form, Additional Coverages, **A.5.**:

**1. Business Income**

Paragraph **A.5.o.(3) Business Income** is deleted and replaced with the following:

**(3)** We will only pay for loss of Business Income that occurs within 24 consecutive months after the date of direct physical loss or physical damage.

This Additional Coverage is not subject to the Limits of Insurance, except for the following: if Actual Loss Sustained Business Income & Extra Expense – Specified Limit Coverage, Form SS 40 60, is attached to this policy, this additional coverage is subject to the Business Income Specified Limit of Insurance indicated in the Declarations.

**2. Claim Expenses**

The following Additional Coverage is added:

In the event of covered loss or physical damage we will pay up to $10,000 in any one occurrence as an additional Limit of Insurance to cover reasonable expenses incurred by you at our specific request to assist us in:

**a.** The investigation of a claim or suit; or

**b.** The determination of the amount of loss, such as taking inventory, or auditing business records.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

**3. Debris Removal**

The following Additional Coverage is added:

In Limits of Insurance, **C.4.b.**, the additional limit of insurance for the Debris Removal Additional Coverage is increased to $25,000 in any one occurrence.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

**4. Extra Expense**

Paragraph **A.5.p.(3)(c)(ii) Extra Expense** is deleted and replaced with the following:

**(ii)** To research replace or restore the lost information on damaged "valuable papers and records"; to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.

We will only pay for Extra Expense that occurs within 24 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance, except for the following: if Actual Loss Sustained Business Income & Extra Expense – Specified Limit Coverage, Form SS 40 60, is attached to this policy, this additional coverage is included in and subject to the Business Income Specified Limit of Insurance indicated in the Declarations.

**5. Lessor's - Tenant Move Back Expenses**

The following Additional Coverage is added:

In the event that your tenants must temporarily vacate the covered Building property due to untenantability caused by direct physical loss or physical damage by a Covered Cause of Loss, we will pay up to $10,000 in any one occurrence as a Limit of Insurance at each "scheduled premises" to cover the sum of all expenses you incur to move those tenants back into your covered Building.

**a. Covered Expenses**

We will only pay for the following expenses:

**(1)** Packing, transporting and unpacking the tenants' Business Personal Property, including the cost of insuring the move



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

back and any necessary assembly or setup of furniture and equipment, and

**(2)** The net cost to re-establish the tenants' utility and telephone services, but only after any refunds due to the tenants were paid.

**b. Time Limitation**

We will only pay for Covered Expenses that you incur within 60 days of the date that the damaged building was repaired or rebuilt.

**6. Lessor's - Lease Cancellation**

The following Additional Coverage is added:

In the event that your tenants cancel their leases in covered Building property due to untenantability caused by direct physical loss or physical damage by a Covered Cause of Loss, we will pay up to $10,000 in any one occurrence as a Limit of Insurance at each "scheduled premises" to cover the loss of rental income that you would have received from such leases. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

**a. Income Not Covered**

We will not pay for the following:

**(1)** Prepaid rent;

**(2)** Security and other deposits made by tenants; and

**(3)** Insurance, taxes or other payments made by you on behalf of the tenants.

**b. Time Limitation**

We will only pay for loss of rental income that you sustain after tenantability is restored and until the earlier of:

**(1)** The date you lease the premises to another tenant;

**(2)** 12 months immediately following the "period of restoration"; or

**(3)** The normal expiration date of the cancelled leases.

**7. Off-Premises Utility Services - Direct Damage**

The following Additional Coverage is added:

We will pay up to $10,000 in any one occurrence as a Limit of Insurance to apply at each "scheduled premises to cover direct physical loss of or physical damage to Covered Property caused by or resulting from the interruption of utility services. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

This Additional Coverage is subject to the provisions of Off-Premises Utility Services - Direct Damage, Form SS 40 18, with the exception of the Utility Services Limit of Insurance contained in that form. Off-Premises Utility Services – Direct Damage, Form SS 40 18 is made a part of this policy, whether or not Off-Premises Utility Services – Direct Damage coverage is indicated in the Declarations.

**8. Ordinance or Law**

The following Additional Coverage is added:

If a covered Cause of Loss occurs to covered Building property, we will pay the following at each "scheduled premises" that are caused by enforcement of any ordinance or law:

**a.** For loss to the undamaged portion of the Building, within in the Building Limit of Insurance;

**b.** Up to $50,000 as a Limit of Insurance to cover demolition costs; and

**c.** Up to $50,000 as a Limit of Insurance to cover increased costs.

This additional coverage is subject to the provisions of Ordinance or Law, Form SS 04 15, which is attached to this policy.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

**9. Outdoor Signs**

The following Additional Coverage is added and supersedes any other coverage for signs in this policy:

This Additional Coverage is in addition to any recoverable Limits of Insurance applicable to Building or Business Personal Property.

We will pay up to full value of outdoor signs at each "scheduled premises" to cover direct physical loss of or physical damage to outdoor signs.

This Additional Coverage is subject to the provisions of Outdoor Signs, Form SS 04 44, with the exception of the Limit of Insurance provision and paragraph **E.** of that form. Outdoor Signs**,** Form SS 04 44 is made a part of this policy whether or not Outdoor Signs coverage is indicated in the Declarations.

**10. Sewer and Drain Back Up**

The following Additional Coverage is added:

We will pay for physical loss of or physical damage to Covered Property solely caused by water that backs up from a sewer or drain.

This coverage is included within the Covered Property Limits of Insurance.

**THIS IS NOT FLOOD INSURANCE**

We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity of the flood to Covered Property. Flood includes the accumulation of surface

water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

**11. Sump Overflow or Sump Pump Failure**

The following Additional Coverage is added:

The maximum we will pay in any one occurrence is $50,000 for any loss, including Business Income or Extra Expense, resulting from physical loss or physical damage to Covered Property that is caused by or resulting from water that overflows due to the failure of a sump pump, sump pump well, or any other type of system designed to remove subsurface water from the foundation area if the failure is directly or indirectly the result of a Covered Cause of Loss. Failure means an abrupt cessation of normal functioning. This Limit of Insurance is the maximum we will pay regardless of any other coverage provided under this policy.

This Additional Coverage is subject to the terms and conditions of this policy with the exception of:

**a.** Paragraph **B.1.d.**, Power Failure, of the Special Property Coverage Form; and

**b.** Paragraph **B.1.f.(4)**, Water, of the Special Property Coverage Form.

**THIS IS NOT FLOOD INSURANCE**

We will not pay for water or other materials that overflow from a sump when the overflow is caused by any flood. This applies regardless of the proximity of the flood to Covered Property. Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

**B.** The following changes apply to the Special Property Coverage Form, Coverage Extensions, **A.6.**. The Limits of Insurance stated in the paragraphs below replace the Limits of Insurance stated in the Special Property Coverage Form for the coverages provided under this section. Except as otherwise stated, any other Limit of Insurance purchased under this policy as an option for the following coverages is in addition to the Limit of Insurance stated below:

**1. Newly Acquired or Constructed Property**

The following changes are made to Newly Acquired or Constructed Property:

**a. Building**

**(1)** The most we will pay in any one occurrence in subparagraph **(1)** is increased from $500,000 to $1,000,000 at each premises.

**(2)** The Limit of Insurance stated above is the maximum Limit of Insurance available for this coverage under this policy.

**b. Business Personal Property**

**(1)** The most we will pay in any one occurrence in subparagraph **(2)** is increased from $250,000 to $500,000 at each premises.

**(2)** The Limit of Insurance stated above is the maximum Limit of Insurance available for this coverage under this policy.

**c. Business Income and Extra Expense**

**(1)** If Business Income or Extra Expense are provided under this policy, the most we will pay in any one occurrence in subparagraph **(3)** is increased from $50,000 to $500,000 in any one occurrence at each premises.

**(2)** The Limit of Insurance stated above is the maximum Limit of Insurance available for this coverage under this policy.

**2. Outdoor Property**

In the Outdoor Property Coverage Extension, the most we will pay is increased to $25,000, but not more than $1,000 for any one tree, shrub or plant.

**C.** The following changes apply only if Business Income and Extra Expenses are covered under this policy. These changes apply to the Special Property Coverage Form, Additional Coverages, **A.5.**:

**1. Business Income Extension for Off-Premises Utility Services**

The following Additional Coverage is added:

We will pay up to $25,000 in any one occurrence as a Limit of Insurance to apply at each "scheduled premises" to cover loss of Business Income and Extra Expense caused by or resulting from the interruption of utility services. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

This Additional Coverage is subject to the provisions of Business Income Extension For Off-Premises Utility Services, Form SS 04 19, with the exception of the Limit of Insurance provision contained in that form. Business Income Extension for Off-Premises Utility Services, Form SS 04 19 is made a part of this policy whether or not Business Income Extension for Off-Premises Utility Services coverage is indicated in the Declarations.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PERILS SPECIFICALLY EXCEPTED

As used herein, "Peril" means a cause of physical loss or damage to property. It has this meaning whether or not it is called a "Peril" or a "Cause of Loss" in this policy.

Even if any of the terms of this policy might be construed otherwise, the following Perils, as described in Paragraphs A. and B. below, are **SPECIFICALLY EXCEPTED FROM THIS POLICY. WE DO NOT COVER OR INSURE AGAINST LOSS OR DAMAGE DIRECTLY OR INDIRECTLY CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED BY, OR WHICH WOULD NOT HAVE OCCURRED BUT FOR, EITHER OF THESE PERILS:**

**A. ACTS, ERRORS OR OMISSIONS** by you or others in:

1. Planning, zoning, developing, surveying, testing or siting property;
2. Establishing or enforcing any building code, or any standard, ordinance or law about the construction, use or repair of any property or materials, or requiring the tearing down of any property, including the removal of its debris;
3. The design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of all or any part of the following:
   a. Land or buildings or other structures;
   b. Roads, water or gas mains, sewers, drainage ditches, levees, dams, or other facilities; or
   c. Other improvements or changes in or additions to land or other property.
4. The furnishing of work, materials, parts or equipment in connection with the design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of any of the above property or facilities; or
5. The maintenance of any of such property or facilities.

This exception A. applies whether or not the property or facilities described above are:

1. Covered under this policy; or
2. On or away from the covered premises.

This exception A. does not reduce the insurance for loss or damage caused directly by a Covered Peril.

As used in this endorsement:

1. If this policy is written to cover the risk of loss from specifically named causes. "Covered Peril" means any Peril specifically named as covered; or
2. If written to cover the risk of loss without specifying specifically named causes, "Covered Peril" means any Peril not described above and not otherwise excluded or excepted from the causes of loss covered by this policy.

**B. COLLAPSE, "CRACKING" OR "SHIFTING"** of buildings, other structures or facilities, or their parts, if the collapse, "cracking" or "shifting":

1. Occurs during "earth movement," "volcanic eruption" or "flood" conditions or within 72 hours after they cease; and
2. Would not have occurred but for "earth movement," "volcanic eruption" or "flood."

But if loss or damage by a covered Peril ensues at the covered premises, we will pay for that ensuing loss or damage.

This exception B. applies whether or not there are other provisions in this policy relating to collapse, "cracking" or "shifting" of buildings, other structures or facilities, or their parts. Any such provision is revised by this endorsement to include this exception.

But if this policy specifically covers (by endorsement or in any other way) loss or damage caused by one or more of the following Perils:

1. Earthquake;
2. Flood;
3. Volcanic action;
4. Volcanic eruption; or
5. Sinkhole collapse,

this exception B. will not reduce that coverage.

As used in this exception B.:



Copyright, Hartford Fire Insurance Company, 1986

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

1. "Cracking" means cracking, separating, shrinking, bulging, or expanding;
2. "Shifting" means shifting, rising, settling, sinking, or lateral or other movement;
3. "Earth movement" means any earth movement, including but not limited to "earthquake," landslide, mudflow, erosion, contraction or expansion, subsidence, any movement of earth resulting from water combining with the ground or soil, and any other "shifting" of earth; all whether or not combined with "flood" or "volcanic eruption." It does not include sinkhole collapse if loss by sinkhole collapse is specifically covered in this policy;
4. "Earthquake" means a shaking or trembling of the earth's crust, caused by underground volcanic or tectonic forces or by breaking or "shifting" of rock beneath the surface of the ground from natural causes. An "Earthquake" includes all related shocks and after shocks;
5. "Volcanic eruption" means the eruption, explosion or effusion of a volcano. It does not include volcanic action if loss by volcanic action is specifically covered in this policy;
6. "Flood" means:
   a. Flood, surface water, waves, tides, tidal water, tidal waves, high water, and overflow of any body of water, or their spray, all whether driven by wind or not;
   b. Release of water held by a dam, levy or dike or by a water or flood control device;
   c. Water that backs up from a sewer or drain; or
   d. Water under the ground surface pressing on, or flowing, leaking or seeping through:
      (1) Foundations, walls, floors or paved surfaces;
      (2) Basements, whether paved or not; or
      (3) Doors, windows or other openings.



Copyright, Hartford Fire Insurance Company, 1986

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - NUCLEAR ENERGY LIABILITY

**1.** This insurance does not apply:

**a.** To any injury or damage:

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under any Medical Payments or Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** To any injury or damage resulting from the "hazardous properties" of "nuclear material"; if:

**(1)** The "nuclear material":

**(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

**(b)** Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The injury or damage arises out of the furnishing by any insured of any "technology services" in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; or

**(4)** The injury or damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(4)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this exclusion:

**a.** "Byproduct material", "source material" and "special nuclear material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**b.** "Computer system and network" means:

**(1)** Leased or owned computer hardware including mobile, networked, and data storage computing equipment;

**(2)** Owned or licensed software;

**(3)** Owned websites;

**(4)** Leased or owned wireless input and output devices; and

**(5)** Electronic backup facilities and data storage repositories employed in conjunction with items 1 through 4 above.

**c.** "Hazardous properties" include radioactive, toxic or explosive properties.

**d.** "Nuclear facility" means:

**(1)** Any "nuclear reactor";

**(2)** Any equipment or device designed or used for:

**(a)** Separating the isotopes of uranium or plutonium;

**(b)** Processing or utilizing "spent fuel"; or

**(c)** Handling, processing or packaging "waste",



© 2015, The Hartford

**(3)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(4)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**e.** "Nuclear material" means "byproduct material", "source material" or "special nuclear material".

**f.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**g.** Injury or damage and "property damage" include all forms of radioactive contamination of property.

**h.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

**i.** "Technology services" means:

**1.** the following services performed for others:

**a.** Consulting, analysis, design, installation, training, maintenance, support and repair of or on: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

**b.** Integration of systems;

**c.** Processing of, management of, mining or warehousing of data;

**d.** Administration, management, operation or hosting of: another party's systems, technology or computer facilities;

**e.** Website development; website hosting;

**f.** Internet access services; intranet, extranet or electronic information connectivity services; software application connectivity services;

**g.** Manufacture, sale, licensing, distribution, or marketing of: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

**h.** Design and development of: code, software or programming;

**i.** Providing software application: services, rental or leasing;

**j.** Screening, selection, recruitment or placement of candidates for temporary or permanent employment by others as information technology professionals;

**k.** "Telecommunication services"; and

**l.** "Telecommunication products".

**2.** web-related software and connectivity services performed for others; and

**3.** activities on the "named insured's" "computer system and network".



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**Section A. Coverages** is amended as follows:

**A.** Paragraph **A.1.b.(1)** is replaced by the following:

**(1)** To "bodily injury" and "property damage" caused by an "occurance" that takes place in the "coverage territory" only if:

**(a)** The "bodily injury" or "property damage":

**(i)** Occurs on the premises shown in the Declarations or the grounds and structures appurtenant to those premises; or

**(ii)** Arises out of the project or operation shown in the Declarations;

**(b)** The "bodily injury" or "property damage" occurs during the policy period; and

**(c)** Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

**B.** Paragraph **A.1.b.(2)** is replaced by the following:

**(2)** To "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(a)** The offense arises out of your business:

**(i)** Performed on the premises shown in the Declarations; or

**(ii)** In connection with the project or operation shown in the Declarations; and

**(b)** The offense was committed during the policy period.

However, with respect to Paragraph **A.1.b.(2)(i)**, if the "personal and advertising injury" is caused by;

**(a)** False arrest, detention or imprisonment; or

**(b)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupance of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

Then such offense must arise out of your business performed on the premises shown in the Declarations and the offense must have been committed on the premises shown in the Declarations or the grounds and structures appurtenant to those premises.



© 2017, The Hartford

**C.** Paragraph **A.2.a. Medical Expenses** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Declarations or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Declarations:

provided that:

**(1)** The accident takes place during the policy period;

**(2)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – FUNGI, BACTERIA AND VIRUSES

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**

This insurance does not apply to:

**1.** Injury or damage arising out of or related to the presence of, suspected presence of, or exposure to:

   **a.** Fungi, including but not limited to mold, mildew, and yeast;

   **b.** Bacteria;

   **c.** Viruses; or

   **d.** Dust, spores, odors, particulates or byproducts, including but not limited to mycotoxins and endotoxins, resulting from any of the organisms listed in **a.**, **b.**, or **c.** above;

   from any source whatsoever.

**2.** Any loss, cost or expense arising out of the testing for, monitoring of, cleaning up of, removal of, containment of, treatment of, detoxification of, neutralization of, remediation of, disposal of, or any other response to or assessment of, the effects of any of the items in **1.a.**, **b.**, **c.** or **d.** above, from any source whatsoever.

However, this exclusion does not apply to "bodily injury" or "property damage" caused by the ingestion of food.


© 2005, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - UNMANNED AIRCRAFT (PROPERTY)

This endorsement modifies insurance provided under the following:

**SPECIAL PROPERTY COVERAGE FORM**

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

**A. COVERAGE**

Paragraph **A.2.**, **Property Not Covered**, Subparagraph **a.** is deleted and replaced with the following:

**a.** Aircraft (including "unmanned aircraft"), automobiles, motor trucks and other vehicles subject to motor vehicle registration.

**C. DEFINITIONS**

The following changes are made to Section **G.**, **PROPERTY DEFINITIONS**:

**1.** The following definition is added:

"Unmanned aircraft" means an aircraft that is not:

**a.** Designed;

**b.** Manufactured; or

**c.** Modified after manufacture

to be controlled directly by a person from within or on the aircraft and which is owned by you or owned by others but in your care, custody, or control.

"Unmanned aircraft" includes equipment designed for and used exclusively with the "unmanned aircraft", provided such equipment is essential for operation of the "unmanned aircraft" or for executing "unmanned aircraft operations".

**2.** The following definition is added:

"Unmanned aircraft operations" means your business activities in support of the specific operations listed in the Description of Business section of the Declarations.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**
**STANDARD PROPERTY COVERAGE FORM**
**UMBRELLA LIABILTY PROVISIONS**

**A. Disclosure Of Federal Share Of Terrorism Losses**

The United States Department of the Treasury will reimburse insurers for a portion of such insured losses, as indicated in the table below that exceeds the applicable insurer deductible:

| Calendar Year | Federal Share of Terrorism Losses |
|---|---|
| 2015 | 85% |
| 2016 | 84% |
| 2017 | 83% |
| 2018 | 82% |
| 2019 | 81% |
| 2020 or later | 80% |

However, if aggregate industry insured losses, attributable to "certified acts of terrorism" under the federal Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

**B. Cap On Insurer Liability for Terrorism Losses**

A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of federal Terrorism Risk Insurance Act, to be an act of terrorism under TRIA. The criteria contained in TRIA for a "certified act of terrorism" include the following:

**1.** The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

**2.** The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

**3.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate industry insured losses attributable to "certified acts of terrorism" under TRIA exceed $100 billion in a calendar year, and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceed $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro-rata basis in accordance with procedures established by the Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

**C. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, the inapplicability or omission of a terrorism exclusion, or the inclusion of terrorism coverage, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Form or Policy, such as losses excluded by the Pollution Exclusion, Nuclear Hazard Exclusion and the War And Military Action Exclusion.


© 2015, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc. with its permission)

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

POLICY NUMBER: 57 SBA BN7134

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

LOSS PAYEE

LOCATION 001 BUILDING 001 LENDER'S LOSS PAYEE

AMINAM, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY, AND ITS SUCCESSORS AND ASSIG
2700-2710 SLOAT BOULEVARD
SAN FRANCISCO CA 94116
DESCRIPTION: LRO

LOC 001 BLDG 001
LONE OAK FUND, LLC
11611 SAN VICENTE BOULEVARD
APT/SUITE 640
LOS ANGELES, CA 90049
VALUE OF PROPERTY 2990900
RE: LRO




Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**POLICY NUMBER:** 57 SBA BN7134

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

MORTGAGEE

LOC 001 BLDG 001
AMINAM LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY,
ITS SUCCESSORS & ASSIGNS
12121 WILSHIRE BLVD STE 555
LOS ANGELES CA 90025-1168





Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GOODS AND SERVICES ENDORSEMENT

This endorsement modifies insurance provided under all Coverage Parts of this Policy.

We may offer or make "goods or services" available to you through this underwriting company, a non-insurer subsidiary, or unaffiliated third parties as a part of this policy. The "goods or services" may be provided for a charge, at a discount, on a subsidized basis, or free of charge. In some cases, we may receive a fee from the unaffiliated third parties that provide "goods or services". We do not warrant or guarantee the "goods or services" provided by third parties, and such third parties shall be solely liable and responsible for the "goods or services" they provide. The "goods or services" offered or made available by us may be modified or discontinued at any time.

"Goods or services" means goods, products or services, including but not limited to risk mitigation, safety, and/or loss prevention services or equipment.



© 2021, The Hartford

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMON POLICY CONDITIONS**
**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

The following is added to the Standard or Special Property Coverage Form PROPERTY LOSS CONDITION, as shown in the Declarations by description of location, property, name and address of loss payee and the following applicable Loss Payable Provision (**A, B** or **C**):

**A. LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Declarations have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**B. LENDER'S LOSS PAYABLE**

**1.** The Loss Payee shown in the Declarations is a creditor (including a mortgageholder or trustee) with whom you have entered a contract for the sale of Covered Property, whose interest in that Covered Property is established by such written contracts as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading; or

**d.** Financing statements.

**2.** For Covered Property in which both you and a Loss Payee have insurable interest:

**a.** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has

started foreclosure for similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this policy at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All the terms of the Property Coverage Form will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's right to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or



Copyright, Hartford Fire Insurance Company, 1992

Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

b. 30 days before the effective date of cancellation if we cancel for any other reason.

4. If we do not renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**C. CONTRACT OF SALE**

1. The Loss Payee shown in the Declarations is a person or organization you have entered a contract with for the sale of Covered Property.

2. For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

   a. Adjust losses with you; and

   b. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

3. The following is added to the OTHER INSURANCE Common Policy Condition:

   For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.



Copyright, Hartford Fire Insurance Company, 1992

THE HARTFORD

# U.S. DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the United States. **Please read this Notice carefully.**

The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States. OFAC acts under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction. OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals and Blocked Persons" or "SDNs". Their assets are blocked and U.S. persons are generally prohibited from dealing with them. This list can be located on OFAC's web site at – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is an SDN, as identified by OFAC, the policy is a blocked contract and all dealings with it must involve OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

THE HARTFORD

**Named Insured**: **2700 SLOAT HOLDING, LLC**

**Policy Number**: 57 SBA BN7134

**Effective Date**: 07/16/23 **Expiration Date**: 07/16/24

**Company Name**: SENTINEL INSURANCE COMPANY, LIMITED

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.

All other terms and conditions remain unchanged.

EXHIBIT O

LONE OAK FUND
CALIFORNIA'S BRIDGE LENDER

11611 San Vicente Boulevard, Suite 640
Los Angeles, California 90049
(310)826-2888
CFL No. 603B623

# Invoice

| Date | Invoice # |
|---|---|
| 2/10/2025 | 85679 |

| Bill To | Property Located At |
|---|---|
| 2700 Sloat Holding LLC<br>201 Spear St. Ste. 1100<br>San Francisco, CA 94105 | 2700 and 2750 Sloat Blvd.<br>San Francisco, CA 94116 |

| Payment Date | Date Funded | Principal | Interest Rate | Maturity Date |
|---|---|---|---|---|
| 2/10/2025 | 08/03/2022 | $10,000,000 | 8.90% | 01/31/2025 |

| Principal Balance | No. of Days | Daily Rate | Amount |
|---|---|---|---|
| $10,000,000 | 30 | 2,472.22222 | 74,166.67 |

Payments are due on the 1st
and late after the 10th of each month.

We appreciate your prompt payment.

| | |
|---|---|
| **Total** | $74,166.67 |
| **Payments/Credits** | $0.00 |
| **Total Due** | $74,166.67 |

**LOAN IS ALL DUE JANUARY 31, 2025.**
**MATURITY INTEREST BEGINNING FEBRUARY 1, 2025 IS 24.00%.**

**NOTHING CONTAINED HEREIN, INCLUDING ACCEPTANCE OF INTEREST, SHALL BE CONSIDERED A WAIVER OF ANY OF LONE OAK FUND'S RIGHTS, CLAIMS AND REMEDIES UNDER THE LOAN DOCUMENTS, UNDER APPLICABLE LAW, OR IN EQUITY, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.**

EXHIBIT P

**Stewart Title of California, Inc.**
13191 Crossroads Parkway North Ste 475
City of Industry, CA 91746
(562) 695-8120

File Number: **1613991**
Loan Amount: **$10,000,000.00**
Close Date: **8/3/2022**
Disbursement Date: **8/3/2022**
Date Prepared: **8/4/2022 5:23:18 PM**

# BORROWER(S) FINAL CLOSING STATEMENT

Certified True and Correct Copy

Stewart Title of California, Inc.

Property: **2700 SLOAT BOULEVARD**
**SAN FRANCISCO, CA 94116 (SAN FRANCISCO)**
**(2514-008)**

**2750 SLOAT BOULEVARD**
**SAN FRANCISCO, CA 94116 (SAN FRANCISCO)**
**(2514-007)**

Borrower(s): **2700 SLOAT HOLDING LLC, A NEVADA LIMITED LIABILITY COMPANY**
**201 Spear Street, Suite 1100**
**San Francisco, CA 94105**

Lender: **Lone Oak Fund, LLC**
**11611 San Vicente Blvd, Ste 640, Los Angeles, CA 90049**

| Description | P.O.C. | Debit | Credit |
|---|---|---|---|
| **Payoffs** | | | |
| First Position Mortgage Lien to Aminam, LLC | | $5,766,000.00 | |
| **Subtotal of Payoffs** | | **$5,766,000.00** | |
| **New Loans** | | | |
| Principal amount of new loan | | | $10,000,000.00 |
| Loan Origination Fee to Lone Oak Fund, LLC | | $125,000.00 | |
| Wire Fee to Lone Oak Fund, LLC | | $35.00 | |
| Reserve for Future Advances to Lone Oak Fund, LLC for 2700 Sloat Holding LLC, a Nevada limited liability company | | $3,000,000.00 | |
| Interest Reserve to Lone Oak Fund, LLC | | $960,000.00 | |
| Broker Fees to Shatar Capital, Inc | | $125,000.00 | |
| **Subtotal of New Loans** | | **$4,210,035.00** | **$10,000,000.00** |
| **Title Charges** | | | |
| Lender's coverage $12,500,000.00 Premium $7,580.00 to Stewart Title of California, Inc. | | $7,580.00 | |
| STG Modified 110.1-06 Endorsement - Deletion of Arbitration Endorsement(s) to Stewart Title of California, Inc. | | $25.00 | |
| Settlement or closing fee to Stewart Title of California, Inc. | | $9,950.00 | |
| Document preparation to Stewart Title of California, Inc. | | $125.00 | |
| Notary fees to First Class Signing Service | | $175.00 | |
| Electronic Document Delivery Fee to Stewart Title of California, Inc. | | $50.00 | |
| Inspection Fee to Stewart Title of California, Inc. | | $80.00 | |
| Overnight Delivery Processing Fee to Stewart Title of California, Inc. | | $35.00 | |
| Recording Service Fee to Stewart Title of California, Inc. | | $16.00 | |
| Wire Processing Fee to Stewart Title of California, Inc. | | $34.00 | |
| Notary Fee 2nd Trip to First Class Signing Service | | $175.00 | |
| **Subtotal of Title Charges** | | **$18,245.00** | |
| **Government Recording and Transfer Charges** | | | |
| Mortgage $326.00 | | $326.00 | |
| Release $300.00 | | $300.00 | |
| **Subtotal of Government Recording and Transfer Charges** | | **$626.00** | |
| **Totals** | | **$9,994,906.00** | **$10,000,000.00** |

**Balance Due TO Borrower:** **$5,094.00**

EXHIBIT Q

March 10, 2025

Mr. Kevin Singer

Superior Court Receiver

Re: *Lone Oak Fund, LLC v. 2700 Sloat Holdings LLC*

San Francisco County case CGC-25-622590

Dear Mr Singer

Below is a copy of the list of requested items from your demand letter dated March 5th. I will address each item.

YOUR DEMAND LETTER

To facilitate my work as the receiver in this matter, please gather and provide the following items to me on or before March 10, 2025, to the extent any of the following are in your actual or constructive possession:

**OVERALL RESPONSE:**

**The 2700 Sloat property was acquired for the sole purpose of developing it for a mixed use housing development. The lender, Lone Oak, is fully aware of this. In fact, the $10,000,000 loan from Lone Oak was SOLELY PROVIDED to "facilitate" development of the Sloat property. The minimal lease revenue received from the leasing of the Sloat property by the Sloat Garden Center was never expected to be applied to the Lone Oak loan interest payments due on the $10,000,000 loan. The loan from Lone Oak included an 18 month $960,000 Interest Reserve Holdback that Lone Oak established upon the original funding date of the loan. In addition to the Interest Reserve, the $10,000,000 Lone Oak loan included a $3,000,000 "Development Project Holdback" account that was held by Lone Oak and available to 2700 Sloat Holding to pay for ongoing**

**development expenses. See attached Loan Closing Statement showing both Holdback accounts. The Interest Reserve and Project Funding holdback accounts were fully depleted by January 2024 and December 2023. All 2024 ongoing development expenses, property expenses and Interest Payments on the $10,000,000 Lone Oak loan were required to be paid from "Non-Lone Oak" funding sources beginning with the exhaustion of the Lone Oak Interest Reserve and Project Development holdback accounts. The lease revenue received from Sloat Garden Center (which Lone Oak never required to be used to pay for the Interest Expense payments on the $10,000,000 loan), is not and was not sufficient to pay all of the 2700 Sloat development, property and Lone Oak interest expenses for 2024 and beyond. The purpose of the loan was to facilitate development of the 2700 Sloat property for affordable and market rate housing and some new retail, not hold it for retail leasing purposes to the Sloat Garden Center or any other tenant in its current limited state.**

**Lone Oak required that the monthly interest payments be made via an automatic monthly ACH payment of the entire amount of the Interest Payment due each month. The ACH interest payment was drawn down from the Interest Reserve Account. There was no offset to the amount of the automatic ACH withdraw of the Interest Payment due each month for any lease revenue collected from the Sloat Garden Center. See attached 2023 monthly interest expense Invoices received from Lone Oak confirming payment will be deducted from the Interest Reserve account.**

**THE PROPERTY GENERALLY**

**The 2700 Sloat property was purchased from the owners of the Sloat Garden Center in December 2020. The purchase required that Sloat Garden Center would be allowed to remain on the Sloat property for a short period of time while the Sloat property was being developed for a new housing project. Therefore, although the Sloat property was acquired by 2700 Sloat Holding LLC, physical possession was never surrendered by Sloat Garden Center due to the holdover lease. Everything on the property belongs to Sloat Garden Center except the building.**

**YOUR LINE ITEM QUESTIONS AND RESPONSES**

1. Property keys and alarm codes (if any);

**We do not have any keys or alarm codes.**

2. Copies of any current insurance policies and utility statements relating to the Property;

**The only insurance policy is provided by Sloat Garden Center and they list 2700 Sloat Holding LLC as an "additional insured". Attached is a copy from 2021. Also, Sloat Garden Center pays all utilities used on site.**

**The existing structure must be torn down to allow for any development of the property.**

3. 24 months of financial statements (balance sheet, income statement and cash flow statement), bank statements, business licenses and records relating to the Property;

**Sloat Holding has no financial statements relating to the operation of the property as a rental property. Sloat Holding does not operate the property or pay any bills related to its operation except for Property Taxes. The tenant is fully responsible for any licensing needed to operate a business on the property.**

4. A list of all vendors that are currently servicing the Property and associated payment information;

**Sloat Holding has no vendors servicing the Property. The tenant, Sloat Garden Center is fully responsible for any and all expenses related to their leasing and operating the Sloat Property.**

5. Copies of any other contracts relating to the Property, including but not limited to the existing property management agreement;

**There is no Property Management agreement for the Sloat property.**

6. Copies of any delinquent invoices relating to the Property;

**2700 Sloat Holding does not have any invoices, delinquent or otherwise, related to the existing building or operation of the Property.**

7. Copies of all leases relating to the Property;

**See attached original lease plus extension modifications that were allowed as long as they did not interfere with the development of the Property.**

8. The federal tax identification number(s) or social security numbers used to operate the Property;

**Sloat Holding does not operate the property.**

9. Any current property tax bills for the Property;

**The paid receipt for the April 2024 Property Tax bill is attached. The unpaid December 2024 bill is attached and the April 2025 bill (not yet due and payable) is attached**

10. Current statements for all outstanding loans against the Property;

**Sloat Holding does not have any statements relating to loans on the Property.**

**However, Lone Oak sent out a monthly invoice/statement for the interest payment. I have attached the last Loan Payment invoice/statement 2700 Sloat Holding received from Lone Oak, dated February 10,2025. It shows that Sloat Holding owed them the usual interest payment amount of $74,166.67 on that date and that the Loan principal amount is $10,000,000. It also shows that the $10,000,000 loan maturity date was January 31, 2025.**

**I am also attaching a Loan Statement Sloat Holding received from Lone Oak's auditors in January 2025. It shows representations made by Lone Oak related to the loan they made to 2700 Sloat Holding. It shows the loan in good standing at the end of 2024.**

11. All construction plans for the Property; and

**Sloat Holding does not have approved construction plans for the property.**

12. Summary of all funds in your possession (including via property management)

**As stated above, the loan representations made by Lone Oak to its auditors in January 2025 show that the $10,000,000 loan was in good standing through that date. 2700 Sloat Holding has not received any Lease revenue from Sloat Garden Center since December 2024. 2700 Sloat Holding does not currently have any Garden Center Lease Revenue funds in its possession and has not had any such funds since prior to Lone Oak filing the NOD on February 12, 2025. The interest reserve ran out in January 2024 and the Monthly Lease Revenue from leasing the Property to the Sloat Garden Center was used to continue to pay for development expenses of the Sloat property (the Lone Oak approved Original Purpose of the $10,000,000 loan from Lone Oak), in addition to paying April 2024 Property Taxes, the 2024 Lone Oak interest and extension fee payments and other administrative expense. There is currently less than $100 in the possession of 2700 Sloat Holding.**

**SUMMARY**

**Lone Oak has increased the Interest Rate on the Note to 24% from it's original 6.9% and then later 8.9%. The lease payment from the Sloat Garden Center barely equaled 50% of the previous 8.9% interest rate and they currently represent less than 25% of the monthly interest rate payment that Loan Oak is accruing against the Property. The 24% interest rate is significantly in excess of any perceived lost lease revenue (which there is none) and therefore, significantly adds to the charges that must be recouped on any foreclosure of the Property.**

**Further, I am requesting that you request written documentation from Lone Oak related to any third party agreements they may have in place with AMINAM concerning AMINAM's second lien recorded against the Sloat Property. We were told the recording of the AMINAM lien was required to obtain the loan from Lone Oak, however the AMINAM loan did not fund and we were never given any documentation from Lone Oak about a possible guaranty arrangement they had/have with AMINAM related to the required recording of the $3,000,000 second lien on the Property. We pointed this out in an email to Lone Oak's auditors, but we never received any communication back from them.**

Raelynn Hickey

2700 Sloat Holding, LLC

EXHIBIT R

City & County of San Francisco
José Cisneros, Treasurer
David Augustine, Tax Collector

# Property Tax Bill (Secured)

For Fiscal Year July 1, 2024 through June 30, 2025

1 Dr. Carlton B. Goodlett Place
City Hall, Room 140
San Francisco, CA 94102
www.sftreasurer.org

| Vol | Block | Lot | Bill No | Mail Date | Property Location |
|---|---|---|---|---|---|
| 18 | 2514 | 007 | 20240344198 | October 21, 2024 | 2750 SLOAT BLVD |

Assessed on January 1, 2024 at 12:01am
To: NAME WITHHELD PER CA AB 2238

**ADDRESS INFORMATION NOT AVAILABLE ONLINE**

| ▶ TOTAL DUE | $22,854.92 |
|---|---|
| 1st Installment | 2nd Installment |
| $11,427.46 | $11,427.46 |
| Due 12/10/2024 | Due 04/10/2025 |

Important Messages

Assessed Value

| Description | Full Value |
|---|---|
| Land | $1,883,644 |
| Structure | |
| Fixtures | |
| Personal Property | |
| Gross Assessed Value | $1,883,644 |
| Less HO Exemption | $0 |
| Less Other Exemption | $0 |
| **Net Assessed Value** | **$1,883,644** |
| **Tax Amount** | **$22,065.62** |

Direct Charges and Special Assessments

| Type | Telephone | Amount Due |
|---|---|---|
| 46 - San Francisco Bay Restoration Authority | (888) 508-8157 | $12.00 |
| 89 - SFUSD Facilities District | (415) 355-2203 | $42.16 |
| 91 - SFCCD Parcel Tax | (415) 487-2400 | $99.00 |
| 98 - SFUSD - Teacher Support | (415) 355-2203 | $310.76 |
| 101 - School Parcel Tax of 2020 | (415) 355-2203 | $325.38 |
| **Total Direct Charges and Special Assessments** | | **$789.30** |

Keep this portion for your records. See back of bill for payment options and additional information.

City & County of San Francisco
Property Tax Bill (Secured)
For Fiscal Year July 1, 2024 through June 30, 2025

**Pay online at www.sftreasurer.org**

| Vol | Block | Lot | Bill No | Property Location |
|---|---|---|---|---|
| 18 | 2514 | 007 | 20240344198 | 2750 SLOAT BLVD |

☐ Check if contribution to Arts Fund is enclosed.
For other donation opportunities go to www.Give2SF.org

Write your block and lot on your check.
2nd Installment cannot be accepted unless 1st is paid.

SECURED 2

San Francisco Tax Collector
Secured Property Tax
P.O. Box 7426
San Francisco, CA 94120-7426

**2nd Installment Due**

| Pay by | April 10, 2025 | **$11,427.46** |
|---|---|---|
| If paid after April 10, 2025 includes 10% penalty and applicable fees | | $12,627.20 |

1825140000700 20240344198 000000000 000000000 0000 2003

City & County of San Francisco
Property Tax Bill (Secured)
For Fiscal Year July 1, 2024 through June 30, 2025

**Pay online at www.sftreasurer.org**

| Vol | Block | Lot | Bill No | Property Location |
|---|---|---|---|---|
| 18 | 2514 | 007 | 20240344198 | 2750 SLOAT BLVD |

☐ Check if contribution to Arts Fund is enclosed.
For other donation opportunities go to www.Give2SF.org

Write your block and lot on your check.
If property has been sold, please forward bill to new owner.

SECURED 1

San Francisco Tax Collector
Secured Property Tax
P.O. Box 7426
San Francisco, CA 94120-7426

**1st Installment Due**

| Pay by | December 10, 2024 | **$11,427.46** |
|---|---|---|
| If paid after December 10, 2024 includes 10% penalty | | $12,570.20 |

1825140000700 20240344198 000000000 000000000 0000 1003

| Pay Now | Contact Us | Tax Rate Information | |
|---|---|---|---|
| Online: www.sftreasurer.org<br><br>Mail a check payable to "SF Tax Collector" with the bottom portion of bill in the enclosed envelope<br><br>In person at City Hall, Room 140.<br>Monday – Friday 8:00AM – 5:00PM<br>Office hours subject to change - please check our website at : www.sftreasurer.org | Free language assistance<br><br>Call: 3-1-1<br>415-701-2311 from outside of San Francisco<br><br>Submit questions online:<br>www.sftreasurer.org/contact-us | Countywide Tax (Secured) | 1.00000000% |
| | | S.F. Bay Area Rapid Transit District Debt Service | 0.01480000% |
| | | S.F. Community College District Debt Service | 0.01718123% |
| | | City and County of S.F. Debt Service | 0.10600267% |
| | | S.F. Unified School District Debt Service | 0.03345173% |
| | | **TOTAL** | **1.17143563%** |

If you disagree with the assessed value as shown on your tax bill, you have the right to an informal assessment review by the Assessor-Recorder's Office. Visit www.sfassessor.org for more information. You also have the right to file an application for reduction in assessment for the following year with the Assessment Appeals Board. The filing period is July 2 to September 16. Visit www.sfgov.org/aab or call 415-554-6778 for more information. If an informal or formal assessment review is requested, relief from penalties shall apply only to the difference between the Assessor-Recorder's final determination of value and the value on the assessment roll for the fiscal year covered.

If a **"Tax-Defaulted"** message is shown on the front of this bill, it indicates that prior year taxes are unpaid. Visit our website for more information.

New owners and current owners with new construction may be required to pay a **supplemental tax bill**. Supplemental tax bills are issued in addition to this annual tax bill.

**Property Tax Postponement for Senior Citizens, Blind, or Disabled Persons**
The State Controller's Office (SCO) administers the Property Tax Postponement (PTP) program, which allows eligible homeowners to postpone payment of current year property taxes on their primary residence. PTP applications are accepted from October 1 to February 10 each year. Go to the SCO website at www.ptp.sco.ca.gov for more information. If you have any questions or to request an application, call (800) 952-5661 or email postponement@sco.ca.gov

---

Did you…

Submit payment for the exact amount?

Confirm that you have sufficient funds in your account? If your payment is not honored by the bank, the payment is null and void and a $50.00 "Payment Failure Fee" will be charged in addition to any late payment penalties.

If the delinquent date falls on a Saturday, Sunday or legal holiday, no penalty is charged if payment is made by 5 PM on the next business day.

If any portion of the total amount due is unpaid after 5 PM on June 30, 2025 , it will be necessary to pay (a) delinquent penalties, (b) costs, (c) redemption penalties, and (d) a redemption fee. After 5 years of tax delinquency, the Tax Collector has the power to sell tax-defaulted property that is not redeemed.

---

Did you…

Submit payment for the exact amount?

Confirm that you have sufficient funds in your account? If your payment is not honored by the bank, the payment is null and void and a $50.00 "Payment Failure Fee" will be charged in addition to any late payment penalties.

If the delinquent date falls on a Saturday, Sunday or legal holiday, no penalty is charged if payment is made by 5 PM on the next business day.

If any portion of the total amount due is unpaid after 5 PM on June 30, 2025 , it will be necessary to pay (a) delinquent penalties, (b) costs, (c) redemption penalties, and (d) a redemption fee. After 5 years of tax delinquency, the Tax Collector has the power to sell tax-defaulted property that is not redeemed.

EXHIBIT S

City & County of San Francisco
José Cisneros, Treasurer
David Augustine, Tax Collector
Property Tax Bill (Secured)
For Fiscal Year July 1,2024 through June 30, 2025

1 Dr. Carlton B. Goodlett Place
City Hall, Room 140
San Francisco, CA 94102
www.sftreasurer.org

| Vol | Block | Lot | Bill No | Mail Date | Property Location |
|---|---|---|---|---|---|
| 18 | 2514 | 008 | 20240344199 | October 21, 2024 | 2700 SLOAT BLVD |

Assessed on January 1, 2024 at 12:01am
To: NAME WITHHELD PER CA AB 2238

**ADDRESS INFORMATION NOT AVAILABLE ONLINE**

| ▶ TOTAL DUE | $85,011.76 |
|---|---|
| 1st Installment | 2nd Installment |
| $42,505.88 | $42,505.88 |
| Due 12/10/2024 | Due 04/10/2025 |

Important Messages

Assessed Value

| Description | Full Value |
|---|---|
| Land | $7,189,684 |
| Structure | |
| Fixtures | |
| Personal Property | |
| Gross Assessed Value | $7,189,684 |
| Less HO Exemption | $0 |
| Less Other Exemption | $0 |
| **Net Assessed Value** | **$7,189,684** |
| **Tax Amount** | **$84,222.46** |

Direct Charges and Special Assessments

| Type | Telephone | Amount Due |
|---|---|---|
| 46 - San Francisco Bay Restoration Authority | (888) 508-8157 | $12.00 |
| 89 - SFUSD Facilities District | (415) 355-2203 | $42.16 |
| 91 - SFCCD Parcel Tax | (415) 487-2400 | $99.00 |
| 98 - SFUSD - Teacher Support | (415) 355-2203 | $310.76 |
| 101 - School Parcel Tax of 2020 | (415) 355-2203 | $325.38 |
| **Total Direct Charges and Special Assessments** | | **$789.30** |

Keep this portion for your records. See back of bill for payment options and additional information.

City & County of San Francisco
Property Tax Bill (Secured)
For Fiscal Year July 1,2024 through June 30, 2025

**Pay online at www.sftreasurer.org**

| Vol | Block | Lot | Bill No | Property Location |
|---|---|---|---|---|
| 18 | 2514 | 008 | 20240344199 | 2700 SLOAT BLVD |

☐ Check if contribution to Arts Fund is enclosed.
For other donation opportunities go to www.Give2SF.org

Write your block and lot on your check.
2nd Installment cannot be accepted unless 1st is paid.

SECURED 2

San Francisco Tax Collector
Secured Property Tax
P.O. Box 7426
San Francisco, CA 94120-7426

| **2nd Installment Due** | | |
|---|---|---|
| Pay by | April 10, 2025 | **$42,505.88** |
| If paid after April 10, 2025 includes 10% penalty and applicable fees | | $46,813.46 |

18251400008OO 20240344199 000000000 000000000 0000 2003

City & County of San Francisco
Property Tax Bill (Secured)
For Fiscal Year July 1,2024 through June 30, 2025

**Pay online at www.sftreasurer.org**

| Vol | Block | Lot | Bill No | Property Location |
|---|---|---|---|---|
| 18 | 2514 | 008 | 20240344199 | 2700 SLOAT BLVD |

☐ Check if contribution to Arts Fund is enclosed.
For other donation opportunities go to www.Give2SF.org

Write your block and lot on your check.
If property has been sold, please forward bill to new owner.

SECURED 1

San Francisco Tax Collector
Secured Property Tax
P.O. Box 7426
San Francisco, CA 94120-7426

| **1st Installment Due** | | |
|---|---|---|
| Pay by | December 10, 2024 | **$42,505.88** |
| If paid after December 10, 2024 includes 10% penalty | | $46,756.46 |

18251400008OO 20240344199 000000000 000000000 0000 1003

| Pay Now | Contact Us | Tax Rate Information | |
|---|---|---|---|
| Online: www.sftreasurer.org<br><br>Mail a check payable to "SF Tax Collector" with the bottom portion of bill in the enclosed envelope<br><br>In person at City Hall, Room 140. Monday – Friday 8:00AM – 5:00PM Office hours subject to change - please check our website at : www.sftreasurer.org | Free language assistance<br><br>Call: 3-1-1<br>415-701-2311 from outside of San Francisco<br><br>Submit questions online: www.sftreasurer.org/contact-us | Countywide Tax (Secured) | 1.00000000% |
| | | S.F. Bay Area Rapid Transit District Debt Service | 0.01480000% |
| | | S.F. Community College District Debt Service | 0.01718123% |
| | | City and County of S.F. Debt Service | 0.10600267% |
| | | S.F. Unified School District Debt Service | 0.03345173% |
| | | **TOTAL** | **1.17143563%** |

If you disagree with the assessed value as shown on your tax bill, you have the right to an informal assessment review by the Assessor-Recorder's Office. Visit www.sfassessor.org for more information. You also have the right to file an application for reduction in assessment for the following year with the Assessment Appeals Board. The filing period is July 2 to September 16. Visit www.sfgov.org/aab or call 415-554-6778 for more information. If an informal or formal assessment review is requested, relief from penalties shall apply only to the difference between the Assessor-Recorder's final determination of value and the value on the assessment roll for the fiscal year covered.

If a **"Tax-Defaulted"** message is shown on the front of this bill, it indicates that prior year taxes are unpaid. Visit our website for more information.

New owners and current owners with new construction may be required to pay a **supplemental tax bill**. Supplemental tax bills are issued in addition to this annual tax bill.

**Property Tax Postponement for Senior Citizens, Blind, or Disabled Persons**
The State Controller's Office (SCO) administers the Property Tax Postponement (PTP) program, which allows eligible homeowners to postpone payment of current year property taxes on their primary residence. PTP applications are accepted from October 1 to February 10 each year. Go to the SCO website at www.ptp.sco.ca.gov for more information. If you have any questions or to request an application, call (800) 952-5661 or email postponement@sco.ca.gov

---

Did you…

Submit payment for the exact amount?

Confirm that you have sufficient funds in your account? If your payment is not honored by the bank, the payment is null and void and a $50.00 "Payment Failure Fee" will be charged in addition to any late payment penalties.

If the delinquent date falls on a Saturday, Sunday or legal holiday, no penalty is charged if payment is made by 5 PM on the next business day.

If any portion of the total amount due is unpaid after 5 PM on June 30, 2025 , it will be necessary to pay (a) delinquent penalties, (b) costs, (c) redemption penalties, and (d) a redemption fee. After 5 years of tax delinquency, the Tax Collector has the power to sell tax-defaulted property that is not redeemed.

---

Did you…

Submit payment for the exact amount?

Confirm that you have sufficient funds in your account? If your payment is not honored by the bank, the payment is null and void and a $50.00 "Payment Failure Fee" will be charged in addition to any late payment penalties.

If the delinquent date falls on a Saturday, Sunday or legal holiday, no penalty is charged if payment is made by 5 PM on the next business day.

If any portion of the total amount due is unpaid after 5 PM on June 30, 2025 , it will be necessary to pay (a) delinquent penalties, (b) costs, (c) redemption penalties, and (d) a redemption fee. After 5 years of tax delinquency, the Tax Collector has the power to sell tax-defaulted property that is not redeemed.

EXHIBIT T


Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

Transaction history Date Check Number Description **Deposits**/ Credits Withdrawals

9/3 < Business to Business ACH Debit - Pacificworkplace Sigonfile 090324 Rjsgzg 2700 Sloat Holding

585.00

9/24 Wire Trans Svc Charge - Sequence: 240924161296 Srf# Ow00004953823650 Trn#240924161296 Rfb# Ow00004953823650 25.00

9/24 WT Fed#09422 Jpmorgan Chase Ban /Ftr/Bnf=Verliant Energy Srf# Ow00004953823650 Trn#240924161296 Rfb# Ow00004953823650 10,000.00

Transaction history Date Check Number Description **Deposits**/ Credits Withdrawals

10/2 < Business to Business ACH Debit - Pacificworkplace Sigonfile 100224 Wnv75H 2700 Sloat Holding

585.00

10/3 Wire Trans Svc Charge - Sequence: 241003179259 Srf# Ow00004984250602 Trn#241003179259 Rfb# Ow00004984250602 25.00

10/7 Withdrawal Made In A Branch/Store 96,426.84 45,769.23 10/18 < Business to Business ACH Debit - The Hartford Inspmtcl 16389517 2700 Sloat Holding LLC 815.52

10/30 WT Seq147879 Ch Planning LLC /Org= Srf# 0074891304380766 Trn#241030147879 Rfb#

**89,046.29**

10/31 Wire Trans Svc Charge - Sequence: 241031190468 Srf# 0074891305956376 Trn#241031190468 Rfb# 40.00

10/31 Wire Trans Svc Charge - Sequence: 241031190650 Srf# 0074891305977376 Trn#241031190650 Rfb# 40.00

10/31 Wire Trans Svc Charge - Sequence: 241031262363 Srf# Ow00005069290814 Trn#241031262363 Rfb# Ow00005069290814 25.00

10/31 WT Seq190468 Lone Oak Fund, LLC /Bnf=Lone Oak Fund, LLC Srf# 0074891305956376 Trn#241031190468 Rfb# 81,583.34

10/31 WT Seq190650 Lone Oak Fund, LLC /Bnf=Lone Oak Fund, LLC Srf# 0074891305977376 Trn#241031190650 Rfb# 50,000.00

10/31 WT Fed#00693 Jpmorgan Chase Ban /Ftr/Bnf=Verliant Energy Srf# Ow00005069290814 Trn#241031262363 Rfb# Ow00005069290814 2,000.00

Transaction history Date Check Number Description **Deposits**/ Credits Withdrawals

11/4 < Business to Business ACH Debit - Pacificworkplace Sigonfile 110424 T5R3Ch 2700 Sloat Holding
585.00

11/6 Wire Trans Svc Charge - Sequence: 241106168114 Srf# Ow00005089353690 Trn#241106168114 Rfb# Ow00005089353690 25.00

11/25 WT Seq205399 Ch Planning LLC /Org= Srf# 0074891330109197 Trn#241125205399 Rfb#
**79,000.00**

11/27 Wire Trans Svc Charge - Sequence: 241127180746 Srf# Ow00005152421545 Trn#241127180746 Rfb# Ow00005152421545 25.00

11/27 WT Seq180746 Lone Oak Fund, LLC /Bnf=Loan Oak Fund LLC Srf# Ow00005152421545 Trn#241127180746 Rfb# Ow00005152421545 81,583.34

Date Check Number Description **Deposits**/ Credits Withdrawals

12/2 < Business to Business ACH Debit - Pacificworkplace Sigonfile 120224 S708Jh 2700 Sloat Holding
585.00

12/31 WT Seq259188 Lone Oak Fund, LLC /Bnf=Loan Oak Fund LLC Srf# Ow00005257591772 Trn#241231259188 Rfb# Ow00005257591772 81,583.34

EXHIBIT U

**City and County of**
**San Francisco Payment Portal**

San Francisco Treasurer and Tax Collection Property Tax

# Thank You!

Your payment is being processed. Your transaction number is **124147934**.

You will receive a confirmation email shortly at **rh@ch-planning.com**. If you do not receive a confirmation of your transaction, check the spam folder in your email inbox.

## Payment Summary

Tax Type
Secured

Block
2514

Lot
007

Property Location
2750 SLOAT BLVD

Bill Number
20230347066

Installment Number
2

---

Tax Type
Secured

Block
2514

Lot
008

Property Location
2700 SLOAT BLVD

Bill Number
20230347067

Installment Number
2

**Total:**

**$53,146.33**

## Payment Details

**Paid By**
2700 SLOAT HOLDING LLC
One East Liberty Street
Suite 600
Reno , NV 89105

Please note that it is your responsibility to ensure that a successful payment is made by the indicated due date. If your first installment becomes past due as a result of a failed transaction, a 10% late penalty will be assessed regardless of the date of the initial payment attempt. If your second installment becomes past due as a result of a failed transaction, a 10% late penalty and a $45 fee will be assessed, regardless of the date of the initial payment attempt.

If you paid by electronic check ("E-Check") and the payment is returned or rejected for ANY reason, a returned item fee of $50 will be assessed in addition to the late penalty and fee amounts listed above if your replacement payment becomes past due.

PLEASE KEEP THIS FOR YOUR RECORDS.

Complete (https://sanfrancisco-ca.county-taxes.com)

EXHIBIT V

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY) 01/22/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| | | | |
|---|---|---|---|
| PRODUCER 1-800-851-7740<br>Florists' Mutual Insurance Company/Hortica,<br>Florists' Insurance Services Inc<br>P O Box 428<br>1 Horticultural Lane<br>Edwardsville, IL 62025 | CONTACT NAME: Ella Exton (Account #97067) | | |
| | PHONE (A/C, No, Ext): 800-851-7740 | FAX (A/C, No): 866-819-9256 | |
| | E-MAIL ADDRESS: ella.exton@hortica.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: FLORISTS MUT INS CO | | 13978 |
| INSURED<br>Sloat Garden Centers Inc<br>420 Coloma Street<br>Sausalito, CA 94965 | INSURER B: | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

**COVERAGES** CERTIFICATE NUMBER: 61255163 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE [ ] OCCUR [X]<br>GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC<br>OTHER: | | | BP 17027 | 02/01/21 | 02/01/22 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>[X] ANY AUTO<br>[ ] OWNED AUTOS ONLY [ ] SCHEDULED AUTOS<br>[X] HIRED AUTOS ONLY [X] NON-OWNED AUTOS ONLY | | | FMA 012370 | 02/01/21 | 02/01/22 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | [X] UMBRELLA LIAB [X] OCCUR<br>[ ] EXCESS LIAB [ ] CLAIMS-MADE<br>[ ] DED [X] RETENTION $ 10,000 | | | EX 11575 | 02/01/21 | 02/01/22 | EACH OCCURRENCE | $ 4,000,000 |
| | | | | | | | AGGREGATE | $ 4,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ]<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | | | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

2700 Sloat Holdings, LLC as their interests appear on attached from L2032 (07/12)
RE: Location 2- 2700-2750 Sloat Blvd, San Francisco, CA 94116

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| 2700 Sloat Holdings, LLC<br>2309 Noriega Street, Suite 208<br>San Francisco, CA 94122<br>USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br>AUTHORIZED REPRESENTATIVE<br>Ella Exton |

© 1988-2015 ACORD CORPORATION. All rights reserved.


The ACORD name and logo are registered marks of ACORD

akoch
61255163

EXHIBIT W

**From:** Wells Fargo Online
**To:** admin@ch-planning.com
**Subject:** Wells Fargo Wire Transfer Initiated
**Date:** Thursday, August 18, 2022 10:34:31 AM

wellsfargo.com

# Your Wire Transfer is being processed

You recently submitted the following transfer:

**Transfer details**

| | |
|---|---|
| **To account** | XXXXX2906 |
| **From account** | XXXXXX4959 |
| **Amount** | $10,000.00 |
| **Send on** | 08/18/2022 |
| **Confirmation number** | OW00002445833507 |

If you did not submit this transfer, or if you have questions, please call Wells Fargo Online Customer Service at 1-800-956-4442. We are available 24 hours a day, 7 days a week

**wellsfargo.com** | Security Center | Contact Us

**Please do not reply to this automated email.**

c0a4a118-f99f-44d9-a00b-dab58d50d76a

EXHIBIT X

**From:** Wells Fargo Online
**To:** admin@ch-planning.com
**Subject:** Wells Fargo Wire Transfer Initiated
**Date:** Friday, July 29, 2022 1:24:33 PM

wellsfargo.com

# Your Wire Transfer is being processed

You recently submitted the following transfer:

**Transfer details**

| | |
|---|---|
| **To account** | XXXXX0613 |
| **From account** | XXXXXX4959 |
| **Amount** | $11,000.00 |
| **Send on** | 07/29/2022 |
| **Confirmation number** | OW00002392051181 |

If you did not submit this transfer, or if you have questions, please call Wells Fargo Online Customer Service at 1-800-956-4442. We are available 24 hours a day, 7 days a week

wellsfargo.com | Security Center | Contact Us

**Please do not reply to this automated email.**

a93269fa-1708-4129-a36e-f7f4a9138873

EXHIBIT Y

# VERLIANT ENERGY LLC

July 1, 2022

Ms. Raelynn Hickey
2700 Sloat Holding, LLC
201 Spear Street
Suite 1100
San Francisco, CA 94105

Re: Condominium Project District Utility Services Feasibility Consulting Fee Proposal

Dear Ms. Hickey,

Thank you for the opportunity for Verliant Energy LLC ("Consultant") to provide the Consulting services to 2700 Sloat Holding, LLC ("Owner"), related to the Condominium development project located at 2700 Sloat Blvd, San Francisco, CA 94116.

CONSULTING FEES

RATE: In consideration for the Consulting Services to be performed by Consultant under this Agreement. Owner will pay Consultant at the rate of $110 per hour. Consultant's time shall not exceed 20 hours per week for any week during the term of this Agreement without prior written authorization from Owner. Consultant shall submit monthly written invoices of the time spent performing Consulting Services on the Project for Owner itemizing in reasonable detail the number of hours spent on all related dates and a brief description of the services rendered on all such dates. The Consultant shall also supply Owner with a monthly written report on all issues worked on in each month.

Payment is due from Owner within 5 days after receipt of each invoice and invoices will be issued via email only. Fees presented are in USD.

RETAINER

Owner will pay in advance at the execution of this Agreement a retainer equal to $21,000 which will be held by Consultant and used in the event of any unpaid invoices.



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

PROJECT SCOPE

As we understand it, the condominium project consists of approximately 400 units with the total gross area exceeding 360,000 sq. ft. The intent of this Consulting Agreement is to evaluate and negotiate the required local utility connections, all related on-site and off-site improvements, related design work and contracts with local utility suppliers and supply construction supervision as requested.

Our detailed scope of work is as follows:

1. Work with MEP and other development team members to develop electrical, heating and cooling load consumption estimates based on development plans.
2. Review applicable technologies for energy demand offsets including solar PV and battery storage.
3. Review available technologies for on-site and/or off-site utility connection options.
4. Review local utility distribution practices and requirements for to establish connection strategy.
5. Negotiate all required design and relocation for undergrounding of all off-site existing utility services to the surrounding neighborhood area.
6. Discuss options for utility procurement.
7. Assist Project team members with the related applications for approvals and permits in various city departments and agencies.
8. Provide construction supervision, as requested by owner, for all related on-site and off-site project improvements.
9. Miscellaneous issues with prior written authorization from Owner.

Sincerely,

______________________________

Damien Quinn
President
Verliant Energy, LLC

AGREED AND ACCEPTED BY OWNER:

2700 SLOAT HOLDING, LLC

Raelynn Hickey

Raelynn Hickey
CEO



Doc ID: af312b15279b5949274ce9143ce6522af2a1477d

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Decl Hickey- 05.29.25.pdf |
| **File name** | Decl%20Hickey-%2005.29.25.pdf |
| **Document ID** | af312b15279b5949274ce9143ce6522af2a1477d |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from app.clio.com**

## Document History

| | | |
|---|---|---|
| SENT | **05 / 29 / 2025**<br>22:20:47 UTC | Sent for signature to Raelynn Hickey (rh@ch-planning.com)<br>from lance@estavillolaw.com<br>IP: 68.74.114.89 |
| VIEWED | **05 / 29 / 2025**<br>22:21:43 UTC | Viewed by Raelynn Hickey (rh@ch-planning.com)<br>IP: 135.180.74.22 |
| SIGNED | **05 / 29 / 2025**<br>22:26:14 UTC | Signed by Raelynn Hickey (rh@ch-planning.com)<br>IP: 135.180.74.22 |
| COMPLETED | **05 / 29 / 2025**<br>22:26:14 UTC | The document has been completed. |

# EXHIBIT "K"

Kevin Singer
Superior Court Receiver
Receivership Specialists
One Sansome Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 590-4823
Facsimile: (415) 946-8837
Kevin@ReceivershipSpecialists.com
efilings@receivershipspecialists.com

FILED
Superior Court of California
County of San Francisco
JUN 10 2025
CLERK OF THE SUPERIOR COURT
By ________ Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

LONE OAK FUND, LLC, a California limited liability company,

Plaintiff,

v.

2700 SLOAT HOLDINGS LLC, a Nevada limited liability company; and DOES 1 through 50, inclusive,

Defendants.

AMINAM, LLC, a California limited liability company,

Nominal Defendants.

Case No.: CGC-25-622590

**STIPULATION AND ~~[PROPOSED]~~ ORDER CONTINUING HEARING ON OSC RE TURNOVER OF RECEIVERSHIP ESTATE PROPERTY**

**HEARING INFORMATION**
Date: June 12, 2025
Time: 9:30 a.m.
Dept.: 501

Court: Civic Center Courthouse
400 McAllister Street
San Francisco, CA, 94102

Case filed: February 20, 2025
Trial Date: None set

**RECITALS**

**WHEREAS**, on or about February 26, 2025, the Court, the Honorable Charles F. Haines presiding, entered an order titled "Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order—Rents, Issues, and Profits" (the "**Appointing Order**") which appointed Kevin Singer as the Superior Court Receiver (the "**Receiver**") over the real property commonly known as 2700-2750 Sloat Boulevard, San Francisco, CA 94116 (the "**Property**").

**WHEREAS**, the Court has scheduled a hearing for June 12, 2025, at 9:30 AM in connection for the Receiver's Motion for an Order to Show Cause regarding turnover of Receivership Estate property (the "**OSC Hearing**").

**WHEREAS**, on June 9, 2025, counsel for Plaintiff Lone Oak Fund, LLC, a California limited liability company ("**Plaintiff**") asked the Receiver's office to seek a continuance of the OSC Hearing for approximately three weeks to allow further time for negotiations between the Parties.

**WHEREAS**, the Receiver fully supports the Parties' settlement negotiations and supports continuing the OSC Hearing on that basis.

**WHEREAS**, Plaintiff, by and through counsel of record Simon Aron, Esq., Defendant 2700 Sloat Holdings, LLC ("**Defendant**"), by and through counsel of record Mark S. Hall, Esq., and the Receiver (collectively, the "**Stipulating Parties**") desire to enter into this Stipulation ("**Stipulation**") to continue the OSC Hearing for three weeks while the Parties continue negotiating.

**WHEREAS**, the Stipulation may be signed in counterparts, all of which taken together shall constitute one original. A faxed signature, electronic signature and/or scanned email signature shall be deemed as an original for all purposes.

**STIPULATION**

**NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and among the Stipulating Parties that the Court order as follows:

1. The Recitals above are incorporated in full by this reference.

2. The OSC Hearing is continued from June 12, 2025, at 9:30 AM to July 3, 2025, at 9:30 AM.

/ / /

/ / / 6/10/2025 ok per SK

/ / /

/ / /

[SIGNATURES TO FOLLOW ON NEXT PAGE]

**IT IS SO STIPULATED AND AGREED:**

DATED: June 9, 2025

WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP

By: /s/ Simon Aron
Simon Aron, Esq.
Attorneys for Plaintiff Lone Oak Fund, LLC

DATED: June 9, 2025

ESTAVILLO LAW GROUP

By: /s/ Mark Hall
Mark S. Hall, ESQ
Attorneys for Defendant 2700 Sloat Holdings, LLC

Dated: June 9, 2025

**SUPERIOR COURT RECEIVER**

By: [signature]
Kevin Singer

**IT IS SO ORDERED.**

Dated: ______________________

By: ______________________
Judge of the Superior Court

CHARLES F. HAINES

**Jackson Wyche**

**From:** Mark Hall <mark@estavillolaw.com>
**Sent:** Monday, June 9, 2025 1:19 PM
**To:** Simon Aron; Jackson Wyche
**Cc:** Elsa Horowitz; Nicole Gibson; Lance Maxwell
**Subject:** RE: 2700 Lone Oak Fund v Sloat Holdings (SF CGC-25-622590): Receiver's Ex Parte Notice

Jackson-

Same here. Feel free to sign on my behalf as well.

ESTAVILLO LAW GROUP

**Mark S. Hall, Esq.**
Senior Attorney | **Estavillo Law Group**

(510) 982-3001 | (949) 991-2057
(510) 982-3002
mark@estavillolaw.com
www.estavillolaw.com

**555 12th Street, Suite 1280**
**Oakland, CA 94607**

**1301 Dove Street, Suite 920**
**Newport Beach, CA 92660**

CONFIDENTIALITY CAUTION: This message is intended only for the use of the addressee(s) and may contain privileged or confidential information. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at our costs.

**From:** Simon Aron <saron@wrslawyers.com>
**Sent:** Monday, June 9, 2025 1:17 PM
**To:** Jackson Wyche <Jackson@receivershipspecialists.com>; Mark Hall <mark@estavillolaw.com>
**Cc:** Elsa Horowitz <ehorowitz@wrslawyers.com>; Nicole Gibson <nicole@estavillolaw.com>; Lance Maxwell <lance@estavillolaw.com>
**Subject:** RE: 2700 Lone Oak Fund v Sloat Holdings (SF CGC-25-622590): Receiver's Ex Parte Notice

CAUTION:This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jackson,

This is approved. You are authorized to execute this on my behalf or, if Elsa is available, maybe she can sign and return to you asap so we might avoid the appearance later this week.

Thanks

Simon

Simon Aron
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard
9th Floor
Los Angeles, California 90064
Telephone: (310) 478-4100
Direct: (310) 744-6601
Fax: (310) 479-14222

---

**From:** Jackson Wyche <Jackson@receivershipspecialists.com>
**Sent:** Monday, June 9, 2025 1:14 PM
**To:** Mark Hall <mark@estavillolaw.com>; Simon Aron <saron@wrslawyers.com>
**Cc:** Elsa Horowitz <ehorowitz@wrslawyers.com>; Nicole Gibson <nicole@estavillolaw.com>; Lance Maxwell <lance@estavillolaw.com>
**Subject:** RE: 2700 Lone Oak Fund v Sloat Holdings (SF CGC-25-622590): Receiver's Ex Parte Notice

CAUTION: EXTERNAL EMAIL

Thank you, Mark. Attached please find a draft stipulation and order regarding the continuance. Simon/Mark, please let me know if you have any comments. Assuming no edits, please return signed copies of the PDF.

**Jackson Wyche** *for*
Receivership Specialists

| | |
|---|---|
| Direct | (424) 276-2504 |
| Southern California | (310) 552-9064 |
| Northern California | (415) 848-2984 |
| Arizona | (602) 343-1889 |
| Nevada | (702) 562-4230 |

www.ReceivershipSpecialists.com

The information contained in this e-mail message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender

---

**From:** Mark Hall <mark@estavillolaw.com>
**Sent:** Monday, June 9, 2025 10:29 AM
**To:** Jackson Wyche <Jackson@receivershipspecialists.com>
**Cc:** Kevin Singer <Kevin@receivershipspecialists.com>; Louise Dawson <Louise@receivershipspecialists.com>; Allie Farinacci <Allie@receivershipspecialists.com>; 'Simon Aron' <saron@wrslawyers.com>; Elsa Horowitz <ehorowitz@wrslawyers.com>; Nicole Gibson <nicole@estavillolaw.com>; Lance Maxwell <lance@estavillolaw.com>
**Subject:** RE: 2700 Lone Oak Fund v Sloat Holdings (SF CGC-25-622590): Receiver's Ex Parte Notice

Jackson-

That would be great.

## PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen and not a party to the within action; my business address is 11500 W Olympic Boulevard, Suite 530, Los Angeles, California 90064.

On June 9, 2025, I served the foregoing documents described herein as:

**STIPULATION AND** [PROPOSED] **ORDER CONTINUING HEARING ON OSC RE TURNOVER OF RECEIVERSHIP ESTATE PROPERTY**

[ X ] BY EMAIL: I emailed said document to the email address(es) included in the attached Service List.

[ X ] BY FEDEX OVERNIGHT (NEXT DAY DELIVERY): I enclosed the documents in an envelope or package provided by FedEx and addressed to the offices of the listed address on the attached Service List. I placed the envelope or packaged for collection and overnight delivery at an office or a regularly utilized drop box of FedEx.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 9, 2025, at Los Angeles, California.

Jackson Wyche

## Service List

| | |
|---|---|
| ***Via email only:*** | |
| Simon Aron, Esq.<br>Elsa Horowitz, Esq.<br>WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP<br>11400 West Olympic Blvd, 9th Floor<br>Los Angeles, CA 90064<br>saron@wrslawyers.com<br>ehorowitz@wrslawyers.com | *Counsel for Plaintiff Lone Oak Fund, LLC* |
| ***Via email and U.S. Mail:*** | |
| 2700 Sloat Holding LLC<br>c/o CH Planning LLC, Manager<br>Attn: Raelynn Hickey<br>201 Spear Street, Suite 1100<br>San Francisco, CA 94105<br>rh@ch-planning.com | *Defendant in pro per* |
| Aminam, LLC<br>Attn.: Ezri Namvar<br>1212 Wilshire Boulevard, Suite 555<br>Los Angeles, CA 90025<br>ezrinamvar@gmail.com | *Nominal Defendant* |
| Raelynn Hickey<br>1663 35th Avenue<br>San Francisco, CA 94122<br>rh@ch-planning.com | *Interested Party/Third Party* |
| ***Via U.S. Mail only:*** | |
| Aminam, LLC<br>Attn: Shira M. Namvar<br>12173 Leven Lane<br>Los Angeles, CA 90049 | *Nominal Defendant* |
| 2700 Sloat Holding LLC<br>c/o Registered Agents Inc.<br>401 Ryland Street, Suite 200a<br>Reno, NV 89502 | *Defendant in pro per* |
| ***Courtesy service via email:*** | |
| John Hickey<br>jh@lifetimeaffordablehousing.org | *Interested Party/Third Party* |
| Daniel Namvar<br>daniel@shatar.com | *Interested Party/Third Party* |
| Mark S. Hall, Esq.<br>ESTAVILLO LAW GROUP<br>mark@estavillolaw.com<br><br>Copy to Nicole Gibson, paralegal<br>nicole@estavillolaw.com | *Counsel for Defendant 7200 Sloat Holding LLC and Raelynn Hickey (no substitution of counsel on file yet)* |

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, a true and correct copy of **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SECURED CREDITOR LOAN OAK FUND, LLC'S MOTION TO EXCUSE COMPLIANCE WITH TURNOVER OF CERTAIN REAL PROPERTY SUBJECT TO STATE COURT RECEIVERSHIP PURSUANT TO BANKRUPTCY CODE § 543(d)** was served via the United States District Court CM/ECF system and/or electronic mail on all parties or persons requiring notice:

- SIMON ARON saron@wrslawyers.com
- CHAPTER 11 - RN USTPRegion17.RE.ECF@usdoj.gov
- J CRAIG DEMETRAS mail@demetras-oneill.com, jcd@demetraslaw.com
- ELSA M. HOROWITZ ehorowitz@wrslawyers.com, jlee@wrslawyers.com
- ROYI MOAS rmoas@wrslawyers.com, mshield@wrslawyers.com
- U.S. TRUSTEE - RN - 11 USTPRegion17.RE.ECF@usdoj.gov
- JARED A. DAY jared.a.day@usdoj.gov

By Jean Lee
Jean Lee, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN
& RABKIN, LLP